## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

EDWARD LEWIS TOBINICK M.D., A
MEDICAL CORPORATION d/b/a
INSTITUTE OF NEUROLOGICAL                     **CASE NO. 9:14-cv-80781-WJZ**
RECOVERY, a California Medical Corporation;
INR PLLC d/b/a INSTITUTE OF
NEUROLOGICAL RECOVERY, a Florida
professional limited liability company; and
EDWARD TOBINICK, M.D., an individual,

Plaintiffs.

v.

STEVEN NOVELLA, M.D., an individual;
YALE UNIVERSITY, a Connecticut
corporation; SGU PRODUCTIONS, LLC, a
Connecticut limited liability company; and
SOCIETY FOR SCIENCE-BASED
MEDICINE, INC., a Florida Corporation,

Defendants
_____/


## OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY AND
## PRELIMINARY INJUNCTIVE RELIEF


        Defendant, STEVEN NOVELLA, M.D., by and through his attorneys, hereby file

this Opposition to Plaintiffs' Motion for Temporary and Preliminary Injunctive Relief.

**I.      Introduction**

        On May 5, 2013, the Los Angeles Times published an exposé on the Plaintiff, Dr.

Tobinick called "*A Wife's Alzheimer's, a Husband's Obsession.*"[1][2]  Novella Decl. ¶7.  This Los

---

        [1]Attached hereto as Exhibit A is the declaration of Dr. Steven Novella, herein after referred to as "Novella Decl."
        [2] Attached hereto as Exhibit B is a true and correct copy of that article.  See Novella Decl. ¶7.
        [2] Attached hereto as Exhibit B is a true and correct copy of that article.  See Novella Decl. ¶7.Defendant Dr. Steven Novella is board certified neurologist at Yale New Haven Hospital and is an Assistant Professor of Neurology at the Yale School of Medicine.

Angeles Times article told the story of a devoted husband who turned to Tobinick's unorthodox "medical" methods, which he claimed would cure his wife's Alzheimer's disease. Tobinick's now-abandoned methods for treating Alzheimer's utilized a drug called "Enbrel." Enbrel was not approved for the treatment of Alzheimer's disease.  Nevertheless, Dr. Tobnick sold it to Alzheimer's patients, and the LA Times article recounted the tale of a desperate husband, willing to try literally anything to save his wife from dementia and death. Tobinick's "treatments" for this one patient were costly, but ineffective.  The patient's husband paid more than $130,000.00 to Tobinick over the course of those two years, for the cost of Enbrel injections alone, before his wife died.

The Defendant, Dr. Novella saw the LA Times article, and it alarmed him that a licensed medical professional was relying on such obviously unfounded treatment. Novella Decl. ¶8.  It seemed that Dr. Tobnick was merely selling false hope, at a tidy premium, as a method of extracting large sums of money from desperate loved ones.  He viewed Tobinick's treatments as an updated version of the snake oil salesman from the American frontier days.  Novella Decl. ¶¶8-14.

Dr. Novella is a board certified neurologist at Yale New Haven Hospital and is eminently qualified to render his opinion on such quackery. [3]  As part of Novella's quest to educate and protect the public from such unethical "medical" practices, Novella wrote and published "*Enbrel for Stroke and Alzheimer's*" for Science-Based Medicine on May 8, 2013, the

---

[3] Defendant Dr. Steven Novella is board certified neurologist at Yale New Haven Hospital and is an Assistant Professor of Neurology at the Yale School of Medicine. Attached hereto as Exhibit A is the Declaration of Dr. Steven Novella (hereinafter "Novella Decl.").  At Yale New Haven Hospital, Dr. Novella is a member of the Botulinum Program, which focuses on treatment of patients with hyperactive neurological disorders including spasms and chronic migraines, but not stroke patients as Plaintiffs allege.  Novella Decl. ¶¶1-3.  Unrelated to his employment with Yale School of Medicine and Yale New Haven Hospital, Dr. Novella is also a medical journalist, and as such, acts as editor of and contributor to Science-Based Medicine, and produces the weekly podcast The Skeptics Guide to the Universe, both dedicated to communicating his opinion on current events in science and medicine.  Novella Decl. ¶¶4-5.  Dr. Novella's podcast has been broadcasted weekly since 2005, with more than 469 published episodes, and is one of the most popular science podcasts available on iTunes.  Novella Decl. ¶5.

article that forms the basis for this suit.  Novella Decl. ¶15.  The premise of that article parallels the previously-published LA Times article.  Dr. Novella's article provides his opinion on the relative risks and merits of using drugs for off-label indications, or in ways that they are not intended, and his concern surrounding the questionable health clinics that make these bold promises.  Both Dr. Novella's article and the L.A. Times article report that Tobinick may have since moved on from using Enbrel in treating Alzheimer's patients to treating stroke patients – presumably due to poor results.  (Although, the profits gained from the ineffective off-label uses appear to have had great results for Dr. Tobnick's bottom line.)

On May 17, 2013, the Plaintiffs demanded a retraction of the critical article, which Dr. Novella declined to provide.  Novella Decl. ¶¶17-18.  Thirteen months later, the Plaintiffs filed suit, alleging Lanham Act violations, unfair competition, trade libel, libel per se, and tortious interference with business relationships.  They *now* seek an untimely and unwarranted prior restraint in the form of a temporary restraining order and a preliminary injunction.  As a result of the excessive thirteen-month delay, Plaintiffs' request for an preliminary injunction is moot, and must be denied for being untimely.

Dr. Novella's critical opinions of the Plaintiffs are not outlier views.  In fact, the prevailing view seems to be that Dr. Tobnick is, at best, irresponsible.  On the first page of Google alone, there are numerous other articles written by other authors, entirely unrelated to the article at hand, that also express critical and unflattering opinions of Tobinick and Plaintiffs' "medical" practices.  For example, in 2008, The Alzheimer's Forum published an article criticizing Tobinick, his treatment of patients, and his self-promotional "studies."[4] That article evaluated a paper published by Tobinick, in which he presented a study involving one patient who purportedly improved his Alzheimer's condition within *minutes* of receiving Enbrel injections (as if such a thing were possible).[5]  The article's author reached

---

[4] http://www.alzforum.org/news/research-news/breakthrough-or-false-hope-etanercept-case-report-draws-scrutiny
[5] Attached hereto as Exhibit D is a copy of that article.

out to seven independent researchers, who all "expressed unease about the way in which these studies were performed."  Furthermore, in that article, Cynthia Lemere, associate professor of Neurology at Bringham and Women's Hospital in Boston stated "[t]his is exciting, but very preliminary information.  The appropriate way to pursue it at this stage is to apply to FDA and NIH for support to run a rigorous trial, not to promote it to the general public."  That article presented the opinion that Tobinick's use of Enbrel gave false hope to Alzheimer's patients, without being based in scientific and clinical research, and pointed to a number of fatal flaws in the case report authored by Tobinick.

More importantly, also on the first page of a Google search for "Dr. Tobinick" is an article published by Casewatch.org, outlining the history of disciplinary action against Tobinick in California, including the formal accusations filed by David Thorton as the Executive Director of the Medical Board of California, Department of Consumer Affairs.[6] The stated allegations in the disciplinary action were for unprofessional conduct relating to his advertisement of Enbrel for the treatment of neck and back pain, in violation of the California Health and Safety Code, constituting unprofessional conduct.  The second cause of action was for Tobinick's unprofessional conduct relating to his failure to obtain a permit for use of "Institute of Neurological Research" as a fictitious name.  The disciplinary action was settled, resulting in a one-year probationary period for Tobinick, in lieu of the revocation or suspension of his medical license and surgeon's certificate, as proposed by Thornton.

In light of his checkered reputation and blemished disciplinary record, Tobinick now seems to be on a quest to cleanse the Internet of reports about Tobinick's misdeeds and questionable practices.  He has apparently decided that Dr. Novella is the easiest target.  While it is cleverly pled, any degree of critical reading of the Complaint and the Motion makes it clear what they are trying to do – suppress bona-fide journalistic criticism of an

---

[6] http://www.casewatch.org/board/med/tobinick/accusation.shtml  Attached hereto as Exhibit C is a copy of the formal Accusations.  See Novella Decl. ¶10.

unscrupulous doctor, and trying to do an end-run around the First Amendment to achieve this ignoble goal.

## II.    Legal Analysis

Plaintiffs have cleverly attempted to disguise this defamation claim as a Lanham Act claim – presumably to ensure the availability of Federal Court jurisdiction and to try to side-step the clear case law that cuts against them in defamation actions.  But, no matter how eloquently someone may call a "dog" a "chicken," it will never lay eggs.  And styling a specious defamation claim as a Lanham Act claim does not remove the underlying speech from the protections afforded by the First Amendment.

Plaintiffs come to this Court seeking extraordinary relief in the form of an impermissible prior restraint on Defendant's speech because of allegedly "false advertising." Tobinick's request for this exceptional relief is impermissible under the First Amendment, and a request for this Court to impose a prior restraint on Defendant's speech.  *"The clearest definition of prior restraint is an administrative system or a judicial order that prevents speech from occurring."*[7]  There has been no judicial determination as to whether Dr. Novella's article is "false," nor whether it is "advertising." (It is neither.)  Yet, Plaintiffs come to this Court requesting Constitutionally extraordinary relief – the suppression of speech without due process.  The motion must be denied.

FIRST, Tobinick is highly unlikely to prevail in this matter, and thus, cannot show a likelihood of success on the merits, as Defendant's statements range from provably true[8] to opinion.

---

[7] Erwin Chemerinsky, *Constitutional Law: Principles and Policies* at 918 (2002).

[8] It is important to note that the Plaintiff must prove the Defendant's statements as false in order to prevail on a defamation claim – the Defendants not need to prove them as true. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) ("the plaintiff [must] bear the burden of showing falsity, as well as [the defendant's] fault, before recovering damages" whether or not P is a public figure); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990) (requiring plaintiff to prove statements false in a defamation case).

SECOND, preliminary injunctive relief in defamation cases is unavailable, as such an injunction would impose an unlawful prior restraint of speech.[9]  The law does not allow for entry of an injunction against allegedly defamatory statements, as the law provides a complete and adequate remedy at law through a defamation action.  "Accordingly, the usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages."  *Gunder's Auto Ctr. v. State Farm Ins.*, 617 F. Supp. 2d 1222, 1225 (M.D. Fla. 2009)(footnote 4) citing *e360 Insight v. Spamhaus Project*, 500 F.3d 594, 606 (7th Cir. 2007).  Plaintiffs' Complaint alleged causes of action including libel and false advertising arising out of this one article written by Dr. Novella.  But here, Plaintiffs are seeking to circumvent the case law prohibiting injunctive relief for defamation cases by disingenuously styling this as a false advertising case.  However, Plaintiffs fail to articulate *how the article constitutes advertising at all*, let alone *false* advertising.

THIRD, there is no irreparable harm.  Monetary damages would be sufficient to compensate a defamed plaintiff and will be available to Tobinick, should Plaintiffs prevail in this matter.  Furthermore, Plaintiffs waited in excess of one year after discovering the allegedly defamatory false advertising to file this suit, and to seek injunctive relief.  That negates any claim of urgency or allegation of irreparable harm.

FOURTH, Tobinick has failed to offer any evidence or a suggested security amount, failing the security requirement of Federal Rule of Civil Procedure 65.

## A.    Entry of a Preliminary Injunction is Impermissible in this Case

Plaintiffs are seeking prior restraint of Dr. Novella's speech by seeking to prohibit him from continued publication of his article, without any determination by the Court that the article is unlawful.  Any movant seeking a prior restraint must overcome a monumental

---

[9] The term "prior restraint" is used "to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. U.S.*, 113 S. Ct. 2766, 2771 (1993).  The essence of a prior restraint is that is places specific communications under the personal censorship of a judge.  *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 468 (5th Cir. 1980).

burden.  "The presumption against prior restraints is heavier – and the degree of protection broader – than that against limits on expression imposed by criminal penalties [… A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.  It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of free wheeling censorship are formidable."  *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975).

Furthermore, as Justice Blackstone eloquently wrote:

> The liberty of the press is indeed essential to the nature of a free state, but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matters when published. Every free man has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity, thus the will of individuals is still left free; the abuse only of that free-will is the object of legal punishment.  Neither is any restraint hereby laid upon freedom of thought or inquiry; liberty of private sentiment is still left; the disseminating, or making public, of bad sentiments destructive of the ends of society, is the crime which society corrects.

*Blackstone's Commentaries* 34, pp. 1326-27.

In *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971), the Supreme Court struck down an injunction prohibiting the petitioners' distribution of leaflets criticizing respondent's business practices.  "No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court."  *Id.* at 419.  Furthermore, the Supreme Court has repeatedly recognized that government restriction of speech in the form of a prior restraint against the media constitutes "the most serious and least tolerable infringement on First Amendment rights."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L. Ed. 2d 693 (1976).

### B.     Standard for Preliminary Injunctions

Notwithstanding the Court's abhorrence of prior restraints, Plaintiffs must independently establish all four of the following elements to obtain a preliminary injunction:

(1) a likelihood of irreparable harm *and* the unavailability of an adequate remedy at law; (2) a substantial likelihood of success on the merits; (3) that the threatened injury to the petitioner outweighs any possible harm to the respondent; and (4) the granting of a temporary injunction will not disserve the public interest. *Burger King Corp. v. Cabrera*, 2010 U.S. Dist. LEXIS 141413, 8, 2010 WL 5834869 (S.D. Fla. Dec. 29, 2010). Tobinick fails to satisfy each and every prong factually and legally, and therefore cannot obtain a preliminary injunction.

> **1.      Plaintiffs do not possess a substantial likelihood of success on the merits**

Plaintiffs must demonstrate a substantial likelihood of success on the merits to obtain a preliminary injunction. "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites." *Burger King* at 8, citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

> **a.      False Advertising Claims**

Plaintiffs must specifically state the grounds for its motion and convince the Court that it is substantially likely to succeed at trial. *Burger King* at 9. Instead, in alleging violations of Section 43 of the Lanham Act, Plaintiffs give us the conclusory statements that Novella's article is an advertisement, and that the contents of the "advertisement" "are literally false." [ECF 6 at 8-9]. "To succeed on a false advertising claim under § 43(a)(1)(B) of the Lanham Act, a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been -- or is likely to be -- injured as a result of the false advertising." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The burden is on the Plaintiffs to affirmatively prove up all five of those elements in order to demonstrate false advertising.

As a preliminary matter, Plaintiffs have presented nothing to show how Dr. Novella's article constitutes advertising, or would be the subject of a false advertising claim under The Lanham Act. "In order for representations to constitute 'commercial advertising or promotion' under Section 1125(a), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services." *Suntree Technologies, Inc. v. Ecosense Int'l*, 693 F.3d 1338, 1349 (11th Cir. 2012) (see also *MPS Entertain v. Abercrombie*, 2013 U.S. Dist. LEXIS 91193 S.D. FL, finding that a press release was not commercial advertisement). The article in question is not commercial speech, it is an academically-minded article of Dr. Novella's expert opinion on off-label drug usages and indications, and the risks of relying on such unfounded claims. Dr. Novella is not in commercial competition with Tobinick. Novella Decl. ¶3. And nothing in Dr. Novella's article provides any indication that one ought to utilize Dr. Novella's services, instead of Tobinick's.

The Eleventh Circuit has previously determined that "[t]he first element of the Lanham Act test requires that the plaintiff show that the statements at issue were either '(1) commercial claims that are literally false as a factual matter' or '(2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers.'" *Hickson* at 1261, citing *United Industries Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998). As to the first type of falsehood, Plaintiffs allege that certain statements in Dr. Novella's article are "literally false" but they simply offer a few cherry-picked statements of opinion that were not made as commercial claims.

"To succeed on a claim of false advertising, the plaintiff must establish that the defendant's deception is likely to influence the purchasing decision... The plaintiff must establish materiality even when a the court finds that the defendant's advertisement is literally false." *1-800 Contacts*, 299 F.3d at 1250. Plaintiffs failed to present any evidence as to how Dr. Novella's article was "literally false." Plaintiffs also failed to present any evidence that the allegedly "false advertising" influenced the purchasing decisions of

customers.  In the alternative, as for the second type of falsehood, Plaintiffs must "present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence."  *Id.* citing *1-800 Contacts* at 1247.  Plaintiffs present no such evidence, or evidence of any kind, regarding customer deception, even though they have had over a year to gather such evidence.

In summation, Plaintiffs have no evidence as to how Dr. Novella's article constitutes an advertisement, let alone a *false* advertisement.  Dr. Novella's article is just that – an article expressing his opinions in order to educate and protect the public, not a commercial promotion.  The Plaintiff's claims that this article is "false advertising" is as far-fetched of a claim as the Plaintiffs' snake oil treatments, which were discredited long before Dr. Novella rendered his opinion on them.  Plaintiffs continue with additional wild conclusions, stating generically that "The Advertisement has deceived consumers… [T]he Advertisement has a material effect on the purchasing decisions of consumers… The misrepresentation of Plaintiffs' services affects interstate commerce… [And] the Advertisement has injured Plaintiffs."  [ECF 6 at 11].  Meanwhile, it is the Plaintiff's advertising of his unfounded treatments that has misled the public – Dr. Novella simply joined a chorus of highly respected voices in bringing that to the public's attention.

Despite all of this, Plaintiffs fail to provide any evidence regarding any alleged consumer confusion of the Lanham Act variety.  In fact, Plaintiffs fail to provide any evidence regarding any specific damage that the article has caused, despite the article having been published over one year ago.  Plaintiffs have not demonstrated any likelihood of success on the merits of their allegation of false advertising in violation of the Lanham Act.

### b.      Libel Claims

Plaintiffs only cite to false advertising as the basis of their request for a temporary restraining order and preliminary injunction, presumably because a preliminary injunction is not available in defamation cases.  Nevertheless, the Complaint makes allegations that the contents of the article constitutes "trade libel."  [ECF 1, ¶¶ 102-105].  "Florida law requires a

trade libel plaintiff to prove special damages as part of his or her claim, and Rule 9(g) unequivocally states that '[i]f an item of special damage is claimed, it must be specifically stated.'  Even if *Leavitt* correctly describes the purpose behind Rule 9(g), it is impossible to ignore that the plain language of the Rule squarely encompasses one of the elements of establishing a trade libel claim.  Accordingly, Rule 9(g) requires Plaintiffs to plead special damages with specificity."  *Nat'l Numismatic Certification, LLC v. eBay, Inc.*, 2008 U.S. Dist. LEXIS 109793, 61-62, 2008 WL 2704404 (M.D. Fla. July 8, 2008) citing *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1344-45 (M.D. Fla. 2003).  Plaintiffs' Complaint fails to plead with any specificity and prove up special damages in alleging that Dr. Novella's article constitutes trade libel, and therefore, Plaintiffs have not demonstrated any likelihood of success on the merits of succeeding on a claim of trade libel.

Additionally, Plaintiffs allege that Dr. Novella's article constitutes libel per se.  [ECF 1, ¶¶106-109].  "A published statement is libelous *per se* if: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession."  *Klayman v. Judicial Watch, Inc.*, 2014 U.S. Dist. LEXIS 71045, 12-13 (S.D. Fla. May 23, 2014).  Plaintiffs have alleged that Dr. Novella's article falls under this fourth category, by injuring his trade or profession.

In order to demonstrate that a statement has injured one's trade or profession, "*Per se* defamatory statements must impute conduct to plaintiffs incompatible with the essential functions of their respective jobs.  Where courts have found conduct to be incompatible with one's profession, the conduct referred to in the defamatory statement went directly to a person's ability to perform duties essential to his or her employment, or was sufficiently related to skills required of the profession."  *Klayman* at 17, citing *Scobie v. Taylor*, No. 13-60457-CIV, 2013 U.S. Dist. LEXIS 99786, 2013 WL 3776270, at *3 (S.D. Fla. July 17, 2013).  For Plaintiffs to meet their burden of proof claiming libel per se, first and foremost, the statements must be false.  Secondly, the statements must directly question the plaintiffs'

abilities to perform their essential duties. Dr. Novella's article did not put forth false statements that disputed Tobinick's abilities to perform his essential duties as a physician. Instead, Dr. Novella's article expressed opinions and addressed concerns about Tobinick's unsuccessful and unethical practices in using Enbrel for off-label purposes and Tobinick's clinic, which makes overly broad promises of a cure, first for Alzheimer's and now for stroke.   Based on the foregoing, Plaintiffs have failed to demonstrate any likelihood of success on the merits of their claim of libel per se.

     **2.**    **An injunction would result in far more harm to Defendants and the public than Plaintiffs' claimed injury**

The third and fourth prongs of *Burger King*'s preliminary injunction test require Plaintiffs to prove that the alleged threatened injury to it outweighs any possible harm to Defendant, and that the injunction would not disserve the public interest.   Because the desired injunction's harm to Defendant and the broader public involves their sacrosanct First Amendment rights, enjoining Defendant's speech in this case would inflict the most egregious harm to free expression itself.   Silencing Defendant, ultimately to protect Tobinick's ego, automatically implicates – and harms – public interest because of the censorship inherent in that relief.   Furthermore, there are likely thousands of patients out there with more money than hope – who may be bilked just as prior patients were – by a clinic that offers little more than a way to separate already suffering people from their money, and in a manner that may actually cause them further medical harm.   The public has a right to know about Tobinick and his practices, and Dr. Novella has served the public in a way that censorship never will.

If the Court issues a prior restraint in this case, it will silence the discourse between the Defendant and among the broader public.   Further, it would violate core First Amendment principals, and impinge on the public right to receive this truthful information.

The Supreme Court places a heavy – almost insurmountable – burden on the plaintiff in seeking an injunction against speech:

> The presumption against prior restraints is heavier-and the degree of protection broader-than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others before hand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*SE. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558–59 (1975).

Plaintiffs do not attempt to balance the equities here to determine the relative harms. Instead, Plaintiffs simply state that "Defendants will not be harmed if the injunction is issued to a greater degree than the Plaintiffs will be harmed if an injunction is not issued. A prohibition on the publication of the Article will not damage the reputations of Defendants." [ECF 6 at 11]. Meanwhile, the Plaintiff says nothing of the damage to free expression, nor of the damage to the public's right to know.

The standard is not whether suppressing the free speech rights of Defendants would harm their reputation, but instead it is a balancing test of whether the harm to Defendants *and the public interest*, if the injunction were granted, outweighs the harm to Plaintiffs, if the injunction were not granted. Plaintiffs cannot articulate any compelling interest sufficient to outweigh the harm to Defendants' rights of free speech. Plaintiffs have offered nothing to show why its demanded prior restraint is constitutional and of greater significance than the First Amendment interests of Defendants and of the public. Plaintiffs have shown no concrete or identifiable damage caused by the article in the 13 months since it was published and has since been available to the public on the Internet.

Plaintiffs claim that prior restraint would not harm the public interest more than Plaintiffs' interests will be harmed if the injunction were not issued. The basis for this claim is that if the negative article about Tobinick were removed, then more people may seek out Tobinick's treatments. [ECF 6 at 12]. That is not alleviating a harm to the public, but instead attempting to remedy a perceived monetary harm to Plaintiffs (and likely exacerbating the harm to the public). Novella Decl. ¶13. More importantly, by prohibiting

Dr. Novella from expressing his opinion and concerns about the off-label drug practices of Tobinick, the public would be placed at a greater harm by not being fully informed as to the relative risks of those medical practices.   Novella Decl. ¶¶8-9.   Dr. Novella's blog is dedicated to researching current events in science and medicine, and expressing his opinions, based on his extensive training and experience as a neurologist and professor of medicine, for the betterment of society.   He is devoted to helping to fully inform the public about all of the potential up- and down-sides of various trends in medicine.   Plaintiffs' assertion in no way demonstrates that the harm to Plaintiffs would outweigh the harm done to the public should the injunction be granted, and Defendants' speech be hindered.

> **3.     Plaintiffs have not shown they will suffer irreparable harm**

Plaintiffs simply claim that they "will suffer irreparable harm in the absence of an injunction due to the loss of their reputation and customers." [ECF 6 at 11].   However, they offer no evidence in support of this request for highly extraordinary relief.   "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *Zardui-Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir. 1985) (internal citations omitted).   Plaintiffs have not provided any evidence and have not met the burden of persuasion demonstrating irreparable harm.

> **a.     Any harm from truthful statements or accurate opinions is not properly addressed by a preliminary injunction**

Dr. Novella's article is an important opinion piece because it benefits the public by providing thoughtful analysis on the benefits and concerns surrounding off-label drug usages, specifically in the context of neurological conditions.   "Statements of opinion are generally not actionable." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1311 (11th Cir. 2010) see, e.g., *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) ("Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability.").

Furthermore, the crux of Plaintiffs' allegations of false advertising, as a basis for seeking preliminary injunction, are three specific *opinions* stated by Dr. Novella that they take issue with.  Meanwhile, in their zeal to attempt to darken the light that Novella shines upon their unscrupulous acts, they ignore the clear legal mandate to evaluate the article as a whole. "It is true that a court must analyze the message conveyed in full context, and that the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other." *1-800 Contacts*, 299 F.3d at 1248 citing *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3rd Cir. 1993).  Dr. Novella's article presented his opinion on Tobinick's off-label drug usage for treating neurological disorders.  Novella Decl. ¶15.  Dr. Novella firmly believes that his educated opinion is backed by best practices in medical research.  Novella Decl. ¶¶18-19.  The Plaintiffs' decision to cherry-pick individual statements, out of context is not sufficient for demonstrating a right to relief at all, ever, much less irreparable harm as the basis for an extraordinary injunction that amounts to a prior restraint on First Amendment protected expression.

Plaintiffs specifically take issue with Dr. Novella's statement that "Tobinick… is claiming that a wide range of neurological conditions not known to be immune mediated are treated by a specific immunosuppressant."  [ECF 6 at 9].  When taken in context, this is not directly an attack on Tobinick, but instead, is Dr. Novella's opinion on the proper procedure for introducing immunosuppressant drugs as treatment for a specific auto-immune disorder. Specifically, in Dr. Novella's opinion, the proper procedure for off-label usage of a drug is such that "When a new immune suppressing drug comes on the market it is common for it to be tried in a variety of conditions – but practice then follows evidence.  Initially we might see some case reports, followed by a case series.  If the drug shows promise, then a double-blind placebo-controlled trial would ultimately determine its effectiveness." *Enbrel for Stroke and Alzheimer's*.

Dr. Novella's comment about Tobinick's off-label usage of Enbrel for Alzheimer's treatment is that there have been no requisite double-blind placebo-controlled trials.

Novella Decl. ¶19.  Therefore, it is too early for Tobnick (nor anyone else) to make bold statements about the effectiveness of Enbrel to treat Alzheimer's.  Nevertheless, Tobnick thought nothing of taking money from his victims for his "miracle cure," which (by all scientific measures) succeeded in only curing his victims of one condition – possession of their money.  Novella Decl. ¶¶13, 20.  Arguably, it may have even *shortened* their lives.  Perhaps had Dr. Novella expressed his views earlier, they might have remained among the living for longer – and at least left more riches in their estates.  We may not ever be able to prove this for certain, but what we can prove for certain is that Dr. Tobnick's attempts to remove these Constitutionally-protected opinions from publication is intolerable.

Plaintiffs then take issue with Dr. Novella's opinion that Tobinick's personally-published case series are "little more than retrospective case series reporting on his own patients."  [ECF 6 at 9].  However, in the general context of the article, Dr. Novella is underscoring the importance of adequate independent research and testing before promoting the off-label usage of a drug.  Novella Decl. ¶¶12-13, 19.  "[M]edicine and research are complex and there are many pitfalls.  Unless you have expertise dealing with strokes or dementia, including how to properly research these conditions, you are likely to fall for these pitfalls."  *Enbrel for Stroke and Alzheimer's.*

Tobinick is not a board certified Neurologist or a neurological expert, with the years of education, training, and experience that are indispensible to being an expert in that complex field.  Novella Decl. ¶12.  Dr. Novella, as a professional, who possesses that kind of expertise and training, has a right – and some might argue, a deep responsibility – to express such a view.  Dr. Novella makes it clear that Tobnick's own case series place certain data forth as "evidence" of success, meanwhile they are instead common fallacies that one sees when beginning a new treatment program for these neurological disorders, including "the placebo effect" and "the cheerleader effect."  If Tobinick were an expert in the field of Neurology, he would have known and understood that.  In Dr. Novella's opinion, best practices require more evidence, analyzed by those with greater experience and expertise,

before making such broad sweeping claims of success.  Novella Decl. ¶9.  As Dr. Tobnick profits from the perpetuation of ignorance, it is in his financial interest to suppress such expression, and to punish it as well – thus dissuading other good-intentioned professionals from rendering such opinions calculated to protect the public.  Novella Decl. ¶¶13, 20.  This Honorable Court is expected to decline to participate in such an ignoble exercise.

Lastly, Plaintiffs take issue with Dr. Novella's characterization of Tobinick's clinic as "a one-man institute" that "has since moved to Florida, which is a very quack-friendly state." [ECF 6 at 10].  Tobinick's website provides links to Tobinick's biography and resume, but does not provide any biographical information on any other physicians.[10]  It is a logical conclusion then that Tobinick is a solo practitioner.  Novella Decl. ¶11.  It is indisputable that Tobinick has opened an office location in Florida.  The characterization of Florida as being a "quack-friendly state" is perhaps hyperbolic, but that does not diminish its protected nature.  "Statements about which reasonable people might differ, however, and which cannot be proved to be true or false, are not actionable as defamation." *Moulton v. VC3,* 2000 U.S. Dist. LEXIS 19916, 8, 2001-1 Trade Cas. (CCH) P73, 202 (N.D. Ga. Nov. 6, 2000).  Dr. Novella's statement that Florida is quack-friendly falls into that category of non-actionable opinion or hyperbole because it is a reflection of Dr. Novella's subjective opinion of the relative standards of Florida's liberal "health care freedom" laws, which he believes provide greater protections to medical practitioners than other states.  Novella Decl. ¶14.  If the State of Florida feels that it has been wronged by such statements, then perhaps it would have standing to complain.[11]

### b.    Delay is fatal to Plaintiffs' claim of irreparable harm

---

[10] www.nrimed.com and www.tobinick.com
[11] Naturally, this point is made as a rhetorical flourish – as group libel is not supportable under Florida law, and should the question ever actually be called as to whether Florida lacks certain standards, it would likely not be to the State's advantage to have such claims tested by scientific methods.

Plaintiffs claim irreparable harm from Novella's articles, yet they waited more than a year to bring a claim. This delay makes it clear that such claims of irreparable harm requiring an immediate prior restraint are fabrications. Having waited more than one year to seek relief, Plaintiffs should now be barred from demanding an injunction.

Federal Courts agree that a plaintiff's delay in filing for a preliminary injunction suggests absence of irreparable harm sufficient to justify denial of injunctive relief. "In determining whether harm is irreparable, courts consider, as one factor, the delay of the movant in seeking relief. Delay, or too much of it, indicates that a suit or request for injunctive relief is more about gaining an advantage (either a commercial or litigation advantage) than protecting a party from irreparable harm." *Pippin v. Playboy Entm't Group, Inc.*, 2003 U.S. Dist. LEXIS 25415, 5-6, 16 Fla. L. Weekly Fed. D 506 (M.D. Fla. July 1, 2003) (internal citations omitted).

Moreover, "preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. As a result, a plaintiff's delay in seeking an injunction 'tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction.' Thus, this Court has rejected injunctive relief based upon a party's delay in filing a motion seeking that extraordinary relief." *Love v. Blue Cross & Blue Shield of Ariz., Inc.*, 2010 U.S. Dist. LEXIS 39988, 38-39, 2010 WL 1249120 (S.D. Fla. Mar. 25, 2010) citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (where a ten week delay was sufficient to negate a plaintiff's claim of irreparable harm); *see Lanvin, Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 192 (S.D.N.Y. 1990) (denying preliminary injunction after seven-month delay); *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (denying preliminary injunction after a seven-month delay); *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1353 (S.D. Fla. 2002) (preliminary injunction denied because Plaintiff waited nearly a year to file suit); *Badillo v. Playboy Entm't Group, Inc.*, 2004 U.S. Dist. LEXIS 8236, 8, 17 Fla. L. Weekly Fed. D 529 (M.D. Fla. Apr. 16, 2004) ("a nine

month delay is fatal in this case to Plaintiffs claims of irreparable harm"). Not only would it be inequitable for Tobinick to obtain injunctive relief now, the delay undercuts any claim of irreparable harm, and reveals the motion as a blatant attempt to receive a double remedy – monetary damages *and* an injunction. The Court should deny Plaintiffs' Motion for Preliminary Injunction, as Tobinick's conduct shows no threat of irreparable harm.

### c.       Plaintiffs have an adequate remedy at law

The second requirement of demonstrating irreparable harm is that there must exist no adequate remedy at law. Furthermore, under the law, the burden of irreparable injury cannot be met by mere economic injury. "An injury is irreparable only if it cannot be undone through monetary remedies. The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Taylor v. Florida State Fair Auth.*, 1995 U.S. Dist. LEXIS 17786, 17-18 (M.D. Fla. Aug. 15, 1995) *citing Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 953 (1974). Despite this bar against using economic losses as evidence of irreparable harm, these losses are the only damages Plaintiffs have alleged. Additionally, Plaintiffs' allegations of economic damage are not supported by any evidence, in spite of the fact that the article was published over a year ago, which would have given Plaintiffs ample opportunity to specifically identify what harm has resulted, if any. Furthermore, this matter, while dishonestly captioned as seeking to only enjoin false advertising, is no different than one seeking to enjoin defamatory statements, and must be denied.

Courts that have analyzed this issue have found that defamation is a claim arising under law, not equity, and for which claimants are entitled only to legal relief (i.e., monetary damages). "With respect to the issue of irreparable harm, the fact that Plaintiff may be embarrassed by the Video is not 'the type of irreparable harm or injury that would tip the scale toward justifying a prior restraint.' *In re King World Productions*, 898 F.2d 56, 60 (6th Cir.

1990) (holding that fact that physician may be embarrassed by publication of video allegedly showing him engaging in medical malpractice did not justify temporary restraining order). Moreover, economic loss, even if difficult to quantify, is no basis for the entry of a preliminary injunction restricting speech. *See, e.g., Hughes NetworkSys., Inc. v. Interdigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir. 1994); *In re King World Productions, Inc.*, 898 F.2d at 60." *Bollea v. Gawker Media, LLC*, 2012 U.S. Dist. LEXIS 162711, 13, 105 U.S.P.Q.2D (BNA) 1496, 40 Media L. Rep. 2601 (M.D. Fla. Nov. 13, 2012).  For this reason, Plaintiffs cannot satisfy this prong of the preliminary injunction test as a matter of law, as it may pursue legal relief in the absence of an injunction.

    4.    **Plaintiffs' Motion fails to pledge a security, as required under the Federal Rules of Civil Procedure, and is grounds for denying Plaintiffs' Motion for Preliminary Injunction**

Rule 65(c) provides that a district court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  The Court has previously determined that a preliminary injunction is improper and cannot be granted where a plaintiff "did not provide any such security, and the district court was unable to discern what amount was proper under Rule 65(c) because [the plaintiff] failed to adequately set forth facts on which the Court [could] make a reasoned determination as to the amount of security which must be posted." *Jones v. Brown*, 518 F. App'x 643, 644 (11th Cir. 2013).

Here, Plaintiffs' Motion for Preliminary Injunction failed to provide any security, as required under the law.  Furthermore, Plaintiffs failed to provide any facts upon which the Court could make a reasonable determination of what an adequate security would be.  Therefore, on these grounds alone, a preliminary injunction would not be permissible here.  If an injunction is to issue, the Plaintiffs should be required to post a bond sufficient to cover all of the Defendants' attorneys' fees – as the Plaintiffs can rest assured that this is an

"exceptional case" under 15 U.S.C. §1117, and that fees and costs will be sought.  If it is not "exceptional" for a snake-oil salesman to seek to suppress media coverage of his misdeeds by misusing the Lanham Act, then the word "exceptional" must have acquired a new definition in the recent past.

### III.   Conclusion

This Court must not enjoin Dr. Novella's speech, and therefore must deny Plaintiffs' motion.  At the time of this motion, Plaintiffs' claims of libel and false advertising are simply that – mere allegations – and have not been adjudicated on the merits.  Any injunction issued by this court would be an impermissible gag of Novella's opinions.

Plaintiffs have failed to prove any of the elements necessary to obtain a preliminary injunction, and have offered no evidence substantiating its claim of irreparable harm. Plaintiffs have further failed to submit any proof that legal damages would be unavailable to redress any of the alleged injuries caused by Defendants.  Plaintiffs have failed to provide any proof that they are substantially likely to succeed on the merits.  And most importantly, Plaintiffs have offered no proof that the alleged injury Defendants have caused outweigh Defendants' substantial First Amendment Rights, or the public's right to receive and participate in Defendants' opinions of Plaintiffs.  The public's interest in free speech and debate would be seriously impacted by an injunction against Defendants in this case.  The injunction Tobinick and Plaintiffs seek would constitute an impermissible prior restraint on speech, one that Florida courts, and courts around the country, have consistently rejected.

/ / / /

/ / / /

Based on the foregoing, Defendant Dr. Novella respectfully requests this Court deny Plaintiffs' Motion seeking a Temporary Restraining Order and Preliminary Injunction.

Respectfully Submitted,

*/s/ Marc J. Randazza*
_____

Marc J. Randazza, Esq.
Florida Bar No. 625566
RANDAZZA LEGAL GROUP
3625 S. Town Center Drive
Las Vegas, Nevada 89135
Tele:  702-420-2001
Fax: 305-437-7662
Email: ecf@randazza.com

CASE NO.: 9:14-cv-80781-WJZ

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 14, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document is being served upon: adb@trippscott.com; pgh@trippscott.com; and shf@trippscott.com; Alexander D. Brown, Esq.; Peter G. Herman, Esq.; and Salvatore H. Fasulo, Esq., Attorneys for Plaintiffs, Tripp Scott, PA, 110 Southeast 6th Street, 15th Floor, Fort Lauderdale, FL 33301 via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully Submitted,

*/s/ Marc J. Randazza*
_____
Marc J. Randazza, Esq.
Florida Bar No. 625566
RANDAZZA LEGAL GROUP
3625 S. Town Center Drive
Las Vegas, Nevada 89135
Tele:  702-420-2001
Fax: 305-437-7662
Email: ecf@randazza.com

Novella Opp