UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:14-CV-80781-ROSENBERG/BRANNON

EDWARD LEWIS TOBINICK, MD, et al.,

    Plaintiffs,

v.

M.D. STEVEN NOVELLA, et al.,

    Defendants.
_____/

### ORDER GRANTING IN PART DEFENDANT'S CONVERTED MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Defendant Society for Science-Based Medicine, Inc.'s Motion to Dismiss Amended Complaint, for More Definite Statement or for Summary Judgment [DE 74] ("the Motion"), filed herein on August 18, 2014. On January 26, 2015, the Court notified the parties of its intent to convert the Motion into a Motion for Summary Judgment.[1] On February 5, 2015, the Motion was so converted. A hearing was held on the Motion for Summary Judgment on February 6, 2015. The Court has carefully considered the Motion, the Response, the Reply, and all supplemental memoranda and exhibits filed in anticipation of the Motion's conversion. The Court is otherwise fully advised in the premises. The Motion is granted with respect to Plaintiffs' Lanham Act and unfair competition claims. With respect to Plaintiffs' trade libel and libel per se claims, the Motion is granted in part.

---

[1] Under Federal Rule of Civil Procedure 12(d), "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." The Court is required to give the parties 10 days' notice, as it did. *See* DE 120; *Donaldson v. Clark*, 819 F.2d 1551, 1555 (11th Cir. 1987).

1

# I. BACKGROUND

The instant case is factually complex. For this reason, the Court believes that its summary of the facts deserves a brief preface, and it begins with an overview of the issues before reciting the facts relevant to the legal issues raised in the Motion for Summary Judgment.

## A. Overview

This case concerns two articles written by Dr. Steven Novella, a defendant in the instant suit.[2] Both articles address the practice of Plaintiff Edward Tobinick ("Plaintiff Tobinick"), a doctor who provides medical treatment to patients with "unmet medical needs" via two institutes—"Edward Lewis Tobinick M.D.," a California medical corporation, and "INR PLLC," a Florida professional limited liability company—both doing business as the "Institute of Neurological Recovery" (collectively "Plaintiffs"). Am. Compl. ¶¶ 2–4, 12. Novella published the first article, "Enbrel for Stroke and Alzheimer's" ("the first article"), on May 8, 2013 in response to a piece published in the *Los Angeles Times*. Am. Compl. Ex. 1 at 1. As Novella described it,

> The [*Times*] story revolves around Dr. Edward Tobinick and his practice of perispinal etanercept (Enbrel) for a long and apparently growing list of conditions. Enbrel is an FDA-approved drug for the treatment of severe rheumatoid arthritis. It works by inhibiting tumor necrosis factor (TNF), which is a group of cytokines that are part of the immune system and cause cell death. Enbrel, therefore, can be a powerful anti-inflammatory drug. Tobinick is using Enbrel for many off-label indications, one of which is Alzheimer's disease (the focus of the LA Times story).

*Id.* The allegedly false statements in the first article concern the viability of Plaintiff Tobinick's treatments, the scientific literature discussing those treatments, the size and locations of Plaintiff Tobinick's Institutes, and, by implication, the categorization of Plaintiff Tobinick's practice as "health fraud." *See* Am. Compl. ¶¶ 54–56, 60–61, 63–64, 69–70, 71–72. Novella published the

---

[2] Novella is not the movant, and Plaintiffs' claims against him are not before the Court today.

second article, entitled "Another Lawsuit To Suppress Legitimate Criticism – This Time SBM" ("the second article"), on July 23, 2014, after Plaintiffs filed their suit. Am. Compl. Ex. 5 at 1. In large part, the second article simply restates the content of the first, and Plaintiffs incorporated it into an Amended Complaint. *See generally id.*; Am. Compl. ¶¶ 102–03. The only statement in the second article which Plaintiffs allege is false and misleading is Novella's statement, as characterized by Plaintiffs, that "there have been no double-blind placebo-controlled clinical trials of the treatment provided by the Plaintiffs."[3] *Id.*

The Society's responsibility for Novella's two articles is far from clear. The articles were not posted on the Society's website, although a link to the first article can be found on the Society's Wiki. *See* DE 138 Ex. 2 at 1, 3–4. Both articles were originally posted, and still remain, on the www.sciencebasedmedicine.org blog, which this Court refers to as "the SBM Blog." *See* Am. Compl. Ex. 1, Ex. 5. Novella, the author of the articles, is involved with both the SBM Blog and the Society. He is the "Founder and Executive Editor" of the SBM Blog, as well as a Board member and Officer of the Society. DE 136 Ex. 6 at 2; Ex. 7 at 2.[4] The Society claims that it neither owns nor operates the SBM Blog; Plaintiffs contend that the SBM Blog is part of the Society's structure and internet presence, such that the Society should be liable for the content of the articles. *See* Mot. at 2 n.1; DE 136 Ex. 1, Supplemental Affidavit of Edward Tobinick, M.D. ("Tobinick Supplemental Aff."), ¶¶ 3–13.

In their Amended Complaint, Plaintiffs allege violations of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); unfair competition under 28 U.S.C. § 1338(b) (Count II); trade libel (Count

---

[3] In the second article, Novella actually states that "*I* [Novella] *could not find* a single double-blind placebo-controlled trial establishing the efficacy of [Tobinick's] treatment for any of the conditions I listed above. (There are small studies for disc herniation showing conflicting results.)." Am. Compl. Ex. 5 at 3 (emphasis added).
[4] The Court notes that at points Plaintiffs' numbering of their exhibits differs from the CM/ECF numbering. The Court uses the CM/ECF numbering throughout.

3

III); and libel per se (Count IV).[5] Plaintiffs' claims naturally fall into two groups: the Lanham Act claims (violations of 15 U.S.C. § 1125(a) and the unfair competition claim), and the state law defamation claims (trade libel and libel per se). With respect to the first set of claims, the Society argues that the allegedly false and/or defamatory statements were not used "in commercial advertising or promotion," as required by 15 U.S.C. § 1125(a)(1)(B). With respect to Plaintiffs' defamation claims, the Society makes two arguments: first, that it was entitled to, and did not receive, pre-suit notice under Florida Statue section 770.01; and second, that it is immune from liability under the Communications Decency Act ("CDA"), 47 U.S.C. § 230.

### B. Facts Relating to the Legal Issues Raised in the Motion for Summary Judgment

Although the Society and Plaintiffs attached affidavits to the original Motion and Response, respectively, both have taken the opportunity provided by the Court's conversion of the Motion to file a multitude of new exhibits. The Court has reviewed all of the supplemental filings and exhibits, but only refers to those it considers most relevant to disposition of the Motion. In particular, and for the reasons discussed below, the Court's recitation of the facts is focused around two issues: commercial speech and pre-suit notice. The facts relevant to each issue are recited in turn.

#### i. The Economic Activities of the Society

The Society for Science-Based Medicine, which was formed on June 7, 2013, is a not-for-profit organization with § 503(c)(3) status. DE 138 Ex. 1, Affidavit of Mark Crislip ("Crislip Aff."), ¶ 3. Jann J. Bellamy, who is the Corporate Secretary for the Society as well as the Secretary of its Board, describes the Society's mission and purpose as follows in her affidavit:

4. The Society's mission is to educate consumers, professionals, business people,

---

[5] By separate Order, Plaintiffs' tortious interference claim, formerly Count V, was dismissed without prejudice. *See* DE 117.

> 5. The Society's website provides resources and information concerning all aspects of the concept of science-based medicine—that all health care practices and products need to be rooted in a single, science-based standard of care, delivered within a consistent framework of scientific standards.
>
> 6. The Society's website provides a central resource for communication among individuals and organizations concerned with the concept of science-based medicine.
>
> 7. The goal of the Society's website is to provide a platform for like-minded individuals to communicate, educate and organize.
>
> 8. The Society's website is a repository for all aspects of the concept of science-based medicine: reference material, blogs, wiki, audio, video, reviews, legal and legislative advocacy, links and more.
>
> 9. The Society's goal is to have a Wiki platform as the central source of information and discussion for all aspects of the concept of science-based medicine.

legislators, law enforcement personnel, organizations and agencies about the concept of science-based medicine and to provide a discussion forum for issues in the area of medical science.

DE 74 Ex. 1, Affidavit of Jann J. Bellamy ("Bellamy Aff."), ¶¶ 1, 4–9. The Society's Articles of Incorporation additionally describe part of its mission as "[o]pposition to health care practices whose diagnoses, diagnostic methods, and therapies have no plausible basis in the scientific model of medicine or an insufficient basis in evidence to warrant their use." DE 136 Ex. 33 at 2.

As the Society stated on the record at the hearing, it has a number of methods by which it raises funds in support of its mission.[6] The Society has a "Donate" button on its homepage. DE 136 Ex. 20 at 2. Memberships are also available for purchase, although "Free Membership" is one of the options. *Id.* The Society also has a Store. The Store's webpage states that "[w]e are not currently offering products for sale," but there are links to purchase eBooks comprised of compiled SBM Blog posts. DE 136 Ex. 26 at 2. The eBooks are published in conjunction with

---

[6] The Society has previously stated that it "does not sell and has not sold any products or services." Bellamy Aff. ¶ 3. Based on the exhibits submitted by Plaintiffs, if that was once the case (the Bellamy Affidavit was signed on July 11, 2014), it is no longer so. After reviewing the exhibits submitted by Plaintiffs, and in light of the representations made by the Society at the hearing of February 6, 2015, the Court considers the issue resolved. No genuine dispute exists: the Society accepts donations and additionally sells memberships and eBooks.

the James Randi Educational Foundation ("JREF"), and links to purchase the eBooks are available on the Society's website (via the Store), the SBM Blog, and the JREF website. *Id.* at 2, 8; DE 136 Ex. 32 at 2. The eBooks are free with Society membership. DE 136 Ex. 26 at 2.[7]

*ii. Pre-Suit Notice*

Prior to the suit's filing, on May 17, 2013, Plaintiffs sent a letter to Novella entitled "RE: 'Enbrel for Stroke and Alzheimer's', retrieved from http://www.sciencebasedmedicine.org/index.php/enbrel-for-stroke-and-alzheimers/ on Friday, May 17, 2013," in reference to the first article. Am. Compl. Ex. 2 at 1. The letter did not reference the Society, and only addressed the first article published by Novella on the SBM Blog on May 8, 2013. *See generally id.* On May 5, 2014, Plaintiffs sent a letter to Yale University entitled "Re: Institute of Neurological Recovery and Dr. Tobinick adv. Dr. Steven Novella & Yale." Am. Compl. Ex. 3 at 1. The May 5, 2014 letter demanded "that Yale immediately and publicly dissociate itself from Dr. Novella's article and the false allegations contained therein." *Id.* at 4. It only referred to the first article, and it did not mention the Society or the Society's website. *See generally id.* On May 21, 2014, Plaintiffs sent a third demand letter to Novella, David Gorski, and SGU Productions entitled "Re: Institute of Neurological Recovery and Dr. Tobinick adv. Dr. Steven Novella, Yale and Science-Based Medicine, Inc." Am. Compl. Ex. 4 at 1. The letter was in regard to "an article written by Steven Novella, MD, Founder and Executive Director, and published by Science-Based Medicine ('SBM') on its Science-Based Medicine website, registered to SGU Productions, LLC, and entitled 'Enbrel for Stroke and Alzheimer's'." *Id.* The letter identified the source of the article as

[7] Plaintiffs include in their exhibits a posting on the SBM Blog dated March 15, 2011 that highlights a course created by Novella for a third party, The Teaching Company. DE 136 Ex. 30. The Court does not consider this relevant to any economic activities of the Society, as the course was created for a third party at least two years before the Society was formed.

"http://www.sciencebasedmedicine.org/enbrel-for-stroke-and-alzheimers/." *Id.* Again, only the first article was discussed, the Society was not mentioned in that letter, and no reference was made to the Society's website. *See generally id.* The email addresses to which the letter was sent were, by Plaintiffs' own admission, the emails for Novella and Gorski. *See* Tobinick Supplemental Aff. ¶¶ 20–24. The May 21, 2014 letter demanded "that SBM immediately and publicly retract Dr. Novella's Article, remove the Article from its website and cease and desist from any further publishing of the Article." Am. Compl. Ex. 4 at 4. Well after the suit was filed, on January 30, 2015, Plaintiffs sent another letter to the Society, Novella, and Gorski entitled "Re: Edward Lewis Tobinick M.D. d/b/a The Institute of Neurological Recovery; INR PLLC d/b/a Institute of Neurological Recovery and Edward Tobinick, M.D. v. Steven Novella, M.D. and Society for Science-Based Medicine, Inc.; Case No. 9:14-cv-80781 RLR." DE 130 Ex. 1 at 1. This letter specifically targeted the Society as well as the Wiki posting. *Id.* at 4–5.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

### III.   ANALYSIS

As discussed *supra*, the Society's responsibility for Novella's articles remains unclear. Evidence exists to support both Plaintiffs' and the Society's positions, and the Court accordingly considers this fact to be in genuine dispute.[8] With respect to Plaintiffs' Lanham Act claims, that

---

[8] Plaintiffs' evidence in support of their position that the SBM Blog is part of the Society's structure and internet presence consists primarily of various statements made by Board members and Officers of the Society, as well as the Society itself, that the SBM Blog is one of two blogs "for the [S]ociety." *See* Tobinick Supplemental Aff. ¶ 11 & n.2; DE 136 Ex. 3 at 7; Ex. 5 at 8; Ex. 8 at 2. Plaintiffs also rely on the cross-membership of the SBM Blog editors and the Society Board members/Officers. *See* Tobinick Supplemental Aff. ¶¶ 9–10; DE 136 Ex. 6 at 2; Ex. 7 at 2. The Society, for its part, has not denied its affiliation with the SBM Blog, and it appears that the two websites support and encourage cross-traffic. Both the SBM Blog and the Society's website link to one another. *See* Tobinick Supplemental Aff. ¶ 3; DE 136 Ex. 22 at 2. And as discussed *supra*, there are links on both the SBM Blog and the Society to pages where users can purchase "Science-Based Medicine" eBooks. However, there are distinctions

8

fact is not material. Upon a careful review of the briefing, the exhibits, and the record as a whole, the Court concludes that whether or not the Society is responsible for the content of the articles, neither article constitutes commercial speech, at least as regards the Society.

That disputed fact *is* material with respect to the Society's argument that they are entitled to CDA immunity on Plaintiffs' defamation claims. For CDA immunity to apply, the Society must be a "provider or user of an interactive computer service." *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, No. 204-CV-47-FTM-34SPC, 2008 WL 450095, at *7 (M.D. Fla. Feb. 15, 2008). Because the relationship between the Society and the SBM Blog remains in dispute, the Court cannot ascertain whether the Society is such a provider with respect to the SBM Blog. Thus, it must deny the Society's Motion on this point. The Court does find, however, that the Society was entitled to pre-suit notice of Plaintiffs' state law defamation claims.

A.   **Plaintiffs' Lanham Act and Unfair Competition Claims**

Count I of Plaintiffs' Amended Complaint alleges violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which makes actionable false or misleading statements made in the context of commercial advertising. Because the Court finds that no reasonable jury could find that the allegedly false and/or defamatory statements constitute commercial speech, the Society is entitled to summary judgment on Counts I and II.[9]

---

between the two sites. First, the SBM Blog predates the Society by at least five years. *See* DE 136 Ex. 3 at 7; Crislip Aff. ¶ 3. Second, donations made to the SBM Blog do not go to the Society; the "Donate" button on the SBM Blog links to a donations page for the New England Skeptical Society, not the Society. *See* Tobinick Supplemental Aff. ¶ 42; DE 136 Ex. 19 at 2; Ex. 21 at 3. Finally, the Society has stated that Novella published the articles without the Society's knowledge, consent, or participation. Crislip Aff. ¶¶ 2, 5.

[9] Because the Court finds that the Society is entitled to summary judgment on Plaintiffs' Lanham Act claim, it is similarly entitled to summary judgment on Plaintiffs' unfair competition claim. *See Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332–33 (11th Cir. 2008) ("Since Natural Answers is unable to bring an unfair competition claim under the *Lanham Act* under the theory of either false advertising or trademark infringement, it follows that the common law claims based on unfair competition and trademark infringement must fail as well."). Both parties agreed on this point at the Court's hearing of February 6, 2015.

The Eleventh Circuit has adopted "[t]he most widely-accepted test for determining whether something is 'commercial advertising or promotion.'" *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012). This test is set forth in *Gordon & Breach Science Publishers S.A. v. American Institute of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994). In *Gordon & Breach*, the District Court for the Southern District of New York stated:

> In order for representations to constitute "commercial advertising or promotion" under [15 U.S.C. § 1125(a)(1)(B)], they must be: (1) commercial speech . . . by a defendant . . . ; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Gordon & Breach*, 859 F. Supp. at 1535–36.[10] In the instant case, the Court considers the dispositive issue to be whether or not the Society's speech qualifies as commercial speech.[11]

For a statement to constitute "commercial speech," "it must at least fall within the meaning of 'commercial speech' pursuant to First Amendment jurisprudence." *See Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1286 (M.D. Fla. 2011), *aff'd*, 693 F.3d 1338 (11th Cir. 2012) (collecting cases). The "core notion of commercial speech," as defined by the Supreme Court, is "speech which does no more than propose a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993) (internal quotation marks omitted). The Supreme Court has identified the proposal of a commercial transaction as "*the*" test for identifying commercial speech. *See id.* at 423. Courts within the Southern District of Florida have taken this definition of commercial speech as "the guiding principle in determining

---

[10] After the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), it does not appear that the second prong of the *Gordon & Breach* test, which requires that the defendant be in commercial competition with the plaintiff, remains good law. *See Educ. Impact, Inc. v. Danielson*, No. CIVA 14-937 FLW LHG, 2015 WL 381332, at *13–14 (D.N.J. Jan. 28, 2015).

[11] Because the Court finds that the speech at issue is non-commercial, it need not address whether the third or fourth prong of the *Gordon & Breach* test is met under these circumstances.

if certain speech is commercial for First Amendment purposes." *Maverick Boat Co. v. Am. Marine Holdings, Inc.*, No. 02-14102-CIV, 2004 WL 1093035, at *11 (S.D. Fla. Feb. 10, 2004) *aff'd*, 418 F.3d 1186 (11th Cir. 2005).

The term "commercial speech" is not strictly limited to that core notion, however. In *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 561 (1980), the Supreme Court took a slightly more expansive view of commercial speech, describing it as "expression related solely to the economic interests of the speaker and its audience." And the Court undertook a still more nuanced analysis in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), which involved informational pamphlets addressing "important public issues such as venereal disease and family planning." *Id.* at 68 (internal footnote omitted). In determining whether these pamphlets constituted commercial speech, the Supreme Court found it relevant that the communications were conceded to be advertisements, that they referred to specific products sold by the defendant, and that the defendant had an economic motivation for the speech. *Id.* at 66 & n.13, 67. It was "[t]he combination of *all* these characteristics" that led the Supreme Court in *Bolger* to conclude that the informational pamphlets constituted commercial speech. *Id.* at 67.

At the hearing and in their briefs, Plaintiffs argue that the science-based medicine movement embraced by the Society, Novella, and the SBM Blog is an enterprise in and of itself. *See generally* Tobinick Supplemental Aff. ¶¶ 41–54. Plaintiffs contend that the Society's participation in that movement, by virtue of the Society's economic activities, renders the relevant speech commercial. The facts Plaintiffs cite in support of this proposition are enumerated in more detail in Part I.B.i, *supra*, but in brief summary, Plaintiffs argue that the

11

Society's sale of eBooks (which are compiled from SBM Blog posts) and memberships, along with its acceptance of donations, render the speech in the articles commercial.

The Court does not find Plaintiffs' arguments persuasive, and concludes that no reasonable jury could find the articles constitute commercial speech, at least with respect to the Society. Certainly, neither article falls within the "core notion of commercial speech," as neither article proposed a commercial transaction. Nor does the Court find that the articles fall within the scope of the definition expounded in *Central Hudson*, "expression related solely to the economic interests of the speaker and its audience." 447 U.S. at 561. Both articles clearly state their intent to raise public awareness about issues pertaining to Plaintiffs' treatments, a goal in line with the Society's educational mission. Although the price of Plaintiffs' treatments is discussed, *see* Am. Compl. Exs. 1, 5, it cannot be said that the articles relate "solely" to the economic interests of the Society and the SBM Blog's readership. The only question is whether the articles can be considered commercial speech under an analysis like that the Supreme Court used in *Bolger*.

The Court finds that neither article constitutes "commercial speech," even under *Bolger*. In *Bolger*, the defendant company capitalized on an ongoing public debate to advertise its products. *See* 463 U.S. at 66–68. The defendant had a clear economic incentive. Its products and brand were referenced, both specifically and generically, in the informational pamphlets it distributed. *Id.* at 66 n.13. Furthermore, the defendant itself conceded that the pamphlets were advertisements. *Id.* at 66. Contrast the facts of *Bolger* to those of the instant case. The Society published articles questioning the viability of Plaintiffs' medical practices and the scientific rigor of their research. The only "products" referenced within the first article are Plaintiffs' own treatments; no competitors' products—let alone products offered for sale by the Society—are cited in the articles. To the extent that Novella's medical practice (and specific drugs used

therein) are discussed in the second article, it is only to illustrate Novella's belief that he and Plaintiffs are not competitors. That discussion is explicitly a response to Plaintiffs' original Complaint, as opposed to an independent plug for Novella's practice—one which, notably, the Society itself does not share. Given the content of the articles, neither can reasonably be considered an "advertisement."

Moreover, the targeted entity, the Society, is a not-for-profit corporation. Like nearly every not-for-profit corporation, it seeks to support itself by soliciting donations and offering products for sale. That does not render its speech commercial, particularly where, as here, there is nothing in the record to indicate that the articles containing the allegedly false and/or defamatory statements do not remain free to view online. The articles simply do not constitute commercial speech, at least with respect to the Society. Therefore, the Society is entitled to summary judgment on Plaintiffs' Lanham Act and unfair competition claims.

### B. Plaintiffs' Defamation Claims and Florida Statute Section 770.01

The Society additionally argues that Plaintiffs' libel claims, pled in Count III (trade libel) and Count IV (libel per se) are precluded due to Plaintiffs' failure to comply with Florida Statute section 770.01, which states a pre-suit notice requirement. *See* Mot. at 8–9. It is undisputed that the Society itself was never sent notice of the suit. Plaintiffs contend, however, that their failure to send a notice letter to the Society prior to filing the suit is not dispositive, or, alternatively, that the Society was not entitled to notice. *See* Tobinick Supplemental Aff. ¶¶ 19–25; Pls.' Resp. at 5–6. For the reasons discussed below, the Court finds Plaintiffs' arguments unavailing. The Society was entitled to notice which it did not receive, and consequently, it prevails on this point.

The Court begins by considering the language and purpose of Florida's pre-suit notice statute. The statute reads as follows:

> Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

Fla. Stat. § 770.01. Under the plain language of the statue, notice must be given *prior* to the filing of the suit—and understandably so, as post-suit notice is meaningless, both in concept and in practice. In practice, it serves no purpose; once suit has been filed, the complaint itself should provide sufficient notice of the claims. In concept, it defeats the purpose of the statute, which "is designed to allow a defendant the opportunity to be put on notice so as to take necessary steps to mitigate potential damages *and perhaps avoid . . . litigation.*" *Nelson v. Associated Press*, 667 F. Supp. 1468, 1475 (S.D. Fla. 1987) (emphasis added). Florida's Supreme Court has identified the opportunity to avoid litigation entirely as an important purpose of the pre-suit notice provision, due to "the opprobrium consequent even to an unfounded suit for libel." *Ross v. Gore*, 48 So. 2d 412, 415 (Fla. 1950) (en banc).

With the statute's purpose in mind, the Court proceeds to address Plaintiffs' arguments that no violation occurred, or, if one *did* occur, that any such violation is irrelevant at this point. Finding that a violation did occur and that the Society is, in fact, entitled to a remedy, the Court then considers the appropriate remedy.

### i.    The Society Was Entitled to Pre-Suit Notice

Plaintiffs contend no violation of the statute occurred for four separate reasons: (1) it was enough to give Novella, a member of the Society's board, notice of the suit; (2) if the notices sent to Novella were deficient, by virtue of their failure to identify the Society as a potential defendant, the supplemental notice sent on January 30, 2015 corrected that deficiency; (3) giving notice would have been futile, as the article remains available on the SBM Blog and, with respect

to the first article, linked on the Society Wiki; and, (4) the Society is not entitled to pre-suit notice because it is not a media defendant. None of these arguments is compelling.

Plaintiffs' first three arguments raise similar issues, and the Court finds all three unavailing for the same reason: namely, that accepting these arguments would render the statute ineffectual. Florida's pre-suit notice statute was intended to give putative defendants the opportunity to retract allegedly false and/or defamatory statements and, potentially, to avoid litigation altogether. *See Nelson*, 667 F. Supp. at 1475. The Society was not given that opportunity, notwithstanding Plaintiffs' arguments to the contrary. Plaintiffs' first argument, that imputed service to Novella should suffice, is a red herring. Whether or not the Society could be served via Novella is irrelevant, as the notices sent to him were wholly deficient with respect to the Society. A party must know that it is being sued, and for what, in order to retract allegedly false and/or defamatory statements as the pre-suit notice statute envisions. The Society was not given such notice, as neither of the two notice letters Plaintiffs sent to Novella referenced the Society, either by name or by description, and neither referred to the Society as a potential defendant. *See* Am. Compl. Exs. 2, 4. Plaintiffs' second argument is likewise unavailing. The statute contemplates pre-suit notice; notice must be pre-suit for the reasons discussed *supra*. Whether or not the January 30, 2015 notice was sufficient is irrelevant, as it was delivered post-suit. Plaintiffs' third argument fails for similar reasons. The Court cannot accept Plaintiffs' argument that the Society's decision not to retract the allegedly false and/or defamatory statements renders their (Plaintiffs') failure to give proper notice retroactively excusable. What the Society would or would not have done had it been given the opportunity to retract the statements at issue calls for speculation beyond the purview of this Court; the Society was due the opportunity, and the Society did not receive it.

The only question, then, is whether or not the Society is a media defendant such that Plaintiffs were required to provide it with a pre-suit notice letter.[12] "Although the express language of section 770.01 does not limit the type of defendant entitled to presuit notice, '[e]very Florida court that has considered the question has concluded that the presuit notice requirement applies only to "media defendants," not to private individuals.'" *Comins v. Vanvoorhis*, 135 So. 3d 545, 549 (Fla. Dist. Ct. App. 2014) (quoting *Zelinka v. Americare Healthscan, Inc.*, 763 So. 2d 1173, 1175 (Fla. Dist. Ct. App. 2000)). In defining the term "media defendant," courts have considered whether the defendant engages in the traditional function of the news media, which is "to initiate 'uninhibited, robust, and wide-open debate on public issues.'" *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)); *see also Comins*, 135 So. 3d 545, 559–60 (holding that blogs and bloggers can fill such a role). Thus, media defendants are not just those who "impartially disseminate information," or "issue unsolicited, disinterested and neutral commentary as to matters of public interest." *Ortega Trujillo*, 17 F. Supp. 2d at 1338. The term also applies to those who "editorialize as to matters of public interest without being commissioned to do so by [their] clients." *Id.*

The Court finds that the Society does, in fact, qualify as a media defendant entitled to the protections of Florida's pre-suit notice statute.[13] The stated mission of the Society, which is a not-for-profit corporation, "is to educate consumers, professionals, business people, legislators, law enforcement personnel, organizations and agencies about the concept of science-based

---

[12] The Court considers the law well-settled as to whether or not the internet constitutes an "other medium" for purposes of the statute. Beyond a doubt, it does. *See Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1307–08 (S.D. Fla. 2008).

[13] Plaintiffs argue that "[the Society] cannot simultaneously contend that it is entitled to protections afforded to a media defendant that engages in the dissemination of news and information through the news and broadcast media, while also claiming it did not disseminate the [articles] at all." Pls.' Resp. at 5. However, Plaintiffs confuse the issue. The question is not whether the Society has claimed responsibility for the articles at issue in the suit. The question is whether the Society, *as an entity*, is a media defendant.

medicine and to provide a discussion forum for issues in the area of medical science." Crislip Aff. ¶ 3; Bellamy Aff. ¶ 4. It also intends to operate "as the central source of information and discussion for all aspects of the concept of science-based medicine." Bellamy Aff. ¶ 9. Its mission encompasses "[o]pposition to health care practices whose diagnoses, diagnostic methods, and therapies have no plausible basis in the scientific model of medicine or an insufficient basis in evidence to warrant their use." DE 136 Ex. 33 at 2.

Clearly, the issues which the Society intends to address are ones of public importance. Although the Society has a particular agenda, that does not rob it of the protections afforded it by the pre-suit notice statute. The Society's mission falls squarely within that of the traditional media; it aims "to initiate 'uninhibited, robust, and wide-open debate on public issues.'" *Ortega Trujillo*, 17 F. Supp. 2d at 1338 (quoting *Gertz*, 418 U.S. at 340). The fact that the Society may be opposed to certain health care practices it believes have "no plausible basis in the scientific model of medicine or an insufficient basis in evidence to warrant their use" does not render it a non-media defendant. A defendant may qualify as a member of the media for purposes of Florida's pre-suit notice provision if it "editorialize[s] as to matters of public interest without being commissioned to do so by its clients." *Id.* Here, there is no evidence that any of the allegedly false and/or defamatory statements were commissioned. The Court concludes that the Society is a media defendant, and it is consequently entitled to a remedy for Plaintiffs' violation of the pre-suit notice statute.

### ii. The Appropriate Remedy Is Dismissal with Leave to Refile

Unfortunately, the statute does not explicitly provide a remedy for its violation. Consequently Florida courts, both state and federal, have not applied this provision consistently. Notice is indisputably a condition precedent to suit under Florida law. *Ross*, 48 So. 2d at 415.

17

Some courts have held that the appropriate remedy for failure to satisfy this condition precedent is dismissal with leave to amend, even though the suit has already been filed and *pre*-suit notice is no longer possible. *See, e.g.*, *Bayliss v. Cox Radio, Inc.*, No. 8:10–CV–1030–T–27MAP, 2010 WL 4023459, at *4 (M.D. Fla. Oct. 13, 2010) (dismissing and remanding). Other courts have taken a different approach, holding that because "[c]ompliance with section 770.01, where necessary, is a condition precedent to maintaining an action," failure to provide proper notice prior to filing the complaint requires dismissal with leave to refile. *See Gifford v. Bruckner*, 565 So. 2d 887, 888 n.1 (Fla. Dist. Ct. App. 1990) (citing *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607 (Fla. Dist. Ct. App. 1975)) (dictum). Finally, a third line of cases requires only allegations of notice at the pleading stage, with resolution of any issues raised as to the sufficiency of that notice to occur either at trial or upon a motion for summary judgment. *See, e.g.*, *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1473–75, 1484 (S.D. Fla. 1987) (entering summary judgment against the plaintiff after "find[ing] as a matter of law that § 770.01 has not been complied with").

This Court aligns itself with the line of cases requiring refiling of the suit for failure to comply with the pre-suit notice provision, at least where, as here, the statute of limitations has not yet run. *See, e.g.*, *Laney v. Knight-Ridder Newspapers, Inc.*, 532 F. Supp. 910, 913 (S.D. Fla. 1982) (dismissing the case "by reason of plaintiff's failure to comply with a condition precedent to bringing suit," and noting that "[p]laintiff is free to refile th[e] action upon compliance" with the statute); *Gifford*, 565 So. 2d at 888 n.1. Summary judgment may be appropriate where the statute of limitations has expired and the plaintiff can no longer provide the defendant with pre-suit notice in compliance with the statute. *See Bayliss*, 2010 WL 4023459, at *4; *cf. Fletcher v. S. Fla. Sun-Sentinel*, 2006 WL 2337176, at *1 (Fla. Cir. Ct. 2006) (affirming trial court's grant

of summary judgment where the notice letter was found to be insufficient and the statute of limitations had expired). That is not the case here, however; the first article was published on May 8, 2013, and the statute of limitations for "action[s] for libel and slander" is two years under Florida law. *See* Fla. Stat. § 95.11(4)(g). Granting summary judgment in advance of the expiration of the statute of limitations would conflict with the "strong preference for deciding cases on the merits . . . whenever reasonably possible." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1331 (11th Cir. 2014). Dismissing Plaintiffs' claims with leave for Plaintiffs to amend their Complaint would do little to effectuate the purpose of the statute as described *supra*, however. The Court adopts the middle ground: dismissal with leave to *refile*, as opposed to amend, is the appropriate remedy for a violation of the statute prior to the expiration of the statute of limitations.

Accordingly, the Court believes the appropriate remedy is to dismiss the Society from the suit, without prejudice for Plaintiffs to refile a separate suit with claims brought solely against the Society—only after, of course, notice has been properly provided. Plaintiffs may not refile their Lanham Act, unfair competition, and tortious interference claims on the same facts alleged in their Amended Complaint.

## IV.   CONCLUSION

For the foregoing reasons, the Society's Converted Motion for Summary Judgment [DE 74] is **GRANTED IN PART**. Summary judgment is **GRANTED** with respect to Plaintiffs' Lanham Act (Count I) and unfair competition (Count II) claims. With respect to Plaintiffs' trade libel (Count III) and libel per se (Count IV) claims, the Motion is **GRANTED** only insofar as Plaintiffs' claims against the Society are **DISMISSED WITHOUT PREJUDICE** with leave for

Plaintiffs to refile a separate suit against the Society. The Clerk of Court is directed to **TERMINATE** the Society for Science-Based Medicine, Inc. from the instant suit.

      **DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this <u>16th</u> day of March, 2015.

Copies furnished to:                                         ROBIN L. ROSENBERG
Counsel of record                                       UNITED STATES DISTRICT JUDGE