**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:14-CV-80781-ROSENBERG/BRANNON**

EDWARD LEWIS TOBINICK, MD, et al.,

      Plaintiffs,

v.

M.D. STEVEN NOVELLA, et al.,

      Defendants.

_____/

## MEMORANDUM OPINION AND ORDER

**THIS CAUSE** is before the Court upon Plaintiffs' Verified Motion for Temporary and Preliminary Injunctive Relief [DE 6] ("the Motion"), filed herein on August 18, 2014. The Motion requests temporary and preliminary injunctive relief relating to Dr. Steven Novella's ("Dr. Novella" or "Novella") alleged violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). The Court has carefully reviewed the Motion and all filings supporting and opposing the Motion. The Court also held a two-day hearing on March 30 and 31, 2015, at which the parties offered testimony, exhibits, and arguments regarding the Motion. The Court denied the Motion at the hearing, and now issues this Memorandum Opinion setting forth its findings and conclusions in greater detail. The Court finds that the following facts have been established by a preponderance of the evidence:

## FINDINGS OF FACT

1. On May 8, 2013, Dr. Novella published an article entitled "Enbrel for Stroke and Alzheimer's" on www.sciencebasedmedicine.org ("the first article"). Ex. 45. The article criticizes Plaintiffs' use of perispinal etanercept, or Enbrel, to treat "a long and apparently

growing list of conditions" including stroke and Alzheimer's Disease.[1] *Id.*

2.  On May 17, 2013, Dr. Tobinick sent a letter to Dr. Novella requesting that he immediately retract his article, as "it is not in the public interest, and it is both false and defamatory." Ex. 50. Dr. Novella did not retract his article, and to this date the article remains available online.

3.  On June 9, 2014, Plaintiffs filed the instant suit. They moved for temporary and preliminary injunctive relief on June 11, 2014.

4.  On July 23, 2014, Dr. Novella published an article entitled "Another Lawsuit to Suppress Legitimate Criticism—This Time SBM" on www.sciencebasedmedicine.org ("the second article"). Ex. 46. The second article largely restated Dr. Novella's comments in the first article, which was hyperlinked in the text.[2] *See id.* Dr. Novella also mentioned his own practice. *Id.* He did so in response to legal theories set forth by Plaintiffs in their Complaint, which alleged that the first article was an advertisement by virtue of the fact that he (Dr. Novella) and Dr. Tobinick are competitors.[3] *See id.*

5.  The Court first makes findings relevant to the allegedly commercial nature of the speech at issue.

6.  Dr. Novella is a neurologist with the Yale-New Haven Hospital. He testified that in his clinical practice he treats patients with headaches, Alzheimer's Disease, dementia, and back pain. He does not prescribe Enbrel or etanercept for any of these conditions.

7.  Dr. Novella spends about twenty hours per week on "skeptical activities." In his own words, he is a science communicator; he testified that he considers it his mission to "promote

---

[1] Because the Court believes that the alleged falsity of statements made in the article is ultimately irrelevant for purposes of its decision today, it does not address any alleged falsity of the statements, nor does the Court address whether any statements made in the article constitute fact or opinion.
[2] Again, because the Court believes that the alleged falsity of statements made in the article is ultimately irrelevant for purposes of its decision today, it does not address any alleged falsity of the statements, nor does the Court address whether any statements made in the article constitute fact or opinion.
[3] The Court notes that this is Dr. Novella's characterizations of Plaintiffs' legal theories, not the Court's.

science and critical thinking to the public," and to lobby for scientific education. His area of expertise within the skeptical community is medicine, in light of his profession. He describes this wing of the skeptical movement as "science-based medicine," and his goal in this arena is, as he testified, to "evaluat[e] the relationship between the scientific evidence and clinical practice."

8. Dr. Novella derives income from his skeptical activities, separate and apart from the income he derives from his clinical practice. With his brother, he co-runs a website and podcast, both entitled "The Skeptic's Guide to the Universe" (hereinafter "SGU"). SGU is a for-profit corporation. The SGU website has paid advertisements on its sidebar. *See, e.g.*, Ex. 47. SGU also sells memberships and has a store, which, although it is currently offline, can still be accessed by searching for it via, e.g., Google. Dr. Novella also derives income from a series of courses he produced for The Teaching Company, a separate entity.

9. Neither of the articles Dr. Novella posted on www.sciencebasedmedicine.org promotes SGU or Dr. Novella's courses for The Teaching Company. *See* Ex. 45, Ex. 46. SGU is mentioned only to the extent that Dr. Novella names it as a defendant in Dr. Tobinick's lawsuit in his second article. Ex. 46. The second article does not link to SGU's website. *Id.*

10. The www.sciencebasedmedicine.org webpage on which the articles were published has a sidebar. Ex. 45, Ex. 46. That sidebar contains a "Donate" button.[4] Ex. 46. As Dr. Tobinick testified, clicking on the "Donate" button takes the viewer to a PayPal page. The sidebar also contains a link that reads "Join the Society for Science-Based Medicine." *Id.* Dr. Tobinick testified that this link takes the viewer to the Society's website, where the viewer can purchase a membership. At the time it was first published, Dr. Tobinick testified, free

---

[4] Different versions of the sidebar appear for each article. The Court considers the more recent version of the sidebar in Exhibit 46 for the purposes of its discussion.

membership was not one of the options, although it now is. The sidebar contains links to commercial websites such as Amazon that sell e-books authored by Dr. Novella. *Id.* Finally, there appear to be ads at the bottom of the sidebar. *Id.*

11. No evidence was introduced by Plaintiffs that indicates that Dr. Novella derives any income from the Society's activities, from the sale of the e-books, or from the ads on the www.sciencebasedmedicine.org website.

12. In response to the instant litigation, Dr. Novella created a legal defense fund. The webpage for the fund appears on the SGU website and is entitled "Science Based Medicine / SGU Legal Defense Support." Ex. 47. The page contains a hyperlink to the first article published by Dr. Novella. *Id.* No evidence was introduced as to the date the page was created, but the Court takes judicial notice of the Internet Archive's history of the page, available at http://web.archive.org/web/20140201000000*/http://www.theskepticsguide.org/legaldefense, which indicates that the page was created on July 31, 2014, after both articles were published. Both the fund and the lawsuit are mentioned by Dr. Novella in one of the SGU podcasts. Ex. 48.

13. The Court found Dr. Novella a credible witness based on his credentials and demeanor. Upon evaluating his testimony, the Court finds that his primary interest in his skeptical activities is the dissemination of information and science education, as opposed to any incidental monetary gain.

14. The Court next makes findings regarding the injury allegedly suffered by Plaintiffs as a result of the articles' publication.

15. Dr. Tobinick testified that his business has declined since Dr. Novella published his articles.[5] He testified that in early 2013 his Florida clinic was treating at least ten patients per week, and that his practice now is treating an average of two patients per week. He also testified that he was forced to close his Newport Beach office due to the loss of business occasioned by the articles. He did not, however, explain why he believed it was Dr. Novella's articles in particular that caused the decline in business, other than to testify that he was aware of no other reason for the decline.

16. In light of the Google search results discussed immediately below, as well as the publication on May 5, 2013 of an article in the *Los Angeles Times* (Ex. 49) that was also, at points, critical of Plaintiffs' practice,[6] the Court does not believe the Plaintiffs have set forth sufficient evidence to attribute Dr. Tobinick's decline in business primarily to Dr. Novella's articles. Clearly, other negative articles, webpages, and blog posts have been written about his practice, and Dr. Tobinick admitted that he is unaware of the number of times individuals have viewed the other webpages and articles introduced into evidence that criticize Dr. Tobinick and/or the use of Enbrel for the treatment of stroke and Alzheimer's. *See* Ex. 78 ("False hopes and real risks with Alzheimer's 'treatments,'" written by Joseph Quinn and published in "Summer/Fall 2013"); Ex. 79 ("Oklahoma doctors question a California physician's treatment for strokes," written by Sonya Colberg and published on June 13, 2011); Ex. 80 ("Selective TNF Inhibition for Chronic Stroke and Traumatic Brain Injury: An Observational Study Involving 629 Consecutive Patients Treated with Perispinal Etanercept,"

---

[5] Because the Court does not address the alleged falsity of the scientific claims for the reasons discussed *supra* in the footnotes, it need not determine whether Dr. Tobinick or any of the other witnesses proffered as experts should, in fact, be deemed experts by this Court.

[6] As Dr. Tobinick testified, he contacted the author of the article, Alan Zarembo, to request that he change certain statements in the article which he (Dr. Tobinick) believed were false and misleading. Mr. Zarembo declined to alter the content of the article.

written by Stephen Page and published in May of 2013).

17. Dr. Tobinick testified that many potential patients research him and his Institutes by running web searches before deciding to utilize his services. He testified that when a Google search is run on certain relevant terms, Dr. Novella's first article appears in the first page of results. *See* Ex. 51. However, Dr. Novella's article is not the only critical piece that appears when the searches are run. *See id.* Other negative results include a one-star Yelp review of the Institute of Neurological Recovery (search: "institute of neurological recovery"), a one-and-a-half-star Yelp review of Dr. Tobinick (search: "tobinick"), "Disciplinary Action against Edward L. Tobinick, M.D. – Casewatch" (searches: "institute of neurological recovery" and "tobinick"), and "Doctor criticized for his questionable 'treatment' for alzheimer's patients" (search: "enbrel alzheimer's"). *Id.* The two searches for which Dr. Novella's first article appears as the top result, "enbrel stroke" and "enbrel alzheimer's," also contain a number of positive articles (e.g., "Arthritis drug shown to slow Alzheimer's down," "Rapid improvement of chronic stroke deficits after perispinal [etanercept treatment]…"). *Id.*

18. Dr. Tobinick gave testimony about a positive story on his treatments that aired on an Australian news channel, "The New Stroke Treatment That's Changing Lives." *See* Ex. 7. Dr. Tobinick testified that such news events are very important to generating interest in his practice. He then noted a comment left on the program's Facebook page linking to the first article written by Dr. Novella, citing it as evidence of the harm suffered by Plaintiffs due to the article. *See* Ex. 8 at 2. However, that comment is one of fifty comments, and the only negative comment on the posting. There are no replies to the comment, or any indication that it generated further debate about the safety or efficacy of Plaintiffs' treatments.

19. Dr. Tobinick testified that one patient specifically stated that she was no longer interested in

his services because she read Dr. Novella's first article (the second article was not published when the message was sent). Although the message itself does not state that it was Dr. Novella's article that caused her to decline his services, Dr. Tobinick testified that his office manager informed him that it was Dr. Novella's article which she read.[7]

20. Plaintiffs' witnesses Dr. Tracey Ignatowski and Dr. Stephen Best mentioned the potential harm to Plaintiffs' reputation in cursory fashion, but did not identify with specificity any injuries resulting to Plaintiffs, or a substantial threat thereof, due to Dr. Novella's articles.

21. Finally, despite the fact that Dr. Tobinick is complaining of irreparable harm, his practice is still viable. As he testified, the national Australian news channel on which he appeared on Sunday, March 29, 2015, sought him out; he did not solicit the interview by sending them a press release or any other means.

22. Dr. Tobinick also gave testimony as a rebuttal witness to explain the reason for his delay in filing suit and requesting preliminary injunctive relief. He testified that in May of 2013, around the time Dr. Novella's first article was published, his father became critically ill. Dr. Tobinick testified that his father's illness lasted into September of 2013 and his recovery took months thereafter.

## CONCLUSIONS OF LAW

Based on the above Findings of Fact, the Court makes the following Conclusions of Law:

1. To obtain a preliminary injunction against Dr. Novella, Plaintiffs must establish four elements: (1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) that the

---

[7] The Court allowed this hearsay testimony to be admitted over objection. *See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

threatened injury to Plaintiffs outweighs the harm an injunction may cause to Dr. Novella; and (4) that granting the injunction will not disserve the public interest. *See Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994).

2. Because a preliminary injunction is "an extraordinary and drastic remedy," it may not be granted unless the moving party "clearly carries the burden of persuasion as to the four prerequisites." *Id.* (internal quotation marks omitted); *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

3. Plaintiffs have not demonstrated a substantial likelihood that they will prevail on the merits with respect to their Lanham Act claim.[8] The Lanham Act provides, in relevant part, that "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(B). Courts have the power to grant injunctions to prevent violations of this provision of the Lanham Act. *Id.* § 1116(a).

4. The alleged misrepresentation must be made "in commercial advertising or promotion." The Eleventh Circuit has adopted "[t]he most widely-accepted test for determining whether something is 'commercial advertising or promotion.'" *Suntree Techs., Inc. v. Ecosense Int'l,*

---

[8] Plaintiffs do not request an injunction based on their state-law defamation claims, for good reason; "[t]he usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages." *Baker v. Joseph*, 938 F. Supp. 2d 1265, 1269 (S.D. Fla. 2013) (quoting *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987)).

*Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012). This test is set forth in *Gordon & Breach Science Publishers S.A. v. American Institute of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994).

5.  In *Gordon & Breach*, the District Court for the Southern District of New York stated: "In order for representations to constitute 'commercial advertising or promotion' under [15 U.S.C. § 1125(a)(1)(B)], they must be," *inter alia*, "commercial speech." *Gordon & Breach*, 859 F. Supp. at 1535–36.

6.  For a statement to constitute "commercial speech," "it must at least fall within the meaning of 'commercial speech' pursuant to First Amendment jurisprudence." *See Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1286 (M.D. Fla. 2011), *aff'd*, 693 F.3d 1338 (11th Cir. 2012) (collecting cases). The "core notion of commercial speech," as defined by the Supreme Court, is "speech which does no more than propose a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993) (internal quotation marks omitted).

7.  The term "commercial speech" is not strictly limited to that core notion, however. In *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 561 (1980), the Supreme Court took a slightly more expansive view of commercial speech, describing it as "expression related solely to the economic interests of the speaker and its audience." And the Court undertook a still more nuanced analysis in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), which involved informational pamphlets addressing "important public issues such as venereal disease and family planning." *Id.* at 68 (internal footnote omitted). In determining whether these pamphlets constituted commercial speech, the Supreme Court found it relevant that the communications were conceded to be advertisements, that they referred to specific products sold by the defendant, and that the

defendant had an economic motivation for the speech. *Id.* at 66 & n.13, 67. It was "[t]he combination of *all* these characteristics" that led the Supreme Court in *Bolger* to conclude that the informational pamphlets constituted commercial speech. *Id.* at 67.

8. The articles propose no commercial transaction, and consequently do not fall within the "core notion" of protected speech. *See City of Cincinnati*, 507 U.S. at 422. Nor does the Court find that the articles fall within the scope of the definition expounded in *Central Hudson*, "expression related solely to the economic interests of the speaker and its audience." 447 U.S. at 561. Both articles clearly state their intent to raise public awareness about issues pertaining to Plaintiffs' treatments, so they cannot be said to relate "solely" to the "economic interests of the speaker and its audience." *Id.* Thus, the articles can only potentially qualify as commercial speech under *Bolger*.

9. The instant articles are different from the pamphlets at issue in *Bolger* in a number of ways. First, the articles are not conceded to be advertisements. Second, the only products referenced in the first article are Plaintiffs' treatments. To the extent that the second article mentions Dr. Novella's practice, it is in direct response to the instant litigation as opposed to an independent plug for that practice.

10. Finally, Plaintiffs have failed to demonstrate that Dr. Novella has an economic motivation for the speech. The Court does not find it relevant that Dr. Novella makes money from the courses he created for The Teaching Company, or from activities associated with the Skeptics Guide to the Universe—specifically, the podcast and the advertisements on the Skeptics Guide to the Universe webpage. The Court finds that these endeavors are unrelated to the specific articles at issue here. Neither endeavor was directly promoted in the articles. Similarly, to the extent that the www.sciencebasedmedicine.org sidebar contains links to the

Society for Science-Based Medicine, links to e-books for sale, and advertisements, no evidence was introduced that indicates that Dr. Novella derives any income from activities associated with either the Society or www.sciencebasedmedicine.org.

11. As the Court understands the testimony and exhibits, the only way in which the articles at issue here have generated money for Dr. Novella was through the legal defense fund. That fund was created in direct response to the instant litigation, after both articles were published, and no testimony was elicited to indicate that the money donated to the fund will be used for any other than Dr. Novella's legal defense—i.e., to defray expenses that Plaintiffs themselves have imposed on him via their lawsuit. The Court declines to adopt Plaintiffs' legal theory that by linking the first article on the legal defense fund webpage, the article was thereby transformed into commercial speech.

12. The question is whether Dr. Novella had an economic motivation for writing the articles when he wrote them, and the Court concludes that he did not. As the Court stated *supra* in its Findings, science communication is Dr. Novella's passion, interest, and hobby. No evidence was introduced to indicate that it is his primary source of income (or even, with respect to the Society and www.sciencebasedmedicine.org, a source of income at all), and the Court accordingly concludes that his motivation for authoring the articles was not economic in nature. Plaintiffs thus have failed to demonstrate that the articles constitute commercial speech under *Bolger*.

13. The Court concludes that Plaintiffs have failed to demonstrate that there is a substantial likelihood that they will be able to show that the speech at issue in the two articles is commercial in nature. Accordingly, Plaintiffs have failed to demonstrate a substantial likelihood of prevailing on the merits.

14. In the alternative, Plaintiffs have not demonstrated that there exists a substantial threat that they will suffer irreparable injury if the injunction is not granted. *See Church*, 30 F.3d at 1342. First, Plaintiffs' delay in filing the Motion is fatal to any claim of irreparable harm. Second, Plaintiffs have failed to demonstrate that any harm they have suffered cannot simply be compensated with money damages.

15. "[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). "Delay, or too much of it, indicates that a suit or request for injunctive relief is more about gaining an advantage (either a commercial or litigation advantage) than protecting a party from irreparable harm." *Pippin v. Playboy Entm't Grp., Inc.*, No. 8:02CV2329T30EAJ, 2003 WL 21981990, at *2 (M.D. Fla. July 1, 2003).

16. In trademark cases, delay alone may serve as the basis for denial of injunctive relief. *See Citibank*, 756 F.2d at 276 ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement."). Courts in the Southern District and elsewhere have rejected injunctive relief based upon a party's delay in filing a motion seeking that extraordinary relief. *See, e.g., Love v. Blue Cross & Blue Shield of Ariz., Inc.*, No. 03–21296–CIV, 2010 WL 1249120, at *5 (S.D. Fla. Mar. 25, 2010) (two years); *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355 (S.D. Fla. 2002) (one year); *see also Badillo v. Playboy Entm't Grp., Inc.*, No. 8:04-CV-591-T-30TBM, 2004 WL 1013372, at *2 (M.D. Fla.

Apr. 16, 2004) (nine months); *Pippin*, 2003 WL 21981990, at *2 (one year).

17. Here, the first article was published on May 8, 2013. Ex. 45. Plaintiffs knew about the article by May 17, 2013, as evidenced by the demand letter sent to Dr. Novella by Dr. Tobinick. Ex. 50. Plaintiffs did not move for injunctive relief until over a year later, on June 11, 2014. Although the Court is sympathetic to Dr. Tobinick's father's health issues, which were the reason Dr. Tobinick offered for his delay in filing the suit, the delay at issue here is not a delay of one, two, or even three months. Dr. Tobinick waited over a year before filing suit. Accordingly, Plaintiffs' significant delay in requesting injunctive relief means they cannot demonstrate that there is a substantial threat that they will suffer any irreparable harm if their request for injunctive relief is not granted.

18. Even if this Court were to find that Plaintiffs' delay in filing the Motion is not fatal to their claim of irreparable injury, Plaintiffs have failed to demonstrate that any truly irreparable injury will occur if the injunction is not granted.

19. Financial damage alone is insufficient to warrant injunctive relief. *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 487 (11th Cir. 1990) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough [to constitute irreparable injury].")). Something more, such as damage to the plaintiff's goodwill or market position, must be shown. *See Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1320 (11th Cir. 2010) (finding no error in the district court's conclusion that the plaintiff had demonstrated a substantial threat of irreparable harm where the advertisements at issue contained "serious indictments" of the safety of the defendant's products "that would likely be remembered by consumers"). However, where the threat to a plaintiff's goodwill and reputation is minimal,

courts have found that the plaintiff may be compensated sufficiently with monetary damages. *Seiko Kabushiki Kaisha*, 188 F. Supp. 2d at 1355; *see also Hi-Tech Pharm., Inc. v. Herbal Health Prods., Inc.*, 311 F. Supp. 2d 1353, 1358 (N.D. Ga. 2004) *aff'd*, 132 F. App'x 348 (11th Cir. 2005) (per curiam) (finding no substantial threat of irreparable injury where the plaintiff's allegations of irreparable harm were "contradicted by . . . testimony that sales of Stamina–Rx have exceeded $3 million in the last month, and the product is currently on back-order").

20. Plaintiffs have not demonstrated that any injury they have suffered cannot be compensated by money damages. The Court concludes that the evidence that Plaintiffs introduced at the hearing is insufficient to demonstrate a substantial threat of irreparable injury, as is necessary for a preliminary injunction to issue.

21. A number of Plaintiffs' witnesses testified (Dr. Tobinick at length) about the harm caused to Dr. Tobinick's reputation and practice by the articles. As the Court found, however, Plaintiffs only conclusively can tie the loss of a single patient to Dr. Novella's articles. Dr. Novella was not a lone voice crying out in the wilderness. For good or for ill, a number of individuals criticized Dr. Tobinick and his treatments before, after, and around the time of the articles' publication. Under these circumstances, to fairly impose the "extraordinary" remedy of a preliminary injunction on Dr. Novella, Plaintiffs would need to show that it was *his* articles that resulted in the decline of Dr. Tobinick's business. This, they have not done.

22. The Court finds it additionally persuasive that the national Australian news program which featured Dr. Tobinick and his treatments on March 29, 2015 sought out the interview with Dr. Tobinick on its own initiative; he did not solicit the engagement. In the Court's opinion, this indicates that Dr. Tobinick's practice remains viable, such that no irreparable injury is

likely to occur.

23. As Plaintiffs have only identified one patient who chose not to utilize their services based on Dr. Novella's articles, and as it appears that Plaintiffs' business is still viable going forward, the Court concludes that Plaintiffs have not suffered the kind of significant reputational injury that would justify a preliminary injunction. To the extent that Plaintiffs have demonstrated any harm as a direct result of the articles' publication, it is not irreparable harm and money damages will be able to adequately compensate Plaintiffs for any loss in this area. *See Seiko Kabushiki Kaisha*, 188 F. Supp. 2d at 1355; *Hi-Tech Pharm., Inc.*, 311 F. Supp. 2d at 1358.

24. Plaintiffs have not demonstrated that there is a substantial threat that they will suffer any irreparable injury. Therefore, their request for injunctive relief fails for this reason as well.

## ORDER

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs' Verified Motion for Temporary and Preliminary Injunctive Relief [DE 6] is **DENIED**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 2nd day of April, 2015.

Copies furnished to:
Counsel of record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE