# <u>EXHIBIT 1</u>

Tobinick Opposition to
Novella Fee Motion

No. 15-14889

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

EDWARD LEWIS TOBINICK, MD, A MEDICAL CORPORATION d/b/a
INSTITUTE OF NEUROLOGICAL RECOVERY, INR PLLC, d/b/a INSTITUTE
OF NEUROLOGICAL RECOVERY, EDWARD TOBINICK, M.D.,

Appellants/Plaintiffs,

vs.

STEVEN NOVELLA, M.D.,

Appellee/Defendant.

---

Appeal from the United States District-Court
for the Southern District of Florida
West Palm Beach Division

---

**PLAINTIFFS'-APPELLANTS' COMBINED OPPOSITION TO
NOVELLA'S MOTION FOR APPELLATE ATTORNEYS' FEES AND
EXPENSES AND PLAINTIFFS'-APPELLANTS' MOTION FOR FEES
AND EXPENSES AGAINST NOVELLA UNDER 11TH CIR. R. 33-1(F)(2)**

---

Cullin O'Brien
Fla. Bar. No. 0597341
CULLIN O'BRIEN LAW, P.A.
6541 NE 21st Way
Ft. Lauderdale, Florida 33308
Telephone: (561) 676-6370
Fax: (561) 320-0285
cullin@cullinobrienlaw.com

Counsel for Appellants/Plaintiffs

## CERTIFICATE OF INTERESTED PERSONS

1.     Babbin, Jeffrey R. - trial counsel for Yale University, defendant.

2.     Cahen, Geoffrey Michael - trial counsel for Edward Tobinick, M.D., an individual, Edward Lewis Tobinick, M.D. a Medical Corporation, d/b/a The Institute of Neurological Recovery, a California Medical Corporation, INR PLLC d/b/a Institute of Neurological Recovery, a Florida professional limited liability company, Appellants.

3.     Cole, Scott A. - counsel for Society for Science-Based Medicine Inc., Defendant.

4.     Cole, Scott & Kissane, P.A. - counsel for Society for Science-Based Medicine Inc., Defendant.

5.     Cullin O'Brien Law, P.A. – trial and appellate counsel for Edward Tobinick, M.D., an individual, Edward Lewis Tobinick, M.D. a Medical Corporation, d/b/a The Institute of Neurological Recovery, a California Medical Corporation, INR PLLC d/b/a Institute of Neurological Recovery, a Florida professional limited liability company, Appellants.

6.     Doroghazi, John M. – trial counsel for Yale University, Defendant.

7.     Fischer, Jason Allan – trial counsel for Steven Novella, M.D., an individual, Defendant/Appellee.

8.    INR PLLC d/b/a Institute of Neurological Recovery, a Florida professional limited liability company, Appellant.

9.    Novella, Steven, M.D., an individual, Defendant/Appellee.

10.    O'Brien, Cullin Avram – trial counsel and appellant counsel for Edward Tobinick, M.D., an individual, Edward Lewis Tobinick, M.D. a Medical Corporation, d/b/a The Institute of Neurological Recovery, a California Medical Corporation, INR PLLC d/b/a Institute of Neurological Recovery, a Florida professional limited liability company, Appellants.

11.    Polk, Edward Samuel – trial counsel for Society for Science-Based Medicine, Inc., Defendant.

12.    Randazza, Marc J. - trial counsel for Steven Novella, M.D., Defendant/Appellee.

13.    Randazza Legal Group, PLLC - trial counsel for Steven Novella, M.D., Defendant/Appellee.

14.    SGU Productions, LLC, a Connecticut corporation, Defendant.

15.    Society for Science-Based Medicine, Inc. a Florida corporation, Defendant.

16.    Spielman, Darren Joel – trial counsel for SGU Productions, LLC a Connecticut limited liability company, Defendant.

17.    The Honorable Robin L. Rosenberg, United States District Court Judge.

18.    The Honorable Dave Lee Brannon, United States District Court Magistrate Judge.

19.    The Institute of Neurological Recovery, a California Medical Corporation, Appellant.

20.    Tobinick, Edward, M.D., an individual, Appellant.

21.    Tobinick, Edward Lewis, M.D., a Medical Corporation d/b/a The Institute of Neurological Recovery, a California Medical Corporation, Appellant.

22.    Wolman, Jay Marshall - trial counsel for Steven Novella, M.D., Defendant/Appellee.

23.    Yale University, a Connecticut corporation, Defendant.

24.    Bona, Jarod - trial counsel for Edward Tobinick, M.D., an individual, Edward Lewis Tobinick, M.D. a Medical Corporation, d/b/a The Institute of Neurological Recovery, a California Medical Corporation, INR PLLC d/b/a Institute of Neurological Recovery, a Florida professional limited liability company, Appellants.

25.    Bona Law, PC - trial counsel for Edward Tobinick, M.D., an individual, Edward Lewis Tobinick, M.D. a Medical Corporation, d/b/a The Institute of Neurological Recovery, a California Medical Corporation, INR PLLC d/b/a Institute of Neurological Recovery, a Florida professional limited liability company, Appellants.

- iii -

26.   Cahen Law PA - trial counsel for Edward Tobinick, M.D., an individual, Edward Lewis Tobinick, M.D. a Medical Corporation, d/b/a The Institute of Neurological Recovery, a California Medical Corporation, INR PLLC d/b/a Institute of Neurological Recovery, a Florida professional limited liability company, Appellants.

27.   Gott, Aaron - trial counsel for Edward Tobinick, M.D., an individual, Edward Lewis Tobinick, M.D. a Medical Corporation, d/b/a The Institute of Neurological Recovery, a California Medical Corporation, INR PLLC d/b/a Institute of Neurological Recovery, a Florida professional limited liability company, Appellants.

28.   Kain Spielman, P.A. trial counsel for SGU Productions, LLC a Connecticut limited liability company, Defendant.

29.   Wiggin and Dana, LLP – trial counsel for Yale University, Defendant.

## CORPORATE DISCLOSURE STATEMENT

1. Appellant/Plaintiff Edward Lewis Tobinick, M.D., a Medical Corporation d/b/a The Institute of Neurological Recovery, is a medical corporation organized under the laws of the State of California.

2. Appellant/Plaintiff INR PLLC d/b/a Institute of Neurological Recovery, is a Florida professional limited liability company.

3. Appellant Edward Tobinick, M.D., is an individual.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..........................................................................................1

II.   ARGUMENT ...............................................................................................1

A.    Because of Novella's Multiple Improper References to
      Mediation, this Court Should Reject the Fee Petition and
      Award Appellants their Attorney's Fees and Costs ............................1

B.    This Is Not an "Exceptional Case" Under the Lanham Act .................2

C.    There Is No Credible Basis Upon Which this Court Can Award
      Fees, Given Randazza's Material Omissions to this Court
      About His Reputation and Qualifications and Given Randazza's
      Pattern and Admitted Practice of Improper Billing ............................6

      1.    Randazza Did Not Disclose the Pending Disciplinary
            Proceedings that Randazza Recently Disclosed in the
            *Purple Innovations* Case on March 8, 2017 ...............................6

      2.    Randazza Did Not Disclose Randazza's Current
            Bankruptcy ...................................................................................8

      3.    Randazza Did Not Specifically Disclose His Prior
            Employment with Excelsior and the Interim Arbitration
            Award Against Randazza Regarding Allegations of his
            Breach of Fiduciary Duties and a Bribe.......................................9

      4.    Randazza Has a Pattern and Admitted Practice of
            Improper Billing.........................................................................10

      5.    Randazza's Colleague Does Not Provide this Court with
            Any Useful Testimony ...............................................................11

      6.    Randazza's Hourly Rate Calculus Is Unreliable.......................12

**Page**

D.   Novella's Proposed Bills Are Grossly Inflated and Unreasonable Such that this Court Should Deny the Fee Petition ....................................................................................... 14

E.   Novella's Failure to Properly Delineate the Time at Issue Should Warrant a Denial of Fees ........................................ 17

F.   Novella's Actual Malice Precludes this Court from Awarding Anti-SLAPP Fees ................................................. 18

G.   Novella Cannot Obtain Anti-SLAPP Fees Under 11th Cir. R. 39-2 ............................................................................... 19

H.   Novella's Work for *Amici* Should Be Grounds for this Court to Deny Fees, Especially Since the *Amici* Represented to this Court that Novella Has no Authorship of the *Amici* Briefs ................ 20

I.   Novella's Desire to Tax Attorneys' Fees for Attorneys Who Did Not Appear in the Case Further Undermines the Credibility of the Fee Petition ................................................................... 21

J.   Novella's Request for Expenses Are Grossly Excessive and Impermissible, Which Should Warrant a Denial of the Novella's Motion ................................................................ 21

K.   Randazza's Failure to Account for How His Bankruptcy Proceedings Are Impacted by His Fee Petition Warrants a Denial or Stay of the Petition .............................................. 22

L.   Any Award of Fees Under the California Anti-SLAPP Procedure Would be Unconstitutional and in Violation of the *Erie* Doctrine ......................................................................... 22

M.   This Court Should Stay Novella's Fee Petition in Light of Appellants' Pending Requests for Supreme Court Review ............... 23

- vi -

**Page**

N.    This Court Should Not Decide Novella's Fee Petition Until
Appellate Review Is Completed in the Related Appeal No. 16-
1210 .................................................................................................23

III.   CONCLUSION................................................................................................24

## TABLE OF CITATIONS

**Cases**                                                              **Page**

*Abbas v. Foreign Policy Grp.*, 783 F.3d 1328 (D.C. Cir. 2015) ............................23

*Adventure Commc'ns v. Kentucky Registry of Elec. Fin.*, 191 F.3d 429
    (4th Cir. 1999) ..................................................................6

*Animal Legal Defense Fund v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) ..............5

*Asbun v. Resende*, No. 15-cv-61370, 2016 WL 4272372, at *1 (S.D. Fla.
    Aug. 4, 2016) ...................................................................13

*Bolger v. Youngs Drug Prods.*, 463 U.S. 60 (1983) .................................................5

*Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993) .......................................6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................5

*Christian Research Inst. v. Alnor*, 165 Cal. App. 4th 1315 (2008) ........................18

*City of Indus. v. City of Fillmore*, 198 Cal. App. 4th 191 (2011) ..........................18

*Competitive Enters. Institute v. Mann*, 150 A.3d 1213 (D.C. Ct. App.
    2016) .................................................................................19

*Dillard v. City of Greensboro*, 213 F.3d 1347 (11th Cir. 2000)............................14

*E. Point Sys. v. Steven Maxim*, No. 3:13–cv–00215–VAB, 2015 WL
    2381079, at *1 (D. Conn. May 18, 2015).......................................14

*Ellis v. Toshiba Am. Info. Sys.*, 218 Cal.App.4th 853(Cal. Ct. App. 2013)......*passim*

*Eastland v. Tennessee Valley Auth.*, 553 F.2d 364 (5th Cir. 1977) .........................5

*Farris v. Cox*, 508 F. Supp. 222 (N.D. Cal. 1981) .................................................15

*Fla. Bd. of Bar Examiners v. G. W. L.*, 364 So.2d 454 (1978) ................................8

- viii -

**Page**

*Gardner v. Simpson Fin. Ltd. P'hip*, 963 F. Supp. 2d 89 (D. Mass. 2013)............14

*Gordon & Breach Sci. Pubs. S.A. v. Am. Institute of Physics*, 859 F.
    Supp. 1521 (S.D.N.Y. 1994) ................................................................*passim*

*Gsell v. Rubin and Yates,* 41 F. Supp. 3d 443 (E.D. Pa. 2014) ........................14, 21

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ..............................................................6

*Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256 (11th Cir. 2004).......................5

*Hudson v. Int'l Computer Negotiations,* 499 F.3d 1252 (11th Cir. 2007) ............19

*In re: Marc John Randazza*, Case 15-14956-abl (D.Nev. Sept. 11, 2015) ............22

*Intercon Solutions v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015)...........23

*Jordan v. Jewel Food Stores*, 743 F.3d 509 (7th Cir. 2014) ...................................5

*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240 (1933)..................15

*League of Women Voters of Florida v. Browning*, No. 06–21265–CIV,
    2008 WL 5733166, at *1 (S.D. Fla. Dec. 4, 2008).......................................21

*Liberty Media Holdings v. FF Magnat Limited d/b/a Oron.com*, No. 12-
    16976 (9th Cir. Feb. 13, 2013) ............................................................*passim*

*Loranger v. Stierheim*, 10 F.3d 776 (11th Cir. 1994)..............................................15

*Marek v. Chesny*, 473 U.S. 1 (1985).......................................................................22

*Marsh v. Austin-Fort Worth Coca-Cola Bottling Co.*, 744 F.2d 1077 (5th
    Cir. 1984) ........................................................................................................5

*Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001) ...........................19

*Moran v. Endres*, 135 Cal.App.4th 952 (Cal. Ct. App. 2006).................................18

**Page**

*Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292 (11th
    Cir. 1988)...................................................................................................18

*Northwestern Nat. Ins. Co. v. Corley*, 503 F.2d 224 (7th Cir. 1974) ......................5

*Osmose v. Viance*, 612 F.3d 1298 (11th Cir. 2010)....................................................5

*Pedraza v. United Guar. Corp.*, 313 F.3d 1323, 1331-1335 (11th Cir.
    2002) .......................................................................................................22

*Pistoresi v. Madera Irrigation Dist.*, No. CV–F–08–843–LJO–DLB,
    2009 WL 910867, at *1 (E.D. Cal. Apr. 2, 2009) ........................................18

*Precision Instrument Mfg. Co. v. Auto. Maintenance Machinery Co.*, 324
    U.S. 806 (1945)...............................................................................................15

*Purple Innovations v. Honest Reviews et al*, 17-cv-00138 (D. Utah) .............*passim*

*Schneider v. TRW*, 938 F.2d 986 (9th Cir. 1991) .....................................................5

*Travelers Casualty Insurance Company of America v. Hirsh*, 831 F.3d
    1179 (9th Cir. 2015) ......................................................................................23

*Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332 (11th
    Cir. 2001)................................................................................................ 13-14

*Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir. 1986) ........................................5

*Tobinick v. Novella*, 848 F.3d 935 (11th Cir. 2017) ........................................*passim*

*Tripoli Co. v. Wella Corp.*, 425 F.2d 932 (3d Cir. 1970) ........................................5

*Twin Peaks Prods. v. Publications Int'l*, 996 F.2d 1366 (9th Cir. 1993) ...............14

*U.S. v. Diebold*, 369 U.S. 654 (1962) ........................................................................5

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175 (8th Cir. 1998) .........................6

- x -

**Page**

*Vidal Sassoon v. Bristol-Myers Co.*, 661 F.2d 272 (2d Cir. 1981) .........................5

*Vocca v. Playboy Hotel of Chicago, Inc.* 519 F. Supp. 900 (N.D. Ill. 1981) ...................................................................................................15

*Yates v. Transamerica Ins. Co.*, 928 F.2d 199 (6th Cir. 1991) ................................5

*Zero Down Supply Chain Solutions v. Global Transp. Solutions*, No. 2:07–cv–400 TC, 2012 WL 5194230, at *1 (D. Utah Oct. 19, 2012) ...................................................................................................15

## CONSTITUTION, STATUTES, RULES AND REGULATIONS

11th Cir. R. 33-1 ................................................................................*passim*

Cal. Code Civ. P. §425.16................................................................*passim*

Federal Rules of Civil Procedure ....................................................*passim*

Federal Rules of Appellate Procedure .............................................*passim*

U.S. Constitution................................................................................*passim*

Appellants[1] respectfully oppose the motion for appellate attorneys' fees and expenses filed by Steven Novella, M.D. ("Novella"), seek fees and expenses against Novella under 11th Cir. R. 33-1(f)(2), and state as follows:

## I.   INTRODUCTION

This Court should allow the District-Court to resolve the motion, as requested by Novella.  (Novella Mot.,*pg.*9,*fn.*4). This Court should otherwise deny the motion for many reasons detailed herein.

## II.   ARGUMENT

### A.   Because of Novella's Multiple Improper References to Mediation, this Court Should Reject the Fee Petition and Award Appellants their Attorney's Fees and Costs

Novella improperly refers to mediation on numerous occasions,[2] which is prohibited by this Court.  11th Cir. R. 33-1(c)(3).  Accordingly, this Court should reject the fee petition, as was previously done to another Novella filing.  *See* Docket at 2/1/16 entry.

---

[1] Appellants/Plaintiffs are Edward Lewis Tobinick, MD, a Medical Corporation d/b/a Institute of Neurological Recovery, ("INR-California"), INR PLLC, d/b/a Institute of Neurological Recovery, ("INR-Florida"), and Edward Tobinick, M.D., ("Tobinick"), which are collectively referred to herein as "Appellants."

[2] *See* Novella Mot.,*pgs.*72,73-74,76,100,108,112.

- 1 -

Under 11th Cir. R. 33-1(f)(2), this Court should award Appellants attorney's fees and costs for opposing Novella's motion. Novella's violation of 11th Cir. R. 33-1(c)(3) was willful given that Novella previously violated the same rule and given that Novella's lawyers actually billed for attempting to fix the problem. (Novella Mot., *pg.*74*of*204*,line*36 ("Review of notice of motion for extension of time to file brief unfiled. Review of relevant local rule."); *id.,line*37 ("Draft revised motion for extension of time in light of rejection of prior due to reference to mediation.")).

**B.      This Is Not an "Exceptional Case" Under the Lanham Act**

Novella wrongly contends that this was an "exceptional case" under the Lanham Act, including contending that Appellants' appeal is[3] frivolous. This is not an exceptional case.  Langer Decl.,¶21, **Exhibit K**; Heller Decl.,*pgs.*20-22, **Exhibit I.**

First, the fact that this Court ordered oral argument means that, as a matter of law, this appeal was not frivolous. This Court does not have oral argument for frivolous cases. 11th Cir. R. 34-3(b)(1).

Second, this Court itself noted the uncertainty of the Lanham Act issues at the oral argument:

---

[3] The U.S. Supreme Court has Appellants' fully-briefed petition for writ of mandamus.

It looked like to me that the 11th Circuit didn't have a crystal clear definition of what commercial speech is as compared to some other circuits. Am I right about that?

CD of January 26, 2017 Oral Arg., 30:11-19, **Exhibit A**.[4] Thus, this Court not only allowed dozens of *amici curiae* to provide guidance, this Court allowed one of the *amici* groups to make a presentation at oral argument.

Finally, this Court found that the proper analysis for determining whether a defendant is engaged in "commercial speech" under the Lanham Act is by examining the secondary/promotional uses of the speech, including determining whether the defendant is putting the speech into a commercial "window." *Tobinick v. Novella*, 848 F.3d 935, 951 (11th Cir. 2017). This secondary/promotional use analysis was articulated in the *Gordon & Breach* case this Court adopted. *Gordon & Breach Sci. Pubs. S.A. v. Am. Institute of Physics*, 859 F. Supp. 1521, 1544 (S.D.N.Y. 1994).

Despite adopting the secondary/promotional use analysis, this Court admitted to not taking into account the "full context" of Novella's attacks, including three of Novella's five attacks. *Tobinick*, 848 F.3d at 951-952, *fns*. 13 & 14. Importantly, moreover, this Court **did not** find that, when all of Novella's attacks are considered, Novella is free from Lanham Act liability.

---

[4] Appellants purchased a CD of the oral argument from the Clerk of Court and paid Bailey & Associates Reporting, Inc. to transcribe the CD for Appellants.

- 3 -

In this age of the Internet, Novella's for-profit webpages are the commercial "windows" described by this Court and *Gordon & Breach*; Novella presenting his first two attacks on his for-profit webpages/podcast is the paradigmatic scenario described by this Court and *Gordon & Breach* where secondary/promotional uses of speech manifests in "commercial speech." Novella took excerpts of the first attack and placed it into this commercial "window" of the third attack, (Doc.274-2,*pg.*18), and placed a direct hyperlink to the second attack in the commercial "window" of the fourth attack/podcast. (Doc.177-8,*pg.*2//Doc.177-9). The final attack contained hyperlinks to SGU's "windows." (Doc.261-20,pgs.21-22*of*33*//see also* Appellants' Initial Br.,*pgs.*3,11,21-24,40,43,45,50,55,58,63//Appellants' Reply Br.,*pgs.*1,7,10-22, 27).

Thus, Appellants' litigation strategy and efforts to pursue Lanham Act claims were appropriate since, *inter alia*, Appellants were trying to show the District-Court and this Court that Novella was making lucrative secondary/promotional uses of his attacks including by putting his attacks into the commercial "windows" of his for-profit webpages. (Appellants' Initial Br.,*pgs.*3,11,21-24,40,43,45,50,55,58,63// Appellants' Reply Br.,pgs.1,7,10-22, 27). The District-Court never performed the secondary/promotional use analysis required by this Court, including whether Novella was using a commercial "window." This Court's decision shows that the District-Court's commercial speech analysis was mistaken for not looking at the

- 4 -

secondary/promotional uses of Novella's attacks. Thus, Appellants could not have been in bad faith trying to support the secondary/promotional use analysis required by this Court.

Further, Appellants cannot be faulted for not predicting that this Court would disregard the material admissible record evidence of Novella's secondary/promotional uses. Although this Court decided to disregard material admissible record evidence of Novella's secondary/promotional uses, this Court did not cite legal authority for doing that. Appellants believed that their evidence of secondary/promotional use would be considered by this Court in a summary judgment analysis based on settled Supreme Court and Circuit Court precedent. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986).[5] Indeed, this Court's disregard of material admissible evidence is at issue in Appellants' pending request for U.S. Supreme Court review.

---

[5] *See also U.S. v. Diebold*, 369 U.S. 654 (1962); *Animal Legal Defense Fund v. Glickman*, 154 F.3d 426, 451 (D.C. Cir. 1998); *Yates v. Transamerica Ins. Co.*, 928 F.2d 199, 202 (6th Cir. 1991); *Schneider v. TRW*, 938 F.2d 986, 1002 (9th Cir. 1991); *Marsh v. Austin-Fort Worth Coca-Cola Bottling Co.*, 744 F.2d 1077, 1079 n.4 (5th Cir. 1984); *Eastland v. Tennessee Valley Auth.*, 553 F.2d 364, 370 (5th Cir. 1977); *Northwestern Nat. Ins. Co. v. Corley*, 503 F.2d 224, 232 (7th Cir. 1974); *Tripoli Co. v. Wella Corp.*, 425 F.2d 932, 934-935 (3d Cir. 1970); *Osmose v. Viance*, 612 F.3d 1298, 311 (11th Cir. 2010); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986); *Bolger v. Youngs Drug Prods.*, 463 U.S. 60 (1983); *Vidal Sassoon v. Bristol-Myers Co.*, 661 F.2d 272, 276 (2d Cir. 1981); *Jordan v. Jewel Food Stores*, 743 F.3d 509, 517-518 (7th Cir. 2014); *United Indus.*

**C.    There Is No Credible Basis Upon Which this Court Can Award Fees, Given Randazza's Material Omissions to this Court About His Reputation and Qualifications and Given Randazza's Pattern and Admitted Practice of Improper Billing**

Testimony supporting fee motions must be credible. *See*, *e.g.*, *Ellis v. Toshiba Am. Info. Sys.*, 218 Cal.App.4th 853, 882-885 (Cal. Ct. App. 2013). Reputation matters. *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3 (1983).

Here, Novella's counsel, Attorney Marc Randazza ("Randazza"), submitted a "curated" *curriculum vitae* that contains material omissions directly bearing upon his credibility and reputation. (Novella Mot.,*fn*.8,*pg.*18*of*204).   Moreover, as detailed below, Randazza has a track record of improper billing practices. Given these issues, this Court should deny the entire fee petition.

**1.    Randazza Did Not Disclose the Pending Disciplinary Proceedings that Randazza Recently Disclosed in the *Purple Innovations* Case on March 8, 2017**

On March 8, 2017, Randazza filed a *pro hac vice* motion for admission to practice in the Federal District of Utah in *Purple Innovations v. Honest Reviews et al*, 17-cv-00138 [Dkt. No. 25] (D. Utah), **Exhibit B**.   Randazza checked "Yes" in

---

*Corp. v. Clorox Co*., 140 F.3d 1175, 1181 (8th Cir. 1998); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993); *Adventure Commc'ns v. Kentucky Registry of Elec. Fin*., 191 F.3d 429, 441 (4th Cir. 1999).

response to the question of whether he has "ever been the subject of disciplinary

action by any bar to which you have been admitted?" **Exhibit B**.  Randazza then also

gave the following sworn statement:

> 6. I wish to disclose that there is a pending disciplinary action against me
> in the State of Nevada, Case No. OBC15-0747.
> 7. The action has been partially dismissed, and the other claims are the
> subject of a pending motion to dismiss.
> 8. Given the ongoing nature of the proceedings, and the lack of findings,
> it is my position that this did not need to be disclosed under the verbiage
> of the question.  However, out of an abundance of candor, caution, and
> respect for the Court, I disclose (sic) am disclosing this information.

*Purple Innovations*, [Dkt. No. 25-3, ¶¶6-8], **Exhibit C**.    The disciplinary

complaint starting the action to which Randazza refers is attached hereto as

**Exhibit D**.

Nearly a month later, when filing his fee petition to this Court, Randazza failed

to make that same disclosure of the pending disciplinary proceedings to this Court.

That is a material omission of the highest order, especially since:

> (a) this Court requires the disclosure of disciplinary proceedings on the
> renewal form for admission to practice law before this Court,[6] which
> Randazza will presumably have to complete at some point;
>
> (b) Randazza is asking this Court to award money;

_____

[6]http://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormBarRenewalDEC
16.pdf (last visited June 3, 2017).

(c) Randazza made the disclosure to the *Purple Innovations* court "out of an abundance of candor, caution, and respect for the Court," *Purple Innovations*, [Dkt. No. 25-3, ¶¶6-8], **Exhibit C**;

and,

(d) the *Purple Innovations* court, apparently based on the disclosure of the disciplinary proceedings, "provisionally" granted Randazza permission to practice in the case for seven (7) days, until March 15, 2017, to be reconsidered thereafter, *Purple Innovations*, [Dkt. No. 34], **Exhibit E.**[7]

### 2.      Randazza Did Not Disclose Randazza's Current Bankruptcy

Randazza did not disclose the fact that he is in bankruptcy.  That is a material omission because Randazza's bankruptcy impacts Randazza's hourly rate, credibility and incentive to inflate his fee petition.  *See Fla. Bd. of Bar Examiners v. G. W. L.*, 364 So.2d 454, 455-460 (1978) ("The filing of the bankruptcy petition was not illegal, but in our view it was done in such a morally reprehensible fashion that it directly affects his fitness to practice law.").

---

[7] Randazza's co-counsel was allowed full admission to practice law by the same court. *See* **Exhibit F**.

### 3.   Randazza Did Not Specifically Disclose His Prior Employment with Excelsior and Excelsior's Interim Arbitration Award Against Randazza Regarding Allegations of his Breach of Fiduciary Duties and a Bribe

Randazza did not specifically disclose his more than three years of employment with Excelsior Media Group/Liberty Media Holdings LLC ("Excelsior" or "Liberty"), from June 2009 through August 2012.  That is a material omission for many reasons of which Randazza is already aware.

Randazza litigated with Excelsior, resulting in an interim arbitration award issued for hundreds of thousands of dollars against Randazza by arbitrator and retired U.S. Magistrate Judge Stephen E. Haberfeld on June 3, 2015. (Doc.304-10,*pgs.*36-37,53-56).  The interim arbitration award concerns allegations regarding Randazza's "violations of fiduciary duty in connection with his negotiating for a $75,000 'bribe,'" (Doc.304-10,*pgs.*36-37,53). Excelsior suggests that Randazza filed for bankruptcy to prevent entry of the award. (Doc.304-12,*pgs.*2-5).

In Randazza's fee petition in the District-Court proceedings, Appellants' ethics expert, Dennis Kennedy ("Kennedy"), noted, "Randazza breached his duty of candor owed to the tribunal by omitting his prior employment as in-house general counsel for Excelsior from the Fee Motion." (Doc.329-2,*pg.*10, **Exhibit G**//*see also* Doc.329-1, **Exhibit H**). The import of Kennedy's testimony was that Randazza was hiding facts that would undermine his credibility and reliability in the fee petition submitted to the

District-Court, since the concealed employment with Excelsior would, *inter alia*, open the door to the also concealed interim arbitration award against Randazza and his subsequent (and current) bankruptcy. (Doc.331,*pgs.*1-3).  Randazza is essentially making those same material omissions here identified by Kennedy, despite being exposed by Kennedy, by omitting and not specifically disclosing his employment with Excelsior in his "curated" *curriculum vitae* submitted to this Court. (*Compare*Novella Mot.,*pgs.*187-188*with*Doc.292-4,*pg.*2*of*10).

### 4.   Randazza Has a Pattern and Admitted Practice of Improper Billing

Randazza's former employer, Excelsior, informed the 9th Circuit that Randazza had duped a District-Court into awarding more fees than the employer was entitled. (Doc.329-1,*pgs.*2-4), **Exhibit H**. Excelsior informed the 9th Circuit how Randazza misrepresented the amount of fees Excelsior actually "incurred" in a fee petition in the case *Liberty Media Holdings v. FF Magnat Limited d/b/a Oron.com*, No. 12-16976 (9th Cir. Feb. 13, 2013) ("*Magnat*").  (Doc.329-1,*pgs.*2-4,29-36,43-44,135-136), **Exhibit H**.

In the District-Court below, Plaintiffs' expert, John Heller ("Heller"), detailed Randazza's impermissible billing, including double-counting and improper accounting for attorney time and effort. (Doc.304-3-9), **Exhibit I**. In response to Heller, Randazza admitted to double-counting, and contended that it was "merely illustrative."

(Doc.315,pg.9). Thus, Heller caught Randazza trying to submit a fictitious "grand total" through deceitful double-counting of billing entries. (Doc.304-3-9).

Moreover, Appellants' expert, Langer, has twice previously opined that Randazza engaged in improper billing.  (Doc.304-10-304-12//Doc.356-9), **Exhibit J**. Langer gives this Court yet another expert opinion as to Randazza's improper billing in the instant fee petition. *See* **Exhibit K**.

Even the District-Court in this case acknowledged Randazza's improper billing: "Novella's reply largely admits that his counsel's time records contain duplicative entries and that he sought recovery of time not related to litigation of the Anti-SLAPP motion." (Doc.333,*pgs*.12-13).  Thus, Randazza is not a credible fee affiant.

### 5.    Randazza's Colleague Does Not Provide this Court with Any Useful Testimony

Randazza's fee expert, Gary Edinger ("Edinger"), claims he has known Randazza for "nearly the entirety" of Randazza's career and has "acted as co-counsel with Mr. Randazza in a case which is presently pending in a Florida trial court." (Novella Fee Mot.,*pgs*.37-38*of*204).  However, Edinger neglected to mention:

(a) Randazza's disciplinary proceedings in Nevada;

(b) Randazza's bankruptcy;

(c) the interim arbitration award against Randazza regarding allegations of his breach of fiduciary duties and a bribe;

(d) Excelsior informing the 9th Circuit in the *Magnat* case how

- 11 -

Randazza misrepresented the amount of fees Excelsior actually "incurred" in a fee petition;

(e) Randazza's improper billing in the District-Court below; and

(f) Randazza's employment with Excelsior, the omission of which Appellant's ethics expert, Kennedy, formerly characterized as a breach of his duty of candor to the tribunal (Doc.329-2,*pg.*10).

These are material matters upon which Edinger should have opined, particularly in light of the expert and other testimony on these issues in this case. Edinger's failure to account for these issues concerning Randazza's credibility should require this Court to outright reject Edinger's analysis. There also appears to be a disconnect between Edinger and Randazza about how many hours were spent in the case. *Compare* Edinger Decl.,¶32 (noting "320.60" hours) *with* Randazza Decl.,¶25 (noting "322.9" hours).

### 6.    Randazza's Hourly Rate Calculus Is Unreliable

There is testimony from Randazza's former employer that, in *Magnat*, Randazza created a fictitious, improper billing scheme in trying to improperly tax an inflated amount of fees against the employer's adversary. (Doc.329-1,*pgs.*2-4,29-36,42-44*of*172), **Exhibit H**. Randazza sought an hourly rate of $500/hour despite the fact that his client was not paying him that amount. (Doc.329-1,*pgs.*2-4,29-36,43-44,135-136*of*172, **Exhibit H**//Doc.329-2,*fn.7*, **Exhibit G).** Yet Randazza is still citing *Magnat* as a basis for seeking a $650/hour rate here and other exorbitant rates for his

- 12 -

colleagues. Randazza's fee request is a house of cards built upon a fictitious, improper billing scheme that began with his improper representation to the *Magnat* court that Excelsior incurred his fees at an hourly rate of $500/hr., when in fact, Randazza was a salaried employee. (Doc.329-1,*pgs.*2-4,29-36,43-44,135-136*of*172// Doc.329-2,*fn.*7, **Exhibit G**).

The hourly rates Randazza claims here are outrageous, especially since Randazza failed to provide a fee agreement. This Court should not simply take Randazza's word for it that Novella has agreed to pay those rates. *See*, *e.g.*, *Asbun v. Resende*, No. 15-cv-61370, 2016 WL 4272372, at *2 (S.D. Fla. Aug. 4, 2016) ("[T]he party opposing a motion for attorney's fees and costs should not be required to rely upon the assertions of opposing counsel as to what type of fee agreements exists."). Indeed, the Society's lawyers are only claiming rates of $160/hour. Randazza is attempting to get a "windfall"[8] from this Court, given that Novella is only out-of-pocket $1,435.84. (Novella Mot.,*pg.*23*of*204). Considering all these facts, and with Randazza getting "provisional" admission into the District of Utah in the *Purple Innovations* case, Randazza's $650/hr. request is unsupportable. Langer Decl., 12, **Exhibit K**.

---

[8] *Tire Kingdom v. Morgan Tire & Auto*, 253 F.3d 1332, 1336-1337 (11th Cir. 2001).

- 13 -

Furthermore, the hourly rates claimed by Randazza's colleagues are not credible. *Dillard v. City of Greensboro*, 213 F.3d 1347, 1355 (11th Cir. 2000). Randazza is seeking fees for attorneys who never appeared in this case and who are not listed in the certificate of interested parties,[9] which is improper. *Gsell v. Rubin and Yates*, 41 F. Supp. 3d 443, 452 (E.D. Pa. 2014). Moreover, Attorney Wolman was given a $200/hour rate in *E. Point Sys. v. Steven Maxim,* No. 3:13–cv–00215–VAB, 2015 WL 2381079, at *1-*2 (D. Conn. May 18, 2015), and a $100/hour rate in *Gardner v. Simpson Fin. Ltd. P'hip*, 963 F. Supp. 2d 89, 95 (D. Mass. 2013).

Without the actual fee contract and sworn testimony from Novella, this Court has no discretion to fashion any award. *Tire Kingdom*, 253 F.3d at 1336-1337.

### D.   Novella's Proposed Bills Are Grossly Inflated and Unreasonable Such that this Court Should Deny the Fee Petition

From Novella's vantage point, there were no new legal concepts in this appeal than what happened in the District-Court below.  Thus, Novella should not be allowed any appeal attorneys' fees. *See*, *e.g.*, *Twin Peaks Prods. v. Publications Int'l*, 996 F.2d

---

[9] There are eight (8) timekeepers listed for Randazza. Novella Mot.,*pg.*185*of*204 (Shepard, Fricker, Sperlein, Wolman, Cahill, Green, Rothell, and Randazza). Randazza is the only attorney who filed an appearance of counsel form for Novella in this appeal.  Moreover, Attorneys Green, Shepard, Sperlein, and Cahill are not even disclosed in Novella's certificate of interested parties.

- 14 -

1366, 1383 (9th Cir. 1993) ("the lawyers in this appeal were familiar with the issues

because they made similar arguments in the District Court.").

Novella's fee petition is flawed by egregiously impermissible and unnecessary

billing entries, which should warrant denial of the motion. *Loranger v. Stierheim*, 10

F.3d 776, 782-783 n.8 (11th Cir. 1994).[10]  Appellants' expert, Langer, highlights the

issues. *See* **Exhibit K**.

For instance, Appellants filed their initial brief on January 13, 2016.  Randazza

claims that, even before Plaintiffs' initial brief was filed, he ran up over $16,000 in

bills for over 40 hours of work, including for work simply examining Appellants'

notice of appeal.

After Appellants' initial brief was filed on January 13, 2016, Novella moved for

and was granted a stay of any answering briefing.  Novella filed the motion on

February 1, 2016 and it was granted on February 3, 2016.  But between January 13,

2016 and February 3, 2016, Randazza ran up over $20,000 in bills with over 52 hours

of work.  So, by February 3, 2016, Randazza ran up over $36,000 in bills and over 93

---

[10] *See also Zero Down Supply Chain Solutions v. Global Transp. Solutions*, No. 2:07–
cv–400 TC, 2012 WL 5194230, at *2-*3 (D. Utah Oct. 19, 2012); *Precision
Instrument Mfg. Co. v. Auto. Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945);
*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933); *Ellis*, 218
Cal.App.4th at 854; *Vocca v. Playboy Hotel of Chicago*, 519 F. Supp. 900, 901–902
(N.D. Ill. 1981); *Farris v. Cox*, 508 F. Supp. 222, 227 (N.D. Cal. 1981).

hours without having filed anything substantive other than a motion to stay briefing which was granted two days after it was filed. Randazza is even trying to bill for the Society's frivolous "motion to dismiss" and Novella has adopted the Society's frivolous fee motion.[11]

Although Novella's briefing obligation was stayed between February 3, 2016 and April 21, 2016, Randazza ran up over $16,000 in bills with over 36 hours of work. At that point, Novella had not filed an answer brief and had over $52,000 in bills with 130 hours of work.

When the stay was lifted on April 21, 2016 until Novella filed his answer brief on May 23, 2016, Randazza ran up over $11,000 in bills for 35 hours of work, bringing the overall total to $63,000 in bills for 165 hours of work.    Subsequently, Randazza ran up over $6,000 in bills for 21 hours of work, in the time between Novella's answer brief was filed and Appellants' reply brief was filed.

Between the time that Appellants' reply brief was filed and the January 26, 2017 oral argument, Randazza ran up over $40,790.00 in bills for over 108.2 hours in work.

---

[11] To the extent permissible, Appellants incorporate herein their filing in response to the Society's motion for fees and seek all the same available relief against Novella.

- 16 -

Since the January 27, 2017 oral argument, Randazza ran up over $9,000 in bills for over 28 hours in work. All told, Randazza claims to have run up over $121,000 in bills for over 322 hours, as depicted below:

| Progress of Appeal | Time Period | Attorney's Fees Claim Billed | Attorney's Hours Claimed |
|---|---|---|---|
| Appellants' Initial Brief Had Not Yet Even Been Filed | 10/30/15 - 01/12/16 | $16,235.00 | 41.1 |
| Novella Moved to Stay the Appeal | 01/13/16 - 02/03/16 | $20,775.00 | 52.4 |
| Novella's Briefing Obligations Were Stayed | 02/04/16 - 04/21/16 | $16,595.00 | 36.5 |
| Stay Lifted and Novella's Answer Brief Was Filed | 04/22/16 - 05/23/16 | $11,590.00 | 35.0 |
| Appellants' Reply Brief Had Not Even Been Filed | 05/24/16 - 06/22/16 | $6,182.00 | 21.0 |
| Between Appellants' Reply Brief and the Oral Argument | 06/23/16 - 01/26/17 | $40,790.00 | 108.2 |
| Since the Oral Argument | 01/27/17 - 04/20/17 | $9,332.50 | 28.7 |
| **Totals** | | **$121,500.00** | **322.9** |

Novella's fee request is unconscionable and overreaching and should cause this Court to reject the request on that basis alone.

### E.    Novella's Failure to Properly Delineate the Time at Issue Should Warrant a Denial of Fees

Novella seeks fees either under the anti-SLAPP procedure or under the Lanham Act.  But under the anti-SLAPP procedure, Novella is not entitled to time unrelated to

- 17 -

the anti-SLAPP motion. *City of Indus. v. City of Fillmore*, 198 Cal. App. 4th 191, 219 (2011); *see also Christian Research Inst. v. Alnor*, 165 Cal. App. 4th 1315, 1320 (2008).   Moreover, there were more issues in this appeal than just the anti-SLAPP motion and the Lanham Act.   Novella, nevertheless, makes vague billing references to work done, which results in a confusing morass of bills.   The burden is on Novella to provide accurate, clear and reliable time records.   *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988).   Novella failed his burden and, moreover, Novella's obfuscation is a basis upon which to deny fees. *See*, *e.g.*, *Ellis*, 218 Cal.App.4th at 854; *Pistoresi v. Madera Irrigation Dist.*, No. CV–F–08–843–LJO–DLB, 2009 WL 910867, at *7-*8 (E.D. Cal. Apr. 2, 2009).

Furthermore, because the District-Court's ruling on the California anti-SLAPP motion did not end the case, Novella is not entitled to anti-SLAPP fees. *Moran v. Endres*, 135 Cal.App.4th 952 (Cal. Ct. App. 2006). Moreover, Novella's stance in the pre-trial stipulation bars anti-SLAPP fees, because Novella represented that the motion was the type of motion the District-Court already denied on September 30, 2015. (Doc.286,*pg.*5//Doc.288,*pg.*10).   Novella did not cross-appeal.

### F.   Novella's Actual Malice Precludes this Court from Awarding Anti-SLAPP Fees

Novella intentionally and falsely attacked Appellants to "tarnish[] personal integrity and reputation" and to imply "professional misconduct and deceit." This

- 18 -

constitutes actual malice.  *Competitive Enters. Institute v. Mann*, 150 A.3d 1213,

1242-1243 (D.C. Ct. App. 2016). Novella was caught admitting to republishing false

statements ("one-man institute" and "moved his clinic to Florida") that he temporarily

corrected because of their falsity. (Doc.261-9@Tr.157:8-23,159:2-25), **Exhibit L**.

That is the textbook definition of actual malice – Novella admitted to re-publishing

falsehoods he knew, and admitted, were false.  The California anti-SLAPP procedure

does not permit fees here, where Novella has actual malice. *Metabolife Int'l, Inc. v.*

*Wornick*, 264 F.3d 832, 839-40 (9th Cir. 2001).

### G.   Novella Cannot Obtain Anti-SLAPP Fees Under 11th Cir. R. 39-2

The California anti-SLAPP procedure only awards fees for frivolous cases.

*Metabolife Int'l*, 264 F.3d at 839-40.  As stated above, this is not a frivolous case.  But

Novella cannot even procedurally assert that fees are warranted under the California

anti-SLAPP procedure *vis-à-vis* 11th Cir. R. 39-2.

11th Cir. R. 39-2 "expressly forbids litigants from seeking appellate attorneys'

fees on grounds of frivolousness." *Hudson v. Int'l Computer Negotiations,* 499 F.3d

1252, 1267 (11th Cir. 2007).   Thus, because a necessary predicate to seeking anti-

SLAPP fees is that the appeal is frivolous, Novella would have had to file an anti-

SLAPP motion under Rule 38.  Yet, under 11th Cir. R. 38-1, the motion should have

been "filed no later than the filing of appellee's brief." 11th Cir. R. 38-1. Novella

filed an answer brief but never filed a Rule 38 motion.

Thus, as a matter of law, this Court should deny Novella's request for anti-

SLAPP fees under 11th Cir. R. 39-2.

### H. Novella's Work for *Amici* Should Be Grounds for this Court to Deny Fees, Especially Since the *Amici* Represented to this Court that Novella Has no Authorship of the Amici Briefs

This Court allowed *amici* to provide input into the appeal. The *amici*

represented to this Court that Novella did not have authorship of the *amici* brief.[12]

Nevertheless, Novella's counsel claim time and seek compensation for *amici* work.[13]

---

[12] UCLA Amicus App. filed 5/26/16, *pg.* 8 *of* 28, *fn.* 1("No party or party's counsel has authored this brief in whole or in part . . ."); Comic Book Amicus App. filed 5/27/16, *pg.* 14 *of* 41, *fn.* 1("Amici state that this brief was not authored in whole or in part by counsel for any party . . ."); Law Prof. Amicus App. filed 5/27/16, *pg.* 8 *of* 25 ("Counsel for the parties did not author this brief in whole or in part."); Reporters Amicus App. Filed 5/31/16, *pg.* 15 *of* 53("amici states that no party's counsel authored this brief in whole or in part . . .").

[13] *See*, *e.g.*, Novella Mot., *pg.* 73 *of* 204, line 13 ("Strategize potential amicus brief . . ."); & line 29 (". . .memo to potential amici"); *id.* at pg. 74 *of* 204, line 10 (". . . forward hosted documents to firm and potential amici"); *id.* at *pg.* 75 *of* 204, line 12 (". . . drafting letter to potential amici"); *id.* *pg.* 76 *of* 204, line 11 ("confer with amicus") and line 15 ("Review correspondence from proposed Amicus and strategize response"); *id.* at *pg.* 77 *of* 204, line 13 ("Review and analysis of draft of amicus brief") and line 16 ("Revisions to draft of opening brief. Legal research for use in same.").

- 20 -

Because either what the *amici* represented to this Court was false or Novella's time is false, this Court should deny the fee petition.

### I.   Novella's Desire to Tax Attorneys' Fees for Attorneys Who Did Not Appear in the Case Further Undermines the Credibility of the Fee Petition

As stated above, Randazza is improperly seeking fees for attorneys who never appeared in this case and who are not listed in the certificate of interested parties. *See footnote 9 supra*; *Gsell*, 41 F. Supp. 3d at 452. The fact that Randazza would even ask for such fees is yet another act of overreaching that justifies denial of the fee petition.

### J.   Novella's Request for Expenses Are Grossly Excessive and Impermissible, Which Should Warrant a Denial of the Novella's Motion

Novella seeks grossly-excessive expenses, including exorbitant hotel expenses. *League of Women Voters of Florida v. Browning*, No. 06–21265–CIV, 2008 WL 5733166, at *15 (S.D. Fla. Dec. 4, 2008) ("The undersigned finds that the hotel and meal costs are unreasonable."). Moreover, Novella seeks expenses for Westlaw, Lyft and interoffice copy fees, which are not recoverable. Langer Decl.,¶19, **Exhibit K**. The fact that Randazza would even ask for such expenses is more overreaching that justifies denial of the fee petition.

Moreover, because the Lanham Act does not define "costs" as attorneys' fees in 15 U.S.C. § 1117(a), and does not use the word "expenses," it is unclear where Novella can recover his expenses under the Lanham Act with his 11th Cir. R. 39-2

motion. *Cf. Marek v. Chesny*, 473 U.S. 1, 48-49 (1985) (Brennan, J. *dissenting*);

*compare*, *e.g.*, *Pedraza v. United Guar. Corp.*, 313 F.3d 1323, 1331-1335 (11th Cir.

2002).

**K.    Randazza's Failure to Account for How His Bankruptcy
       Proceedings Are Impacted by His Fee Petition Warrants a
       Denial or Stay of the Petition**

In seeking bankruptcy protection, Randazza has stayed proceedings in which he

is a party. *See In re: Marc John Randazza*, Case 15-14956-abl [Dkt. No. 15,*pgs.*33-

34] (D.Nev. Sept. 11, 2015), **Exhibit M**.  Randazza has not explained why his fee

petition here should not also be stayed.  The fee petition itself is not compensating

Novella for what Randazza charged. Novella has only paid Randazza $1,435.84.

(Novella Mot.,*pg.*23*of*204).  Instead, any award would be a direct line of new capital

to Randazza.  It would appear that Randazza's creditors would have an interest in this.

Randazza does not appear to have informed the bankruptcy court about this fee

petition. *See  Randazza*, [Docket], **Exhibit N**.  Thus, this Court should deny the fee

petition or stay adjudication of same pending the resolution of Randazza's bankruptcy.

**L.    Any Award of Fees Under the California Anti-SLAPP
       Procedure Would be Unconstitutional and in Violation of
       the *Erie* Doctrine**

The California anti-SLAPP procedure violates the *Erie* doctrine, violates INR-

California's first, fifth, seventh, and fourteenth Amendment rights, and violates

Federal Rules of Civil Procedure 8, 7, 12, 15, 56, 54, 38, 42, 37, 34, 33, 30, 26, 56,

and 65, and Federal Rules of Appellate Procedure 3, 4, 27, 32, 38, and 39. *See*, *e.g.*, *Intercon Solutions v. Basel Action Network*, 791 F.3d 729, 731 (7th Cir. 2015); *Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1337 (D.C. Cir. 2015). The California anti-SLAPP procedure has no place in federal court. *Travelers Casualty Insurance Company of America v. Hirsh*, 831 F.3d 1179, 1182-1186 (9th Cir. 2015) (concurring, J. Kozinski, footnote omitted).

## M.   This Court Should Stay Novella's Fee Petition in Light of Appellants' Pending Requests for Supreme Court Review

The U.S. Supreme Court has Appellants' fully-briefed petition for writ of mandamus and is scheduled to have Appellants' petition for writ of certiorari, due to be filed September 5, 2017, both arising from the substantive decision from which Novella seeks fees here, this Court should not grant Novella's request. Thus, the substantive decision could be impacted and basing any fee award on the decision would be premature. Thus, this Court should stay Novella's fee petition in light of the pending requests for further appellate review.

## N.   This Court Should Not Decide Novella's Fee Petition Until Appellate Review Is Completed in the Related Appeal No. 16-1210

There is a related appeal, No. 16-16210, and this Court has ordered that there be oral argument. This Court should not decide Novella's fee petition until the related appeal is final.

- 23 -

## III.   CONCLUSION

For the reasons stated above, this Court should deny Novella's motion for fees and expenses. This Court should instead award Appellants their costs and attorney's fees for having to oppose the fee motion, which violates 11th Cir. R. 33-1(c)(3).

*/s/ Cullin O'Brien*
Cullin O'Brien
Fla. Bar No. 0597341
CULLIN O'BRIEN LAW, P.A.
6541 NE 21st Way
Ft. Lauderdale, FL 33308
T: (561) 676-6370
F: (561) 320-0285
cullin@cullinobrienlaw.com
*Counsel for Plaintiffs/Appellants*

## CERTIFICATE OF COMPLIANCE

**Type-Volume**. This document complies with the word limit of FRAP 27 because, excluding the parts of the document exempted by the applicable rules, this document contains 5,180 words according to Microsoft Word word processing software.  **Typeface and Type-Style**. This document complies with the typeface requirements of FRAP 27, 32(a)(5), and the type-style requirements of FRAP 27 and 32(a)(6).

*s/Cullin O'Brien*
Cullin O'Brien, attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2017, a copy of the brief as served on the

- 24 -

following by CM/ECF or in some other authorized manner for those counsel or

parties who are not authorized to receive electronic Notices of Electronic Filing.

<div align="right">

*s/Cullin O'Brien*

Cullin O'Brien

</div>

# EXHIBIT A

**(Transcription by Bailey & Associates Reporting, Inc. of CD of 1/26/17 Oral Argument
Purchased from the Clerk of Court)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

NO. 15-14889

_____

D.C. DOCKET NO. 9:14-cv-80781-RLR

EDWARD LEWIS TOBINICK, MD,                  Before:
A medical corporation, d/b/a the     Hon. Frank Hull
Institute of Neurological            Hon. Beverly Martin
Recovery, INR PLLC,                  Hon. Jane Restani
A Florida professional limited
liability company d/b/a Institute
of Neurological Recovery, M.D.
EDWARD TOBINICK, an individual,

        Plaintiffs-Appellants,
-vs-

STEVEN NOVELLA, an individual,
SOCIETY FOR SCIENCE-BASED
MEDICINE, INC., a Florida
Corporation, SGU PRODUCTIONS,
LLC, a Connecticut limited
liability company, et al,

        Defendants-Appellees,


YALE UNIVERSITY,
A Connecticut corporation

        Defendants.
_____/

                    January 26, 2017


Transcribed By:
PATRICIA BAILEY-ENTIN, FPR
Notary Public, State of Florida
BAILEY & ASSOCIATES REPORTING, INC.
Fort Lauderdale Office

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

```
 1   APPEARANCES:

 2        On behalf of the Plaintiffs/Appellants:
          CULLIN O'BRIEN, Esquire
 3
          On behalf of the Defendants/Appellees:
 4        MARC RANDAZZA, Esquire

 5        Amicus:
          EUGENE VOLOKH
 6                               -  -  -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 3

1          ( The following RECORDED proceedings were had):

2                    THE COURT:  Tobinick versus Steven Novella,

3          et al.

4                    And before you begin, I want to remind you

5          of our traffic light system.  We don't expect you

6          to stop mid-sentence, but when your time is

7          expired, we do ask that you bring your argument to

8          a conclusion.

9                    And are these your aids?  I know we allowed

10         them.  I'm just trying to see whose party --

11                   UNIDENTIFIED MALE SPEAKER:  Yes, Your

12         Honor.

13                   THE COURT:  Are these yours?

14                   UNIDENTIFIED MALE SPEAKER:  Yes, Your

15         Honor.

16                   THE COURT:  Okay.  All right.

17                   And please know that the culture of our

18         Court is that we've read the briefs.  We are very

19         familiar with the factual and procedural

20         background of your case so you can use your

21         limited time to go to the heart of your argument.

22                   With those brief remarks, we will begin

23         with Mr. O'Brien on behalf of the appellant.

24                   MR. O'BRIEN:  Good morning, Your Honors.

25         May it please the Court, we're here today because

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 4

1          the District Court committed fundamental errors in

2          excluding record evidence.

3               The Plaintiffs did not get their day in

4          court.

5               The District Court was required to consider

6          the full context of Dr. Novella's false,

7          misleading and deceptive factual attacks that were

8          designed with the dual purpose of vilifying the

9          Plaintiffs in obtaining paid members and selling

10         merchandise for him.

11              The District Court did not take into

12         account this full context.

13              As we see in the record, Docket No. 272-26,

14         Dr. Novella clearly "uses Facebook as the top of

15         our funnel to drive people all the way to becoming

16         SGU members."

17              Docket No. 272-27 is an example of the

18         Facebook posting that's designed to garner

19         membership in its for-profit entity.

20              The District Court was also required to

21         consider the secondary promotional uses of Dr.

22         Novella's false attacks, including Dr. Novella's

23         goals of hurting Plaintiffs' competing business,

24         funneling money to his for-profit entity --

25              THE COURT:  You're -- you're saying that

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 5

1           Dr. Novella was competing for patients --

2                MR. O'BRIEN:  Yes.

3                THE COURT:  -- right, with your client?

4                MR. O'BRIEN:  Yes, Your Honor.

5                THE COURT:  Where is that?

6           Can you tell me what page that appears on

7      in your brief, your opening brief at this point?

8                MR. O'BRIEN:  In the brief?

9                THE COURT:  Yes, sir.

10               MR. O'BRIEN:  I'd have to look for the word

11      "competing".

12               THE COURT:  Okay.  We -- we can do it when

13      you come back.

14               MR. O'BRIEN:  Yeah, absolutely, Your Honor.

15               THE COURT:  I'm talking about patients.

16      I'm not talking about funding.

17               MR. O'BRIEN:  Well, Your Honor, they

18      both -- Dr. Novella's a neurologist.  Dr. Novella

19      treats patients --

20               THE COURT:  No, I understand the facts.  I

21      just wanted to know where you made the argument

22      about competing for patients in your opening

23      brief.

24               MR. O'BRIEN:  Okay.

25               Just Dr. -- the Plaintiffs get the same

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 6

```
 1          types of patients that Dr. Novella sees from New

 2          England.

 3               There are people from New England who

 4          utilize Plaintiffs' services.  They pull patients

 5          from the same geographical location.

 6               I don't have the cite on the brief, but

 7          I -- I will get that for you.

 8               THE COURT:  And really what I'm talking

 9          about that you argue that his motivation for doing

10          the blog was to get patients from your -- from

11          your client but that's --

12               MR. O'BRIEN:  That's one of the

13          motivations.  There's many motivations.  One was

14          to get money for himself.

15               THE COURT:  I mean I hear you.

16               I just -- when you come back, you can tell

17          me where that is in your brief.

18               MR. O'BRIEN:  Absolutely, Your Honor.

19               This is -- this is a turf war.  This is a

20          medical turf war.

21               You have dog -- dogmatists who were

22          neurologists and you have Plaintiffs who have a

23          patented treatment for treating the conditions

24          that neurologists treat.

25               Neurologists use off-label treatments.
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 46 of
258
Case: 15-14889   Date Filed: 08/05/2017   Page: 45 of 597

Page 7

1            For example, there's record evidence that

2       Dr. Novella uses Neurontin to treat patients.  Dr.

3       Tobinick and the Plaintiffs use Etanercept.

4       They're both off-label treatments to treat the

5       same neurological dysfunctions.

6            The District Court also did not examine,

7       properly examine the manner in which Dr. Novella's

8       false statements were actually false, misleading

9       and deceptive.

10           Did not do a thorough analysis of exactly

11      what Dr. Novella was saying.

12           There's no First Amendment protection for

13      false, misleading and deceptive statements.  The

14      District Court literally left that question open.

15           Did not go into the manner in which what

16      Dr. Novella was doing was false, misleading and

17      deceptive in the full context, taking all the

18      attacks together as one.

19           THE COURT:  Well, as the District Judge

20      went off on, this wasn't commercial speech.

21           MR. O'BRIEN:  That was -- that was one of

22      the -- the was the primary holding in summary

23      judgment.

24           THE COURT:  Okay.  Well, that's why he

25      didn't reach the other issue.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 8

1          MR. O'BRIEN:  Well, one of the amicus,

2     Professor Tushnet says a strong consideration as

3     to whether something is commercial speech is

4     whether it's false, misleading and deceptive.

5          And the Osmos case under Lanham Act cases

6     must take into account the full context.

7          The fact that it's false, misleading and

8     deceptive by definition makes it commercial

9     speech.

10         That's from the amicus curiae that

11    presented briefs in this case.

12         THE COURT:  As I understand it, before -- I

13    just want to ask you on a different topic.

14         Before the District Court, you didn't

15    oppose the motion to dismiss in opposing the

16    motion to dismiss, you didn't raise the Erie

17    question.

18         That wasn't raised by you and presented by

19    you in your responsive brief, correct?

20         MR. O'BRIEN:  Yes, Your Honor.

21         Just for the record, you're referring to

22    the special motion to strike which was Docket No.

23    93.

24         THE COURT:  Yes.

25         MR. O'BRIEN:  The response --

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 9

1              THE COURT:  Sorry.

2              MR. O'BRIEN:  No problem.  I just want to

3        be clear for the record because Dr. Novella filed

4        two different motions to dismiss.

5              THE COURT:  And did he raise Erie in one of

6        them?

7              MR. O'BRIEN:  In response to that motion,

8        we did not raise Erie.

9              But the District Court --

10             THE COURT:  Now in any of his responses

11       before the District Court did he raise Erie?

12             MR. O'BRIEN:  My clients are -- Dr.

13       Novella?

14             THE COURT:  Your -- your clients?

15             MR. O'BRIEN:  My clients, I don't believe

16       so.

17             But the hearing that was held preliminarily

18       on the anti-SLAPP --

19             THE COURT:  Right.

20             MR. O'BRIEN:  -- motion which is Docket No.

21       93 --

22             THE COURT:  Which would be the logical

23       place to raise the Erie issue.

24             MR. O'BRIEN:  But, Your Honor, the hearing

25       was held in 2014, in November of 2014.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 10

1          Since that hearing, more cases came out,

2     including the Intercon case.

3          And regardless, the District Court has a

4     footnote in her order where she specifically talks

5     about the Erie problem.  She considered the Erie

6     problem and said there is no Erie problem.

7          THE COURT:  Well, the problem is there was

8     a concession before the District Court on that

9     Erie wasn't -- that it wasn't a problem.

10          MR. O'BRIEN:  Well, it wasn't -- it was --

11     it was a concession at that time.  There's new

12     law.  It was fundamental error.

13          THE COURT:  Well, did you go back after

14     this new law came in and say -- ir did the new law

15     come in after the case was already before the

16     Court of Appeals or did it come before the case

17     was before the Court of Appeals?

18          MR. O'BRIEN:  The Intercon case came before

19     this case was before the Court of Appeals.  We

20     didn't --

21          THE COURT:  You didn't go back to the

22     District Court?

23          MR. O'BRIEN:  Correct, we did not.

24          But what we -- but we didn't know is that

25     how bad it would affect summary judgment.  Because

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 11

1          the anti-SLAPP procedure infected everything.

2                And so had we known it would have infected

3          summary judgment, we would have made an Erie

4          question at summary judgment.

5                We did not believe that it would infect

6          summary judgment.

7                Here's how it infected it.

8                We tried to amend.  We tried to amend this

9          complaint consistent with the scheduling order.

10         We tried to amend to include these additional

11         attacks that kept coming up during the case.

12               A couple weeks later, the District Court

13         issued the anti-SLAPP ruling.

14               Then a couple weeks after that, the

15         District Court said I'm not going to give you

16         leave to amend because it essentially resets the

17         case in light of the anti-SLAPP order.

18               So we move for leave to amend, which

19         would've mooted, which would've completely mooted,

20         completely mooted the anti-SLAPP issue.

21               The District Court issued an anti-SLAPP

22         order and then didn't allow us to amend because of

23         that order.

24               It got even worse on summary judgment.

25               The Court cited back to the anti-SLAPP

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 12

1        order and the denial of leave to amend to exclude

2        record evidence.

3                The District Court literally excluded

4        record evidence.

5                The statements in podcast 472, the

6        statements in the update page, the manner in which

7        Dr. Novella was using the SGU website as a

8        commercial window, a funnel, took it out of the

9        case.

10               I didn't get any leave to amend.

11       Anti-SLAPP comes in, I'm not going to let you

12       amend because of my anti-SLAPP order.

13               I think that is -- we didn't know that that

14       was going to happen.  That is by definition an

15       Erie problem.  Rule 15, leave to amend freely

16       given.

17               Dr. Novella didn't even -- hadn't even

18       answered.  Had not even answered at the time that

19       we asked for a leave to amend, hadn't even

20       answered at the time that leave to amend was

21       denied.

22               We move for leave to amend in the time of

23       the scheduling order.  There was no finding of

24       futility.  There was no finding of prejudice.

25               It was literally it will essentially reset

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 13

1        the case.  I just issued this anti-SLAPP order.

2        I'm not going to give you leave to amend.

3              So had we known that that was going to

4        happen, we would have handled it differently.

5              But more cases came out, Your Honor, on

6        anti-SLAPP.  The 9th Circuit's case came out

7        during -- during the pendency of this appeal.

8              THE COURT:  But of course what you're

9        relying on is not the majority opinion in the 9th

10       Circuit case, correct?

11             MR. O'BRIEN:  Correct, Your Honor.  Relying

12       on concurring opinions.

13             THE COURT:  All right.

14             MR. O'BRIEN:  Pretty strong concurring

15       opinions.

16             Anti-SLAP procedure has no place in federal

17       court.  That's pretty strong.  We think it was

18       just fundamental error to deny leave to amend.

19             Had we had leave to amend, we would have

20       been able to address all the -- all the web pages,

21       all the attacks.

22             There were no substantial countervailing

23       reasons to deny leave to amend.  And the denial of

24       leave to amend severely prejudiced us on summary

25       judgment.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 14

1          THE COURT:  Your motion for leave to amend,

2      that included a new cause of action, didn't it?

3          MR. O'BRIEN:  Civil conspiracy, that's

4      correct, Your Honor.

5          And it did -- we did it within the confines

6      of the scheduling order.

7          That's what scheduling orders are for.  You

8      do discovery and you -- there was a leave to amend

9      pleading deadline and we filed the motion for

10     leave to amend within that deadline.  That's the

11     point of a scheduling order.

12         Dr. Novella hadn't even answered.  I don't

13     believe the Court has discretion to deny leave to

14     amend without substantial countervailing reasons,

15     especially when there's no prejudice found.

16     There's no futility found.

17         And then on summary judgment, it's Docket

18     No. 288, page 6, footnote 4, excluded evidence.

19     The whole point of the civil system is that the

20     evidence that comes into the case is before the

21     Court.

22         We're dealing with the Lanham Act case,

23     full context.  You're not supposed to look at

24     the -- you're not supposed to look at the face in

25     parts.

Page 15

```
 1              You're not supposed to look at the ear

 2         separately from the nose, just to look at the face

 3         in full context.

 4              We had record evidence right here that the

 5         District Court just assumed out of the case and

 6         then said it's not commercial speech because I'm

 7         only going to consider the first two attacks, not

 8         the full context.

 9              What it does is incentivizes people who are

10         attacking businesses, to wait until the amended

11         complaint is done and then start attacking and

12         then well, it doesn't matter because those attacks

13         won't be part of the case.

14              So we can just keep attacking and attacking

15         and attacking.  It's not going to be part of the

16         full context.  It wasn't around at the time of the

17         amended complaint.

18              That's fundamentally unfair.

19              The theory with leave to amend, Your

20         Honors, is that we're not supposed to bait a

21         separate action.

22              What essentially the District Court is

23         saying is that we have to go somewhere else to

24         assert these claims about the new attacks.

25              The whole point of leave to amend is to put
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 16

1      all the issues that can be brought together in the

2      same case.

3           It doesn't make -- it doesn't make sense to

4      not allow us to have our day in court by having

5      this evidence presented to the District Court

6      because these attacks and these new attacks had

7      additional false statements.  The attacks got

8      worse.

9           Let me go into some of these attacks.

10          One Man Institute moved his clinic to

11     Florida.  He's not a one man institute.  He didn't

12     move his clinic to Florida.  He had offices in

13     California and Florida.

14          Dr. Novella corrected that and then

15     uncorrected it.  He corrected it for a matter of

16     hours and then republished it acknowledging that

17     it was false.

18          Dr. Novella says that Dr. Tobinick has a

19     lack of formal training in neurology.  That's just

20     false.

21          He's saying that he has no -- specialist

22     with not proper training.

23          The biggest issues, Your Honors, is the

24     Medical Board of California.  The update page

25     which --

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 17

1                    May I approach the boards?

2                    THE COURT:  The problem is the audio is not

3          going to hear you, just so -- just so you know.

4                    MR. O'BRIEN:  The update page is referred

5          to here on the legal defense page top number

6          274-2.

7                    The update page has allegations about the

8          Medical Board of California.

9                    It says wow, there's this -- there's these

10         accusations and they're devastating, and I'm going

11         to update you public when we find out what

12         happens.

13                   Well, Dr. Novella published that update

14         page knowing about the Medical Board of

15         California's adoption of a court decision that

16         stated specifically -- the reference to this is

17         Docket No. 261-31, page 5 -- there is sufficient

18         data and research about the drug safety and

19         potential effectiveness to support the treatment

20         espoused by Dr. Tobinick and followed by

21         Respondent.

22                   The evidence presented at the hearing

23         establishes that physicians can provide medication

24         or treatments to their patients with the standard

25         of care.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 18

1          That's Docket No. 261-31, page 23.

2          It published a page about a physician

3     accusing him of being in violation of medical

4     board standards when the medical board adopted a

5     decision saying the treatment is within the

6     standard of care and is safe.

7          And then they withdrew the allegation

8     against Dr. Tobinick.

9          The Docket No. For that is docket 260-30,

10    page 4.

11         THE COURT:  The statement that you think is

12    true about Dr. Tobinick's treatment is that --

13    that the board found was that Enbrel is effective

14    for treatment of disc related pain.

15         MR. O'BRIEN:  That's a separate -- that's a

16    separate statement.  That's something else that

17    Dr. Novella left out of his web pages.

18         THE COURT:  Okay.  Well --

19         MR. O'BRIEN:  Dr. Novella --

20         THE COURT:  -- Enbrel is an arthritis

21    medicine, right?

22         MR. O'BRIEN:  It can -- it's FDA approved

23    to treat psoriasis and arthritis.

24         THE COURT:  Okay.

25         MR. O'BRIEN:  It's also --

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 58 of
Case: 15-14889   Date Filed: 08/05/2017   Page: 57 of 597
258

Page 19

1          THE COURT:  But it's not FDA approved to

2     treat neurological disorders.

3          MR. O'BRIEN:  It's not FDA approved for

4     that, that's correct, Your Honor.  But that's the

5     whole point of the Reyes decision.

6          The Reyes decision says that Dr. Tobinick

7     can use the treatment within the standard of care

8     to treat stroke.

9          They had previously stated in 2007 -- this

10    is the Medical Board of California.  The citation

11    is Docket No. 261-29, page 4.

12         Published peer reviewed studies since May

13    2002 have provided evidence that paraspinal

14    Etanercept is effective for the treatment of disc

15    related pain.

16         Your Honor, Dr. Novella is saying that the

17    patents are unethical under AMA guidelines.  That

18    was also on the update page.

19         That's just false.

20         It's a drug delivery patent.  It's not a

21    medical use patent.  It was a complete

22    mischaracterization of the treatment.

23         Dr. Novella was trying to make it seem to

24    consumers that somehow this is an unlawful,

25    unethical treatment that's dangerous and patients

Page 20

1          should stay away from it.

2                  Specifically --

3                  THE COURT:  I'm confused about the

4          timeline.

5                  Are these two updates extant before you

6          filed your lawsuit?

7                  MR. O'BRIEN:  No, they were not there

8          before we filed the lawsuit.

9                  The timeline is as follows, Your Honor.

10                 THE COURT:  So --

11                 MR. O'BRIEN:  The Enbrel for stroke and

12         Alzheimer's, page--

13                 THE COURT:  Oh.

14                 MR. O'BRIEN:  I'm sorry?

15                 THE COURT:  This is just subject to your

16         motion to amend; is this what you were --

17                 MR. O'BRIEN:  This came up as the case is

18         going on.

19                 As the case is going on, Dr. Novella --

20                 THE COURT:  I understand that.  That's why

21         I asked about the timeline.

22                 But what you're putting up here is not in

23         existence at the time you file your lawsuit.  I'm

24         just clarifying that.

25                 MR. O'BRIEN:  Correct.  But we did in the

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 21

1         amended --

2              THE COURT:  How much after is the date of

3         these two pages versus -- or updates of pages, web

4         pages?

5              MR. O'BRIEN:  Well, podcast 472 did come

6         out a couple days before we filed the lawsuit.

7              THE COURT:  Okay.

8              MR. O'BRIEN:  But we did -- before we filed

9         the amended complaint, but we did not have the

10        transcript so we couldn't tell who was saying what

11        on the transcript.

12             The timeline is as follows, Your Honor.

13        The first attack came in May of 2013.  Dr.

14        Tobinick sent a letter asking for that --

15             THE COURT:  We know about what happened

16        prior to the lawsuit.

17             I'm trying to focus on just these two pages

18        and the timeline for when they were published,

19        updated, however you want to say it, and when you

20        file your motion to amend.

21             MR. O'BRIEN:  When we filed the motion to

22        amend?

23             THE COURT:  Right.

24             MR. O'BRIEN:  Well, the motion to amend

25        wanted to incorporate these pages.

Page 22

1              THE COURT:  I got that.

2              MR. O'BRIEN:  Okay.

3              THE COURT:  So how much after the

4      publication of these did you file your motion to

5      amend?

6              MR. O'BRIEN:  This podcast came out in July

7      of 2014.  We filed the motion for leave to amend

8      May of 2015.

9              THE COURT:  Okay.  And then how about the

10     other one?

11             MR. O'BRIEN:  The legal defense page came

12     up in July of 2014.

13             But, Your Honor, we were incorporate --

14             THE COURT:  They were both -- so it was

15     about a year later after they became available

16     that you file your motion for leave?

17             MR. O'BRIEN:  Well, we also wanted to

18     include the --

19             THE COURT:  Sir, I'm just trying to

20     understand the timeline.

21             MR. O'BRIEN:  Yes, Your Honor, with respect

22     to those two pages.

23             However, with respect to the update page,

24     and I'm referring to this update page here, that

25     came out April 1st of 2015, the update page.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 23

```
 1              THE COURT:  Is that the second blog?  Is
 2         that --
 3              MR. O'BRIEN:  It's not a blog.  It's a for
 4         profit website.
 5              THE COURT:  I'm just trying to be sure
 6         we're talking about the same thing.
 7              So when you say "update page", you mean
 8         when he updated the blog or whatever you want to
 9         call it.
10              MR. O'BRIEN:  What I'm referring to is the
11         Docket No. 260-19, which is a web page called
12         another -- an update on the web page.
13              It was on the SPM web site.  You are
14         correct, Your Honor.  It was not on the for profit
15         SG website.
16              This is a dot org.  It's a for profit
17         company.
18              THE COURT:  We understand that.
19              I have two clean-up questions, I want to
20         make sure, SGU Productions, LLC did not file a
21         brief on appeal; is that correct?
22              MR. O'BRIEN:  I don't believe that's
23         correct.  They might have filed something.  I
24         don't know if it was a brief, but it was something
25         in response to --
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 24

```
 1              THE COURT:  No, I'm talking about on appeal
 2        in this Court, I couldn't find any brief of SGU
 3        Productions, LLC.
 4              MR. O'BRIEN:  Unless I'm misremembering, I
 5        do believe they filed something.  I don't know
 6        whether I would call it a brief, but I believe
 7        something was filed.
 8              I know they tried to move to dismiss the
 9        appeal and then I believe they may have filed
10        something.
11              I can look for that.
12              THE COURT:  Are you representing SGU
13        Productions, LLC today?
14              MR. O'BRIEN:  Am I representing them?
15              THE COURT:  Yes.
16              MR. O'BRIEN:  No.  I represent the
17        Plaintiffs.
18              THE COURT:  The Plaintiff, okay.
19              MR. O'BRIEN:  We're trying to sue Dr.
20        Novella --
21              THE COURT:  I got it.  You're right.
22              MR. O'BRIEN:  -- who owns SGU.
23              THE COURT:  Okay.
24              MR. O'BRIEN:  That's his --
25              THE COURT:  You don't know whether SGU
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 25

1          Productions filed a brief or not.

2                MR. O'BRIEN:  I don't -- I don't know.  I

3          believe they filed something.

4                THE COURT:  I mean, they are a defendant

5          here.

6                So I guess maybe I ought to say are you

7          trying to keep them in the case?

8                MR. O'BRIEN:  If we -- we want leave to

9          amend.

10               The summary judgment order --

11               THE COURT:  I'm trying to get the three

12         defendants here, and it was confusing to me.  Some

13         have already been dismissed.

14               MR. O'BRIEN:  Correct, Your Honor.

15               THE COURT:  And it was confusing to me who

16         you were trying in your appeal to still, on

17         appeal, keep in the case, okay?

18               And it looked like it was only Dr. Novella,

19         is really all you wanted to keep in this case.

20               MR. O'BRIEN:  At the time of summary

21         judgment, only Dr. Novella --

22               THE COURT:  I'm talking about today.

23               MR. O'BRIEN:  Today we want to reverse the

24         summary judgment order as to Dr. Novella.

25               THE COURT:  Okay.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 26

```
 1              MR. O'BRIEN:  We want leave to amend.

 2              THE COURT:  Okay.

 3              But is there any other party?

 4              SSBM, are you trying to keep them in the

 5         case or?

 6              MR. O'BRIEN:  They're not part of our

 7         proposed amended complaint.

 8              THE COURT:  Okay.

 9              One more time.  We're going to do an

10         opinion here, and who do you request reversal as

11         to?

12              The only three defendants left are Novella,

13         SSBM and SGU, I think.

14              MR. O'BRIEN:  They weren't -- they weren't

15         left.  The only defendant left was Dr. Novella.

16              THE COURT:  Okay.  That's why I'm asking

17         these questions because it's confusing.

18              So the answer is, the only entity,

19         defendant, you're trying to get us to reverse as

20         to is Dr. Novella.

21              MR. O'BRIEN:  As to the summary judgment

22         order, correct, Your Honor.

23              However, we are also seeking leave to

24         amend.  The proposed amended complaint that we

25         filed includes Dr. Novella.  It includes SGU.  It
```

Page 27

1          includes Jay Novella and it includes Paul

2          Ingraham.

3                  THE COURT:  So those would be two new

4          defendants.

5                  MR. O'BRIEN:  Correct.

6                  THE COURT:  Okay.

7                  So you want the old defendants back in and

8          you want two new defendants?

9                  MR. O'BRIEN:  Correct, Your Honor.

10                 THE COURT:  Okay.

11                 THE COURT:  But as to the old defendants,

12         you're not trying to get back in SSBM.

13                 MR. O'BRIEN:  Correct.  That's not part of

14         the proposed amended complaint.

15                 THE COURT:  So you're not asking for an

16         order as to them.  You've abandoned any claims

17         against SSBM.

18                 MR. O'BRIEN:  They were dismissed on

19         summary judgment.  We're not appealing that order

20         and we are not seeking to put them into the

21         proposed amended complaint, which is Docket No.

22         177-1.

23                 THE COURT:  Okay.  Thank you.

24                 You're over your time and you have save

25         rebuttal of five.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 67 of
258
Case: 15-14889   Date Filed: 08/05/2017   Page: 66 of 597

Page 28

1            We will now turn to the appellee, Mr.

2        Randazza, perhaps I've got that right.

3            THE COURT:  There is a question pending for

4        plaintiff about where in your opening brief it

5        said that Dr. Novella was competing for patients

6        with Dr. Tobinick.

7            I think that question is hanging out there.

8            THE COURT:  Yeah.

9            And specifically his motivation for doing

10       the blogs was to compete for patients, so thank

11       you.

12           THE COURT:  Okay.

13           MR. RANDAZZA:  May it please this honorable

14       court.

15           A bedrock principle of scientific progress

16       is scientific debate.  That's what this case is

17       about.

18           This case is not about any of the

19       distractions that may appear before it.

20           In this case, Dr. Novella, a research

21       neurologist and a scientist devoted to writing

22       about frankly scientific -- things that he finds

23       to be scientific quackery, has been sued for

24       defamation and -- and/or a creative theory under

25       the Lanham Act in order to shut down that

1        scientific debate.

2               Now, the defamation claims were brought by

3        three different entities, one of them being a

4        California entity, and thus, under choice of law

5        rules California law applied.  California

6        substantive law, not procedural.

7               The Florida defendants were then dismissed

8        out after the Plaintiff saw the writing on the

9        wall.

10              However, I think we need to look at why is

11       the Lanham Act claim there at all.

12              The Lanham Act claim is there because, as

13       this Court well knows, equity will not enjoin a

14       liable.  But we did have a two-day hearing on a

15       motion for preliminary injunction.  And that was

16       entirely based upon the Lanham Act claims.

17       However, all claims were argued at that time,

18       evidence was presented at that time.

19              The claim that the Plaintiff did not have

20       his day in court is belied by the record.  The

21       Plaintiff had multiple days in court.

22              In fact, many more than my client believes

23       were necessary, but certainly enough to establish

24       this record and to support these well-reasoned

25       opinions by Judge Rosenberg that this case must be

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 30

1           dispensed with at summary judgment.

2                Judge Martin, you appear to have a

3           question.

4                THE COURT:  Oh, sorry.

5                MR. RANDAZZA:  Bad poker face.

6                THE COURT:  Well, actually, if you're going

7           to give me an opening --

8                MR. RANDAZZA:  I would love it.

9                THE COURT:  -- I will take it.

10               MR. RANDAZZA:  Yes, Your Honor.

11               THE COURT:  So one of the great things

12          about this job is, you know, these cases allow us

13          to learn more about topics that I don't know much

14          about.

15               It looked like to me that the 11th Circuit

16          didn't have a crystal clear definition of what

17          commercial speech is as compared to some other

18          circuits.

19               Am I right about that?

20               Or maybe I should ask it, how would you

21          articulate the 11th Circuit task for what is

22          commercial speech?

23               MR. RANDAZZA:  The 11th Circuit appears to

24          rely on the Southern District of New York's

25          decision in Gordon and Breach, where it is -- it

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 31

1          is speech that -- really I dial it down to, it is

2          speech that proposes a commercial transaction.

3          Speech that advertises for a service.

4                You know, we have had a moving target in

5          this case as to what this commercial speech

6          supposedly is.

7                It initially began that their theory was

8          that my client was selling skeptical services.

9          And I still do not completely and granularly

10         understand what that means, but that was the

11         original theory.

12               Then there was another theory that my

13         client was actually selling key chains and

14         mementos that are advertised on the side of the

15         articles.

16               Then we have this new theory that he is

17         selling competing neurology services.  And, you

18         know, it might be the case if my client was

19         handing out a brochure in front of this clinic or

20         someplace here in Miami saying don't go to Dr.

21         Tobinick's clinic, go to my clinic which is

22         conveniently located 1800 miles to the north in

23         Connecticut where, by the way, he's a research

24         neurologist, as the record shows, not running a

25         clinic.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case: 15-14889    Date Filed: 08/05/2017    Page: 70 of 597

Page 32

1           THE COURT:  What if he's not handing out

2       key chains on the street but in the -- the -- I'll

3       call them the blog posts, he, you know, expressly

4       competes for patients, is that commercial -- I

5       mean, would that be commercial speech in your

6       view?

7           MR. RANDAZZA:  If he happened to.  First

8       the record shows it doesn't but let's just say

9       that --

10          THE COURT:  I know.  This is a

11      hypothetical, yeah.

12          MR. RANDAZZA:  Yes.  In this hypothetical

13      situation, if he ran the same kind of clinic in

14      Connecticut that Dr. Tobinick runs here in Florida

15      and in California, I still don't think that

16      changes this case any.

17          THE COURT:  He openly says Dr. Tobinick's

18      patients should come to me because I'm a better

19      doctor, that's -- that's not --

20          MR. RANDAZZA:  If he went that far as to

21      say yes, here is clinic A, here is clinic B, that

22      would be comparative advertising, yes.

23          However --

24          THE COURT:  And then we would have to get

25      to the issue of whether they were false

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

1          statements.

2                    MR. RANDAZZA:  You would, yes, Judge.

3                    THE COURT:  Okay.

4                    MR. RANDAZZA:  However, in this situation

5          in this record, we don't have that.

6                    In fact, in this record what we have

7          established is that Dr. Novella is a research

8          neurologist, akin to a law professor.

9                    A law professor, my esteemed colleague here

10         practices law and is a law professor but certainly

11         is not looking for clients, you know, or

12         looking -- rather looking for students.

13                   Students get in the way of him doing this

14         fun stuff and publishing but they're a necessary

15         evil.

16                   THE COURT:  We won't tell his students you

17         said that.  I'm sure he'll disavow it.

18                   MR. RANDAZZA:  Perhaps he will.  I won't

19         speak for him.

20                   So Dr. Novella, patients are really

21         secondary to him.  He is a research scientist and

22         a publisher.

23                   So the notion that if this happens to be

24         false -- I don't care if it's false and I don't

25         think you should care if it's false because we're

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

1        not there.

2             Is it false is really only a question that

3        we ask if we determine it is commercial speech.

4        I've not had the pleasure of looking at these, but

5        I don't think that these change that.

6             The mere fact that there might be an

7        economic motivation or that there might be some

8        kind of similar fields of occupation of these two

9        gentlemen is irrelevant.

10            If we look into, since we're talking

11       hypotheticals, Judge Martin, let's look at the

12       hypothetical world we'll be in if this Court were

13       to hold otherwise.

14            You would not want anyone with any

15       expertise about medicine challenging any

16       assertions about medicine.

17            All medical columns -- and frankly if I

18       were the editor at any -- at Scientific American,

19       I would say no more doctors can write about doctor

20       stuff.  I want chefs to write about that.

21            And, you know, with all due respect to

22       Anthony Bourdain, he's a brilliant man, but I

23       don't think he should be writing about medicine.

24       And, similarly, Mr. Bourdain would have to

25       probably write the medical column because he can't

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

1        write about other restaurants because he's a chef.

2        It's just bizarre.

3            So I don't -- I don't think that that is --

4        that is ground that this Court probably wants to

5        walk on to and create.  It would create --

6        frankly, it would end any peer review.

7            How do we have peer review if we don't have

8        people who are actually peers reviewing one

9        another's data, reviewing one another's claims?

10           Now, under the defamation standard -- again

11       I said before, and I wasn't trying to be

12       irreverent when I said I don't care if it's false.

13           It doesn't have to be just false.  It has

14       to be over the actual malice standard because

15       there is no question here that this is a public

16       figure.  He has, frankly, bragged about that in

17       his pleadings.

18           So even if my client is wrong, well, that

19       is how the marketplace of ideas works.

20           The only -- you know, my colleague here

21       argues that we should take a look at the

22       dissenting opinion in Metcalf in the 9th Circuit.

23           I think Judge Restani, I think you hit it

24       on the head that this is not -- not really any

25       kind of precedent whatsoever.

Page 36

```
 1                  And being the dissenting opinion --
 2             THE COURT:  Wasn't it a concurrence?  I
 3        don't remember.
 4             MR. RANDAZZA:  Thank you, Your Honor.
 5        You're right.
 6             However that holding, that principle that
 7        Judge Kozinski wanted to put forward, with all
 8        respect to Judge Kozinski, his colleagues rejected
 9        it en banc.  So that is settled law.
10             Every single circuit that has looked at the
11        California anti-SLAPP statute has ruled that it is
12        procedural in nature -- I mean, I'm sorry.
13             It is substantive in nature and applies in
14        federal court.
15             So this -- this other case that was brought
16        up, I want to say the 7th Circuit case, did not
17        examine the California statute.  Has no relevance
18        to this case whatsoever.
19             So when we get back to my issue of I don't
20        care if it's false, it doesn't matter.  This is
21        scientific opinion.  This is scientific debate.
22             There is no room for us to stifle this with
23        using Lanham Act claims and defamation claims
24        without support.
25             THE COURT:  Well, the statements that he's
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 37

1          a one man clinic and those kind of statements, are

2          those scientific?

3                    MR. RANDAZZA:  No, Your Honor.

4                    THE COURT:  Okay.

5                    Are they false?

6                    MR. RANDAZZA:  That's open to

7          interpretation.

8                    What is a one man clinic?  What is a one

9          man show?

10                    I think people would my law firm a one man

11          show, but I'm not the only lawyer there.  And

12          regardless, that is not something that would be

13          deemed to be sufficient to deem it false enough to

14          get over the actual malice standard.

15                    I would call your attention to the

16          foundational case creating that standard, New York

17          Times versus Sullivan.

18                    That exhibit -- I mean, that -- that ad,

19          remember that itself was an advertisement and it

20          was rife with errors.

21                    For example, that Martin Luther King had

22          been arrested seven times when -- when

23          Commissioner Sullivan had only had him arrested

24          four times.

25                    These isolated and cherry picked errors,

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 38

1    even if that's an error, do not give rise to

2    liability.

3         THE COURT:  Your colleague who argued first

4    spent a lot of time on this denial of the motion

5    to amend.

6         And I think some of these were -- it was

7    almost a year after some of these existed when the

8    motion to amend was made, but, you know, the

9    strongest part of his argument on that is the,

10    what I'm calling the second blog notes.

11         There was only, like, a month or 60 days,

12    something, that that had been in existence when he

13    filed the motion to amend.

14         I think he makes a pretty good point about

15    that, that he should have been able to amend to

16    include that.

17         MR. RANDAZZA:  Well, let's look at the

18    procedural history here.

19         First they filed the complaint.  We filed a

20    motion to dismiss.  They then amended in order to

21    moot that using their first -- using their one

22    bite at the apple.

23         Then they waited until, I want to say it

24    was hours before the deadline, after all of this

25    development had happened, after the case had

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 39

```
 1              really progressed to -- to such a level that we
 2              had multiple hearings.
 3                   Then they sought leave to amend.  Then they
 4              withdrew that motion for leave to amend, and then
 5              they sought after the deadline to amend.
 6                   And their whole point here is if only you
 7              had let us amend, we could have mooted the
 8              anti-SLAPP motion.
 9                   You know, I mean, it's almost like I would
10              have gotten away with it if it wasn't for you
11              meddling kids and Scooby Doo.
12                   I mean no, it doesn't work that way,
13              especially under the anti-SLAPP statute.
14                   Once you -- if you try to amend out of it,
15              it is an admission that the claims themselves were
16              not supportable.  It doesn't work that way.
17                   So the comfort that they're seeking to moot
18              the anti-SLAPP motion by trying to amend out the
19              claims really is not there for that.
20                   THE COURT:  But I'm right on the timeline
21              of the second blog post and the motion to amend,
22              right?
23                   I mean, that -- that was a fairly short
24              period of time.
25                   MR. RANDAZZA:  Yeah.  The second blog post,
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 40

1        I believe was my client seeking legal defense

2        assistance.

3               So putting up an ad for --

4               THE COURT:  Is that one of these documents

5        here?

6               MR. RANDAZZA:  Let me take a look.

7               THE COURT:  You mean it's the July 23rd,

8        2014 post?

9               THE COURT:  No, this one was in '15, I

10       think.

11              THE COURT:  I was (inaudible).

12              THE COURT:  But I could be wrong.

13              THE COURT:  What I'm talking about is I

14       suppose it was inevitable.

15              MR. RANDAZZA:  So you're talking about the

16       one on the right here where the -- where my client

17       discusses the lawsuit itself.

18              THE COURT:  Right.

19              MR. RANDAZZA:  Saying that he's been

20       sued --

21              THE COURT:  Right.

22              MR. RANDAZZA:  -- improperly in a SLAPP

23       suit and seeking help for that.

24              THE COURT:  And is that 2015?  He just said

25       it was 2014.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 80 of
Case: 15-14889   Date Filed: 08/05/2017   Page: 79 of 597

Page 41

 1                    THE COURT:  I'm the one --

 2                    THE COURT:  I'm mistaken.  Maybe I'm

 3            mistaken.

 4                    THE COURT:  And I could be wrong.

 5                    MR. RANDAZZA:  I don't see a date on here.

 6                    THE COURT:  Okay.  When I allowed the

 7            demonstrative exhibits, I'm pretty sure that they

 8            said -- because we're not going to allow something

 9            demonstrative that's not in the record.

10                    I assume these were attached to the motion

11            to amend or they were argued about in the District

12            Court.

13                    Are these in the record?

14                    They may not have come into evidence, but

15            you said I hadn't seen these.  Let me --

16                    MR. RANDAZZA:  I'm sorry.  No, I hadn't

17            seen the actual boards themselves.

18                    THE COURT:  Okay.

19                    MR. RANDAZZA:  I did not know what was on

20            the--

21                    THE COURT:  But you've seen the documents,

22            okay.

23                    MR. RANDAZZA:  Yes.

24                    THE COURT:  I just want to make sure

25            because when I --

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 42

1           MR. RANDAZZA:  No, these aren't --

2           THE COURT:  -- bring something in, it

3     should be already in the record and I recall that

4     being stated, so I just wanted to clarify.

5           And this tells me -- I've seen counsel just

6     give the Court two pages, because I can't read a

7     word of that.

8           So I'm just going to -- and we've got a lot

9     of lawyers here.  Just hand out two pages to

10    opposing counsel, we could probably see it better.

11          THE COURT:  Maybe I'm totally out of the

12    timeline, but I thought the two blog posts that

13    were -- that were the subject of the suit were in

14    '13 and '14.

15          And then there was another one that came

16    out right before his, a third one, or are we only

17    talking about two?

18          MR. RANDAZZA:  We're only talking about

19    two, Judge Restani.

20          THE COURT:  Okay.

21          THE COURT:  What are the dates for the two

22    because then --

23          THE COURT:  But there were some new facts,

24    I mean, some relative comparatively new facts

25    close in time to his motion to amend, as I recall.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 43

1          We've had a lot of cases this week.  I'm not --
2               MR. RANDAZZA:  I don't believe there were.
3               THE COURT:  Okay.  Well, he'll --
4               MR. RANDAZZA:  And that's not what the--
5               THE COURT:  Okay.  I guess Plaintiff
6       could -- appellant could tell us when he comes
7       back if there is something.
8               MR. RANDAZZA:  Yeah, the judge did not find
9       that there were any new facts that warranted
10      changing the deadline.
11              Remember this motion for leave to amend was
12      after the deadline.
13              But even if it was before, it is within her
14      discretion to decide not to grant leave to amend,
15      especially when, as she said --
16              THE COURT:  You just said it was before the
17      deadline (inaudible)--
18              MR. RANDAZZA:  No.  The first -- they did
19      one to moot the first motion to dismiss.  Then
20      they filed another, which they withdrew.
21              And then after the deadline, they sought it
22      again.
23              THE COURT:  Okay.
24              THE COURT:  I have another record question,
25      which clearly I need help with.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 44

1          The California anti-SLAPP statute allows

2     the judge to stay discovery.  Did this judge stay

3     discovery?

4          MR. RANDAZZA:  No.  And that -- and that

5     demonstrates something in this case that we need

6     to understand, is that it does not authorize the

7     judge to stay discovery.

8          It authorizes the judge to stay discovery

9     if it is in state court; however, that is a

10    procedural element of the statute.

11         THE COURT:  Okay.  Okay.

12         MR. RANDAZZA:  So that is -- is not

13    intertwined with --

14         THE COURT:  I'm with you on all that.  But

15    the fact is she -- this judge did not stay

16    discovery in this case.

17         MR. RANDAZZA:  The judge did not.  We did

18    not request it and I think we specifically pointed

19    out that it was not -- it was not to be done.  And

20    it didn't happen.

21         Discovery continued at great pace.  In

22    fact, the Plaintiff took significant discovery

23    while we waived the right to virtually any

24    discovery.  I think we took a phone deposition of

25    a number of minutes.

Case: 15-14889   Date Filed: 08/05/2017   Page: 83 of 597

Page 45

1           THE COURT:  Right.

2           Thank you.

3           THE COURT:  Okay.  Let's go back to these

4      two documents here.

5           I do see the podcast for 7/2.  It says July

6      2014.  And is the other one that's legal defense

7      support, what was it update?  Is there an update

8      date on it?

9           MR. RANDAZZA:  I'm seeing April 2015, June

10     2015, but I cannot --

11          THE COURT:  Right.

12          MR. RANDAZZA:  -- testify as to what those

13     -- what's updated.

14          THE COURT:  What changed in the update

15     versus what was already there?

16          MR. RANDAZZA:  As I'm aware, as I believe,

17     it was a -- my client changed some elements that

18     the Plaintiff objected to unilaterally as part of

19     an effort to resolve the matter.

20          THE COURT:  Okay.

21          MR. RANDAZZA:  But while you're -- while

22     you're looking at this, remember this is a -- this

23     is seeking a legal defense contribution.

24          And if I may approach Your Honors, I do not

25     have blown-up demonstrative aids, but I do have

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 46

1          something from the record, and I don't want Judge

2          Martin to strain looking over there.

3                  Let's remember when we're looking at these

4          --

5                  THE COURT:  I'm the closest one.

6                  THE COURT:  Well, the April 1st, 2015 was a

7          web page on the blog which provided an update on

8          the status of the lawsuit.

9                  And it was on the web page of SFSBM, who I

10         think are out of this case.

11                 MR. RANDAZZA:  They are out of this case,

12         yes.

13                 THE COURT:  Okay.

14                 THE COURT:  I'm sorry.  I took both.

15                 MR. RANDAZZA:  What you're seeing is the

16         equivalent of -- I mean, I don't usually get the

17         joy of having something so analogous to New York

18         Times versus Sullivan.  Usually I have to make a

19         few logical leaps.

20                 But this is the precise ad, the appendix to

21         the opinion in New York Times versus Sullivan

22         where the committee to free Martin Luther King was

23         seeking legal defense contributions.

24                 They're trying to tell you that seeking

25         legal contributions is commercial speech.

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 86 of
Case: 15-14889   Date Filed: 08/05/2017   Page: 85 of 597

258

Page 47

1          If only Commissioner Sullivan had been so

2      creative 60 years of First Amendment juris

3      prudence would go up in smoke.  I really don't

4      think that that is the -- that is the step that we

5      should be taking here today.

6          THE COURT:  (Inaudible).

7          MR. RANDAZZA:  Your Honors --

8          THE COURT:  Amicus, is that his time?

9          THE COURT:  Okay.

10          The Amicus, sir, you may proceed.

11          MR. VOLOKH:  Thank you, Your Honor.  Eugene

12      Volokh for Amicus Professors of Law in Medicine.

13          So I just wanted to respond to a few

14      questions that were -- that were raised during

15      argument.

16          The first is that even if Dr. Novella

17      potentially could treat the same patients that Dr.

18      Tobinick would have, we're not aware to what

19      extent, but even if this were so, this would be

20      actually quite similar to what often happens when

21      one person, who is knowledgeable because they're

22      in the same field as another person, criticizes

23      another person's work in the course of public

24      debate.

25          Newspapers, for example, often criticize

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

1       things that rival newspapers say.  There could be

2       a scandal about something.

3             The famous shattered Glass scandal with

4       Steven Glass's falsifications in the New Republic

5       was broken by a Forbes online publication that saw

6       itself as operating in the same space and in a

7       sense being competitors.

8             That this is routine in anytime media

9       criticizes media, they criticize a competitor.

10            In the field of medicine, this is

11      especially so because, of course, it's important

12      that the -- that any debate be well informed.

13            So in mortality and morbidity conferences

14      at hospitals where doctors are evaluating each

15      other's work, in expert witness reports, in

16      scholarly papers, it is quite routine for doctors

17      who work in the same field to evaluate other

18      doctor's work.

19            Now, I do think if somebody says this

20      doctor doesn't do a good job, therefore hire me,

21      therefore come to me, I will cure your

22      Alzheimer's, that would be -- that would be

23      commercial advertising.

24            But if a doctor is publishing in the course

25      of scientific debate something that's critical of

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case: 15-14889    Date Filed: 08/05/2017    Page: 87 of 597

Page 49

 1          another doctor or a newspaper critical of another

 2          newspaper or any -- any law professors, for

 3          example, critical of other law professors who may

 4          indeed be competing for the same students or the

 5          same outside clients, that is fully protected

 6          speech.

 7               A second point I wanted to mention was in

 8          response to the question about one man clinic.

 9               It is true that particular factual

10          statements, not about medicine at large, but about

11          a particular person may lead to liable liability.

12               It wouldn't be Lanham Act liability because

13          it's not commercial speech.  But in principle it

14          could be liable liability, but they have to be

15          said with the requisite mental state, actual

16          malice.

17               They have to be false and substantially

18          false.  That minor mistakes, as my colleague

19          pointed out, long been recognized as not

20          sufficient to make something false.

21               Also defamatory, that saying somebody is a

22          one man clinic in many situations is not the sort

23          of thing that has a tendency to cast someone in

24          contempt or --

25               THE COURT:  But in this case, one man

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 50

1      clinic was represented to be a hallmark of

2      quackery.

3            MR. VOLOKH:  Your Honor, I think it is --

4      it does represent the opinion that small, kind of

5      a doctor doing his own thing is not to be trusted

6      the way that the UCLA Medical Center might be or

7      the way that Yale Medical Center might be or

8      something along those lines.

9            But, again, there the focus isn't is it a

10     one man or one doctor and a couple of other

11     people.

12           It's rather kind of somebody who's

13     independent of the scientific mainstream as

14     opposed to somebody who is within the scientific

15     mainstream.

16           Now to be sure, sometimes people who are

17     outside the mainstream are right, but I think in

18     context this is something that would not be seen

19     as a defamatory statement of fact.

20           To turn to the -- to a couple of cases that

21     were cited.  One is, I believe I looked at

22     Metcalf.

23           The opinion in Metcalf, that was being

24     referred to, was, in fact, a dissent from denial

25     of a hearing (phonetic).

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 51

1           And the 9th Circuit has long persisted in

2       treating these kinds of anti-SLAPP statute issues

3       as a substantive for Erie purposes.

4           As to the point about Intercon coming

5       around and explaining why it is that Plaintiff

6       shifted to making an Erie argument, the Intercon

7       v. Basel case from the 7th Circuit did not endorse

8       the plaintiff's position.  It didn't even really

9       support it.

10          All it said is because the underlying state

11      statute had been held unconstitutional, period, by

12      the Washington Supreme Court.

13          The 7th Circuit couldn't apply it simply

14      because it didn't exist anymore really.

15          So I just wanted to try to respond to the

16      things that had arisen, but I'm delighted to

17      answer questions.

18          THE COURT:  While we've got you, I'd just

19      be interested, so the update on the Tobinick

20      lawsuit -- I'm not great with docket numbers --

21      you know, we're talking a lot about the wrestling

22      case from the Southern District.

23          MR. VOLOKH:  Yes, Your Honor.

24          THE COURT:  I mean, that talked about

25      speech, you know, seeking to make money and self

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 52

1          promotion and all that was commercial speech.

2               I mean, how does that play out on these

3          facts if you -- if you take the update on the

4          Tobinick lawsuit as trying to get -- raise money

5          for a defense?

6               MR. VOLOKH:  Yes, Your Honor.

7               World Wrestling Foundation [sic], we think

8          is inapplicable for three reasons here.

9               One is this circuit in Suntree Technologies

10         specifically adopted the Gordon and Breach

11         scientific publishers prospective.  That's 693

12         F.3d at page 1349.

13              Second is that the focus of World Wresting

14         Federation was under this was a fundraising thing

15         that was all about that.

16              That was the heart of -- of the project

17         they were doing rather than -- in this case it's

18         sort of collateral to the initial criticism.

19              But the most important reason is we think

20         that Basel is simply inconsistent with the U.S.

21         Supreme Court's decisions.  Both in some measure

22         in New York Times v. Sullivan, But also in Riley

23         v. National Federation for the Blind.

24              In Riley versus National Federation for the

25         Blind involved fundraising in that case for

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 53

```
 1          National Federation for the Blind.

 2               And so it was directly -- it was all about

 3          raising money for it.  And, in fact, in attempting

 4          to regulate it, the state took the view, I believe

 5          it was North Carolina, took the view that look,

 6          this is commercial speech.

 7               They're just trying to raise funds, and

 8          therefore we can -- in that case, this had to do

 9          with speech compulsions which are more tolerable

10          in commercial speech.

11               THE COURT:  Can I just follow up with you

12          on that?

13               So when I asked your colleague, I believe

14          on that side of the courtroom, what was the 11th

15          Circuit test for commercial speech, I think he

16          said the case from the Southern District of New

17          York, which I took to mean the wrestling case.

18               And you're saying that that case is not

19          good law or it's not in keeping with the Supreme

20          Court's precedent.

21               MR. VOLOKH:  Yes, Your Honor.

22               It's confusing.  There are two Southern

23          Districts.

24               THE COURT:  Okay.

25               MR. VOLOKH:  I believe he was referring to
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 54

1          Gordon and Breach because I believe he was

2          referring to the Suntree case where this

3          circuit --

4                THE COURT:  Okay.

5                MR. VOLOKH:  -- had specifically endorsed

6          the Gordon and Breach test.

7                THE COURT:  Okay.

8                MR. VOLOKH:  I'm unaware of this --

9                So in any case, so in Riley v. National

10         Federation for the Blind, the Supreme Court

11         specifically said that when -- even when

12         fundraising is intertwined with fully protected

13         speech, there was charitable fundraising.  Here

14         it's even more protected scientific speech.

15               THE COURT:  Okay.  And you're talking about

16         Suntree Techs --

17               MR. VOLOKH:  Exactly.

18               THE COURT:  -- adopted Gordon and Breach.

19         And Suntree Techs was 2012, and Gordon and Breach

20         was Southern District 1994.

21               MR. VOLOKH:  Yes, Your Honor.

22               At page 1349 Suntree Tech --

23               THE COURT:  Yeah.

24               MR. VOLOKH:  -- says the most widely

25         accepted test for determining as set forth in

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 55

1          Gordon and Breach --

2                THE COURT:  Right.

3                MR. VOLOKH:  And then proceeds to --

4                THE COURT:  To set forth the test.

5                MR. VOLOKH:  Yes, Your Honor.  So we view

6          that --

7                THE COURT:  The first prong of Gordon and

8          Breach is commercial speech?

9                MR. VOLOKH:  (Inaudible).

10               THE COURT:  Where the representations must

11         be commercial speech by defendant who is in

12         commercial competition with the Plaintiff.

13               MR. VOLOKH:  Yes, Your Honor.  Those are

14         some elements that are required, but those by

15         themselves are not sufficient for that.

16               THE COURT:  Right.  I realize, but I'm not

17         even sure they are met here.

18               Speech by a defendant who is in commercial

19         competition with the Plaintiff for the purpose --

20         I'm quoting from 1349.

21               MR. VOLOKH:  Uh-huh.

22               THE COURT:  -- for the purposes of

23         influencing customers to buy the defendant's

24         goods.

25               I don't know how this is trying to get them

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 56

1          to buy Dr. Novella versus the Plaintiff.

2                MR. VOLOKH:  Your Honor, I agree -- I agree

3          entirely.

4                And on top of that, there is also the

5          commercial speech element we think is not met.

6                THE COURT:  Well, that's the first element.

7                MR. VOLOKH:  Right.

8                THE COURT:  But even if it is, it's still

9          got to be for the purpose of influencing consumers

10         to buy the defendant's goods.

11               I don't know whether that's the right test

12         or the wrong test, but that's the test this court

13         adopted in Suntree.

14               MR. VOLOKH:  Your Honor, we agree entirely.

15               THE COURT:  Right.

16               MR. VOLOKH:  And we think this is a test

17         that would lead to the conclusion that this speech

18         is not actionable under the Lanham Act.

19               THE COURT:  Right.

20               THE COURT:  You think that's our test and

21         you think that's the right test.

22               MR. VOLOKH:  Yes, we do.

23               THE COURT:  Okay.

24               Thank you.

25               THE COURT:  Yeah, let's cover that.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

1           It's not a test.  The question is -- that's

2       a great one -- is it the right test?

3           You do this all the time and we don't.  Is

4       this the right test?

5           MR. VOLOKH:  Yes, Your Honor, absolutely --

6           THE COURT:  Okay.

7           MR. VOLOKH:  -- because it is a test that

8       reflects the reality.

9           THE COURT:  Sometimes our test people say

10      is not the right test.

11          MR. VOLOKH:  Well, Your Honor, sometimes

12      they might but in this case --

13          THE COURT:  Sometimes they tell us that.

14          MR. VOLOKH:  In this case, we think it is

15      because it reflects the reality that much very

16      important speech that's in -- that's within public

17      debate is, in fact, said by people who are working

18      within the same field, and that's why they have so

19      much to say about it.

20          So unless the speech is commercial speech,

21      which this is not because this doesn't promote the

22      defendant's goods and services -- and unless it

23      promotes the defendant's goods and services.

24          In this case, it's a little redundant of

25      the commercial speech test, this should not be

Page 58

```
 1          treated as actual (inaudible) under the Lanham

 2          Act, but should instead satisfy the much higher

 3          standards of liable law, which requirement --

 4               THE COURT:  I'm going to ask about that.

 5          He dismissed -- the Plaintiff dismissed the libel

 6          claim.

 7               I don't know whether that amended complaint

 8          has a libel claim back in it.  Do you know?

 9               MR. VOLOKH:  Your Honor, I'm afraid -- I'm

10          afraid we do not.

11               THE COURT:  Yeah, I'm going to ask the

12          Plaintiff whether --

13               As I understood what we had, the District

14          Court ruled on was Lanham Act and state unfair

15          competition.

16               MR. VOLOKH:  So I believe that the original

17          lawsuit included a libel complaint but please --

18               THE COURT:  It had a libel and a libel per

19          se complaint.

20               MR. VOLOKH:  Yes.

21               THE COURT:  But I thought he dismissed

22          those claims and was traveling under Lanham Act

23          and only state court, state law unfair

24          competition.

25               MR. VOLOKH:  Your Honor, I apologize but --
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

1          THE COURT:  You don't know.

2          MR. VOLOKH:  -- I'm sure the Plaintiff

3     will --

4          THE COURT:  But your time is up.

5          MR. VOLOKH:  Yes, Your Honor.

6          THE COURT:  Let's see if Judge Martin or --

7          THE COURT:  No.

8          THE COURT:  Okay.

9          Thank you, sir.

10          MR. VOLOKH:  Thank you very much, Your

11     Honors.

12          THE COURT:  I just wanted to tell Mr.

13     Randazza I'm sorry I misunderstood your argument

14     there, but I got it now.

15          MR. RANDAZZA:  You got it right.

16          THE COURT:  Yeah, I got it.

17          THE COURT:  All right.

18          So Mr. Novaldes (phonetic) is no time.

19          All right, Mr. O'Brien.

20          MR. O'BRIEN:  Okay.

21          To answer --

22          THE COURT:  Before we start the clock, can

23     you clarify this for me.

24          As I understood it in the District Court,

25     I'm not talking about your amended complaint, you

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 60

1          dismissed the libel part, or the District Court

2          dismissed it.

3               Tell me about your libel claims.

4               MR. O'BRIEN:  Are you talking about the

5          second amended complaint, Your Honor?

6               The complaint that we wanted to have in the

7          case?

8               THE COURT:  No, I'm not talking about the

9          one that wasn't allowed.

10              MR. O'BRIEN:  Okay.

11              THE COURT:  I'm talking about -- because

12         we'll get to whether that should have been allowed

13         and what's in there.

14              As I understood it, up to that point in

15         time, you were traveling on only Lanham Act and

16         state law unfair competition; is that correct?

17              MR. O'BRIEN:  That's what was ruled on in

18         summary judgment.  Because of the anti-SLAPP order

19         --

20              THE COURT:  I understand why.  There was no

21         libel claim in the case at that time?

22              MR. O'BRIEN:  At the time of the summary

23         judgment order, Your Honor?

24              THE COURT:  Yes.

25              MR. O'BRIEN:  Yes, that's correct.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 61

1              THE COURT:  Okay.

2              And so then in the -- you first, actually

3         when you did your initial complaint, you had trade

4         libel, libel per se and tortious interference, and

5         then they were dismissed.

6              And then you left Lanham Act and unfair

7         competition and that was a summary judgment.

8              MR. O'BRIEN:  Correct, Your Honor.

9              THE COURT:  All right.

10             So then tell me in the second amended

11        complaint, the one he says -- now he says it was

12        shortly after the deadline.

13             MR. O'BRIEN:  No.

14             THE COURT:  Okay.

15             MR. O'BRIEN:  No, it was --

16             THE COURT:  We'll straighten that out.

17             MR. O'BRIEN:  Okay.

18             THE COURT:  Okay.

19             So whatever it is that you say the District

20        Court abused its discretion in not allowing, what

21        were the causes of action in that proposed second

22        amended complaint?

23             MR. O'BRIEN:  Count one, Lanham Act.

24             THE COURT:  Okay.

25             MR. O'BRIEN:  Count two, Florida unfair

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 62

1          competition.

2               THE COURT:  Those were already there.

3               MR. O'BRIEN:  Florida, Florida.  Specifying

4          Florida --

5               THE COURT:  Not California.

6               MR. O'BRIEN:  -- unfair competition.

7               Well, it wasn't specified in the complaint,

8          but we are -- want to specify Florida.  Specify

9          Florida.

10               THE COURT:  The complaint will speak for

11          itself.  We'll decide whether it's Florida or

12          California.  I'll look at it.

13               MR. O'BRIEN:  Well, it says -- above the

14          count, it says Florida unfair competition.

15               THE COURT:  Well, then that's what it says.

16               MR. O'BRIEN:  Above the count, Florida.

17               THE COURT:  Okay.

18               MR. O'BRIEN:  Count three --

19               THE COURT:  Lanham Act and count two was

20          unfair competition.

21               MR. O'BRIEN:  Florida unfair competition.

22               THE COURT:  All right.  And then was there

23          any other count?

24               MR. O'BRIEN:  Yes, Your Honor.  Count three

25          is Florida trade libel.

Page 63

1           Count four, Florida defamation per se.

2           Count five, Florida civil conspiracy.

3           THE COURT:  And those were the new things

4     you wanted to add to the complaint.

5           MR. O'BRIEN:  That's right.

6           THE COURT:  And new -- new defendants?

7           MR. O'BRIEN:  Yes.  Yes, Your Honor.  Jay

8     Novella and Paul Ingraham.

9           THE COURT:  There were -- I said new --

10    those are the new ones, okay?

11          MR. O'BRIEN:  Correct, Your Honor.  Jay

12    Novella --

13          THE COURT:  Two claims and two new

14    defendants?

15          MR. O'BRIEN:  Yes, that had not previously

16    been alleged.

17          THE COURT:  Okay.

18          And -- and you are adding back claims or

19    seeking to add back trade libel and libel per se

20    claims that you had previously --

21          MR. O'BRIEN:  No, had not previously

22    dismissed it because that --

23          THE COURT:  Well, how did they go away?

24    When the first complaint had them, how did they go

25    away?

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 64

1           You just amend it and didn't --

2           MR. O'BRIEN:  We sought leave to amend

3      within the scheduling order.  We filed it the day

4      motions for leave to amend were supposed to be

5      filed.

6           THE COURT:  I need you to listen --

7           MR. O'BRIEN:  And then --

8           THE COURT:  I need you to listen to the

9      question.  I'm not starting (inaudible).

10          I've got to figure out where the claims

11     are.  All right.

12          So what I'm asking is in the original

13     complaint -- forget about all this leave to amend

14     and everything -- there were some trade libel and

15     libel per se claims.

16          How did they go away?

17          Was it because one of the first amended

18     complaint you filed dropped them?

19          MR. O'BRIEN:  No, no.

20          What happened --

21          THE COURT:  How did they go away?  Don't

22     talk about amendment.

23          MR. O'BRIEN:  I'm trying to answer that --

24          THE COURT:  Okay.

25          MR. O'BRIEN:  -- because it is relevant to

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 65

1        amendment.

2            We moved for leave to amend the last day of

3        the scheduling order.  Then the court issued an

4        anti-SLAPP order saying there's no -- there's

5        insufficient actual malice.

6            THE COURT:  And then did you dismiss the

7        trade libel?

8            MR. O'BRIEN:  As a result of not being able

9        to get leave to amend, we were stuck with the

10       complaint that we had filed in August of 2014.

11           So as a result, just got rid of everything

12       other than Lanham Act.

13           THE COURT:  The August 2014 complaint

14       didn't have the trade libel in it then.

15           MR. O'BRIEN:  Yes, it did.  Yes, it did,

16       Your Honor.

17           THE COURT:  Then we'll have to go back.

18           THE COURT:  After you lost on the

19       anti-SLAPP, then you dismissed these other state

20       law Florida claims, correct?

21           MR. O'BRIEN:  No, they were not Florida

22       claims -- well, I mean --

23           THE COURT:  Florida --

24           MR. O'BRIEN:  -- we dismissed the claims.

25       We dismissed counts three, four and five --

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

1          THE COURT:  Okay.

2          MR. O'BRIEN:  -- which were trade libel,

3     libel per se and tortious interference.

4          THE COURT:  Okay.

5          MR. O'BRIEN:  And that was Docket No. 55.

6          THE COURT:  Okay.

7          MR. O'BRIEN:  But prior to that, we wanted

8     to amend, but because of the anti-SLAPP order, and

9     because the District Court did not give us leave

10     to amend, we just -- we got rid of those

11     complaints.

12          THE COURT:  And so the first time you were

13     trying to do California law and then in this later

14     effort you were trying to do Florida on the trade

15     libel?

16          MR. O'BRIEN:  We were specifying in the

17     second -- the proposed second amended complaint,

18     we were specifying Florida.

19          THE COURT:  The first one where you had

20     them before they got dismissed in Docket No. 55,

21     what law were you asserting there?

22          MR. O'BRIEN:  That complaint was Docket No.

23     55 and it was not specified.  The counts were not

24     specified.

25          THE COURT:  You didn't put California or

Page 67

```
 1          anything that --

 2              MR. O'BRIEN:  No, I don't have immediate

 3          memory recall.

 4              I believe that the counts were ambiguous as

 5          to whether -- which law.

 6              So I think it was a matter of

 7          interpretation, as far as I recall.  If you look

 8          at the --

 9              THE COURT:  It must have been California

10          because you're saying you dismissed them because

11          of the ruling on the anti-SLAPP.  So you must have

12          been --

13              MR. O'BRIEN:  No, it wasn't -- it wasn't

14          because we had two Florida Plaintiffs, Your Honor.

15          And the reason why the anti-SLAPP order came in,

16          there was a choice of law analysis.

17              THE COURT:  Right.

18              MR. O'BRIEN:  Because, again, Dr. Novella

19          is a Connecticut defendant.

20              THE COURT:  Okay.  Now you've answered my

21          question.  I'm going to start the clock.

22              THE COURT:  Wait, wait, wait.  I just want

23          to say, I'm happy to hear you say you don't have

24          immediate recall of something because your memory

25          of the docket is amazing, isn't it?
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 68

```
 1              I mean, all that he remembers.  I'm
 2      impressed.
 3              MR. O'BRIEN:  Well, I appreciate that.  But
 4      I do want to make sure that we all remember what
 5      the timeline of these attacks are because I think
 6      it's the most important part of what I'm trying to
 7      say.
 8              And so let's just --
 9              THE COURT:  You have the two that we
10      understand, one from the '13 and one from '14.
11      And then there's one in April '15 from --
12              MR. O'BRIEN:  No.
13              Let me just say it and cite the docket
14      entries so we're all clear, okay?
15              THE COURT:  All right.
16              MR. O'BRIEN:  The first attack was Docket
17      No. 55-1, Docket No. 260-15.  That's the original
18      attack in May of 2013.
19              THE COURT:  And I'm looking at the District
20      Court's order.  The first thing she says is
21      background, Plaintiff's amended complaint filed on
22      August 2014 brought five counts against four
23      defendants, DE 55.
24              MR. O'BRIEN:  Okay.
25              THE COURT:  She's got it.
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 69

1            MR. O'BRIEN:  Well, I want to make sure we

2       are crystal clear because there's complete

3       confusion as to what we're trying to put into this

4       case.

5            The second attack was on July 23rd, 2014,

6       and that's Docket No. 260-18.

7            Neither of those attacked are up there,

8       okay?  Neither of those attacks are up here.

9            There's a secondary use of that attack,

10      which I'll get to in a second.

11           The third attack, which is part -- excuse

12      me, podcast 472, which is docket numbers 260-17,

13      177-8 and 177-9, is a yet another attack and

14      that's this --

15           THE COURT:  And the date was?

16           MR. O'BRIEN:  That came out July 26th,

17      2014.  Made additional false statements.

18      Additional false statements, I'll get to in a

19      second because we should care when people are

20      saying false things about a business, especially

21      an inventor.

22           THE COURT:  Stop it.  Quit yelling at us

23      all right?

24           MR. O'BRIEN:  I apologize.  I had too much

25      coffee.

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

1              THE COURT:  I thought it was unfair when

2         you, in your brief, did not follow the spirit of

3         our law and put extra argument when you were

4         supposed to be listing the issues which were

5         before us which doesn't count against your word

6         count.

7              I no longer think it's unfair because there

8         were five amicus briefs, but please don't do that

9         again.

10             You've got to follow the rules.  It wasn't

11        unfair.  You didn't do anything in the context of

12        this case to your opponents, but just try and

13        follow the spirit of our rules, okay?

14             MR. O'BRIEN:  Yes, Your Honor.

15             THE COURT:  All right.

16             THE COURT:  So July 26, '14 --

17             MR. O'BRIEN:  Okay.

18             THE COURT:  Was -- you are up to that.

19             MR. O'BRIEN:  So there was podcast 472,

20        which was the third attack, which was --

21             THE COURT:  But your amended complaint was

22        filed in August --

23             MR. O'BRIEN:  Yes, Your Honor.

24             THE COURT:  -- right after that.

25             MR. O'BRIEN:  Correct.

Page 71

1            The reason why we did not include this

2       podcast, although we did reference podcast, in the

3       amended complaint, we did reference podcast, is we

4       did not have a transcript of the podcast which

5       didn't come out until a long time after that and

6       we couldn't figure out who was saying what on the

7       podcast transcript about the Plaintiffs.

8            The next page that's relevant that was

9       excluded --

10           So podcast 472 completely excluded from

11      summary judgement, completely excluded.

12           The legal defense page, which is Docket No.

13      274-2, page -- or 274-2, page 18 was on -- was

14      initially published on July 26th, 2014.  And then

15      it was continually updating.

16           One of the updates was to update to have

17      another page, which was the update web page, which

18      is what Judge Martin, you were referring to

19      initially, which was -- came out April 1st, 2015.

20      That's Docket No. 260-19.

21           THE COURT:  Yeah, but what's the change

22      that occurs there versus what it was already

23      extant.

24           MR. O'BRIEN:  Okay.

25           THE COURT:  I mean it was just --

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 72

1          MR. O'BRIEN:  That was not -- that was not,

2     like, a supplement.  It was a completely new

3     attack.

4          THE COURT:  That's not what I asked.

5          MR. O'BRIEN:  There was no --

6          THE COURT:  It wasn't a new page.  It was

7     an update.

8          MR. O'BRIEN:  No, it was called -- we call

9     it the update page.  It was a completely new web

10    page.  It was a completely new web page.

11         THE COURT:  Was all the text totally

12    different?

13         MR. O'BRIEN:  Yes, yes.  It was all

14    different.  It was all different.

15         One of the attacks was that the -- my

16    client's patents are unethical under AMA

17    guidelines.  That was one of the attacks.

18         The other attack is what I was describing

19    before, they had us --

20         THE COURT:  That sounds like patent

21    unethical under ADA guidelines.

22         MR. O'BRIEN:  The AMA.

23         THE COURT:  That sounds like that's got to

24    be a libel claim, not a --

25         MR. O'BRIEN:  No, that's a -- that's a

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case: 15-14889   Date Filed: 08/05/2017   Page: 111 of 597

Page 73

```
 1              business saying that their patents are unethical

 2              under a specific guideline, that's a falsifiable

 3              statement.

 4                   They're either unethical under the

 5              guidelines or not.  We have the specific

 6              guidelines.  We can test that in front of a jury.

 7                   The other -- the other statement about the

 8              clients that were challenging concerns the medical

 9              board accusation that was withdrawn.

10                   It has -- it has been withdrawn.  It was

11              withdrawn after the update page came up and it was

12              withdrawn.

13                   I need to -- I need to say that Dr. Novella

14              is not -- is not a research neurologist.

15                   To answer your question, Judge Martin, page

16              40, Page 40 of the opening brief, he's not a

17              research neurologist.

18                   And we -- we make this --

19                   THE COURT:  You know, so that addresses his

20              motivation in making these statements.

21                   MR. O'BRIEN:  One of the motivations.

22                   So the Lanham Act, if we look at the text,

23              it doesn't say commercial speech.  It says in

24              commercial advertising or promotion.

25                   Our friend of the court here said the words
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case: 15-14889    Date Filed: 08/05/2017    Page: 112 of 597

Page 74

```
 1            "promoting".
 2                  So if I may show you, we have testimony
 3            that (inaudible).  He is promoting.  This is a pay
 4            to get (inaudible) content to this web -- become a
 5            member.
 6                  THE COURT:  All right.  You're -- you're
 7            away from the microphone.  It won't even pick you
 8            up -- pick you up.
 9                  And I gave you five minutes before and now
10            you've expired over the five minutes rebuttal.
11            I'm trying to be fair to both parties but if a
12            colleague has a question.
13                  THE COURT:  I have a question.
14                  Your page 40, it says that Novella was
15            trying to make money by his blog or his post.
16            He's an actual competitor because he treats people
17            for stroke, back pain and sciatica and Alzheimer's
18            disease.
19                  That sentence, that's it?
20                  He's an actual competitor?
21            MR. O'BRIEN:  Yes.
22            THE COURT:  And he treats those people?
23            MR. O'BRIEN:  Yes.
24            THE COURT:  Okay.
25            MR. O'BRIEN:  He prescribes off label
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case: 15-14889   Date Filed: 08/05/2017   Page: 113 of 597

Page 75

```
 1          treatments.

 2                  THE COURT:  Okay.

 3                  So you're saying --

 4                  MR. O'BRIEN:  And they both solicit

 5          patients from the same geographical area.

 6                  THE COURT:  And this was to get his -- get

 7          Dr. Tobinick's patients away from him and to Dr.

 8          Novella?

 9                  MR. O'BRIEN:  Well, yes.

10                  THE COURT:  Okay.

11                  MR. O'BRIEN:  I would refer you to the

12          expert report, Professor Glassman, Docket No.

13          272-22.

14                  He talks about the way that a patient, when

15          they go to the Internet and they see these

16          attacks, what it makes them think about the

17          Plaintiffs.

18                  He's also promoting consumer choice on this

19          legal defense page.  This is what we do so that

20          consumers can make informed decisions.

21                  He's specifically stating that the whole

22          point of this is to drive consumers away from the

23          Plaintiffs.

24                  There's a comment.  There's a comment.

25                  THE COURT:  It has to be to drive them away
```

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 76

1            from Plaintiffs and to get them for himself.

2                 MR. O'BRIEN:  It doesn't have to be.  I

3            think it would be a very bad rule of law to say

4            you know what, unless you're a competitor, we

5            don't care whether what you're saying is false.

6                 I think that's not a good rule of law

7            because you would have businesses that would not

8            know how to exist because you'd have false

9            statements all up and down the Internet.

10                Oh, hey, they're not a competitor.  They

11           don't sell Coca-Cola products, they can say any

12           false statements they want.

13                One man institute, that's --

14                THE COURT:  (Multiple speakers).

15                Judge Martin wants to ask something.

16                THE COURT:  I just want to be sure.  If we

17           got to the actual malice question, which I don't

18           -- I'm not sure we do, but I just want to be sure

19           I understand, your position is that the false

20           statements equals actual malice.

21                MR. O'BRIEN:  There's a lot of actual

22           malice.

23                THE COURT:  I know.  No, no.

24                But is there anything else other than the

25           false statements that you say constitutes actual

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 116 of 258
Case: 15-14889   Date Filed: 08/05/2017   Page: 115 of 597

Page 77

1          malice?

2                  MR. O'BRIEN:  Yes, there's a lot.

3                  THE COURT:  No, I don't want a lot.  I just

4          want to know what category.

5                  MR. O'BRIEN:  There is a lot.

6                  THE COURT:  So something other than false

7          statements.

8                  MR. O'BRIEN:  He knew he was publishing

9          falsehoods.

10                 THE COURT:  Well, okay.  So that's it?

11         False statements.

12                 I'm not talking about the number of false

13         statements.

14                 I'm talking about is there something else

15         that you think constitutes actual malice other

16         than false statements in this case?

17                 MR. O'BRIEN:  So the concept of actual

18         malice is either actual knowledge it's false or

19         anger, hostility, unreasonable investigation,

20         unreliable sources.

21                 So when he describes, for example, on

22         podcast 472 that the patient described in the LA

23         Times article had no apparent change, that's

24         actual malice.

25                 Because even the article itself said that

Page 78

1           the patient had apparent changes from Dr. -- from

2           the Plaintiff's treatment.

3                   THE COURT:  Okay so it's a falsehood.

4                   MR. O'BRIEN:  Health fraud is not an

5           opinion.  Health fraud is not an opinion.

6                   Lack of formal training in neurology is not

7           an opinion.

8                   THE COURT:  Your time has expired.

9           You've -- Judge Martin said you've answered her

10          question.

11                  THE COURT:  Thank you.

12                  THE COURT:  Thank you very much and the

13          case is submitted to the Court.

14                  We're way over.

15                  So we've done --

16                  MR. O'BRIEN:  Thank you.

17                  THE COURT:  -- about 30 minutes, 35 minutes

18          actually on your side.  And --

19      (Thereupon, the RECORDED HEARING was concluded )

20                  -  -  -

21

22

23

24

25

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

Page 79

                    C E R T I F I C A T E

                         -   -   -

            I, TRISH BAILEY-ENTIN, Court Reporter,

State of Florida at Large, certify that I was authorized

to and did stenographically transcribe the foregoing

proceedings and that the transcript is a true and

complete record of my stenographic notes.


            Dated this 19th day of February, 2017.




                    _____

                    TRISH BAILEY-ENTIN, CR

14c00259-d0e1-454f-b9f8-fe19ec6a6f83

**EXHIBIT B**

(*Purple Innovations v. Honest Reviews et al*, 17-cv-00138 [Dkt. No. 25] (D. Utah), *Pro Hac Vice* Application by Attorney Randazza)

W. ANDREW MCCULLOUGH, L.L.C (2170)
Attorney for Defendants Honest Reviews and Monahan
6885 South State Street, Suite 200
Midvale, Utah 84047
Telephone:  (801) 565-0894

# UNITED STATES DISTRICT COURT
## District of Utah   Central Division

| | | |
|---|---|---|
| | * | |
| PURPLE INNOVATIONS, LLC | * | Motion for Pro Hac Vice Admission and |
| Plaintiff | * | Consent of Local Counsel |
| | * | |
| v. | * | |
| HONEST REVIEWS, RYAN MONAHAN, | * | |
| and    GHOSTBED, INC. | * | |
| | * |   Case No. 2;17-cv-138-DB |
| Defendants. | * | |

Pursuant to D.U. Civ Rule 83-1.1(d), I move the admission of Marc J. Randazza as pro hac vice counsel for HONEST REVIEWS, LLC., and RYAN MONAHAN  (Defendants) and consent to serve as local counsel.   The application for pro hac vice admission is attached as exhibit A to this motion, an Electronic Case Filing Registration Form as exhibit B, and the admission fee, if required, has been paid to the court with the submission of this motion.

Dated this 8th day of March, 2017.

W. Andrew McCullough
W. Andrew McCullough
Signature of local counsel

# EXHIBIT A

Application for Admission Pro Hac Vice
Marc J. Randazza

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## APPLICATION FOR ADMISSION PRO HAC VICE

Name of Attorney: Marc J. Randazza  Telephone: (702) 420-2001
Firm Name: Randazza Legal Group, PLLC
Business Address: 4035 S. El Capitan Way
Las Vegas, NV 89147

Current bar memberships and date of admission:

| Jurisdiction | Bar Number | |
|---|---|---|
| State Bar of Nevada | 12265 | Admitted on 01/06/2012 |
| State Bar of California | 269535 | Admitted on 05/20/2010 |
| State Bar of Florida | 625566 | Admitted on 03/25/2003 |
| State Bar of Arizona | 27861 | Admitted on 08/26/2010 |
| State Bar of Massachusetts | 651477 | Admitted on 01/24/2002 |
| | | Admitted on |
| | | Admitted on |

Have you ever been the subject of disciplinary action by any bar to which you have been admitted? _____ No     x   Yes (see attached Declaration)

Prior pro hac vice admissions in the District of Utah:     x   none

Case Name: _____
Case Number: _____
Admission Date: _____

(Attach list of other cases separately if more space is needed.)

I certify that I am a member in good standing of all bars to which I have been admitted. I further agree to read and comply with the Utah Rules of Professional Conduct and the Utah Standards of Professionalism and Civility. This certification that the foregoing is true and correct is made under penalty of perjury.

_____     March 7, 2017
Signature     Date

Nonresident United States attorneys and attorneys employed by agencies of the federal government are exempt from the pro hac vice fee. All other attorneys must pay a fee of $250.00 concurrent with this application. This application must be filed as an attachment to a motion for admission and consent filed by local counsel.

If you have not previously registered for CM/ECF in the District of Utah, please attach a completed Electronic Case Registration Form with this application to receive your login and password.

## EXHIBIT C

**(*Purple Innovations v. Honest Reviews et al*, 17-cv-00138 [Dkt. No. 25-3] (D. Utah), Sworn
Statement by Attorney Randazza)**

# EXHIBIT C

Declaration of Marc J. Randazza
in Support of Application for Admission
*Pro Hac Vice*

W. Andrew McCullough (2170)
6885 S State Street, Suite 200
Midvale, Utah 84047
Telephone: (801) 565-0894
Facsimile: (801) 565-1099
wandrew48@ymail.com

Marc J. Randazza (*pro hac vice* forthcoming)
RANDAZZA LEGAL GROUP, PLLC
4035 S. El Capitan Way
Las Vegas, Nevada 89147
Telephone: (702) 420-2001
Facsimile: (305) 437-7662

*Attorneys for Honest Reviews, LLC and Ryan Monahan*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PURPLE INNOVATIONS, LLC, a Delaware limited liability company, | **DECLARATION OF MARC J. RANDAZZA IN SUPPORT OF APPLICATION FOR ADMISSION *PRO HAC VICE*** |
| Plaintiff, | |
| v. | Case No.: 2:17-cv-00138-PMW |
| HONEST REVIEWS, LLC, a Florida Corporation, RYAN MONAHAN, an individual, and GHOSTBED, INC., a Delaware corporation, | Honorable Dee Benson |
| Defendants. | |

I, MARC J. RANDAZZA, declare:

1.      I have personal knowledge of the following matters.  The statements herein are true and correct to the best of my knowledge.

2.      I am over the age of 18 years and have never been convicted of a crime of any kind.

3.     I make this declaration in support of my Application for Admission Pro Hac Vice in the above-captioned proceeding.

4.     I am licensed to practice law in the State of Nevada, State of California, State of Florida, State of Arizona, and the Commonwealth of Massachusetts.

5.     I am in good standing with each and every bar and court that I am admitted to.

6.     I wish to disclose that there is a pending disciplinary action against me in the State of Nevada, Case No. OBC15-0747.

7.     The action has been partially dismissed, and the other claims are the subject of a pending motion to dismiss.

8.     Given the ongoing nature of the proceedings, and the lack of findings, it is my position that this did not need to be disclosed under the verbiage of the question.  However, out of an abundance of candor, caution, and respect for the Court, I disclose am disclosing this information.

9.     There are no other pending disciplinary actions against me before any bar or court.

10.    I have never been disciplined by any bar or court.

11.    Should the complaint result in actual discipline, of any kind at all, I will promptly inform the court.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _March 7, 2017_ .

Marc J. Randazza

- 2 -

## EXHIBIT D

**(Disciplinary complaint referred to by Attorney Randazza in *Purple Innovations v. Honest Reviews et al*, 17-cv-00138 [Dkt. No. 25-3] (D. Utah))**

1   Case No.: OBC15-0747

**FILED**

**JUL 25 2016**

STATE BAR OF NEVADA
BY: _____
OFFICE OF BAR COUNSEL

## STATE BAR OF NEVADA

## SOUTHERN NEVADA DISCIPLINARY BOARD

| | |
|---|---|
| STATE BAR OF NEVADA, | ) |
| Complainant, | ) |
| vs. | ) |
| | ) **COMPLAINT** |
| MARC J. RANDAZZA, Esq., | ) |
| Nevada Bar No. 12265, | ) |
| Respondent. | ) |

TO:   Marc J. Randazza, Esq.
      Randazza Legal Group, PLLC
      4035 S. El Capitan Way
      Las Vegas, NV 89147

PLEASE TAKE NOTICE that pursuant to Supreme Court Rule ("SCR") 105(2), as amended effective March 1, 2007, a **VERIFIED RESPONSE OR ANSWER** to this Complaint must be filed with the Office of Bar Counsel, State Bar of Nevada, 3100 W. Charleston Boulevard, Suite 100, Las Vegas, Nevada, 89102, within twenty (20) days of service of this Complaint. Procedure regarding service is addressed in SCR 109.

Complainant, State Bar of Nevada ("State Bar") by and through its Assistant Bar Counsel, David J. Rickert, alleges that:

1.     Attorney Marc J. Randazza ("Respondent"), Bar No. 12265, is now a licensed attorney in the State of Nevada, having had his principal place of business for the practice of law in Clark County, Nevada from at least June 2011 through August 2012.

2.     In or about June 2009, the Respondent drafted and signed a contract with Excelsior Media Corp. ("Excelsior") to become corporate in-house general counsel for Excelsior.

3.     At that time, Excelsior was headquartered in California.

4.     Excelsior is a related company to Corbin Fisher ("Corbin"), and has a subsidiary called Liberty Media Holdings, LLC ("Liberty").

5.     Excelsior, Corbin, and Liberty are involved in the production and distribution of pornography.

6.     After becoming general counsel, the Respondent performed legal work on behalf of all three entities.

7.     While the Respondent was still working as general counsel for Excelsior, Excelsior relocated its corporate headquarters to Las Vegas, Nevada in approximately February 2011.

8.     As of the filing of this complaint, Excelsior remains an active domestic Nevada corporation.

9.     The Respondent continued working as Excelsior's general counsel, and relocated to Las Vegas himself in approximately June 2011.

10.     While the Respondent was an attorney admitted to practice in one or more other states at that time, he was not admitted as a Nevada attorney until approximately January 6, 2012.

11.     A portion of the Respondent's work as general counsel was in pursuing violations of Corbin/Excelsior/Liberty's ("C./E./L.") intellectual property, for example individuals

-2-

1   or companies downloading or distributing C./E./L.'s pornographic materials without
2   appropriate payment or permission.

3       12.    The Respondent, on behalf of Liberty, filed suit against FF Magnat Limited d/b/a
4   Oron.com ("Oron") for alleged violations of his client's intellectual property.

5       13.    In July and August 2012, the Respondent engaged in multiple settlement
6   negotiations with Oron's counsel.

7       14.    In this time period, the Respondent was involved in settlement negotiations with
8   Oron for a payment to himself.

9       15.    The eventual amount agreed upon with opposing counsel was $75,000.00.

10      16.    This $75,000.00 was to be paid to the Respondent as part of Oron's broader
11  settlement with his client.

12      17.    One purpose of this payment was so that the Respondent would be conflicted
13  off of litigation against Oron in the future.

14      18.    On or about August 13, 2012, the Respondent presented an execution copy of
15  the Oron settlement agreement to CEO Jason Gibson for his signature.

16      19.    At that time, Mr. Gibson noticed the proposed $75,000.00 payment amid the
17  other settlement provisions, and asked the Respondent about it.

18      20.    This was the first time Mr. Gibson was made aware of the proposed $75,000.00
19  payment to the Respondent.

20      21.    Mr. Gibson was upset, and expressed concerns to the Respondent about the
21  payment of this $75,000.00.

22      22.    The Respondent did not receive the $75,000.00 payment from any settlement
23  with Oron.

24      23.    In August 2012, the Respondent loaned approximately $25,000.00 to Liberty, to
25  cover part of overseas legal fees that would be incurred in the Oron litigation.

-3-

24.     On or about August 21, 2012, on the Respondent's advice, Mr. Gibson signed a promissory note on Liberty's behalf noting the terms of repayment of this $25,000.00 loan to the Respondent.

25.     Liberty was not advised of its right to seek the advice of independent counsel with regards to this promissory note.

26.     The Respondent did not obtain Liberty's informed consent, confirmed in writing, to the essential terms of the transaction, and to the Respondent's role as a lender in the transaction.

27.     In mid- to late-August 2012, approximately $550,000.00 was sent to the Respondent's out-of-state trust account- this was a settlement payment in relation to the Oron litigation.

28.     The Respondent's trust account, that received and held the $550,000.00, was outside of Nevada.

29.     The Respondent resigned from his employment with C./E./L. on or about August 29, 2012.

30.     Between August 28 and August 30, 2012, the Respondent authorized, or personally performed, multiple erasures of data on a C./E./L. corporate laptop computer that was in his possession, and that he had used for work-related purposes.

31.     This laptop computer contained C./E./L. corporate information.

32.     The Respondent was also in possession of a C./E./L. corporate iPhone, that he had used for work-related purposes, and that contained C./E./L. corporate information.

33.     After resigning on August 29, 2012, for a time the Respondent refused to turn over either the corporate laptop or the corporate iPhone.

34.     The Respondent did later turn over the laptop and iPhone for examination.

-4-

35.    Forensic examination was performed on both the corporate laptop and the corporate iPhone, in an attempt to recover deleted corporate data.

36.    Some corporate data was recovered from these devices.

37.    Other corporate data appears to have been permanently lost.

38.    While corporate in-house general counsel for Excelsior (approximately June 2009 through August 2012), the Respondent maintained an outside legal practice and separate law firm, and represented other clients.

39.    One of these clients was an entity known as Bang Bros (or Bang Brothers), a production company for pornography, and possible business competitor of C./E./L.

40.    In or around June 2012, Liberty was negotiating for the possible acquisition of Cody Media, another pornography company.

41.    The Respondent suggested to C./E./L. the possibility of getting financing for the deal from Bang Bros.

42.    The Respondent did not disclose the conflict of interest to C./E./L.

43.    The Respondent never obtained informed consent, confirmed in writing, from C./E./L. for he or his firm to represent Bang Bros in the June 2009 - August 2012 timeframe.

44.    Another client the Respondent represented in the June 2009 - August 2012 timeframe was XVideos, a "tube site" that permitted users to upload copyrighted videos onto its website.

45.    One or more of C./E./L.'s pornographic videos were uploaded to XVideos' "tube site," without permission, and where they could be widely accessed by the public.

46.    The Respondent advised C./E./L. not to pursue a lawsuit against XVideos for violation of their intellectual property.

47.    The Respondent did not disclose the conflict of interest to C./E./L.

1      48.     The Respondent never obtained informed consent, confirmed in writing, from

2   C./E./L. for he or his firm to represent XVideos in the June 2009 - August 2012 timeframe.

3      49.     Another client the Respondent represented in the June 2009 - August 2012

4   timeframe was PornGuardian, an anti-piracy company that works against violations of

5   pornographers' intellectual property rights.

6      50.     While the Respondent was representing C./E./L. in the 2012 litigation against

7   Oron, he also worked on negotiating a settlement for PornGuardian from Oron at the same

8   time.

9      51.     The Respondent did not disclose the conflict of interest to C./E./L.

10      52.     The Respondent never obtained informed consent, confirmed in writing, from

11   C./E./L. for he or his firm to represent PornGuardian in the June 2009 - August 2012

12   timeframe.

13      53.     Two other clients the Respondent represented in the June 2009 - August 2012

14   timeframe were Titan Media and Kink.com.

15      54.     Titan Media is a pornography company, and a possible business competitor of

16   C./E./L.

17      55.     Kink.com is a pornography company, and a possible business competitor of

18   C./E./L.

19      56.     While the Respondent was representing C./E./L., he worked on negotiating

20   producer agreements for Liberty with Titan Media and Kink.com.

21      57.     The Respondent did not disclose either conflict of interest to C./E./L.

22      58.     The Respondent never obtained informed consent, confirmed in writing, from

23   C./E./L. for he or his firm to represent Titan Media or Kink.com in the June 2009 - August

24   2012 timeframe.

25

Case 9:14-Case-09-54193-ai-Document 856-1 Entered 09/07/16 16:36:09 08/24/16 Page 134 of Doc 836-1 Filed 09/09/16 Page 134 of 258

Case: 15-14889      Date Filed: 06/05/2017      Page: 133 of 597

59.     The Respondent has been engaged in protracted litigation with C./E./L. over his employment and compensation since 2012, including arbitration and bankruptcy proceedings.

60.     In light of the foregoing, Respondent violated Rules of Professional Conduct ("RPC") 1.4 (Communication), 1.7 (Conflict of Interest: Current Clients), 1.8 (Conflict of Interest: Current Clients: Specific Rules), 1.10 (Imputation of Conflicts of Interest), 1.15 (Safekeeping Property), 1.16 (Declining or Terminating Representation), 2.1 (Advisor), 5.6 (Restrictions on Right to Practice), and 8.4 (Misconduct).

WHEREFORE, Complainant prays as follows:

1.     That a hearing be held pursuant to Nevada Supreme Court Rule 105;

2.     That Respondent be assessed the costs of the disciplinary proceeding pursuant to Supreme Court Rule 120(1); and

3.     That pursuant to Supreme Court Rule 102, such disciplinary action be taken by the Southern Nevada Disciplinary Board against Respondent as may be deemed appropriate under the circumstances.

Dated this 25th day of July, 2016.

STATE BAR OF NEVADA
C. Stanley Hunterton, Bar Counsel

By: _David Rickert_
David J. Rickert, Assistant Bar Counsel
3100 W. Charleston Boulevard, Suite 100
Las Vegas, Nevada 89102
(702) 382-2200
Attorney for State Bar of Nevada

## EXHIBIT E

**(Order Granting Pro Hac Vice Admission Provisionally to Attorney Randazza in *Purple Innovations v. Honest Reviews et al*, 17-cv-00138 [Dkt. No. 34] (D. Utah))**

W. Andrew McCullough (2170)
6885 S State Street, Suite 200
Midvale, Utah 84047
Telephone: (801) 565-0894
Facsimile: (801) 565-1099
wandrew48@ymail.com

*Attorneys for Honest Reviews, LLC and Ryan Monahan*

<table>
<tr>
<td colspan="2" align="center">IN THE UNITED STATES DISTRICT COURT<br>DISTRICT OF UTAH, CENTRAL DIVISION</td>
</tr>
<tr>
<td>PURPLE INNOVATIONS, LLC,<br>a Delaware limited liability company,<br><br>     Plaintiff,<br><br>v.<br><br>HONEST REVIEWS, LLC, a Florida<br>Corporation, RYAN MONAHAN, an<br>individual, and GHOSTBED, INC., a<br>Delaware corporation,<br><br>     Defendants.</td>
<td align="center"><strong>ORDER FOR PRO HAC VICE<br>ADMISSION</strong><br><br>Case No.: 2:17-cv-00138-PMW<br><br>Honorable Dee Benson</td>
</tr>
</table>

It appearing to the Court that the Petitioners provisionally meet the pro hac vice

admission requirements of DUCiv. R. 83-1.1(d), the motion for the admission pro hac vice of

Marc J. Randazza in the United States District Court, District of Utah in the subject case is

provisionally GRANTED through March 15, 2017, to be reconsidered thereafter.

DATED this 9th day of March, 2017.

Hon. Dee Benson
U.S. District Judge

**EXHIBIT F**

**(Order Granting Pro Hac Vice Admission to Attorney Randazza's Co-Counsel in *Purple Innovations v. Honest Reviews et al*, 17-cv-00138 [Dkt. No. 33] (D. Utah))**

W. Andrew McCullough (2170)
6885 S State Street, Suite 200
Midvale, Utah 84047
Telephone: (801) 565-0894
Facsimile: (801) 565-1099
wandrew48@ymail.com

*Attorneys for Honest Reviews, LLC and Ryan Monahan*

<table>
<tr><td colspan="2" style="text-align:center"><strong>IN THE UNITED STATES DISTRICT COURT</strong><br><strong>DISTRICT OF UTAH, CENTRAL DIVISION</strong></td></tr>
<tr><td>PURPLE INNOVATIONS, LLC,<br>a Delaware limited liability company,<br><br>     Plaintiff,<br><br>v.<br><br>HONEST REVIEWS, LLC, a Florida Corporation, RYAN MONAHAN, an individual, and GHOSTBED, INC., a Delaware corporation,<br><br>     Defendants.</td><td><strong>ORDER FOR PRO HAC VICE ADMISSION</strong><br><br>Case No.: 2:17-cv-00138-PMW<br><br>Honorable Dee Benson</td></tr>
</table>

It appearing to the Court that the Petitioners meet the pro hac vice admission requirements of DUCiv. R. 83-1.1(d), the motion for the admission pro hac vice of D. Gill Sperlein in the United States District Court, District of Utah in the subject case is GRANTED.

DATED this 9th day of March, 2017.

*[signature: Dee Benson]*

Hon. Dee Benson
U.S. District Judge

# EXHIBIT G

## (Declaration of Dennis Kennedy)

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 140 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 1 of 37
Case: 15-14009   Date Filed: 09/09/2017   Page: 135 of 252

# EXHIBIT B

(Affidavit of Dennis L. Kennedy)

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 141 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 2 of 37
Case: 15-14889 Date Filed: 06/03/2017 Page: 140 of 37

## AFFIDAVIT OF DENNIS L. KENNEDY

STATE OF NEVADA        )
                       ) ss:
COUNTY OF CLARK        )

Comes now, DENNIS L. KENNEDY, who being first duly sworn, deposes and says:

1.        I am a resident of Henderson, Nevada.

2.        I am an attorney and have been licensed to practice law in the State of Nevada since 1975. Between 1975 and 2006, I was a member of the law firm of Lionel Sawyer & Collins, and I was a shareholder and director of that firm from 1979 until January 6, 2006. Since January 9, 2006, I have been a partner in the law firm of Bailey❖Kennedy (formerly known as Bailey❖Merrill). My primary area of practice during these 41 years has been civil litigation. Since 1988, I have devoted a substantial amount of my time (both professional and personal) to the area of professional responsibility and legal ethics. My activities in this area include: (i) service on the State Bar Disciplinary Committee (Southern) for nine years, three years as Chairman; (ii) service on the State Bar Ethics and Professional Responsibility Committee for eight years, three years as Chairman; (iii) service on various Nevada Supreme Court Committees charged with adoption, review and revision of ethics and disciplinary rules; (iv) representation of attorneys and judges charged with ethical and disciplinary offenses; (v) defense of the Nevada State Bar and the Nevada Commission on Judicial Discipline in litigation; (vi) representing lawyers, judges and others in litigation against the Nevada State Bar and the Nevada Commission on Judicial Discipline; (vii) giving expert testimony and advice on professional ethics; (viii) conducting continuing legal education on matters of professional ethics; and (ix) occupying the position of adjunct professor of law at the William S. Boyd School of Law (UNLV), where I teach Nevada Civil Practice, a course whose components are Civil Procedure,

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 142 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 3 of 37
Case: 15-14889     Date Filed: 06/09/2017     Page: 141 of 338

Evidence, and Professional Ethics.  All of this is set forth in my curriculum vitae, which is

attached hereto as Exhibit 1.  I am charging $1,000.00 per hour for my work on this matter.  This

is my usual rate for matters of this type.

      3.     I have been retained by Edward Lewis Tobinick, M.D. ("Dr. Tobinick"), Edward

Lewis Tobinick, MD, a California medical corporation d/b/a Institute of Neurological Recovery

("Tobinick MD"), and INR PLLC d/b/a Institute of Neurological Recovery ("INR")

(collectively, the "Tobinick Parties") to render certain opinions with respect to Defendant's

Omnibus Motion for Attorneys' Fees and Costs, filed October 29, 2015 (the "Fee Motion"), in

the matter entitled *Edward Lewis Tobinick, M.D., et al. v. Steven Novella, M.D., et al.*, United

States District Court, Southern District of Florida, Case No. 9:14-cv-80781-RLR (the "Case").

## MATTERS REVIEWED

      4.     In preparing this Report, I (along with one of my associates acting under my

direction and supervision) reviewed the following documents and materials, and the opinions

expressed herein are based upon that review:

      4.1.     Order Granting Defendant Steven Novella's Special Motion to Strike

(Anti-SLAPP Motion), filed June 4, 2015;

      4.2.     Order Denying Plaintiffs' Motion for Sanctions and Plaintiffs' Motion to

Vacate Anti-SLAPP Order Under Rule 60(b), filed September 15, 2015;

      4.3.     Order Granting Defendant Dr. Steven Novella, M.D.'s Motion for

Summary Judgment, filed October 2, 2015;

      4.4.     The Fee Motion, along with the Affidavit of James C. Hauser, the

Declaration of Marc J. Randazza, and the Curriculum Vitae of Marc J. Randazza;

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 143 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 4 of 37
Case: 15-14889     Date Filed: 06/05/2017     Page: 142 of 337

4.5.    Plaintiffs' Omnibus Opposition to the Fee Motion, along with the

Declaration of John G. Heller and the Declaration of Lester Langer;

4.6.    Defendant Steven Novella, M.D.'s Reply to Plaintiffs' Omnibus

Opposition to the Fee Motion; and

4.7.    The Declaration of Jason Gibson.

5.    I have personal knowledge of the facts recited herein, derived from a review of

the pertinent documents and materials discussed above, as well as any information identified as

having been provided to me by counsel for the Tobinick Parties, and I am competent to testify as

to all opinions expressed herein.  The opinions expressed herein are solely my own and may be

modified in the event that other evidence or documents are presented to me.  I was assisted in the

preparation of this Report by Joshua P. Gilmore, Esq., an associate in my office.

## SUMMARY OF OPINIONS

6.    For the reasons stated below, it is my opinion that Marc J. Randazza, Esq.

("Randazza") had a duty to disclose his prior employment as in-house general counsel for

Excelsior Media Group ("Excelsior") in connection with the Fee Motion in order to be forthright

about his prior work history as an attorney and to assist the District Court in assessing his hourly

rate.  Mr. Randazza breached his duty of candor owed to the tribunal by failing to do so.

## OPINION AND ANALYSIS

7.    The following are my detailed opinions and analyses of the professional

responsibility issues presented by the Fee Motion that I have been asked to address.

### Material Facts

8.    The following events do not reasonably appear to be in dispute, and therefore, are

understood to be true for purposes of this opinion.

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 144 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 5 of 37
Case: 15-14889   Date Filed: 08/05/2017   Page: 143 of 397

8.1.     On October 29, 2015, Defendant Steven Novella, M.D. ("Dr. Novella")
filed the Fee Motion.  Dr. Novella argued, *inter alia*, that he was entitled to an award of
attorneys' fees and costs incurred in the Case under the California anti-SLAPP law,
California Code of Civil Procedure Section 425.16, and/or the Lanham Act, 15 U.S.C.
Section 1501 *et seq.*

8.1.1.     In seeking an award of attorneys' fees, Dr. Novella argued that
Mr. Randazza's $650 hourly rate is reasonable based on his years of experience,
skill, and reputation.

8.1.2.     Along with a Declaration from Mr. Randazza describing his
background and qualifications, Dr. Novella provided the District Court with a
copy of Mr. Randazza's curriculum vitae (the "Randazza CV").

8.2.     On November 16, 2015, the Tobinick Parties filed their Opposition to the
Fee Motion.  The Tobinick Parties argued, *inter alia*, that Dr. Novella is not entitled to an
award of fees and costs and, in any event, Mr. Randazza's hourly rate is unreasonable.

8.3.     On November 23, 2015, Dr. Novella filed his Reply to the Tobinick
Parties' Opposition to the Fee Motion.

### Issues Presented

9.     The professional responsibility issues presented by the Fee Motion that I have
been asked to address are as follows: Whether Mr. Randazza had a duty to disclose to the District
Court his prior employment as in-house general counsel for Excelsior; and, if so, whether he

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 145 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 6 of 37
Case: 15-14889   Date Filed: 06/05/2017   Page: 144 of 337

breached his duty of candor owed to the tribunal by failing to disclose such prior employment in connection with seeking an award of attorneys' fees on behalf of Dr. Novella.[1]

### *Mr. Randazza Breached His Duty of Candor Owed to the Tribunal by Omitting from the Fee Motion his Prior Employment as In-House General Counsel for Excelsior*

10.    The basic rules and principles governing a lawyer's duty of candor owed to the tribunal are as follows:

10.1.    A lawyer shall not knowingly[2] make a false statement of fact to a tribunal or fail to correct a false statement of material fact previously made to a tribunal by the lawyer. FLA. BAR R. PROF. CONDUCT, R. 4-3.3(a)(1). "There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." *See* FLA. BAR R. PROF. CONDUCT, R. 4-3.3 comment;[3] *see also In re Ronco, Inc.*, 838 F.2d 212, 218 (7th Cir. 1988) (noting that a half-truth "can be just as misleading, sometimes more misleading, than an absolutely false representation").

10.2.    Similarly, a lawyer shall not "offer evidence that the lawyer knows to be false." FLA. BAR R. PROF. CONDUCT, R. 4-3.3(a)(4).

---

[1]    Whether an attorney's conduct fell below the standard of care is generally established through expert testimony. *See, e.g., Willage v. Law Offices of Wallace & Breslow, P.A.*, 415 So. 2d 767, 768 (Fla. Dist. Ct. App. 1982). An expert is someone who is qualified by virtue of special knowledge, skill, experience, training or education to express an opinion on matters within the scope of such knowledge, FED. R. EVID. 702, and, with limited exception not applicable here, is permitted to opine as to the ultimate issue in a case, FED. R. EVID. 704(a). The Florida Rules of Professional Conduct are evidence of the standard of care to which Florida-licensed attorneys are held. *See* FLA. R. PROF'L CONDUCT, PREAMBLE; *Pressley v. Farley*, 579 So. 2d 160, 161 (Fla. Dist. Ct. App. 1991).

[2]    Knowledge denotes "actual knowledge of the fact in question," which "may be inferred from circumstances." FLA. R. PROF'L CONDUCT, TERMINOLOGY.

[3]    The comment accompanying each Florida Rule of Professional Conduct is intended to provide guidance for interpreting that rule. *See* FLA. R. PROF'L CONDUCT, SCOPE.

10.3.    Rule 4-3.3 "sets forth the special duties of lawyers as officers of the court

to avoid conduct that undermines the integrity of the adjudicative process." *See* FLA.

BAR R. PROF. CONDUCT, R. 4-3.3 comment; *see also Ramey v. Thomas*, 382 So. 2d 78, 81

(Fla. Dist. Ct. App. 1980) ("An attorney is first an officer of the court, bound to serve the

ends of justice with openness, candor, and fairness to all.").

10.4.    "The heart of all legal ethics is in the lawyer's duty of candor to a

tribunal." *Forum v. Boca Burger, Inc.*, 788 So. 2d 1055, 1062 (Fla. Dist. Ct. App. 2001).

"[T]he courts are . . . dependent on members of the bar to marshal and present the true

facts of each cause in such manner as to enable the judge . . . to cook the adversary

contentions in a crucible and draw off the material, decisive facts to which the law may

be applied." *Dodd v. Fla. Bar*, 118 So. 2d 17, 19 (Fla. 1960).

10.5.    "In light of the propensity of appellate courts to reverse when an

attorney's conduct violates the rules of professional conduct, trial judges are advised to

take appropriate measures to prevent such conduct." *Muhammad v. Toys R Us, Inc.*, 668

So. 2d 254, 259 n.1 (Fla. Dist. Ct. App. 1996).

11.    Based on these and other rules and principles governing professional

responsibility and legal ethics,[4] and the documents and materials reviewed in connection with the

Fee Motion, it is my opinion that Mr. Randazza had a duty to disclose his prior employment as

in-house general counsel for Excelsior in order to permit the District Court to make an informed

decision concerning the reasonableness of his hourly rate for purposes of calculating the lodestar

(assuming, *arguendo*, that attorneys' fees are awarded in the first instance); specifically:

---

[4]      Attorneys appearing or practicing in a case brought in the United States District Court for
the Southern District of Florida shall abide by the Rules Regulating the Florida Bar, including
the Rules of Professional Conduct. *See* LR 11.1(c).

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 147 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 8 of 37
Case: 15-14889 Date Filed: 08/09/2017 Page: 146 of 337

11.1.    In the Fee Motion, Mr. Randazza argued that his hourly rate ($650) is reasonable because he is a "nationally accomplished attorney." (*See* Fee Mot. [Dkt. # 292], pg. 15.) Mr. Randazza provided the District Court with a copy of his curriculum vitae and supporting Declaration describing his background and qualifications.[5] (*See id.*, Ex. 2 [Dkt. # 292-2]; *id.*, Ex. 4 [Dkt. # 292-4].)

11.2.    Alongside attesting to the reasonableness of his hourly rate and the hourly rates of other members of his law firm (Randazza Legal Group), Mr. Randazza provided the District Court with an Affidavit from James C. Hauser, Esq. ("Mr. Hauser"), in which Mr. Hauser opined that the hourly rates charged by members of Randazza Legal Group, including Mr. Randazza, for representing Dr. Novella in the Case are reasonable. (*See generally id.*, Ex. 1 [Dkt. # 292-1].) Mr. Hauser relied on the Randazza CV in opining that Mr. Randazza's hourly rate is reasonable. (*See id.*, ¶¶ 5, 8, 15.)

11.3.    According to the Randazza CV, Mr. Randazza has been working at Randazza Legal Group as its managing partner since July 2009. The Randazza CV does not state that Mr. Randazza worked full-time as in-house general counsel for Excelsior from June 2009 to August 2012.

11.4.    The Randazza CV is misleading because it suggests that Mr. Randazza has been working full-time at Randazza Legal Group since July 2009. Yet, Mr. Randazza did not begin working full-time at Randazza Legal Group until on or about August 2012.

---

[5]    Mr. Randazza did not attest to the accuracy or completeness of his curriculum vitae. However, he did so in an unrelated matter entitled *Marc J. Randazza, et al. v. Crystal Cox*, United States District Court, District of Nevada, Case No. 2:12-cv-2040-JAD-PAL. (*See id.*, Decl. of Marc J. Randazza in Support of Mot. for Summ. J. [Dkt. # 75-1], ¶ 19; *id.*, Ex. I [Dkt. # 75-11] (describing his legal experience without reference to his prior employment as in-house general counsel for Excelsior).)

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 148 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 9 of 37
Case: 15-14889      Date Filed: 08/05/2017      Page: 147 of 357

11.5.   Mr. Randazza has been practicing law for approximately 14 years.  (*See*

Fee Mot. [Dkt. # 292], pg. 8.)  Nearly twenty percent (20%) of that time was spent

working for Excelsior.[6]  Therefore, the omission of his prior employment as in-house

general counsel for Excelsior is material.

11.6.   Curriculum vitae is Latin for "course of (one's) life."  Unlike a resume,

which is intended to summarize a person's background and highlight his or her

qualifications and experience, a curriculum vitae is intended to provide a complete

picture of a person's background, qualifications, and experience, including employment

history.

11.7.   In my opinion, because Mr. Randazza attached his curriculum vitae to the

Fee Motion as evidence supporting the reasonableness of his hourly rate (and provided a

copy of it to Dr. Novella's expert, Mr. Hauser), he had a duty to ensure its accuracy in all

material respects in order to be forthright and candid about his background,

qualifications, and experience.  In other words, Mr. Randazza had a duty to disclose his

entire employment history (insomuch as it relates to his years of practice as an attorney)

to the District Court to aid in assessing the reasonableness of his hourly rate.

11.8.   Under applicable state and federal law, a district court must consider,

among other factors, an attorney's legal experience in determining the reasonableness of

his or her hourly rate.  *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.4 (1983);

*Harman v. City & Cty. of San Francisco*, 69 Cal. Rptr. 3d 750, 769 (Cal. Ct. App. 2008).

---

[6]      Several significant ethical issues that arose during the course of Mr. Randazza's tenure as
Excelsior's in-house general counsel are discussed in the Interim Arbitration Award (the
"Award") entered in the matter entitled *Marc J. Randazza v. Excelsior Medial Corp., et al.*,
JAMS No. 1260002283.  (*See* Opposition to Fee Mot., Ex. [Dkt. #304-11].)  The existence of
the Award, and the issues at its heart, make Mr. Randazza's conduct material to the District
Court's consideration of the Fee Motion.

Case 9:14-cv-80781-RLR  Document 368-1  Entered on FLSD Docket 08/24/2017  Page 149 of
Case 9:14-cv-80781-RLR  Document 329-2  Entered on FLSD Docket 06/03/2016  Page 10 of
Case: 15-14889    Date Filed: 09/05/2017    Page: 149 of 597
37

Therefore, Mr. Randazza's prior legal experience, including work as in-house general

counsel for Excelsior, is relevant to the District Court's review and analysis of the issues

presented in the Fee Motion, without which the District Court has an incomplete picture

of Mr. Randazza's background and qualifications.

    11.9.   For these reasons, it is my opinion that Mr. Randazza breached his duty of

candor owed to the tribunal by omitting his prior employment as in-house general

counsel for Excelsior from the Fee Motion.[7]

12.    I reserve the right to supplement this Affidavit if additional or different

information is provided to me.

DATED this **23d** day of May, 2016.

_____
DENNIS L. KENNEDY

Subscribed and Sworn to before me on
this **23rd** day of May, 2016.

_____
Notary Public, in and for said County and State

My commission expires: _____09-26-2017_____

> **JENNIFER J. KENNEDY**
> Notary Public State of Nevada
> No. 98-3885-1
> My Appt. Exp. Sept. 26, 2017

---

[7]    This is not the first time that Mr. Randazza breached his duty of candor owed to the tribunal. As noted by Jason Gibson, the President of Excelsior, Mr. Randazza represented to the District Court in an unrelated matter entitled *Liberty Media Holdings, LLC v. FF Magnat Limited d/b/a Oron.com, et al.*, United States District Court, District of Nevada, Case No. 2:12-cv-01057-GMN-RJJ, that his law firm charged customary hourly rates (rather than negotiated, discounted hourly rates) for representing Liberty Media Holdings, LLC ("Liberty"), an affiliate of Excelsior, in a copyright infringement action. Such statement was materially misleading because it implied that Liberty had actually incurred and was responsible for substantially more in attorneys' fees.

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 150 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 11 of
Case: 15-14889     Date Filed: 05/05/2017     Page: 149 of 597
37

# Exhibit 1

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 151 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 12 of
Case: 15-14689     Date Filed: 07/05/2017     Page: 150 of 557
37

# DENNIS L. KENNEDY
# CURRICULUM VITAE

## EDUCATION

- B.A. Economics, University of Washington (1972)
- J.D., University of Washington School of Law (1975)
- Board of Editors, Washington Law Review

## PROFESSIONAL ASSOCIATIONS

- State Bar of Nevada
- American Bar Association
- American College of Trial Lawyers
- American Bar Association Standing Committee on Lawyers' Professional Responsibility

## EMPLOYMENT

- Lionel Sawyer & Collins (1975 - 1/6/2006)
- Bailey❖Kennedy (1/9/2006 - present)

## OTHER POSITIONS

- Adjunct Professor, UNLV/William S. Boyd School of Law; Health Care Law (2001, 2003, 2005); Nevada Civil Practice (2006, 2007, 2008, 2015, 2016)
- Chairman, Board of Trustees, Nathan Adelson Hospice (1995 - present)

## PUBLICATIONS

- Co-Author, Nevada Civil Practice Manual (5th ed., 2001)(2003-2013 supplements)

- Co-Editor (with Professor Jeffrey Stempel), Nevada Civil Practice Manual (5th ed.) (2003-2013 supplements)

- Solo and Small Firm Ethics Traps, Clark County Bar Association COMMUNIQUE (December 2013)

  Some Things That Can Hurt You If You Don't Pay Attention, Clark County Bar Association COMMUNIQUE (November 2015)

## SUPREME COURT AND BAR COMMITTEES

- State Bar of Nevada Disciplinary Committee (1989-1997). Chairman, Southern District (1993-1995)

1

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 152 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 13 of
Case: 15-14889 Date Filed: 07/05/2017 Page: 151 of 597
37

- Member of State Bar Committee on Ethics and Professional Responsibility (December 2001 - December 2009; Chairman 2003-2007)

- Member of State Bar Committee on the Revisions to the Nevada Rules of Professional Conduct (the "Ethics 2000 Committee") (2003-2004)

- State Bar Professionalism Task Force (2004-present); Chairman, CLE Subcommittee (2009-2010). (Task force recently developed a mentoring program designed to assist newly admitted lawyers in the transition into the profession.)

- Nevada Supreme Court Bench-Bar Committee (SCR 14) (2005-present) (General function of the Committee is to consult with the Supreme Court on issues affecting the practice of litigation, including proposed amendments to the Nevada Rules of Civil and Appellate Procedure.)

- Member of Nevada Supreme Court Article 6 Commission (2007-2011) (Commission's projects were (i) the proposed intermediate court of appeals, (ii) changes in judicial selection process and (iii) changes in judicial campaign fund raising and disclosure). Final report of Commission issued June 2011

- Member of Nevada Supreme Court Committee on Public Access to Lawyer Discipline (1994). Committee report resulted in amendments to SCR 121

- Member of Nevada Supreme Court Committee on Judicial Ethics and Election Practices (1995). Committee report resulted in the adoption of the Rules Governing the Standing Committee on Judicial Ethics and Election Practices (1997)

- Member of Nevada Supreme Court Committee to Study the Amendment of NRCP 68 (offers of judgment) (2008-present)

- Nevada Supreme Court Judicial Education Requirements Study Committee (2015) (Committee is charged with studying the subject of judicial education and making a recommendation to the Nevada Supreme Court. Final report submitted April 2016)

## RATINGS AND RANKINGS

- Martindale Hubbell "A" "V" rating.

- Mountain States "Super Lawyer" 2015; Top 10 – ranked third overall – for Nevada, Utah, Montana, Idaho and Wyoming.

- Mountain States "Super Lawyer" 2005-present (top 75 lawyers in Nevada, Utah, Montana, Idaho and Wyoming).

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 153 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 14 of
Case: 15-14809   Date Filed: 07/05/2017   Page: 152 of 362
37

- Chambers U.S.A. - one of the top 5 commercial litigators in Nevada (2005-present).

- Best Lawyers In America - Commercial Litigation and "Bet the Company" cases (1998-present).

- Best Lawyers' 2012 Las Vegas Health Care Lawyer of the Year.

<u>REPORTED CASES (1985-present)</u>

- <u>Lakeside Community Hospital v. Levenson</u>, 101 Nev. 777, 710 P.2d 727 (1985).

- <u>Herbst v. Humana Health Ins. of Nevada</u>, 105 Nev. 586, 781 P.2d 762 (1989).

- <u>In re Discipline of Stuhff</u>, 108 Nev. 629, 837 P.2d 853 (1992).

- <u>In re Discipline of Singer</u>, 109 Nev. 1117, 865 P.2d 315 (1993).

- <u>Forsyth v. Humana, Inc.</u>, 827 F. Supp. 1498 (D. Nev. 1993), aff'd in part and rev'd in part by <u>Forsyth v. Humana, Inc.</u>, 99 F.3d 1504 (9th Cir. 1996); superseded on rehearing by <u>Forsyth v. Humana, Inc.</u>, 114 F.3d 1467 (9th Cir. 1997); affirmed by <u>Humana, Inc. v. Forsyth</u>, 525 U.S. 299 (1999).

- <u>Snoeck v. Brussa</u>, 153 F.3d 984 (9th Cir. 1998).

- <u>State of Nevada v. Reliable Health Care</u>, 115 Nev. 253, 983 P.2d 414 (1999).

- <u>Baker v. District Court</u>, 116 Nev. 527, 999 P.2d 1020 (2000).

- <u>Nguyen v. State</u>, 116 Nev. 1171, 14 P.3d 515 (2000) (amicus brief for Nevada Resort Assn.).

- <u>Brown v. District Court</u>, 116 Nev. 1200, 14 P.3d 1266 (2000).

- <u>Badillo v. American Brands</u>, 117 Nev. 34, 16 P.3d 435 (2001).

- <u>Badillo v. American Brands</u>, 202 F.R.D. 261 (D. Nev. 2001).

- <u>Michel v. Bare</u>, 230 F. Supp. 2d 1147 (D. Nev. 2002).

- <u>Maduka v. Sunrise Hospital</u>, 375 F.3d 909 (9th Cir. 2004).

- <u>Poulos v. Caesar's World, Inc.</u>, 379 F.3d 654 (9th Cir. 2004).

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 154 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 15 of
Case: 15-14889     Date Filed: 05/05/2017     Page: 153 of 397
37

- International Game Technology, Inc. v. Second Judicial District Court, 122 Nev. Adv. Op. 13, 127 P.3d 1088 (2006).

- Leroy's Horse and Sports Place v. Racusin, 2001 WL 1345974 (9th Cir. November 1, 2001) (reversing district court judgment re damages and attorney's fees and remanding for jury trial); Leroy's Horse and Sports Place v. Racusin, CV-S-950-00927 (D. Nev. July 8, 2003) (jury verdict of $2,310,000); Hartunian v. Racusin, 2005 WL 79089 (9th Cir. January 14, 2005) (reversing district court order refusing to award pre-judgment interest on $2,310,000 jury verdict and remanding for determination of interest amount); Racusin v. American Wagering, Inc., 465 F.3d 1048 (9th Cir. 2006), withdrawn on rehearing 493 F.3d 1067 (2007) (reversing BAP decision subordinating debt and affirming client's status as creditor entitled to payment of $2,310,000 judgment).

- Nanopierce Technologies, Inc. v. Depository Trust Clearing Corp., 123 Nev. 362,168 P.3d 73 (September 20, 2007) (brief and oral argument on behalf of amicus curiae North American Securities Administrators Assn.).

- State of Nevada v. District Court (RJR Tobacco), 125 Nev. 37, 44, 199 P.3d 828 (January 29, 2009).

- Betsinger v. D.R. Horton, Inc., 126 Nev. 162, 232 P. 3d 433 (May 27, 2010).

- Orion Portfolio Services 2, LLC v. Clark County, ex rel. University Medical Center, 126 Nev. Adv. Op. No. 39, 245 P. 3d 529 (October 14, 2010).

- U-Haul International, Inc. v. Albright, 626 F. 3d 498 (9th Cir. 2010).

- Bahena v. Goodyear Tire & Rubber Co., 126 Nev. Adv. Op. 57, 245 P.3d. 1182 (2010) (brief on behalf of amicus curiae United States Chamber of Commerce).

- Stultz v. Bellagio, LLC, Nevada Supreme Court Case No. 56164 (October 29, 2011).

- Walters v. Eighth Jud. Dist. Ct. ex rel. Cnty., of Clark, 127 Nev. Adv. Op. No. 66, 263 P.3d 231 (2011).

- In re City Center Construction and Lien Master Litigation, Nevada Supreme Court Case No. 57186 (October 19, 2011).

- Richman v. District Court, Nevada Supreme Court Case No. 60676 (May 31, 2013).

- Golden Gaming, Inc. v. Corrigan Management, Inc., Nevada Supreme Court Case Nos. 61696 and 62200 (March 26, 2015).

4

Case 9:14-cv-80781-RLR  Document 368-1  Entered on FLSD Docket 08/24/2017  Page 155 of
Case 9:14-cv-80781-RLR  Document 329-2  Entered on FLSD Docket 06/03/2016  Page 16 of
Case: 15-14889    Date Filed: 05/05/2017    Page: 154 of 597
37

- <u>Keisic v. Valley Health System, LLC, et al.</u>, Nevada Supreme Court Case No. 64445 (December 29, 2015).

## ETHICS/PROFESSIONAL RESPONSIBILITY REPRESENTATION

- Defense of non-Nevada lawyer on charges of unauthorized practice (and related offenses) before State Bar Disciplinary Panel (1998-1999).  (Name of counsel and law firm are confidential.)

- Representation of candidate for district court in defense of complaint regarding campaign advertisements before Standing Committee on Judicial Ethics and Campaign Practices.  (1998).  Name of candidate is confidential.

- Representation of attorney in appeal of disqualification order (SCR 160).  <u>Brown v. Eighth Judicial District Court</u>, 116 Nev. 1200, 14 P.3d 1266 (2000).

- Representation of attorney before fee dispute panel in matter involving recovery of quantum meruit fee in the absence of written fee agreement in contingent fee case.  <u>West v. Myers</u>, No. 02-128.

- Representation of members of Nevada Commission on Judicial Discipline in defense of action challenging constitutionality of the Commission's rules and activities.  <u>Snoeck v. Brussa</u>, 153 F.3d 984 (9th Cir. 1998).

- Representation of Members of Nevada Commission on Judicial Discipline in defense of RICO and Civil Rights claims.  <u>Mosley v. Gang, et al.</u>,   Case No. CV-S-00-0976-JLQ(LRL).

- Representation of State Bar of Nevada in defense of action brought by out-of-state law firm challenging the constitutionality of SCR 199 firm name provision. <u>Lewis & Roca v. Bare</u>, Case No. CV-S-99-0757-JBR (RLH).

- Representation of law firm in challenge to constitutionality of Supreme Court Rule prohibiting use of trade name by lawyers.  <u>Michel v. Bare</u>, 230 F. Supp. 2d 1147 (D. Nev. 2002) (declaring SCR 199(1) unconstitutional).

- Representation of candidate for district court in defense of complaint regarding allegedly untrue and defamatory statements made concerning opponent before Standing Committee on Judicial Ethics and Campaign Practices.  (2002).  Name of candidate is confidential.

- Representation of Nevada Commission on Judicial Discipline in defense of § 1983 civil rights claim.  <u>Luckett v. Hardcastle, et al.</u>, Case No. CV-S-05-0726 RLH-RJJ.  (Complaint dismissed).

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 156 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 17 of
Case: 15-14889 Date Filed: 05/05/2017 Page: 155 of 597
37

- Representation of attorney in defense of lawsuit alleging negligence and malpractice. Malignaggi v. Goldberg, Case No. A 508763, District Court, Clark County, Nevada (case dismissed).

- Representation of law firm in opposing disqualification motion. Provenza v. Yamaha Motor Co., Case No. A446708, District Court, Clark County, Nevada.

- Representation of law firm in opposing disqualification motion. Roth v. BMW, Case No. A453810, District Court, Clark County.

- Representation of non-Nevada lawyer regarding allegations of lack of candor toward tribunal (SCR 172) (2006). (Name of counsel and law firm are confidential.)

- Representation of law firm in opposing disqualification motion. Daniell v. Peake Development, Case No. A508494, District Court, Clark County.

- Representation of attorney in defense of State Bar proceeding regarding violations of NRPC 1.8 (business transactions with client) and NRPC 1.7 (conflict of interest). Name of attorney confidential (SCR 121).

- Representation of attorney in defense of claims for misappropriation of confidential information. Friedman v. Friedman, Case No. D07-376354D, District Court, Clark County, Nevada.

- Representation of attorneys in defense of claims alleging violations of NRPC 4.2 arising out of contacts with putative class members prior to class certification. Del Webb Communities, Inc. v. The Eighth Judicial District Court of the State of Nevada in and for the County of Clark, and The Hon. Timothy C. Williams, District Judge, and Real Parties in Interest, Case No. 49423, Nevada Supreme Court.

- Representation of attorney in defense of State Bar proceeding regarding violations of NRPC 1.5 (fees) and NRPC 4.2 (contact with represented person). Case dismissed. Name of lawyer is confidential. (SCR 121).

- Representation of entity owned by attorney in defense of NRPC 1.8 claim. In re Receivership of Southwest Exchange, Case No. A535439, District Court, Clark County, Nevada.

- Representation of attorney in defense of malpractice/breach of fiduciary duty claim. Sorrell v. Snell & Wilmer, Case No. 08-CV-00761-RCJ-LRL, U.S. District Court, Nevada. Case settled.

- Representation of attorney in appeal of judgment refusing to enforce contingency fee agreement's term regarding attorney's entitlement to particular fee in the

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 157 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 18 of
Case: 15-14889 Date Filed: 07/05/2017 Page: 156 of 397
37

event of his termination.  Golightly v. Gassner, Case No. 50212, Nevada Supreme
Court.  Case decided.

- Representation of party in defense of claim for attorney's fees arising out of
  alleged "frivolous" litigation.  Club 93, Inc. v. County of Elko, CV-C-08-163,
  Fourth Judicial District Court, Elko, Nevada.  Case settled.

- Representation of client against attorney in claim for refund of alleged "non-
  refundable" retainer.  Sperberg v. Hunterton, Case No. 08-149 (State Bar Fee
  Dispute Proceeding).  Case decided.

- Representation of attorney in action against former partner and others for
  wrongful expulsion from law firm. Powell v. Powell Naqvi, Case No. 08-566761,
  Eighth Judicial District Court.  Case settled.

- Representation of clients in seeking review of U.S. Magistrate Judge's order
  imposing monetary sanctions upon parties, individual lawyers, and law firm.
  Dennis Montgomery, Montgomery Family Trust v. eTreppid Technologies,
  L.L.C.; Warren Trepp, Department of Defense of the United States of America;
  and Does 1 through 10, and Related Cases, Case No. 3:065-CV-00145-PMP-
  VPC, U.S. District Court, District of Nevada.  Matter settled.

- Representation of suspended attorney in proceedings seeking reinstatement to
  Nevada Bar.  (In re Richard Pipkins).  Matter pending.  Representation
  terminated.

- Representation of attorney and law firm in opposing disqualification motion.
  Edwin K. Slaughter, et al. v. Uponor, Inc., et al., Case No. 2:08-CV-01223-RCJ-
  GWF, U.S. District Court, District of Nevada.  Case dismissed.

- Representation of non-Nevada lawyer on State Bar inquiry into charges of
  unauthorized practice.  (2009-2010).  Matter concluded without action by State
  Bar.  Name of lawyer is confidential.

- Representation of attorneys in defense of State Bar disciplinary proceeding
  alleging fee-splitting with non-lawyer and other matters.  State Bar v. Eglet (Case
  No. SG-10-0874) and Adams (Case No. SG-12-0803).

- Representation of attorney in fee dispute arbitration. Davidson v. Gentile, Case
  No. 10-085, Nevada State Bar Fee Dispute Committee.  Matter decided.

- Representation of attorney in defense of State Bar disciplinary proceeding.  State
  Bar of Nevada v. Anthony Lopez, Bar No. 08-175 (and numerous related and
  consolidated cases).  Matters pending.

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 158 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 19 of
Case: 15-14889     Date Filed: 05/05/2017     Page: 159 of 597
37

- Representation of judicial candidate in action challenging constitutionality of Nevada Code of Judicial Conduct Canon 4, Rule 4.1(A)(11). <u>Kishner v. Nevada Standing Committee on Judicial Ethics and Election Practices</u>, Case No. 2:10-cv-01858-RLH-RJJ, U.S. District Court, Nevada.  Matter concluded.

- Representation of attorney in matter where attorney disclosed confidential information relating to the representation of a client to prevent the commission of a criminal and fraudulent act by the client. Nevada RPC 1.6(b)(2) and (3). Attorney's name is confidential.  Case settled.

- Representation of former clients in action against law firm and attorney.  <u>Frias Holding Co. v. Greenberg Traurig</u>, Case No. A-10-630319-C, Eighth Judicial District Court, Clark County, Nevada.  Engagement concluded.

- Representation of former client against law firm in defense of fee collection proceeding and in prosecution of malpractice counterclaim.  <u>Lionel Sawyer & Collins v. DeWald</u>, State Bar Fee Dispute Committee Matter No. 10-108.  Case dismissed.

- Representation of law firm and lawyers in dispute with insurer over coverage for claims of professional negligence.  <u>Pacifica v. Goold Patterson, et al.</u>, Case No. A557726 (and related cases), Eighth Judicial District Court, Clark County, Nevada.  Matter settled.

- Representation of attorneys in defense of five consolidated disciplinary complaints arising out of consumer bankruptcy representation.  Nevada RPC 1.3, 1.4, 5.3 and 8.1.  <u>State Bar v. Haines and Krieger</u>, Case Nos.10-121-2842; 10-134-2842; 10-137-2557; SG10-0023; and SG10-0044. Matters concluded.

- Representation of law firm and lawyers in defense of lawsuit alleging violations of Nevada RPC 1.8.  <u>Richman v. Haines & Krieger, LLC, et al.</u>, Case No. A-11-643004-C, Eighth Judicial District Court, Clark County, Nevada; Case No. 60676, Nevada Supreme Court (May 31, 2013).  Matter pending following remand.

- Representation of lawyers in defense of 46 consolidated bar grievances and complaints arising out of consumer bankruptcies and residential loan modifications.  State Bar v. George Haines and David Krieger, Grievance No. SG11-1800 (and related matters).

- Representation of attorneys in challenge (by mandamus) to order of disqualification.  In re City Center Construction and Lien Master Litigation: <u>MGM Mirage Design Group v. District Court</u>, Nevada Supreme Court Case No. 57186 (October 19, 2011).

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 159 of
37
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 20 of
Case: 15-14889     Date Filed: 05/05/2017     Page: 159 of 357

- Representation of Trust Beneficiaries in motion to disqualify counsel for trustee. In Re Cook Trusts, Case No. P-11-071394-T. Eighth Judicial District Court, Clark County, Nevada. Matter Decided.

- Representation of former client in defense of fee collection suit by law firm and prosecution of malpractice counterclaim. Lionel Sawyer & Collins v. DeWald, Case No. 79 194 Y 00090 11 nolg (AAA). Engagement concluded.

- Representation of not-for-profit entity in State Bar proceeding alleging unauthorized practice by assisting homeowners in dealings with mortgage lenders. (Name of client is confidential). Engagement concluded.

- Representation of Stokes & Stokes, Ltd. in the defense of various bar grievances. Case settled.

- Representation of parties in action seeking to overturn arbitrators' decision on grounds of fraud and partiality. Parker v. Carlson, et al., Case No. A571921, Eighth Judicial District County, Nevada. Matter settled.

- Representation (special counsel) of Allstate Insurance Co. on privilege and work product issues arising from interviews of former clients of an attorney. Allstate Insurance Co., v. Balle, et al., Case No. 2:10-CV-02205-KJD-RJJ, United States District Court, District of Nevada. Matter concluded.

- Representation of attorney and law firm in defense of allegations of unauthorized practice (Rule 5.5) and failure to register as a multi-jurisdictional law firm (Rule 7.5A). Waite v.Clark County Collection Service, Case No.2:11-cv-01741-LRH-VCF, United States District court, District of Nevada. Matter concluded

- Representation of attorney in defense of State Bar disciplinary proceeding as to alleged violations of RPC 1.7 (current client conflict), RPC 5.4 (professional independence/fee splitting with non-lawyers), and RPC 8.4 (misconduct involving dishonesty and fraud). State Bar v. Noel Gage, Case No. 08-053-1890. Disciplinary case concluded with settlement. Settlement approved by the Nevada Supreme Court. Client reinstated as member of State Bar.

- Representation of bar applicant before State Bar Moral Character and Fitness Committee on charges relating to alcohol abuse, plagiarism and financial responsibility. In re Melanie Feldhauser-Thomas. Matter concluded.

- Representation of law firm and its clients in opposing motion to disqualify law firm for acquisition and use of allegedly privileged documents. In re C.E. Cook Family Trust, Consolidated Case No. P-11-071394-T, District Court, Clark County, Nevada. Matter concluded.

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 160 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 21 of
Case: 15-14889 Date Filed: 05/05/2017 Page: 159 of 397
37

- Representation of attorney in defense of State Bar disciplinary proceedings as to alleged violation of trust account rules. <u>State Bar v. Joseph Scalia</u>, Case Nos. SG11-1737, SG12-0903. Engagement concluded.

- Representation of former client of law firm in dispute with law firm arising out of law firm's conflict of interest in defending former client and another defendant at trial, where former client was found liable and other defendant was not. Names of client and law firm are confidential. Matter settled.

- Representation of attorney in appeal of letter of private reprimand resulting from attorney's conduct in federal court litigation. <u>In re Steven Gibson</u>, Case No. SG-12-0104. Matter decided.

- Representation of law firm in dispute with second law firm over payment of fees alleged to be due under fee sharing agreement. <u>Gage Law Firm v. Feinberg Mayfield Kaneda & Litt, LLP d/b/a Fenton Grant Mayfield Kaneda & Litt, LLP f/k/a Feinberg Grant Mayfield Kaneda & Litt</u>, Case No. A-14-697336-B, District Court, Clark County, Nevada. Matter pending.

- Representation of defendant entity sued by plaintiff's counsel with whom defendant entity had prior relationship, in proceedings regarding disqualification of plaintiff's counsel. Matter is confidential.

- Representation of departed lawyer in dispute with former firm regarding client files and compensation. Matter is confidential.

- Representation of law firm in dispute with departed lawyer regarding compensation. Matter is confidential.

- Representation of former attorneys' client in action against attorneys for malpractice and breach of fiduciary duty. <u>McKenna v. Chesnoff, et al.</u>, Case No. 2-14-cv-1773-JAD-CWH pending in the United States District Court, District of Nevada.

- Representation of law firm and attorney in defense of claims for breach of duty and aiding and abetting breach of fiduciary duty. <u>Hugh S. Proctor, et al. v. CPF Recovery Ways, LLC, et al.</u>, Case No. 2:14—cv-01693-RFB-PAL pending in the United States District Court, District of Nevada. Case settled.

- Representation of attorney in disciplinary proceedings resulting from attorney's conviction of a crime. <u>State Bar of Nevada v. Chandan Manansingh</u>, No. CR13-1850 (2015).

- Representation of attorney in defense of allegations of unauthorized practice of law. Matter is confidential.

- Representation of two partners of law firm in connection with their resignation from that firm and formation of a new firm. Matter is confidential.

10

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 161 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 22 of
Case: 15-14689     Date Filed: 07/05/2017     Page: 1600 of 597
37

- Representation of non-party for purpose of asserting accountant-client privilege in case where non-party's confidential information was at risk of disclosure. Core-Vent Bio Engineering, Inc. v. Polo Nevada Investments, Case No. A644240, Eighth Judicial District Court, Clark County, Nevada. Matter concluded.

- Representation of attorney regarding potential disciplinary complaint arising out of litigation financing and transactions involving medical liens. Name of attorney is confidential.

- Representation of client in contemplated action against former attorney for malpractice. Names of client and attorney are confidential.

- Representation of client in matter following the striking of client's answer and imposition of sanctions for discovery violations and misconduct of prior counsel (Rule 3.3). Jane Doe v. Valley Health System, LLC, et al., Case No. 09-A-595780-C in the Eighth Judicial District Court, Clark County, Nevada. Matter pending.

- Representation of managing partner of Las Vegas office of national law firm in connection with his departure from that firm and the formation of a new law firm. Names of attorney and law firm are confidential.

RETENTION AS EXPERT:  ETHICS/PROFESSIONAL RESPONSIBILITY

- Retained by bar applicant to give expert testimony before State Bar Moral Character and Fitness Committee regarding duty of confidentiality arising out of applicant's seeking employment with law firm representing adverse party. Testimony given. (2004)  (Name of bar applicant is confidential).

- Retained by Cherry & Bailus to give expert testimony before State Bar Fee Dispute committee on issues regarding attorneys' withdrawal/termination of representation. Testimony given.

- Retained by Dominic Gentile to give expert testimony in U.S. Bankruptcy Court, Orange County, California, on attorney's obligations to client upon withdrawal and attorney's duty to withdraw. Offer of proof; no testimony given. In re Ken Mizuno; The Bankruptcy Estate of Ken Mizuno v. Ken Mizuno, Dominic P. Gentile, Terrance G. Reed, et. al., Case No. SA94-14429LR, Adv. No. AD95-01043, United States Bankruptcy Court, Central District of California.

- Retained by Law Offices of Stan Hunterton to testify in State Court case on issues concerning attorney's obligations in billing client for fees and charging for costs and expenses. Report prepared. No testimony given. Shinehouse & Duesing, a Nevada partnership, and Rumph & Peyton, a Nevada Partnership v. R.D. Prabhu, an individual, Case No. A379297, District Court, Clark County, Nevada. Case

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 162 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 23 of
Case: 15-14889     Date Filed: 07/05/2017     Page: 161 of 397
37

dismissed and re-filed as <u>Shinehouse & Duesing v. Prabhu</u>, Case No. A456661, District Court, Clark County, Nevada.  Case dismissed.

- Retained by Law Offices of Gary Logan to testify as to lawyer's duties to jointly represented clients.  Testimony given.  <u>Nault v. Mainor</u>, Case No. A401657, District Court, Clark County, Nevada,  <u>Mainor v. Nault</u>, 120 Nev. Adv. Op. 84, 101 P.3d 308 (2004).

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify as to duties of attorney (competence) and scope of representation.  Report prepared.  Case dismissed.  <u>Ilbert Mednicoff, an individual and CCN, Inc., a Nevada corporation v. George F. Holman, an individual, Robert L. Bolick, an individual, Stewart A. Gollmer, an individual, Gary Fields, an individual, Law Offices of Robert L. Bolick, Ltd., a Professional corporation and Does 1 through 100, inclusive</u>, Case No. A377374, District Court, Clark County, Nevada.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify as to duties of law firm to supervise work of associate attorney.  Report prepared.  Case dismissed.  <u>Anthony Guymon, an incompetent person, by and through his Guardian ad Litem, Barbara Guymon; Barbara Guymon v. Cory J. Hilton; Hilton & Kahle; Villani, Hilton & Kahle; Villani, Gardner & Hilton; Perry & Spann; Pico & Mitchell, Ltd.; and Does 1 to 10, inclusive</u>, Case No. 00-A-422013-C, District Court, Clark County, Nevada.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify as to lawyer's conduct in trial and settlement of case.  Report prepared.  Case dismissed.  <u>Mark J. Brown v. Alan Catley (and related cross actions)</u>, Case No. A381988, District Court, Clark County, Nevada.

- Retained by State Bar  to testify in disciplinary proceeding as to lawyer's duties under SCR 170 (prohibition on filing frivolous litigation).  <u>State Bar v. Mirch</u>, Case No. 3-34-20.  Report prepared.  Testimony given.  <u>In The Matter of Discipline of Kevin Mirch</u>, Case No. 49212, Nevada Supreme Court, April 10, 2008 (attorney disbarred).

- Retained by Holland & Hart to testify as to duties owed by lawyer who engages in business transactions with clients.  <u>Rivers v. Romano, et al.</u>, Case No. A483701, District Court, Clark County, Nevada.  Report prepared.  Testimony given.  Case dismissed.

- Retained by attorney to testify regarding duties under SCR 152 (scope of representation), SCR 153 (diligence) and SCR 166 (declining or terminating representation), <u>State Bar v. Goldberg</u>, No. 04-013-1536.  Testimony given.  Case dismissed.

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 163 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 24 of
Case: 15-14889 Date Filed: 05/05/2017 Page: 162 of 597
37

- Retained by Cristalli & Saggese to testify as to issues regarding formation of attorney-client relationship, scope of representation, and breach of duties arising therefrom. Johnson v. Smith, Case No. 512364. Report prepared. Case dismissed.

- Retained by Snell & Wilmer to testify regarding duties and responsibilities of attorney providing opinion in real estate sale transaction. Sundance West LLC, et al. v. Orix Capital Markets, LLC, Case No. CV-04-01995, Second Judicial District Court, Washoe County, Nevada. Report prepared. Case dismissed.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify regarding issues pertaining to insurer's "captive" law firm, including disclosure and client consent requirements. Artisan Tile & Plumbing, Inc., a Nevada corporation, formerly known as Davila Jimenez, Inc. doing business as Pueblo Landscape Company, Inc. v. Assurance Company of America, a New York Corporation; Bennion Clayson Marias & Haire fka Bennion & Clayson; Does 1 through 10, inclusive, Case No. A503744, District Court, Clark County, Nevada.

- Retained by Menter & Witkin to testify regarding (i) attorney's acceptance of defense of insured subject to insurer's litigation guidelines; (ii) conflicts arising from attorney's representation of four co-defendants in construction defect litigation; (iii) duty of insurer to provide independent counsel; and (iv) whether attorney's conduct met standard of care. National Fire & Marine Insurance Company v. Roger Gurr and Elsie Gurr (and counterclaim), Case No. 3:05-CV-0658-BES-VPC, United States District Court, District of Nevada. Report prepared. Case settled.

- Retained by Alverson, Taylor, Mortensen & Sanders to testify regarding attorney's conduct in determining proper defendants in litigation. Lesky v. Callister, Case No. 527875, District Court, Clark County, Nevada. Report prepared. Case dismissed.

- Retained by Gordon & Silver to testify regarding conduct of attorney and law firm in business transaction with client. Richards v. Allison, MacKenzie, et al., Case No. 03-01781A, First Judicial District Court, Carson City, Nevada. Report prepared. Case dismissed. Appeal pending.

- Retained by Deaner Scann Malan & Larsen to testify regarding an alleged conflict of interest arising from law firm's prior work and status of lawyer as shareholder in party to case. D & J Properties v. Siena Office Park 2, Case No. A537781, District Court, Clark County, Nevada. Report prepared. Testimony Given. Matter decided.

- Retained by Solomon Dwiggins & Freer to testify regarding the conduct of a lawyer and his law firm in the handling of an estate where the lawyer acted as trustee of various trusts and retained his own law firm to represent him. Leseberg

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 164 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 25 of
Case: 15-14889     Date Filed: 08/05/2017     Page: 169 of 597
37

v. Woods, Case No. P59334, District Court, Clark County, Nevada. Report
prepared. Deposition testimony given. Trial testimony given. Case settled.

- Retained by Menter & Witkin to testify regarding (i) duties of Nevada lawyer
residing out of state and maintaining office in Nevada (SCR 42.1); and (ii) duties
of multi-jurisdictional law firm maintaining office in Nevada (NRPC 7.5A).
Roger and Elsie Gurr v. National Fire & Marine Insurance Company, Reiser &
Associates, and Does 1 through 40, Case No. 07-CV-615-HDM-VPC, in the
United States District Court, Reno. Report prepared. Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith to testify regarding restitution of
fees paid to law firm who is later disqualified due to conflict of interest. American
Heavy Moving and Rigging, Inc. v. Lewis Brisbois Bisgaard & Smith, LLP, State
Bar Fee Dispute Case No. 07-055 (State Bar Fee Dispute Panel). Rebuttal report
prepared. Testimony given. Case decided.

- Retained by Michael Warhola to testify regarding waiver of attorney-client
privilege by inadvertent disclosures of e-mail from client. Seidman v. Dilloo,
Case No. D260143, District Court, Clark County, Nevada. Report prepared.

- Retained by attorney as consulting expert regarding opposing counsel's violations
of NRPC 1.2(d) and 8.4(d) by rendering legal aid and advice to fugitive client to
enable him to prosecute and defend litigation in Nevada. Joseph A. Bravo, David
Z. Chesnoff, and Eckley M. Keach, Capital Growth Limited, Inc., Punta Arena De
La Ventana, S.A. de C.V., Boca De La Salina, SA De C.V. v. Capital Growth,
LLC, and Kerry Rogers, and All Related Actions, Case No. A536644, A542755,
A535548, District Court, Clark County, Nevada. Report prepared. Underlying
case dismissed. Bar Grievance filed. Screening panel testimony given. Matter
decided.

- Retained by attorney as consulting expert to advise whether opposing counsel's
conduct (harassment of witness) violated NRPC 8.4(d). Julia Brady, et al v.
Kerry Rogers, et al., Case No. A572440, District Court, Clark County, Nevada.
Report prepared. Underlying case dismissed.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify regarding
duties and responsibilities of a lawyer who is counsel of record in pending
litigation, whose client retains other counsel and then ceases communicating with
the lawyer. Geier v. Denue, et al., Case No. A525883, Eighth Judicial District
Court, Clark County, Nevada. Report prepared. Case settled.

- Retained by Marquis & Aurbach (later replaced by Lionel Sawyer & Collins) to
testify regarding duties of lawyer who prepares a trust document, is appointed
trustee upon client's death, and then retains his own law firm to represent the
trust. In the Matter of the Total Amendment and Restatement of the William
Eversole Family Trust Originally Dated April 6, 1996, Case No. P-09-0654430-T,

14

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 165 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 26 of
Case: 15-14889 Date Filed: 08/05/2017 Page: 164 of 357
37

Eighth Judicial District Court, Clark County, Nevada. Report prepared. Case
settled.

- Retained by law firm to advise as to firm's duties when potential conflict arises
  between clients jointly represented by firm in defense of litigation. NRPC 1.7.
  (Name of firm and identities of clients are confidential).

- Retained by Thorndal Armstrong Delk Balkenbush & Eisinger to testify regarding
  the scope of duties owed by a lawyer who has been retained to render only limited
  services. Brewer v. State of Nevada, et al., Case No. 554064, Eighth Judicial
  District Court, Clark County, Nevada. Report prepared. Matter settled.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify regarding
  the duties owed to a minority shareholder by a lawyer who represents a closely
  held corporation. Jackson v. Ira Levine, et al., Case No. A538983, Eighth Judicial
  District Court, Clark County, Nevada. Report prepared. Trial testimony given.
  Case decided.

- Retained by Schiff Hardin, LLP to testify as to reasonableness of attorneys' fees.
  DTPI Holdings, LLP v. Forrest Binkley & Brown Capital Partners, LLP, Case
  No. 2:07-CV-00690-BES-RJJ, U.S. District Court, District of Nevada. Report
  prepared. Case decided.

- Retained by Doyle Berman Murdy, P.C. to opine on attorney's conduct in
  representing several parties in related transactions. XMASCO, LLC v. Wellborn
  & Associates, P.C., et al., Case No. A566261, Eighth Judicial District Court,
  Clark County, Nevada. Case dismissed.

- Retained by Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, to testify as to
  attorney's duties regarding safekeeping and distribution of client's funds. Azine,
  et al. v. Johnson, et al., Case No. A587009, Eighth Judicial District Court, Clark
  County, Nevada. Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith to testify as to law firm's duties in
  preparing and communicating with client regarding drafts of transactional
  documents. Padilla v. Smith, Case No. A569307, Eighth Judicial District Court,
  Clark County, Nevada. Report prepared. Case settled.

- Retained by Solomon Dwiggins & Freer to testify regarding attorney's conduct in
  representing trustors and beneficiaries of a trust. Buck v. Hoffman, Case No.
  CV09-00324, Second Judicial District Court, Washoe County, Nevada. Report
  prepared. Deposition taken. Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith to testify regarding attorney's
  conduct in representing closely held corporation. RPC 1.13. Rita Quam Family
  Trust, et al. v. OPA Management, LLC, et al., Case No. A568829, Clark County

15

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 166 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 27 of
Case: 15-14689 Date Filed: 03/03/2017 Page: 169 of 337
37

District Court. Report prepared. Case concluded on summary judgment in favor of attorney. Amended Complaint filed,. Additional report prepared. Matter settled.

- Retained as special counsel to brief and argue defendants' rights and obligations (*vis-a-vis*, non-settling plaintiffs) regarding possibly privileged or confidential documents received by defendants from some plaintiffs as a part of a settlement. Klaas v. Vestin Mortgage, Case No. A528385, Clark County District Court (matter decided).

- Retained by Glaser, Weil, Fink, Jacobs, Howard & Shapiro, LLP to testify as to lawyer's obligations upon receipt from a third party of documents and information which appear to have been misappropriated from adverse party. Merits Incentives, LLC v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark, 127 Nev. Adv. Op. 63, 262 P.3d 720 (2011).

- Retained by Thorndal, Armstrong, Delk, Balkenbush & Eisinger to testify regarding attorney's conduct (diligence and competence) in representing client in complex mechanic's lien litigation. Maui One Excavating v. Mead & Pezzillo, et al., Case No. A539801, Clark County District Court. Report prepared. Case settled.

- Retained by Robertson & Vick, LLP to testify as to reasonableness of attorneys' fees. Voggenthaler, et al. v. Maryland Square, et al., Case No. 2:08-CV-01618 RCJ (GWF), U.S. District Court, District for Nevada. Report prepared. Matter decided.

- Retained by Travelers Companies, Inc. to opine on issues relating to the unauthorized practice of law (Nevada RPC 5.5 and SCR 49.10). Opinion prepared.

- Retained by Chamberlain Hrdlicka White Williams & Martin to opine on several Nevada RPC 8.3 issues in Valdez v. Cox Communications, et al., Case No. 2:09-CV-1797-PMP-RJJ in the U.S. District Court, District of Nevada. (Oral opinion delivered.)

- Retained by Mark Zaloras and the Law Offices of Peter Goldstein to opine on several malpractice, billing and fee issues. Gaxiola-Lim v. Michel, Case No. A-10-613812-C, Clark County District Court. Preliminary report prepared. Matter settled.

- Retained by the Cashill Law Firm to opine on attorney's entitlement to a fee for work done on behalf of an incompetent client. Merle Layton Trust, Case No. PR98-00336. Second Judicial District Court, Washoe County, Nevada. Report prepared.

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 167 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 28 of
Case: 15-14689        Date Filed: 07/05/2017    Page: 166 of 597
37

- Retained by Marquis Aurbach Coffing to testify as to attorney's conduct in representation of clients and matters relating to negotiation of release from malpractice liability. Gugino v. Nevada Contractors Ins. Co., et al., Case No. A-11-637935-B, Clark County District Court. Report prepared. Testimony given. Matter pending.

- Retained by Vernon L. Bailey, Esq. to testify as to attorneys' conduct in representation of clients and matters relating to legal malpractice, breach of fiduciary duty and negligence. Inca Investments, Inc.; Platina, Inc. v. Kevin R. Hansen, Esq.; Wilde Hansen, LLP; Gregory L. Wilde, Esq.; Richard S. Ehlers, Esq., Case No. A-09-604391-C, Clark County District Court. Report prepared. Deposition taken. Case settled.

- Retained by Laxalt & Nomura to testify as to attorneys' obligations to and conduct affecting opposing party in litigation. Pompei v. Hawes, et al., Case No. A-11-642012-C, Clark County, District Court. Report prepared. Deposition taken. Matter pending.

- Retained by Randolph Goldberg to testify as to attorney's conduct regarding various issues. State Bar v. Goldberg, Case Nos. 09-049-1536; 09-102-1536; and 09-235-1536. Report prepared. Matter pending.

- Retained by multi-jurisdictional law firm to render advice on compliance with Nevada registration and practice requirements (Nev. R.P.C. 7.5A).

- Retained by Christian, Kravitz, Dichter, Johnson & Sluga, LLC to testify regarding attorneys' obligations when terminating employment with a law firm and starting a new firm. Burr v. Dodds, Case No. A-11-650060-B, Clark County District Court. Matter settled.

- Retained by Hong & Hong to testify as to duties of attorneys (competence) in conduct of litigation. Wacht v. Peel & Brimley, Case No. A646410, Clark County District Court. Report prepared. Matter decided.

- Retained by attorney to render opinion on duties regarding disposition of disputed funds held by attorney. (Nev. R.P.C. 1.15) (Attorney's name is confidential.)

- Retained by Greenspoon Marder, P.A. to render opinion on attorney's duty to obtain clients' informed consent before settling or dismissing claims. Pittman v. Westgate Planet Hollywood Las Vegas, LLC, Case No. 2:09-CV-00878-PMP-GWF, United States District Court, District of Nevada. Report prepared. Matter decided.

- Retained by Simon & Berman to render opinion on conduct of lawyer and law firm in representing client in litigation (diligence, competence and

Case 9:14-cv-80781-RLR Document 368-1 Entered on FLSD Docket 08/24/2017 Page 168 of
Case 9:14-cv-80781-RLR Document 329-2 Entered on FLSD Docket 06/03/2016 Page 29 of
Case: 15-14889 Date Filed: 05/05/2017 Page: 167 of 597
37

communications)., Chandler v. Black & LoBello, et al., Case No. A-11-643955, refiled as Case No. A-12-660252, Clark County District Court. Matter settled.

- Retained by Lewis Brisbois Bisgaard & Smith LLP to render opinion on conduct of attorney in matters pertaining to failed investment. Softwind Capital, LLC v. Global Project Solutions, LLC, et al., Case No. 2:11-CV-02057-JCM-GWF, United States District Court. Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith LLP to render opinion on conduct of attorney regarding loans made to client (Nevada RPC 1.8). Albert D. Massi v. Donald and Mary Nobis, Case No. A672579 in the District Court, Clark County, Nevada. Case settled.

- Retained by law firm as consulting expert to render opinion regarding attorney's duty to report misconduct by opposing counsel. Nevada RPC 8.3(a). Name of law firm and subject attorney are confidential.

- Retained by Lewis Roca Rothgerber to render opinion on whether the common religious affiliation of the judge and one party's counsel requires the judge to recuse himself. Lynan v. Health Plan of Nevada, Case No. A583772 and Magana v. Health Plan of Nevada, Case No. A583816, District Court, Clark County, Nevada. Report prepared. Matter decided.

- Retained by Littler Mendelson to render opinion as to the propriety of self-dealing and other activities by company's in-house counsel. Randazza v. Excelsior Media Corp., JAMS Case No. 1260002283. Report prepared. Testimony given. Case decided.

- Retained by Judy M. Sheldrew, Esq. to render an opinion on the propriety of several attorneys' conduct in dealing with client having diminished capacity Andrews v. Rowe, et al., Case No. 12-PB-0075 in the Ninth Judicial District Court, Douglas County, Nevada. Report prepared. Case settled.

- Retained by Christine A. Zack to opine on issues of unauthorized and multi-jurisdictional practice of law. In re: Fundamental Long Term Care, Inc., Case No. 8-11-BK-22258-MGW, District of Florida. Matter settled.

- Retained by Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, to opine on issues of supervision and trust account matters. SBS Retail, Inc. v. Yves Chantre, Inc., Case No. A-13-681083-C, District Court, Clark County, Nevada. Matter pending.

- Retained by Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, to opine on issues regarding the conduct of class counsel in dealing with class representative. Goldsmith v. Sill, et al., Case No. 2-12-CV-0090-LDG-CWH in the U.S. District Court, District of Nevada. Report prepared. Case pending.

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 169 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 30 of
Case: 15-14889   Date Filed: 07/05/2017   Page: 169 of 537
37

- Retained by Lewis Brisbois Bisgaard & Smith LLP to opine on issues regarding conduct of counsel with respect to claims alleged in <u>David Siebrasse, as Personal Representative of the Doreen Siebrasse Estate v. Jeffrey Burr, Ltd.; Jeffrey Burr; Mark Dodds; John Mugan; et al.</u>, Case No. A-11-648532-C, in the District Court, Clark County, Nevada. Report prepared. Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith LLP to opine on issues regarding conduct of counsel with respect to claims alleged in <u>T&R Construction Group v. Clark Tatom, LLC; and Bradley R. Tatom</u>, Case No. A-13-689637-B, in the District Court, Clark County, Nevada. Report prepared. Case settled.

- Retained by Fulbright & Jaworski to opine on that firm's conduct in representing related entities in commercial transaction. <u>Verano Land Group, LP v. VTLM Texas LP, et al</u>, Case No. A-12-655514-B in the Eighth Judicial District Court, Clark County, Nevada. Report prepared. Deposition taken. Matter pending.

- Retained by Bowen Hall to opine on (i) propriety of lawyer threatening to withdraw from case during contested hearing unless the client accepted a settlement offer, and (ii) other issues of competency and diligence. <u>James J "Butch" Peri v. Stephen C. Mollath; Prezant & Mollath; et al.</u>, Case No. CV08-02546 in the Second Judicial District Court, County of Washoe, State of Nevada. Trial testimony given. Case settled.

- Retained by Wilson, Elser, Moskowitz, Edelman & Dicker, LLP to opine on lawyer's duties with respect to firm trust account and partner's improper conduct. <u>SBS Retail Inc., et al. v. Yves Chantre Inc., et al.</u>, Case No. A-13-681083-C, in the District Court, Clark County, Nevada. Report prepared. Case settled.

- Retained by Lewis Roca Rothgerber to opine on attorneys' conduct during trial and compliance with Nevada RPC 3.3 (candor to the tribunal) in the matter entitled <u>Health Plan of Nevada, Inc., et al. v. Helen Meyer, et al.</u>, Nevada Supreme Court Case No. 64692. Report prepared. Case settled.

- Retained by McDonald Family Trust to opine on the conduct of shareholders and the entity's counsel in a related party transaction. Nevada RPC 1.13. <u>Russell G. Sheltra, individually and as Trustee of the Russell G. Sheltra Gaming Trust and Little Bonanza, Inc. v. Margaret McDonald and Timothy McDonald, Individually and as Trustees of the Robert and Gloria McDonald Family Trust, et al.</u>, Case No. CV14-01111, in the Second Judicial District Court, Washoe County, Nevada. Case pending.

- Retained by Holland & Knight to opine on the reasonableness of attorneys' fees in the matter entitled <u>Leerad, LP, et al. v. Imperial Credit Corporation d/b/a A.I. Credit Corporation, et al.</u>, Case No. A631490, in the Eighth Judicial District Court, Clark County, Nevada. Report prepared. Case pending.

- Retained by Thorndal, Armstrong, Delk, Balkenbush & Eisinger to opine on conduct of attorney in commercial real estate transaction. <u>Shulman v. Bendavid,</u>

19

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 170 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 31 of
Case: 15-14889     Date Filed: 05/05/2017     Page: 169 of 357
37

Case No. A682679, District Court, Clark County, Nevada. Case Pending. Report prepared. Deposition taken. Case settled.

- Retained by Clyde Snow & Sessions to opine on attorney's conduct in a matter affecting several clients (RPC 1.7; 2.2). United States of America v. Leon Benzer, et al., Case No. 2:13-cr-00018-JMC-GWF pending in the United States District Court, District of Nevada. Report prepared. Testimony given. Matter decided.

- Retained by Liberty Media Holdings LLC to opine on conduct of its in-house counsel in several matters. Randazza v. Liberty Media Holdings, LLC, Case No. A-12-673275-C in the Eighth Judicial District Court, Clark County, Nevada. Report prepared. Matter pending.

- Retained by Weinberg Wheeler Hudgins Gunn & Dial to opine on conduct of attorneys in representation (and withdrawal) of clients in litigation. Lee v. 70 Ltd. Partnership, Case No. A-13-691389-C, Eighth Judicial District Court, Clark County, Nevada. Report prepared. Matter pending.

- Retained by Rock Fusco & Connelly, LLP to opine on conduct of attorneys in the conduct of litigation. International Game Technology v. Armstrong Teasdale, LLP, Case No. A-15-715079-C, Eighth Judicial District Court, Clark County, Nevada. Case pending.

- Retained by Durham Jones & Pinegar to opine on conduct of attorney with respect to financial dealings with client (RPC 1.7 and 1.8). Center Firearms Corp. v. Long Mountain Outfitters, Case No. A-14-709294-B, Eighth Judicial District Court, Clark County, Nevada. Report prepared. Case decided.

- Retained by law firms to opine on issues regarding potential conflicts of interest which arise after retention in a matter. Names of law firms are confidential.

- Retained by Faux Law Group to opine on lawyers' conduct in the litigation and settlement of a matter. Nahabedian v. Sutcliffe, et al., and related claims, counterclaims and third-party claims, Case No. A-12-673897-C, District Court, Clark County, Nevada. Case settled.

- Retained by Gibbs, Giden, Locher, Turner & Senet LLP to opine on the conduct of a law firm and its attorneys (competence and supervision) in the representation of an HOA client. Vistana Condominium Owners Assn., Inc. v. Kummer Kaempfer Bonner Renshaw & Ferrario, Case No. 08-A-578306, District Court, Clark County, Nevada. Report prepared. Deposition taken. Case pending.

- Retained by Rimini Street, Inc. and Seth Ravin to opine on the reasonableness of the fees and costs incurred by the Plantiffs' counsel in the case entitled Oracle USA, Inc., et al. v. Rimini Street, Inc. and Seth Ravin, Case No. 2:10-cv-0106-LRH-PAL pending in the United States District Court, District of Nevada. Report prepared. Case pending.

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 171 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 32 of
Case RLS-14889   Date Filed 06/09/2017   Page 170 of 397
37

- Retained by Lipson, Neilson, Cole, Seltzer & Garin, PC to opine on the conduct of members of Wasserman Kornheiser, LLP, at issue in the claims alleged in the matter entitled <u>Carlisle Homeowners Association v. Pacifica Covington, LLC, et al.</u>, Case No. A-13-678911-D, District Court, Clark County, Nevada.

- Retained by Lewis Roca Rothgerber to opine on conduct of attorney in the litigation of a matter. <u>Huckabay Properties, Inc. v. Beau Sterling, et al.</u>, Case No. CV-15-00765, Second Judicial District Court, Washoe County, Nevada. Case settled.

- Retained by Gordon & Rees to opine on the conduct of attorney regarding business transaction with client. <u>Blanchard v. Rosenfeld</u>, Case No. A637650, District Court, Clark County, Nevada. Report prepared. Case pending.

- Retained by Loose Brown & Associates to opine on the conduct of a law firm and one of its lawyers in the representation of a client in litigation. Matter is confidential.

- Retained by Morris Polich & Purdy to opine on conduct of lawyer and law firm in representation of client in litigation. <u>Sunport Business Trust v. Serle, et al.</u>, Case No. A-15-716677-C, District Court, Clark County, Nevada. Report prepared. Rebuttal report prepared. Case pending.

- Retained by Caldwell Leslie & Proctor, PC to opine on the reasonableness and necessity of attorneys' fees incurred by Renown Health, Renown Regional Medical Center, and Nevada Heart Institute d/b/a Renown Institute for Heart & Vascular Health in the matter entitled <u>Arger, et al. v. Renown Health, et al.</u>, Case No. CV11-02477, Second Judicial District Court, Washoe County, Nevada, such fees are sought as damages by the Renown Parties in the matter entitled <u>Renown Health, et al v. Holland & Hart, LLP, et al.</u>, Case No. CV14-02049, Second Judicial District Court, Washoe County, Nevada. Report prepared. Case pending.

- Retained by Edward Lewis Tobinick, M.D, Edward Lewis Tobinick, MD d/b/a Institute of Neurological Recovery and INR PLLC d/b/a Institute of Neurological Recovery to opine on the conduct of Marc J. Randazza, Esq. of Randazza Legal Group, PLLC in the matter entitled <u>Edward Lewis Tobinick, M.D., et al. v. Novella, et al.</u>, Case No. 9:14-cv-80781-RLR, pending in the U.S District Court, Southern District of Florida (West Palm Beach).

<u>CONTINUING LEGAL EDUCATION INSTRUCTION (1997-Present)</u>

- Southern Nevada Association of Women Attorneys (1/7/16): "Things to Fear in the New Year"

- Clark County Bar Association (12/9/15): "12th Annual Ethical Issues"

- Clark County Bar Association (6/25/15): "Things You Don't Know Can Hurt You – Here are 12 of them"

- Water Law Institute: 17th Annual Law of the Colorado River Conference (5/1/15): "Ethics and Social Media"

- Southern Nevada Association of Women Attorneys (1/15/15): "Ethics Issues for 2015"

- Clark County Bar Association (11/13/14): "11th Annual Ethics CLE"

- American Bar Association Section of Environment, Energy and Resources, 32nd Annual Water Law Conference: Ethics for Water Lawyers (6/6/14)

- Association of Legal Administrators, Las Vegas Chapter (5/13/14): "Issues in New Business Intake."

- American Bar Association Group Legal Services Association and Solo, Small Firm and General Practice Division Annual Meeting (5/2/14): "Ethics Issues In Marketing and Client Development."

- State Bar of Nevada: Section of Environmental and Natural Resources Law (2/27/14) "Ethics Issues for Environmental Lawyers."

- Clark County Bar Association (12/13/13). 10th Annual Ethics CLE.

- City of Henderson, City Attorneys' Annual Retreat (10/17/13). "A Lawyer Walks Into a Bar . . . The Dangers of Casual Advice and Conversation."

- Las Vegas Paralegal Society: Keeping Abreast of Conflicts and Unauthorized Practice (6/18/13).

- Association of Legal Administrators, Las Vegas Chapter: Legal Administrator's Role in Preventing Malpractice (6/11/13).

- American Bar Association Section of Environment, Energy and Resources, 31st Annual Water Law Conference: Water Lawyers and Ethics (6/7/13).

- Clark County Bar Association (5/8/13) "4th Annual Solo and Small Firm Ethical Traps."

- UNLV Boyd School of Law (3/8/13) "Professionalism and Popular Culture."

- Clark County Bar Association (11/2/12). 9th Annual Ethics CLE.

- Clark County Bar Association (3/28/12).  "3[rd] Annual Hanging Out a Shingle?
  Solo and Small Firm Ethical Traps."

- American Bar Association Business Law Section Spring Meeting (3/22/12).
  "Saints and Sinners: Ethical Issues and Dilemmas in Client and Practice
  Development."

- Southern Nevada Association of Women Attorneys (2/24/12).  "Ten for Twelve:
  Ethics 2012."

- Clark County Bar Association (11/3/11) "8th Annual Ethics CLE."

- Nevada Paralegal Assn. (6/18/11) "UPL: Attorney Supervision of Paralegals."

- Department of Energy Contractor Attorneys' Assn. (5/27/11) "Ethics: Ten Things
  You Should Know."

- Southern Nevada Association of Women Attorneys (2/25/11) "Ten For Eleven:
  Ethics 2011."

- Clark County Bar Association (2/4/11) "Hanging Out A Shingle?  Solo and Small
  Firm Ethical Traps."

- Clark County Bar Association (9/30/10) "7[th] Annual Ethics Issues: 2010."

- American Society of Breast Surgeons (4/30/10) Avoiding and Responding to
  Litigation.

- Clark County Bar Association (3/26/10) Avoiding Solo/Small Firm Ethical Traps.

- Southern Nevada Association of Women Attorneys (2/26/10) Ethics 2010: Ten
  Thoughts for '10.

- State Bar of Nevada (11/12/09): Nevada Legal Ethics (2009).

- State Bar of Nevada, Clark County Bar Association and Washoe County Bar
  Association (10/13/09, Las Vegas; 10/14/09, Carson City): 2009 Professionalism
  Summit.

- Clark County Bar Association (9/18/09):  "Sixth Annual Ethics Issues: 2009."

- Public Relations Society of America (7/24/09):  "Keeping Out of Hot Water:
  Legal Considerations in Communications."

- Lecture and panel discussion with Justice Nancy Saitta and District Judge Linda
  Bell: "Professionalism in Litigation."  Boyd School of Law (4/1/09).

23

Case 9:14-cv-80781-RLR  Document 368-1  Entered on FLSD Docket 08/24/2017  Page 174 of
Case 9:14-cv-80781-RLR  Document 329-2  Entered on FLSD Docket 06/03/2016  Page 35 of
Case: 15-14809    Date Filed: 07/05/2017    Page: 1736 of 3397
37

- Southern Nevada Association of Women Attorneys (2/20/09): "ETHICS 2009: Being Good Gets Harder Every Year."

- State Bar of Nevada (12/5/08): "Nevada Legal Ethics 2008."

- State Bar of Nevada (11/19/08): "Nevada Legal Ethics 2008."

- Indiana State Bar Association (11/13/08): "Ethics: A Western Perspective on Maintaining A Healthy Legal Practice."

- Clark County Bar Association (9/19/08): "Fifth Annual Ethics Issues 2008" (Prepared materials. Presentation made by David J. Merrill).

- Southern Nevada Association of Women Attorneys (2/22/08): "Ethics 2008 - Be Careful Out There."

- State Bar of Nevada (11/30/07) "Nevada Legal Ethics 2007."

- State Bar of Nevada (11/16/07) "Nevada Legal Ethics 2007."

- Clark County Bar Association (10/31/07)  "Lawyer Advertising: The New Rules."

- Wisconsin Law Alumni Association (9/8/07) "The New Rules of Professional Conduct."

- Clark County Bar Association (8/24/07) "Fourth Annual Legal Ethics - 2007."

- National Assn. of Retail Collection Attorneys (5/11/07) "Ethics Issues for Legal Collection Professionals."

- Southern Nevada Association of Women Attorneys (2/23/07) "Desperately Seeking Ethics - 2007."

- State Bar of Nevada (12/1/06) "Nevada Legal Ethics 2006."

- State Bar of Nevada (11/17/06) "Nevada Legal Ethics 2006."

- Clark County Bar Assn. (6/30/06) "Ethics 2006: The New Nevada Rules of Professional Conduct."

- State Bar of Nevada Professionalism Summit: Speaker and Panel Member (4/20/06).

- Southern Nevada Association of Women Attorneys (1/27/06) "Ethics Issues for 2006."

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 175 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 36 of
37
Case: 15-14689   Date Filed: 09/09/2017   Page: 174 of 357

- State Bar of Nevada (11/18/05) "Nevada Legal Ethics 2005."

- State Bar of Nevada (11/4/05) "Nevada Legal Ethics 2005."

- Clark County Bar Assn. (9/15/05) "Ethics 2005:  Current Issues."

- Clark County Bar Assn. (3/4/05) Speaker and Panel Member: First Annual Professional Summit.

- State Bar of Nevada (11/19/04) "Ethics 2004: Year in Review."

- State Bar of Nevada (11/5/04) "Ethics 2004: Year in Review."

- Clark County Bar Assn. (7/30/04) "Current Issues In Ethics."

- Lorman Business Institute (7/20/04) "Current Issues in Ethics."

- National Hospice Assn. (3/21/04) "Legal Issues For Physicians In End of Life Care."

- Southern Nevada Assn. of Women Attorneys (1/30/04) "Ethics Issues for 2004."

- State Bar of Nevada (1/20/04) "Workers Compensation: Current Issues in Ethics."

- National Business Institute (10/21/03) "Current Issues In Attorney Client Privilege and Confidentiality."

- Sterling Educational Systems (9/25/03) "Common Ethical Problems for Transactional Lawyers."

- Clark County Bar Assn. (2/28/03) "ERISA 2003:  What's New?"

- Southern Nevada Assn. of Women Attorneys (1/31/03) "Ethics:  2003."

- State Bar of Nevada (11/22/02) "Nevada Legal Ethics - the Year In Review."

- American Corporate Counsel Assn. (6/18/02) "Issues of Attorney-Client Privilege for In-House Counsel."

- National Business Institute (12/7/01) "Current Issues In Legal Ethics:Nevada 2001."

- National Business Institute (7/13/01) "Attorney-Client-Privilege and the Work Product Doctrine In Nevada."

Case 9:14-cv-80781-RLR   Document 368-1   Entered on FLSD Docket 08/24/2017   Page 176 of
Case 9:14-cv-80781-RLR   Document 329-2   Entered on FLSD Docket 06/03/2016   Page 37 of
Case: 15-14689     Date Filed: 07/05/2017     Page: 179 of 397
37

- National Business Institute (12/12/00) "Practical Legal Ethics."

- State Bar of Nevada (3/31/00) "Professionalism and Ethics."

- Southern Nevada Assn. of Women Attorneys (1/28/00) "Multi-Disciplinary Practice: Ethical Considerations."

- State Bar of Nevada (12/10/99) "Winning Without Losing Your Professionalism."

- National Business Institute (11/17/99) "Practical Legal Ethics."

- Law Seminars Int'l. (6/25/99) "Ethics Considerations for Construction Lawyers."

- National Practice Institute (12/4/98) "Ethical Problems: Dealing With Difficult Lawyers."

- ALAS (10/21/98) "Ethical Issues for Healthcare Lawyers."

- State Bar of Nevada (3/21/98): "Ethics and Attorneys' Fee Agreements."

- CLE International (12/5/97) "Current Issues In Ethics"

- Institute for Paralegal Practice (8/26/97) "Preventing Unauthorized Practice of Law"

[Additional CLE instruction available upon request.]

**EXHIBIT H**

**(Declaration of Jason Gibson and Exhibits)**

# EXHIBIT A

(Declaration of Jason Gibson)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 9:14-cv-80781-RLR

EDWARD LEWIS TOBINICK, M.D., et  )
al.,  )
  )
                  Plaintiffs,  )
  )
     vs.  )
  )
STEVEN NOVELLA, M.D., et al.,  )
  )
             Defendants.  )
_____  )
  )

**<u>DECLARATION OF JASON GIBSON</u>**

I, Jason Gibson, pursuant to 28 U.S.C. §1746, declare as follows:

1.  My name is Jason Gibson.

2.  I am over the age of 18 and I am competent to make the statements in this declaration.

3.  I am not receiving any remuneration from the Plaintiffs or their counsel in the above-

captioned case.

4.  I am the president of Excelsior Media Group ("Excelsior") and manager of Liberty Media

Holdings, LLC ("Liberty").  I make this declaration to inform the Court as to a significant

omission in the *curriculum vitae* submitted by attorney Marc J. Randazza ("Randazza") in his

fee petition to this Court, [Dkt. No. 292-4].

5.  Randazza was employed as a full-time in-house counsel at Excelsior from June 2009 until August 2012.  Randazza omitted his in-house counsel position at Excelsior entirely from his *curriculum vitae*. [Dkt. No. 292-4].

6.  Regarding the full-time in-house position Randazza omitted from his *curriculum vitae*, his employment resulted in litigation, including an Interim Arbitration Award entered against Randazza by arbitrator and retired U.S. Magistrate Judge Stephen E. Haberfeld regarding, *inter alia*, "violations of fiduciary duty in connection with [Randazza's] negotiation for a $75,000 'bribe." [Dkt. No. 304-10, at pp. 31-56//Dkt. No. 304-11, at pp. 3-28]. Randazza subsequently offered to pay us $20,000 per his five bar licenses he is able to keep from having suspended/disbarred.   In his attorney's own words, suspension/disbarment was expected in Florida, so we could expect $80,000 if none of the other four bars took action. We refused this offer.

7.  After that, Randazza then filed for bankruptcy days before the Interim Arbitration Award against him could be confirmed, [Dkt. No. 304-12], and, currently, there is litigation regarding the issues, including in bankruptcy court. *See*, *e.g.*, *In re Marc John Randazza*, Case No. Bk-S-15-14956-abl, Adv. No. 15-01193-abl [Dkt. No. 11] (D. Nev. Feb. 10, 2016) (first amended complaint), attached hereto as **Exhibit 1**.

8.  In the litigation stemming from Randazza's in-house position at Excelsior, Excelsior discovered and was uncomfortable with statements contained in fee motion implying Randazza was outside counsel at our company and billing our company on an hourly basis for a rate that was far above what his salary from the company actually was.   In *Liberty*

*Media Holdings, LLC v. FF Magnat Limited d/b/a Oron.com*, No. 12-16976 [Dkt. No. 27]

(9th Cir. Feb. 13, 2013), attached hereto as **Exhibit 2**, Liberty's successor counsel informed

the U.S. Ninth Circuit Court of Appeals of Randazza's discrepancy in the fee motion, stating,

*inter alia*:

> Liberty prevailed in the District Court on a motion for attorney fees, but is now in
> the extraordinary position of having to ask for a reassessment of the amount of
> attorney fees awarded in its favor.  The impetus for this request is Liberty's recent
> discovery that statements made by its former counsel in support of its motion may
> have misled the District Court into concluding that it had incurred more attorney
> fees than it had actually incurred during the underlying litigation.

*Id.* at pp. 1-2.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____April 1, 2016_____.

_____

Jason Gibson

**EXHIBIT 1**

1 | Wendy Medura Krincek, Esq., (Bar No. 6417)
LITTLER MENDELSON, P.C.
2 | 3960 Howard Hughes Parkway
Suite 300
3 | Las Vegas, NV 89169-5937
Tel: (702) 862-8800
4 | Fax: (702) 862-8811

5 | Arthur Carvalho, Jr. (Cal. Bar No. 125370)
Vaughn M. Greenwalt (Cal. Bar No. 298481)
6 | LANG, HANIGAN & CARVALHO, LLP
21550 Oxnard Street, Suite 760
7 | Woodland Hills, California 91367
Tel (818) 883-5644
8 | Fax (818) 704-9372
*Appearing Pro Hac Vice*

9 |

10 | Attorneys for Creditors
EXCELSIOR MEDIA CORP., and
11 | LIBERTY MEDIA HOLDINGS, LLC.

12 | UNITED STATES BANKRUPTCY COURT

13 | DISTRICT OF NEVADA

14 |

15 |

In re )                                   CASE NO: BK-S-15-14956-abl
16 |                          )
MARC JOHN RANDAZZA, )
17 |                          )       CHAPTER 11
            Debtor.          )
18 | _____ )       **ADV NO. 15-01193-ABL**
                             )
19 | EXCELSIOR MEDIA CORP., a Nevada )   FIRST AMENDED COMPLAINT BY
Corporation; and LIBERTY MEDIA )      CREDITORS EXCELSIOR MEDIA CORP.,
20 | HOLDINGS, LLC., a Nevada Limited )   AND LIBERTY MEDIA HOLDINGS, LLC
Liability Company, )                  TO DETERMINE NON-
21 |                          )       DISCHARGEABILITY OF DEBTS OWED
            Plaintiffs, )              BY DEBTOR, MARC JOHN RANDAZZA
22 |                          )
        vs. )                          DEMAND FOR JURY TRIAL
23 |                          )
MARC JOHN RANDAZZA, an individual, )
24 |                          )
25 |            Defendant. )
     _____ )
26 |

27 |

28 |

LANG, HANIGAN & CARVALHO
21550 Oxnard Street, Suite 760
Woodland Hills, CA 91367
(818) 883-5644

1

*FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*

1  By and through its counsel of record, Plaintiffs Excelsior Media Corp., and Liberty Media

2  Holdings, LLC., ("Plaintiffs" or "E/L"), hereby file this first amended complaint objecting to

3  discharge of debt pursuant to 11 U.S.C. §523(a)(2)(A), §523(a)(4) and §523(a)(6) (the "FAC").

4  Plaintiffs allege and state as follows:

5  ## I.     JURISDICTION AND VENUE

6  1.     This Court has jurisdiction of this matter under 28 U.S.C. §157 and 11 U.S.C. §523.

7  The claims for relief alleged in this complaint arise under Title 11 of the United States Code and are

8  related to a case pending in the United States Bankruptcy Court for the District of Nevada (the

9  "Bankruptcy Court"). The pending bankruptcy case to which the claims for relief alleged in this

10  Complaint are related is In re Marc John Randazza, Bk Case No. BK-S-15-14956-abl (the

11  "Randazza Case").

12  2.     The determination of dischargeability is a core proceeding under 28 U.S.C. §157(b).

13  Regardless of whether this is a core proceeding, consent is hereby given to the entry of final orders

14  and judgment by the Bankruptcy Court.

15  3.     Pursuant to 28 U.S.C. §1409, venue is proper in the District of Nevada, because the

16  Randazza Case is pending in this district and division.

17  ## II.     THE PARTIES

18  4.     Plaintiffs are domiciled in the State of Nevada.

19  5.     Defendant Marc John Randazza ("Defendant" or "Randazza") is the debtor in the

20  Randazza Case.

21  ## III.     GENERAL ALLEGATIONS

22  6.     Defendant Randazza is the former in-house General Counsel of E/L. Randazza was

23  employed as E/L's General Counsel continuously from June, 2009 until August 2012.

24  7.     Excelsior Media is a sister company to various entities including Liberty Media

25  Holdings and Corbin Fisher. Corbin Fisher is an on-line entertainment website and brand name

26  whose intellectual property is owned by Liberty Media Holdings. Excelsior is a film production

27  company that creates videos for Corbin Fisher. E/L has consistently endeavored to and succeeded at

28

2

conducting its business in a principled and professional manner. E/L relocated its headquarters from San Diego, California to Las Vegas in February 2011.

8.      Randazza also relocated from San Diego, California to Las Vegas in 2011 to continue his employment relationship with E/L. Randazza markets himself as a "specialist" in First Amendment and intellectual property law; particularly with regard to the adult entertainment industry.

9.      E/L and Randazza became acquainted while Randazza was an associate at a firm specializing in First Amendment work in Florida. E/L later decided to hire a General Counsel. Randazza pursued and accepted the position. Randazza drafted the Employment Agreement, which was executed by the parties in June, 2009. The primary reason E/L decided to hire a General Counsel was to ensure its intellectual property was protected. One of the most significant challenges faced by E/L and all companies in the film and entertainment industry is the illegal downloading and sharing of content/videos produced by E/L. However, Randazza was tasked with handling all of E/L's legal matters.

## A.      THE EMPLOYMENT AGREEMENT

10.      Pursuant to the Employment Agreement, Randazza was to wind down his private practice during his first 90 days of employment and become E/L's full-time General Counsel employed on an at-will basis.

11.      Section "6.C" of the Employment Agreement permitted Randazza to continue to provide professional services to a "limited number of outside clients" during non-working hours if such work did not present a conflict of interest for E/L. Contrary to his obligations under the Employment Agreement, Randazza continued to aggressively grow his private practice during his employment.

12.      Randazza's compensation consisted of an annual salary of $208,000. Randazza also included in the Employment Agreement the rather unique arrangement of a nondiscretionary bonus of 25% of any settlement funds paid to E/L.

13.      At the time of the execution of the Employment Agreement, the parties contemplated that Randazza would be handling all of E/L's legal matters independently. Instead, Randazza

3

*FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*

1   eventually utilized his own firm, Randazza Legal Group ("RLG") and various outside counsel to
2   assist in E/L's legal matters.

3       14.    The Employment Agreement also required that E/L provide Randazza with a laptop
4   computer and PDA/phone, which were to be primarily used for E/L business and only occasional
5   and incidental personal use permitted. The Employment Agreement further provided that such
6   equipment was not to be used for professional services rendered to other clients.

7       15.    The Employment Agreement provided for severance in the amount of 12 weeks of
8   salary if E/L were to unilaterally terminate Randazza in the fourth year of employment or later.
9   There is no severance obligation if Randazza resigned or was terminated for cause.

10      16.    The Employment Agreement also includes a governing law provision stating "[t]his
11  Agreement shall be governed by and construed in accordance with the laws of the State of
12  California, without regard to conflict of laws." Randazza was able to reside virtually anywhere he
13  wanted. Initially, Randazza and his wife were located to San Diego, California. However,
14  Randazza relocated to Las Vegas, Nevada in June 2011, just as few months after E/L relocated its
15  headquarters.

16      17.    At Randazza's request, E/L hired Erika Dillon ("Dillon"), a paralegal from out of
17  state. Dillon was employed by E/L as a paralegal at the time of Randazza's resignation.

18      **B.     ISSUES ARISE BETWEEN E/L AND RANDAZZA**

19              **i.      Randazza Attempts To Negotiate A Personal Settlement Payment To**
20                       **The Detriment Of E/L**

21      18.    Randazza had filed suit on behalf of E/L in the U.S. District Court of Nevada and in
22  Hong Kong against an Internet file-locker website, Oron.com ("Oron"), asserting copyright
23  infringement claims arising out of Oron's facilitation of the illegal downloading of E/L content.
24  Randazza and counsel for E/L in Hong Kong obtained a preliminary injunction on behalf of E/L
25  preventing Oron from disbursing any of its Hong Kong based assets.

26      19.    After extensive negotiations, in which E/L's CEO, Jason Gibson ("Gibson") was
27  involved, on July 1, 2012, the E/L and Oron executed a settlement agreement which provided for
28  payment by Oron to Excelsior of $550,000.

4

20.    Pursuant to the settlement agreement $550,000 was to be transferred to the RLG trust account and Randazza agreed to be personally liable if the funds were prematurely disbursed (before all terms were complied with), including being responsible for a 10% penalty.

21.    Oron later claimed the settlement agreement was not enforceable.  E/L sought the intervention of the district court and obtained an order declaring the settlement agreement to be valid and enforceable as a judgment against Oron.

22.    After the entry of the order declaring the settlement agreement to be enforceable, Randazza engaged in further settlement negotiations with Oron's counsel to resolve both the Hong Kong proceeding and address the judgment/order issued by the District Court of Nevada.  On August 13, 2012, Randazza presented Gibson, with a new Oron settlement agreement.  The settlement agreement provided for a payment of $600,000 to E/L to be held in trust until various provisions of the settlement agreement were preformed.  However, the settlement agreement also provided for payment of $75,000 to Randazza.  Notably, there were no restrictions upon disbursement of Randazza's payment.

23.    Randazza did not inform Gibson that the settlement offer by Oron was only valid until August 14, 2012.

24.    Upon review of the settlement agreement, Gibson discovered the provision calling for a payment of $75,000 to Randazza.  Randazza had not previously disclosed this provision to Gibson and did not obtain Gibson's authority or consent to negotiate or include such a provision.  The payment to Randazza immediately raised questions for Gibson as did the nervous manner in which Randazza presented the agreement to him.  In response to Gibson's inquiry regarding the $75,000 payment, Randazza characterized it to be a "bribe" to his firm for a promise not to sue Oron again.  When Gibson questioned why that payment should not go to the E/L, Randazza claimed Oron had specifically taken the position that not a penny more than $600,000 could go to E/L.

25.    Randazza's entire explanation did not ring true in Gibson's eyes, nor did Randazza's self-dealing sit well with E/L.  Gibson advised Randazza that he was not comfortable with that payment given that Randazza was already being compensated by E/L for his work on the matter and

5

1    that it seemed illogical that Oron would care at all whether all of the $675,000 it was willing to pay

2    went to E/L or not.

3       26.     E/L's concerns with Randazza grew significantly because of this incident. Over the

4    proceeding few weeks, Randazza made various attempts to discuss the "bribe" in an effort to obtain

5    Gibson's consent to include it in the settlement agreement. Gibson rebuffed Randazza's efforts

6    having determined it was best to closely consider the quality of Randazza's work for E/L.

7       27.     Randazza reacted strongly to Gibson's refusal to address the term of the settlement

8    agreement. Following a happy hour event during this time period, Randazza began cleaning

9    personal items out of his office and loudly saying "F\*\*ck this shit, I quit."

10              **ii.      Randazza Takes Unilateral Control Of The Oron Settlement**

11                    **Funds and Resigns.**

12       28.     In late August, 2012, Gibson learned from outside counsel in Hong Kong that the

13    $550,000 settlement payment from Oron had been received by Randazza into his firm's trust

14    account without immediately notification to Gibson. Randazza had previously notified the

15    executive team as soon as settlement monies were received touting his successes.

16       29.     Gibson questioned Randazza about the delay and Randazza responded claiming the

17    delay was due to the money finally being released late the day before. Gibson indicated E/L's desire

18    to move forward with fulfilling the conditions of settlement such that the $550,000 could be

19    immediately released to E/L and also expressed displeasure with the fact that E/L likely would only

20    receive about $262,500 of the total settlement amount once fees, costs, and Randazza's 25% bonus

21    were taken into account.

22       30.     Randazza refused to comply with Gibson's directive, stating that he was not

23    forwarding the $550,000 and instead, "I'm taking out my share, the costs we owe to outside parties,

24    and paying myself back the $25,000 I advanced. Then I'm giving you your net, which is more than

25    you expected." In other words, Randazza was unilaterally taking control of the settlement funds.

26    E/L found this to be completely inappropriate but was at a loss as to how to rectify the situation as

27    the money was in Randazza's trust account over which it had no control.

28

31.     Only a couple of hours later, Randazza communicated the following to E/L: "Given our now openly adversarial relationship, it seems appropriate that I withdraw from representing Liberty in any further matters. There might be a way I can continue to wind down existing matters, but it's going to require a call to discuss it. When are you free?"

32.     E/L communicated to Randazza that it construed his email as a resignation, which it accepted effective immediately, instructed that neither he nor RLG touch the Oron settlement funds, advised it had retained new counsel, Littler Mendelson, and further instructed that Randazza retain all E/L property in its possession for the time being. E/L then promptly paid Randazza his salary through his last day of employment and accrued, unused PTO.

                    iii.     **The Aftermath Of Randazza's Resignation And Randazza's Bad**
                             **Faith Conduct.**

33.     After Randazza's resignation, E/L learned that without its knowledge or consent, Randazza had begun storing all of E/L's legal records on the RLG server to which only he and the paralegal had access. Immediately after resigning, Randazza cut off all E/L access to its legal records and refused to grant E/L any access to, or copies of, its records. In addition, E/L had no access to records regarding legal settlements or agreements with vendors and outside counsel that were engaged in its legal matters.

34.     Since his resignation, Randazza has continually engaged in conduct designed to make E/L's life difficult while at the same time attempting to portray a facade of being conciliatory. E/L's paralegal Erika Dillon informed the Human Resources Manager that Randazza was pressuring her to leave E/L to work for Randazza's outside firm. On the day of Randazza's resignation, but prior to his resignation email being sent, Randazza and Dillon plotted to delete and wipe information from computer hard drives and cut-off E/L's access to its records in anticipation of their resignations.

        Randazza further engaged in the following conduct:

        a.     The day he resigned, Randazza contacted Hong Kong counsel and informed them he
               was no longer counsel for E/L because E/L refused to pay his or the Hong Kong
               firm's fees. This blatant falsehood was calculated to cause harm to E/L. In

                                               7

1    corresponding with the Hong Kong firm, E/L learned Randazza had not disclosed to

2    them that he was General Counsel for E/L. E/L had to immediately wire

3    approximately $33,000 to the Hong Kong firm in order for the firm to continue

4    representing E/L because of their unease over Randazza's improper communication.

5  b.  Randazza also began contacting other outside counsel attempting to influence them

6    to withdraw from representation of E/L. On August 20th, local counsel for litigation

7    in Philadelphia informed E/L that he had been contacted by Randazza about

8    Randazza's departure and requested to withdraw as counsel for E/L.

9  c.  On September 4, 2014, when Randazza knew E/L's CEO was out of state, Randazza

10    and Dillon appeared unannounced at E/L's headquarters despite knowing this was

11    not something that E/L would tolerate from an ex-employee. Caught off-guard, the

12    Human Resources Manager allowed Randazza access to his office.

13  d.  After prodding, Randazza eventually returned his company owned laptop, but not

14    without first wiping the computer several times. In fact, Randazza wiped his laptop

15    the day before his resignation. Randazza was informed in writing to retain all E/L

16    property in his possession before he wiped his computer. In addition, E/L

17    subsequently sent Randazza a formal preservation notice. As an attorney, Randazza

18    knows he is not permitted to spoliate evidence. Randazza's spoliation is a serious

19    issue as it *at least* creates an adverse inference that he deliberately destroyed relevant

20    evidence.

21  e.  E/L has further learned that Randazza attempted to coerce at least one former

22    employee to provide unfavorable testimony against E/L in the parties underlying

23    arbitration. Fortunately, that former employee alerted E/L to the duress he was being

24    placed under by Randazza.

25  **C.  E/L LEARNS OF MULTIPLE UNETHICAL ACTS RANDAZZA ENGAGED**

26  **IN DURING HIS EMPLOYMENT**

27  35.  Randazza involved his lawfirm, RLG, in the Oron litigation. Randazza never had

28  E/L enter into any form of fee agreement with RLG as any prudent General Counsel would and

8

1  should. Randazza often asserted to E/L that when he used RLG, he would not make money on his

2  firm's work and E/L would only have to pay a highly discounted hourly rate reflecting RLG's direct

3  costs incurred for the labor. In short, E/L was never to be charged the customary hourly rates of

4  RLG attorneys. Nor, would it ever have incurred charges of $500 per hour for Randazza's time as

5  he was an employee of E/L. With that in mind, Randazza and his firm filed a Motion for Attorneys

6  Fees and Costs in the Oron matter. In the Motion, Randazza represented to the court that E/L

7  incurred/expended approximately $134,000 in attorneys fees and costs.

8      36.    Unbeknownst to E/L, Randazza misrepresented to the court that it paid Randazza

9  and RLG their standard rates to the tune of $134,000, and that E/L was receiving regular billing

10  from RLG. A review of Randazza's filings in other matters show this is not the first time such

11  misrepresentations have been made. E/L discovered these misleading statements during the process

12  of locating new counsel.

13     37.    Discovery in the underlying arbitration between the parties has also confirmed that

14  throughout the course of Randazza's employment with E/L, he engaged in unethical conduct, and

15  the representation of various companies that created conflicts of interest in light of his employment

16  as E/L's General Counsel. Indeed, Randazza offered legal advice to known infringers of E/L's

17  copyrighted material and ignored E/L's please to take action against said companies. Occasionally,

18  he even dissuaded E/L from taking said action against those undisclosed clients; including, but not

19  limited to Xvideos.com and XNXX.com. The full extent of Randazza's conflicts remain unknown

20  as E/L does not have knowledge of Randazza's full and complete client base.

21     37.    On multiple occasions, Randazza also engaged in negotiations with adverse parties

22  who had litigation pending against E/L, regarding those parties retaining his services in order to

23  conflict him out from any future cases against them. In fact, Randazza improperly engaged in those

24  negotiations during E/L's litigation with TNAFlix, Oron, and Megaupload.

25     38.    Randazza also negotiated to potentially broker a deal for the sale of TNAFlix while

26  actively litigating against them on E/L's behalf, he encouraged E/L to enter into an unethical

27  business transaction during the Oron litigation, jeopardized the entire Oron settlement as a result of

28  his unethical behavior and explicit non-compliance with the settlement agreement, and encouraged

9

1  E/L to enter into agreements with vendors he represented without any disclosure therefor. Randazza

2  never disclosed the existence of any of these conflicts of interest and never sought written informed

3  consent from E/L.

**D.    THE ARBITRATION**

5  39.    On December 19, 2012, Randazza initiated arbitration proceedings against E/L,

6  under the auspices of Judicial Arbitration and Mediation Services, Inc. ("JAMS") for employment-

7  related claims lacking any basis in law or fact (the "Arbitration"). In an effort to multiply the costs

8  to E/L, Randazza also initiated a state court action against E/L for those same claims.

9  40.    E/L filed counterclaims against Randazza alleging numerous serious violations of the

10  his fiduciary duties to E/L, legal malpractice, conversion, breach of contract, and other contract-

11  related claims.

12  41.    The parties agreed to the appointment of the Hon. Stephen E. Haberfeld (Ret.) As the

13  arbitrator for that matter (the "Arbitrator").

14  42.    The parties conducted over 2 years of discovery and pre-hearing litigation, as well as

15  the Arbitration hearing itself which was held over 5 days from February 9-13, 2015.

16  43.    On June 3, 2015, the Arbitrator issued his Interim Arbitration Award (the "IAA").

17  The IAA found in favor of E/L on all of the claims and counterclaims, and awarded E/L damages

18  against Randazza in a sum exceeding $568,715. A true and correct copy of the IAA is attached

19  hereto as **Exhibit 1**, and fully incorporated herein by reference.

20  44.    Among other things, the Arbitrator made numerous findings of fact in the underlying

21  dispute, particularly relevant are the following:

22         a.    "Whether or not Mr. Randazza's employment by E/L was terminated

23                voluntarily by Mr. Randazza or involuntarily by E/L, the principal proximate

24                cause for the ending of Mr. Randazza's employment was Mr. Randazza's

25                breaches of fiduciary duty and the covenant of good faith and fair dealing,

26                implied in his employment agreement, as an employee, executive and general

27                counsel of E/L." IAA, p.2 ¶C

28

*FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*

b.   "Mr. Randazza's credibility was also undermined by the variance between his
testimony and positions at hearing and his written Nevada State Bar
submission concerning the Oron litigation $75,000 bribe..." IAA p. 6 fn.4

c.   "The evidence established at the hearing was that Mr. Randazza intended that
his allegations would induce [Gibson] to authorize a settlement financially
favorable to Mr. Randazza, based on Mr. Randazza's belief at the time – and
ultimately proven incorrect – that [Gibson] would so settle, rather than have
to litigate true or false allegations related to his own sexuality, sexual
activity, and the pornographic natuer of E/L's business." IAA p. 6-7 ¶F

d.   "Turning to E/L's counterclaims, Mr. Randazza owed fiduciary duties to E/L,
because he was their in-house general counsel and their attorney of record in
judicial civil actions, and an E/L executive and employee. As such, Mr.
Randazza owed E/L, as his clients, employers and principals, the highest duty
of loyalty and honesty in the performance of his professional and executive
obligations [...] Each of Mr. Randazza's ethical duties owed to his
principals/clients was a legal fiduciary duty owed to them. Mr. Randazza
violated those fiduciary duties owed by him to E/L, as his
principals/clients/employers – including by the following:" IAA p.13 ¶Q

e.   "(1) engaging in negotiations for monetary bribes to be paid to him –
including the Oron $75,000 which [Gibson] noticed, without Mr. Randazza's
affirmative disclosure of it – which would result in his being 'conflicted out'
of future litigation or any disputes with parties then and/or in the future with
interests adverse to E/L's interests, (2) taking control for his personal benefit
of, and refusing to relinquish control over, Oron settlement funds – all of
which ought to have been for the benefit and under the direction and control
of his principals/clients E/L, before and after the end of his employment and
representations on behalf of E/L, (3) Mr. Randazza's ordering and causing
the deliberate 'wiping' of his and legal assistant's corporate laptops, as an

11

integral part of his planned resignation as E/L's General Counsel and outside

counsel of record, and (4) Mr. Randazza's continuing an undisclosed (and

thus unconsented-to) legal work for clients (e.g., Bang Bros., Xvideos,

XNXX, Porn [Guardian], Titan Media, Kink), whose interests were actually

and potentially adverse to E/L's interests." IAA p.14-15

f.   "As E/L's inside general counsel and employee, Mr. Randazza had a legal

and fiduciary duty – no later than when his employment ceased, regardless of

whether or not with or without cause and/or by whom ended – to deliver

every file and other piece of data and/or information – complete, intact and

undeleted, unmodified and immediately accessible and usable by E/L [...]

Because of his noncompliance, indeed resistance to compliance with those

duties, they continue to the day of the rendering of this award [...] Those

continuing fiduciary duties owed by him to E/L exist, including by reason of

his exclusive control over the computers and thus superior knowledge of

what was on each computer's hard drive before and after he had everything

on the returned laptops completely and multiply deleted..." IAA p.16

g.   "By the same token, that ordered conduct raises an inference that whatever

was deleted was known and intended by Mr. Randazza to be harmful to him

and any claims and contentions which he might make in any dispute with E/L

– i.e., deliberate spoliation, in addition to conversion." IAA p.17

h.   "Mr. Randazza committed spoliation of evidence, as well as improper

conversion of his employer's files, data and equipment and, in so doing, also

violated his fiduciary duties owed to E/L." IAA p. 17

i.   "... Mr. Randazza's response to E/L's [state bar] grievance contained at least

one material misrepresentation acknowledged during an evidentiary session

in this arbitration..." IAA p. 17 ¶S

j.   "E/L was damaged in at least the amount of $275,000, by reason of the Oron

resettlement, as a direct and proximate result of events being set in motion by

12

1    Mr. Randazza's violations of fiduciary duty and other duties, by his having

2    secretly negotiated a $75,000 bribe to conflict himself out from suing Oron in

3    the future." IAA p. 18 ¶T

4    k.    "The extent of Mr. Randazza's contractual material breaches made them also

5    breaches of fiduciary duty – regardless of whether or not those breaches of

6    fiduciary duty were conflicts of interests, as some were." IAA p. 19 ¶V

7    l.    "Disgorgement of compensation paid by E/L to Mr. Randazza is an available

8    remedy, which is appropriate in the circumstances of Mr. Randazza's clear

9    and serious violations of fiduciary duty owed to E/L, and within the

10   Arbitrator's discretion, based on the evidence in this arbitration." IAA p. 19

11   ¶W

12   m.    "E/L are the prevailing parties in this arbitration. As such one or both of

13   Respondents is or may be entitled to contractual attorneys fees under the

14   employment agreement." IAA p. 22 ¶Y

15   45.    The damages awarded by the Arbitrator to E/L have not been fully calculated, but

16   exceed $1 million. IAA p.23-26 ¶1-9

17   46.    Subject to a determination of the full amount of damages to be awarded to Plaintiffs,

18   the IAA, "including the Determinations hereinabove set forth, is intended to be in full settlement of

19   all claims, issues, allegations and contentions, on the merits, submitted by any party against any

20   adverse party in this arbitration." IAA p. 26.

21   47.    The findings made in the IAA are binding on Defendant Randazza and he is

22   collaterally estopped from re-litigating the facts and issues determined by the arbitrator. *See In re*

23   *Molina*, 228 B.R. 248 (9th Cir. BAP 1998); *In re O'Neill*, 260 B.R. 122 (Bankr.E.D.Tex.2001); *In*

24   *re Marx*, 171 B.R. 218 (Bankr.N.D.Tex.1994).

25   ///

26   ///

27   ///

28   ///

13

## III. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(2)(A) - False Pretenses, False representation, or Actual Fraud)

48. Plaintiffs hereby incorporate by reference each and every allegation stated hereinabove as though fully set forth herein.

49. In or about the year 2009, Defendant Randazza represented and induced Plaintiffs to enter into the Employment Agreement, as alleged above with the implied and actual promise that if it entered into the Employment Agreement, Defendant would act in accord with all duties, fiduciary or otherwise, inherent in the position of employee/executive/principal as well as in accord with the heightened duties, fiduciary and otherwise, inherent in his position as attorney and in-house General Counsel to E/L. By the nature of his position and relationship with E/L as in-house general counsel, employee, principal, and executive, as well has his fiduciary duties, Randazza owed a duty to disclose to E/L.

50. In reliance and in furtherance of said representations, Plaintiffs contributed substantial time, money, and labor to fulfill its obligations under the Employment Agreement. Moreover, Plaintiffs fully relied on the advice of Defendant in all legal matters.

51. As Plaintiffs' general counsel, Defendant had an affirmative duty to disclose to Plaintiffs all facts material to his work on their behalf and to keep Plaintiffs fully apprized of his activities. Plaintiffs relied on Defendants full disclosures in making decisions regarding their operations of the companies and in continuing their relationship with Defendant.

52. Defendant failed to disclose to Plaintiffs various facts material to his work and to his continued employment including: the true nature of his dealings with infringers of Plaintiffs intellectual property; his engagement in negotiations with adverse parties who had litigation pending against Plaintiffs, regarding those parties retaining his services in order to conflict him out of any future cases against them; his negotiations to broker a deal for the sale of a defendant (TNAFlix) while actively litigating against them on EL's behalf.

14

53.     Had Plaintiffs been aware of these facts and circumstances, Plaintiffs would not have taken Defendants advise on any matter, would not have acceded to the payments made to Defendant by the various third parties, would have immediately terminated Defendants' employment for cause and would not have contributed any time, money, or labor to the fulfillment of the Employment Agreement, or paid the substantial amounts comprising Randazza's compensation.

52.     At the time Defendant made such representations and committed the nondisclosures, he did so with the intent to induce Plaintiffs to act as alleged. At the time Defendant made such representations, and committed such nondisclosures, such representations were false, and he knew that they were false, and/or purposefully did not disclose said facts in that he intended to act for the sole benefit of himself, and at the detriment of E/L, in full disregard for the Employment Agreement and his duties to E/L. Consequently, Plaintiffs are entitled to an award of compensatory damages, disgorgement of funds paid to Defendant, and punitive damages against Defendant in an amount according to proof at trial.

53.     As a result of the false representations of Defendant, Plaintiffs have been damaged in an amount exceeding $1 million dollars. Plaintiffs are also entitled to an award in the amount of the compensation paid to Defendant in reliance on his fraud as alleged herein as well as the attorneys fees and costs incurred in connection with the Arbitration and punitive damages against Defendant in an amount according to proof at trial.

54.     Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(2)(A): (1) determining: (i) Defendant is liable to Plaintiffs in the full amount of the Arbitration Award to be issued by the Arbitrator or, in the alternative in an amount to be proved at trial herein; and (ii) that said liability is non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection with the prosecution and defense of the Arbitration and this adversary proceeding.

## SECOND CLAIM FOR RELIEF

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(4) - Fraud or Defalcation while acting in a Fiduciary Capacity)

55.     Plaintiffs hereby incorporate by reference each and every allegation stated hereinabove as though fully set forth herein.

15

1    56.    As Plaintiffs' general counsel, Defendant was tasked with the responsibility of

2    handling all of Plaintiff's legal affairs, including, but not limited to, employment, regulatory,

3    transactional, intellectual property protection and litigation matters. In such capacity, Defendant

4    owed to Plaintiffs the full panoply of fiduciary duties, all of which required Defendant to give to

5    Plaintiffs his absolute and complete fidelity. These duties include, but are not limited to:

6            a. the duty to fully and completely disclose to Plaintiffs all facts relevant to all of

7    Plaintiff's legal matters;

8            b. the duty to maintain inviolate the confidence, and at every peril to himself to

9    preserve the secrets, of Plaintiffs;

10           c. the duty to protect Plaintiff in every possible way;

11           d. the duty to assiduously avoid assuming a position adverse or antagonistic to

12   Plaintiffs without Plaintiffs' free and intelligent consent;

13           e. the duty to represent Plaintiffs' interests without being influenced by the his own

14   personal or financial interests or the interests of other clients or third parties; and,

15           f. the duty to maintain Plaintiffs' funds and property separate from his own, to

16   promptly, regularly and honestly account for Plaintiffs' fund and property and promptly pay over to

17   Plaintiffs all funds to which Plaintiffs are entitled.

18   57.    Defendant breached those duties by all of the acts and omissions alleged above and

19   as determined by the Arbitrator in the IAA; including, but not limited to, willfully violating the

20   Employment Agreement, engaging in willful conflicts of interests at the expense of Plaintiffs,

21   benefitting himself at the expense of Plaintiffs, committing acts of legal malpractice, making false

22   representations, spoliation and destruction of evidence, failing to account for or pay over to

23   Plaintiffs funds belonging to them and converting Plaintiffs funds and property.

24   58.    As a direct and proximate result of Defendant's breaches of his fiduciary duties,

25   Plaintiffs have suffered damages in an amount exceeding $1 million, including costs and attorneys

26   fees and disgorgement; the full measure of which the Arbitrator will determine once the automatic

27   stay has been lifted. Or in the alternative, should the stay not be lifted, according to proof at trial.

28

16

*FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*

1    59.    The breaches of fiduciary duties alleged above were committed with the intent to

2    deprive Plaintiffs of their money and interests by means of deceit and concealment of material facts,

3    which actions were despicable and done maliciously and oppressively, with the intent to cause

4    injury to Plaintiffs and with a willful and conscious disregard for Plaintiffs' rights. Consequently,

5    Plaintiffs are entitled to an award of compensatory damages, disgorgement of funds paid to

6    Defendant, and punitive damages against Defendant in an amount according to proof at trial.

7    60.    Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(4): (1) determining that:

8    (i) Defendant is liable to Plaintiffs in the full amount of the Arbitration Award to be issued by the

9    Arbitrator or, in the alternative in an amount to be proved at trial herein; and (ii) said liability is

10   non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection

11   with the prosecution and defense of the Arbitration and this adversary proceeding.

12                                    THIRD CLAIM FOR RELIEF

13   (For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(6) - Willful or

14                                        Malicious Injury)

15   61.    Plaintiffs hereby incorporate by reference each and every allegation stated

16   hereinabove as though fully set forth herein.

17   62.    Pursuant to §523(a)(6) of the Unites States Bankruptcy Code, a debt incurred by a

18   debtor who engages in wilful and malicious conduct which results in damages shall be

19   nondischargeable.

20   63.    While acting as in-house general counsel for Plaintiffs, the Debtor engaged in the

21   following wilful and malicious acts, among others:

22            a.    Willfully and maliciously engaging in voluntary conflicts of interest for the

23                  sole benefit of himself and at the intentional expense of his clients, Plaintiffs.

24                  As found by the arbitrator: "(1) engaging in negotiations for monetary bribes

25                  to be paid to him – including the Oron $75,000 which [Gibson] noticed,

26                  without Mr. Randazza's affirmative disclosure of it – which would result in

27                  his being 'conflicted out' of future litigation or any disputes with parties then

28                  and/or in the future with interests adverse to E/L's interests, (2) taking control

                                              17

                FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS

1     for his personal benefit of, and refusing to relinquish control over, Oron

2     settlement funds – all of which ought to have been for the benefit and under

3     the direction and control of his principals/clients E/L, before and after the end

4     of his employment and representations on behalf of E/L, (3) Mr. Randazza's

5     ordering and causing the deliberate 'wiping' of his and legal assistant's

6     corporate laptops, as an integral part of his planned resignation as E/L's

7     General Counsel and outside counsel of record, and (4) Mr. Randazza's

8     continuing an undisclosed (and thus unconsented-to) legal work for clients

9     (e.g., Bang Bros., Xvideos, XNXX, Porn [Guardian], Titan Media, Kink),

10     whose interests were actually and potentially adverse to E/L's interests."

11     IAA p.14-15

12     b.   Willfully, maliciously, and intentionally engaging in spoliation of evidence

13     and the corporate property of Plaintiffs. As found by the arbitrator: "As

14     E/L's inside general counsel and employee, Mr. Randazza had a legal and

15     fiduciary duty – no later than when his employment ceased, regardless of

16     whether or not with or without cause and/or by whom ended – to deliver

17     every file and other piece of data and/or information – complete, intact and

18     undeleted, unmodified and immediately accessible and usable by E/L [...]

19     Because of his noncompliance, indeed resistance to compliance with those

20     duties, they continue to the day of the rendering of this award [...] Those

21     continuing fiduciary duties owed by him to E/L exist, including by reason of

22     his exclusive control over the computers and thus superior knowledge of

23     what was on each computer's hard drive before and after he had everything

24     on the returned laptops completely and multiply deleted..." IAA p.16

25     c.   By willfully, maliciously, and intentionally engaging in spoliation of

26     evidence to conceal his bad acts. As found by the arbitrator: "By the same

27     token, that ordered conduct raises an inference that whatever was deleted was

28     known and intended by Mr. Randazza to be harmful to him and any claims

18

*FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*

and contentions which he might make in any dispute with E/L – i.e., deliberate spoliation, in addition to conversion." IAA p.17 [...] "Mr. Randazza committed spoliation of evidence, as well as improper conversion of his employer's files, data and equipment and, in so doing, also violated his fiduciary duties owed to E/L." IAA p. 17

  d. By willfully, maliciously, and intentionally making repeated misrepresentations to investigative administrative bodies, including the State Bar of Nevada - to conceal his willful and malicious injuries to Plaintiff. As found by the arbitrator: "... Mr. Randazza's response to E/L's [state bar] grievance contained at least one material misrepresentation acknowledged during an evidentiary session in this arbitration..." IAA p. 17 ¶S

  f. By willfully, maliciously, and intentionally breaching his fiduciary duties to Plaintiffs by, among other things, negotiating bribes for himself at Plaintiffs' expense, and committing intentional violations of Plaintiffs' settlement agreements. As found by the arbitrator: "E/L was damaged in at least the amount of \$275,000, by reason of the Oron resettlement, as a direct and proximate result of events being set in motion by Mr. Randazza's violations of fiduciary duty and other duties, by his having secretly negotiated a \$75,000 bribe to conflict himself out from suing Oron in the future." IAA p. 18 ¶T

  g. By willfully, maliciously, and intentionally breaching his employment contract with Plaintiffs, to whom he owed fiduciary duties. As determined by the arbitrator: "The extent of Mr. Randazza's contractual material breaches made them also breaches of fiduciary duty – regardless of whether or not those breaches of fiduciary duty were conflicts of interests, as some were." IAA p. 19 ¶V

64. As a direct and proximate result of the foregoing, Plaintiffs have suffered damages in an amount not presently ascertained but believed to be in excess of \$1,000,000.

<div align="center">19</div>

65.     In committing the acts hereinabove described, the Debtor acted wilfully, maliciously, and with deliberate intent to injure Plaintiffs. Therefore Plaintiffs are entitled to punitive and exemplary damages in an amount to be determined at the time of trial, including contractual attorneys fees.

66.     Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(6): (1) determining that: (i) Defendant is liable to Plaintiffs in the full amount of the Arbitration Award to be issued by the Arbitrator or, in the alternative in an amount to be proved at trial herein; and (ii) said liability is non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection with the prosecution and defense of the Arbitration and this adversary proceeding.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.     For consequential and special damages as awarded by the Arbitrator as will be awarded in the forthcoming final award or, alternatively, according to proof at trial;

2.     For a disgorgement of the monies paid to Defendant in his capacity as Plaintiffs' attorney;

3.     For punitive damages according to proof at trial;

4.     For a decree determining that all debts determined to be owing by Defendant to Plaintiffs which are the subject of this action are deemed and adjudicated to be non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and/or §523(a)(4);

5.     Attorneys fees according to proof;

6.     For costs of suit incurred herein; and

7.     For such other and further relief as this Court deems just and appropriate.

Dated:     February 10, 2016          LANG, HANIGAN & CARVALHO, LLP



By s/ Vaughn M. Greenwalt
Vaughn M. Greenwalt
Attorneys for Plaintiffs

20

*FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*

Case: 15-14889    Date Filed: 05/05/2017    Page: 202 of 597

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the within action.

DATED: February 10, 2016          LANG, HANIGAN & CARVALHO, LLP

By: s/ Vaughn M. Greenwalt
Vaughn M. Greenwalt
Attorneys for Plaintiffs

21

**EXHIBIT 2**

No. 12-16976

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

LIBERTY MEDIA HOLDINGS, LLC, *Plaintiff-Appellee*,

v.

FF MAGNAT LIMITED d/b/a ORON.COM, *Defendant-Appellant*.

———————————————

On Appeal from a Judgment of the United States District Court
for the District of Nevada

Hon. Gloria M. Navarro, United States District Judge
No. 2:12-cv-01057-GMN-RJJ

———————————————

APPELLEE'S MOTION FOR AN ORDER REASSESSING AND
SUMMARILY AFFIRMING THE AMOUNT OF THE DISTRICT
COURT'S ATTORNEY FEES AWARD OR, IN THE ALTERNATIVE,
REMANDING THIS CASE TO THE DISTRICT COURT, FOLLOWING
THE DISPOSITION OF THIS APPEAL, FOR THE LIMITED PURPOSE
OF OBTAINING A REASSESSMENT OF THE AMOUNT OF ITS
ATTORNEY FEES AWARD

———————————————

Mitchell J. Langberg (NV Bar No. 10118)
Scott M. Schoenwald (NV Bar No. 5484)
Laura E. Bielinski (NV Bar No. 10516)
BROWNSTEIN HYATT FARBER
    SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Telephone: (702) 382-2101
Facsimile: (702) 382-8135
*Attorneys for Appellee*
*Liberty Media Holdings, LLC*

Appellee Liberty Media Holdings, LLC ("Liberty") hereby moves this Honorable Court for an order reassessing and summarily affirming the amount of the attorney fees award entered in its favor on September 4, 2012 (Dist. Ct. Doc. Nos. 114 and 115) or, in the alternative, remanding this case to the United States District Court for the District of Nevada, following the disposition of this appeal, for the limited purpose of reassessing the amount of its attorney fees award.

This motion is made pursuant to Rule 27 of the Federal Rules of Appellate Procedure and the local rules of this Circuit and is based on the following Points and Authorities, the attached Declaration of Henry Leonard, the attached exhibits, all papers on file with the Court in this action, such further evidence as the Court deems appropriate, and the oral arguments of counsel at the hearing on this motion if requested by the Court.

## POINTS AND AUTHORITIES

### I.    INTRODUCTION.

Liberty prevailed in the District Court on a motion for attorney fees, but is now in the extraordinary position of having to ask for a reassessment of the amount of attorney fees awarded in its favor.  The impetus for this request is Liberty's recent discovery that statements made by its former counsel in support of its motion may have misled the District Court into concluding that it had incurred more attorney fees than it had actually incurred during the underlying litigation.

1

Case 9:11-cv-00877-RJR-9 Document 3689-1 Entered on FLSD Docket 06/28/2016 Page 207 of 258

Concerned that this mistake would perpetuate if it remained silent, Liberty determined that the interests of justice required it to bring this issue to this Court's attention even though:  (1) the District Court ultimately based its attorney fees award on a lodestar analysis that did not depend on the amount of attorney fees incurred; and (2) Appellant FF Magnat Limited d/b/a Oron.com ("Oron") has not appealed the amount of that award.[1]  Liberty would have raised this issue directly with the District Court once it became apparent, but Oron's filing of its notice of appeal had already divested the District Court of jurisdiction over issues relating to attorney fees.  *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

Liberty respectfully submits that, despite the false impression created by its former counsel's filings in support of the attorney fees motion, the Court should let the amount of fees awarded by the District Court stand.  Because the outcome of the lodestar method employed by the District Court required an examination of the reasonableness of the attorney fees expended on Liberty's behalf rather than the reasonableness of the attorney fees actually incurred by Liberty, no further analysis by the District Court is necessary.  This Court may exercise its broad remedial powers conferred by 28 U.S.C. § 2601 ("Section 2601") to reassess and summarily

---

[1] Oron challenges on appeal the District Court's legal authority to award Liberty attorney fees, but does not dispute the amount of the award.  *See Appellant's Opening Brief*, at 2, 24-25 (filed 12/14/12).

affirm the amount of the attorney fees award under these circumstances.  If the Court nevertheless finds that this issue calls for the District Court's reassessment of the amount of fees awarded (which it should not), a remand solely for this limited purpose should be ordered following the disposition of this appeal.

## II.    <u>STATEMENT OF RELEVANT FACTS.</u>

After granting Liberty's motion to enforce its agreement with Oron that settled the underlying litigation, the District Court entered a written order and judgment awarding attorney fees to Liberty in the amount of $131,797.50 pursuant to Section 505 of the Copyright Act ("Section 505").  *See* Exhibit 1, at 3:17-18, 8:21-22, 9:14-16; Exhibit 2.  The District Court exercised its discretion to grant such relief because Liberty was the prevailing party under Section 505 and an attorney fees award would further the purposes of the Copyright Act.  *See* Exhibit 1, at 4:9-7:19.

Upon finding that Liberty's recovery of attorney fees was warranted, the District Court proceeded to calculate the amount of its award.  *See id*. at 7:20-9:12. References to the charges that Liberty claimed to have "incurred" for the legal services rendered by its attorneys, the Randazza Legal Group, appeared throughout the papers filed by that counsel and, in turn, throughout the District Court's analysis.  The District Court, for example, stated:

(1)    "To pursue this case, Plaintiff enlisted Randazza Legal Group

3

and ***incurred charges*** ranging from $400-$500 per hour for

partners, $350 per hour for of counsel, $325 per hour for

associate attorneys, and $125 per hour for law clerks," [Exhibit

1, at 3:2-5 (emphasis added); *see also id.* at 8:12-14 (same)];

(2)   "The resolution of this case required 325.90 labor hours from

Randazza Legal Group, resulting in Plaintiff ***incurring***

$134,910.00 in attorney fees and $64,911.50 in costs," [*Id.* at

3:5-7 (emphasis added)];

(3)   "On August 26, 2012, Plaintiff supplemented its original

request for seeking attorneys' fees ***incurred*** in attempting to

satisfy the judgment against Defendant," [*Id.* at 3:8-10

(emphasis added)]; and

(4)   "[T]he hourly rates that Plaintiff's attorneys ***charged*** are

reasonable rates in the Las Vegas legal market," [*Id.* at 8:11-12

(emphasis added)].

This confusion occurred through no fault of the District Court, but rather was

entirely the result of the filings made by Liberty's former counsel in support of the

attorney fees motion.

Following Oron's commencement of this appeal, Liberty learned that various

assertions made in support of its attorney fees motion apparently led the District

4

Court to misconstrue the extent of the attorney fees that it had actually incurred in the underlying litigation.  For instance, Liberty's motion stated:

    (1)    Liberty had "*incurred*" attorney fees "worth" $134,910.00 based on "325.90 total labor hours," [Exhibit 3, at 4:25-26 (emphasis added)];

    (2)    The $199,821.50 in attorney fees and costs sought by Liberty "was reached by adding Liberty's $64,911.50 in costs to the $134,910 *incurred* by Liberty's attorneys and legal assistants in this matter, at their *regular* hourly rates of $500, $400, $350, $325, and $125 per hour, respectively," [*Id.* at 5:2-4 (emphasis added)];

    (3)    "The fees counsel *charged* Liberty in this matter were *customary* and, like other enforcement actions of this nature, *accrued on an hourly basis*," [*Id.* at 8:1-2 (emphasis added)];

    (4)    Liberty *incurred* Randazza Legal Group's c*ustomary fees that are regularly charged to all clients*:  Marc Randazza, owner, at $500 per hour; Ronald Green, partner, at $400 per hour; Jason A. Fischer, of counsel, at $350 per hour; J. Malcolm DeVoy, associate, at $325 per hour; and Laura Tucker, law clerk, at $125 per hour," [*Id.* at 8:2-5 (emphasis added)]; and

(5)   "In the above-captioned matter, Randazza Legal Group
      ***regularly billed Liberty*** for their services, calculated based on
      the ***attorneys' standard hourly rates***," [*Id.* at 8:7-8 (emphasis
      added)].

Liberty's motion was supported by:  (1) the affidavit of a Randazza Legal Group
attorney, which stated that "[m]ultiplying the appropriate rate by the hours their
respective user spent working on this matter, the total attorney's fees ***incurred***
representing Liberty in this matter are $134,910.00," [Exhibit 4, ¶ 28, at 4:23-24
(emphasis added)]; and (2) the declaration of an attorney fees expert, which
concluded that "[t]he rates and hours Liberty ***incurred*** in this case" and "the rates
***charged*** by Randazza Legal Group" to Liberty were reasonable.[2]  *See* Exhibit 5, ¶
11, at 2:26-3:2; ¶ 21, at 4:11; ¶ 23, at 4:20 (emphasis added).

Liberty made similar assertions in a subsequently filed supplement to its
attorney fees motion that sought an additional $15,142.50 in fees, for a total of
$150,052.50 in attorney fees, relating to legal services made necessary by Oron's
failure to abide by the terms of the parties' agreement that settled the underlying
action.[3]  *See* Exhibit 7.  These statements included:

---

[2]  Liberty's memorandum of law in support of its motion also referred to
attorney fees "incurred."  *See* Exhibit 6, at 3:18, 4:24, 5:24, 6:21, 7:23.

[3]  Liberty relatedly observed in its reply in support of its attorney fees motion
that "the fees ***incurred*** after the settlement agreement were substantial."  *See*
Exhibit 9, at 1:28 (emphasis added).

(1)    "In its renewed motion, Liberty sought nearly $200,000 in attorneys' fees and costs that it **incurred** in the course of litigation – much of which **accrued** after the parties had entered into a valid and binding settlement agreement," [*Id*. at 1:27-2:2 (emphasis added)];

(2)    "Liberty has **incurred** an additional $15,142.50 in attorney's fees," [*Id*. at 2:5-6 (emphasis added)];

(3)    "In responding to Oron's actions following the entry of judgment, Liberty has **incurred** an additional 40 hours of attorney time, at a cost of $15,142.50 just between August 10 and 25 alone," [*Id*. at 2:8-9 (emphasis added)];

(4)    "As Oron caused, and continues to cause, **the accrual of** these subsequent attorneys' fees, their burden should fall on Oron, rather than Liberty," [*Id*. at 3:10-11 (emphasis added)]; and

(5)    "Oron (and its counsel) [should be] ordered to **repay** Liberty its [total of] $214,964.00 in attorney's fees and costs," [*Id*. at 3:23-25 (emphasis added)].

Liberty supported its supplemental attorney fees request with the affidavit of a Randazza Legal Group attorney, which stated that Liberty had been "forced to **incur** more than $15,000 in additional legal fees responding to Oron's ongoing

7

attempts to avoid performance of its obligations under the settlement agreement with Liberty." *See* Exhibit 8, ¶ 7, at 2:22-24 (emphasis added).

Despite these various assertions, Liberty neither incurred nor was charged attorney fees in the amount stated in support of its motion. Marc Randazza, Esq. of the Randazza Legal Group served as Liberty's general counsel during the course of the underlying litigation, and in that capacity was a salaried employee of Liberty.[4] *See* Leonard Declaration, ¶ 5. Mr. Randazza consequently did not charge Liberty on an hourly basis for his own services in the Oron matter. *See id*. Mr. Randazza also charged Liberty reduced hourly rates for the legal services provided by others in his firm. *See id*., ¶ 6. Thus, while the legal services rendered on Liberty's behalf were "worth" a total of $150,052.50, as maintained in Liberty's motion and related supplement, Liberty did not actually incur attorney fees in that amount at the Randazza Legal Group's regular hourly rates or otherwise.

While the District Court focused on the attorney fees that Liberty claimed to have incurred, the reasonableness of the fee request ultimately provided the basis for its award. *See* Exhibit 1, at 7:20-9:12. To make this determination, the District Court undertook a lodestar analysis through which it concluded that the Randazza Legal Group's hourly billing rates for this matter were reasonable in the Las Vegas legal market, found that most of the hours claimed were recoverable, and decided

---

[4] Liberty advised the District Court in its attorney fees motion that Mr. Randazza served as its general counsel. *See* Exhibit 3, at 9:20-21.

that the lodestar factors required no upward or downward adjustment. *See id*. at

7:20-9:12. Based on these considerations, the District Court awarded Liberty

attorney fees in the amount of $131,797.50 and entered judgment accordingly. *See*

*id*. at 3:17-18, 8:21-22, 9:14-16; Exhibit 2.

## III.    ARGUMENT.

### A.    This Court Has Authority Under 28 U.S.C. § 2106 To Reassess And Summarily Affirm The Amount Of The District Court's Attorney Fees Award In Order To Further The Interests Of Justice.

Even though Oron has not appealed the amount of the District Court's

attorney fees award, Liberty recognizes that the interests of justice support a

reassessment of that amount. Liberty's concern is that its former counsel's filings

in support of its attorney fees motion caused the District Court to misapprehend the

amount of attorney fees that it had incurred or been charged in the underlying

litigation. *See Black's Law Dictionary*, at 782 (8th ed. 2004)(defining "incur" as

"[t]o suffer or bring on oneself (a liability or expense)"; *see also id*. at 248

(defining "charge" as "[t]o demand a fee; to bill"). The relief now requested by

Liberty will ensure that any misconception caused by its motion does not taint the

attorney fees award properly entered in its favor by the District Court.[5]

---

[5] The Court should not construe this motion as an acknowledgement that the amount of attorney fees awarded to Liberty by the District Court was somehow excessive.

A remand of this issue for consideration by the District Court is unwarranted, however, because it would result in an unnecessary additional proceeding. Any misunderstanding resulting from Liberty's assertions regarding its attorney fees incurred in the underlying litigation should have no bearing on the disposition of its motion because the actual fees charged for legal services rendered on behalf of a prevailing party do not set the parameters of a reasonable attorney fees award. The record below confirms that the District Court properly premised its attorney fees award on the reasonableness of Liberty's fee request as determined using the lodestar method. *See* Exhibit 1, at 7:20-9:12; *see also Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1222-23 (9th Cir. 2010)(affirming the use of a traditional lodestar analysis to ascertain a reasonable attorney fees award in a copyright infringement action); *see generally Hensley v. Eckerhart*, 461 U.S. 424, 433-37 (1983)(discussing the lodestar method).

A "lodestar" is calculated by multiplying the number of hours the prevailing party "reasonably expended" on the litigation by a reasonable hourly rate. *See McGrath v. County of Nevada*, 67 F.3d 248, 252 (9th Cir. 1995). The resulting lodestar figure, which is presumptively reasonable, may then be adjusted upward or downward based on a variety of factors.[6] *See id*. The outcome of a lodestar

---

[6] Because reasonable attorney fees are "calculated according to the prevailing market rates in the relevant community," [*Blum v. Stenson*, 465 U.S. 886, 895 (1984)], fees may be awarded at such rates for services provided by in-

analysis therefore does not depend in any way on whether the party seeking an attorney fees award had actually incurred or been charged the subject fees.

Given that the amount of attorney fees actually incurred by Liberty was not determinative and that the District Court has already found that the attorney fees claimed by Liberty were reasonable as required by Section 505, no involvement by the District Court in a reassessment of the amount of its attorney fees award is necessary. *See* Exhibit 1, at 7:20-9:12; *see also* 17 U.S.C. § 505 (authorizing a court to "award a reasonable attorney's fee to the prevailing party"). This motion instead presents an issue that is appropriate for disposition by this Court under its expansive authority, conferred by Section 2106, to provide relief "as may be just under the circumstances." *See Nonnette v. Small*, 316 F.3d 872, 878 (9th Cir. 2002)("[l]ike the Supreme Court, we have statutory authority to provide such relief "'as may be just under the circumstances'").

This Court has long recognized that it "has the power to make such disposition of [a] case as justice may require." *See Bank of China v. Wells Fargo Bank & Union Trust Co.*, 190 F.2d 1010, 1012 (9th Cir. 1951); *see also Haynes v.*

---

house counsel as well as by attorneys and legal staff paid at below market rates. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 284-89 (1989)(legal staff); *Brandenberger v. Thompson*, 494 F.2d 885, 889-90 (9th Cir. 1974)(pro bono counsel); *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F.Supp. 656, 661 (S.D.N.Y. 1996)(in-house counsel). The District Court has already found that the Randazza Legal Group's hourly rates in this case were "reasonable" for the Las Vegas market. *See* Exhibit 1, at 8:11-12.

*United States*, 390 U.S. 85, 101 (1968)("[w]e have plenary authority under 28 U.S.C. § 2106 to make such disposition of the case 'as may be just under the circumstances'").  Liberty respectfully submits that the Court should exercise this authority and summarily affirm the amount of attorney fees awarded by the District Court, which has not been appealed by Oron, on the basis that the amount of attorney fees actually incurred by Liberty was inconsequential to the District Court's lodestar analysis.

### B.    **If The Court Declines To Exercise Its Authority Under Section 2601, The Interests Of Justice Support A Limited Remand, Following The Disposition Of This Appeal, To Allow The District Court To Reassess The Amount Of Its Attorney Fees Award.**

Any remand ordered for the limited purpose of obtaining from the District Court a reassessment of the amount of its attorney fees award is unnecessary until after a decision has been rendered on Oron's appeal.  Oron does not appeal the amount of attorney fees granted to Liberty, but rather appeals whether the District Court had legal authority to award Liberty attorney fees in any amount.  *See* Oron's Opening Brief, at 2, 24-25 (filed 12/14/12).  Not only can the Court decide the question presented by Oron without ordering an immediate remand, it would promote judicial economy for the Court not to order an immediate remand given that the parties are in the process of briefing this issue.  Moreover, while Liberty is confident that it will demonstrate on appeal that the District Court properly exercised its discretion under Section 505 to award attorney fees in this matter, the

determination of whether Liberty may recover attorney fees necessarily is a

prerequisite to the determination of the appropriate amount of such a recovery.

Under these circumstances, any remand ordered by the Court for the limited

purpose of allowing the District Court to reassess the amount of its attorney fees

award in Liberty's favor should occur following the disposition of Oron's appeal.

## IV.    **CONCLUSION.**

For the foregoing reasons, Liberty respectfully requests that the Court grant

the relief requested by this motion in its entirety.

Dated this 13th day of February, 2013.

BROWNSTEIN HYATT FARBER
SCHRECK, LLP


By: /s/ Mitchell J. Langberg
Mitchell J. Langberg (NV Bar No. 10118)
Scott M. Schoenwald (NV Bar No. 5484)
Laura E. Bielinski (NV Bar No. 10516)
100 N. City Parkway, Suite 1600
Las Vegas, Nevada 89106
Telephone: (702) 382-2101
Facsimile: (702) 382-8135
*ATTORNEYS FOR APPELLEE*
*LIBERTY MEDIA HOLDINGS, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **APPELLEE'S MOTION FOR AN ORDER REASSESSING AND SUMMARILY AFFIRMING THE AMOUNT OF THE DISTRICT COURT'S ATTORNEY FEES AWARD OR, IN THE ALTERNATIVE, REMANDING THIS CASE TO THE DISTRICT COURT, FOLLOWING THE DISPOSITION OF THIS APPEAL, FOR THE LIMITED PURPOSE OF OBTAINING A REASSESSMENT OF THE AMOUNT OF ITS ATTORNEY FEES AWARD** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 13, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I further certify that I have mailed the foregoing document by First-Class, United States Mail, postage prepaid, to the following:

> Stevan Lieberman
> Greenberg & Lieberman LLC
> 2141 Wisconsin Ave. NW
> Suite C2
> Washington, DC 20007

>  /s/ Paula Kay
> an employee of Brownstein Hyatt Farber Schreck, LLP

## DECLARATION OF HENRY LEONARD

I, Henry Leonard, PhD, CPA, CMA, hereby declare under penalty of perjury as follows:

1.    I am the Chief Financial Officer of Appellee Liberty Media Holdings, LLC ("Liberty"). I have served in this capacity since November 2011 and have been employed by Liberty since 2009. I make this Declaration in support of "Appellee's Motion For An Order Reassessing And Summarily Affirming The Amount Of The District Court's Attorney Fees Award Or, In The Alternative, Remanding This Case To The District Court, Following The Disposition Of This Appeal, For The Limited Purpose Of Obtaining A Reassessment Of The Amount Of Its Attorney Fees Award."

2.    I have personal knowledge of the matters set forth in this Declaration and, if called as a witness, could and would competently testify thereto.

3.    As Chief Financial Officer, I am involved in Liberty's day-to-day financial decisions and am familiar with the billing and payment processes for Liberty's vendors and service providers, including Liberty's former counsel, the Randazza Legal Group.

4.    The Randazza Legal Group represented Liberty in the matter of *Liberty Media Holdings, LLC v. FF Magnat Limited d/b/a Oron.com*, United States

District Court, District of Nevada, Case No. 2:12-cv-01057-GMN-RJJ (the "Oron Litigation").

5.     Marc Randazza, Esq. of the Randazza Legal Group served as Liberty's general counsel during the course of the Oron Litigation, and in that capacity was a salaried employee of Liberty.  Mr. Randazza did not charge Liberty an hourly rate for his own services in the Oron Litigation.

6.     Mr. Randazza also charged Liberty reduced hourly rates in the Oron Litigation for the legal services provided by other attorneys and legal assistants employed by his firm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of February, 2013 at Las Vegas, Nevada.


Henry Leonard

# INDEX OF EXHIBITS TO MOTION

Exhibit 1          Order, Document No. 114 dated 09/04/2012

Exhibit 2          Judgment in a Civil Case, Document No. 115 dated 09/04/2012

Exhibit 3          Plaintiff's Emergency Renewed Motion For Attorney's Fees
                   and Costs, Document No. 89 dated 08/10/2012; and Exhibit A
                   to Plaintiff's Emergency Renewed Motion For Attorney's Fees
                   and Costs, Document No. 89-4 dated 08/10/2012

Exhibit 4          Affidavit of Ronald D. Green, Jr. in Support of Plaintiff's
                   Renewed Motion for Attorneys' Fees and Costs, Document No.
                   89-2 dated 08/10/2012

Exhibit 5          Declaration of John Krieger in Support of Plaintiff's Renewed
                   Motion for Attorneys' Fees, Document No. 89-3 dated
                   08/10/2012

Exhibit 6          Plaintiff's Memorandum of Law in Support of Motion for
                   Attorney's Fees and Costs, Document No. 89-1 dated
                   08/10/2012

Exhibit 7          Plaintiff's Supplement to Emergency Renewed Motion for
                   Attorney's Fees and Costs, Document 101 dated 08/26/2012;
                   Exhibit A to Plaintiff's Supplement to Emergency Renewed
                   Motion for Attorney's Fees and Costs, Document 101-2 dated
                   08/26/2012; and Exhibit B to Plaintiff's Supplement to
                   Emergency Renewed Motion for Attorney's Fees and Costs,
                   Document 101-3 dated 08/26/2012

Exhibit 8          Affidavit of Ronald D. Green in Support of Plaintiff's
                   Supplement to Emergency Renewed Motion for Attorneys'
                   Fees, Document No. 101-1 dated 08/26/2012

Exhibit 9          Plaintiff's Reply in Support of Emergency Renewed Motion for
                   Attorney's Fees, Document No. 106 dated 08/28/2012

# EXHIBIT 1

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

LIBERTY MEDIA HOLDINGS, LLC,           )     Case No.: 2:12-cv-01057-GMN-RJJ
                                       )
                Plaintiff,             )     **ORDER**
        vs.                            )
                                       )
FF MAGNAT LIMITED, *d/b/a Oron.com*;   )
MAXIM BOCHENKO, *a/k/a Roman Romanov*; )
and JOHN DOES 1-500,                   )
                                       )
                Defendants.            )
_____)

Pending before the Court is the Emergency Renewed Motion for Attorneys' Fees and Costs (ECF No. 89) filed by Plaintiff Liberty Media Holdings, LLC ("Plaintiff" or "Liberty Media" or "Liberty"). Defendant Oron.com ("Defendant" or "Oron") filed a Response (ECF No. 104) and Plaintiff filed a Reply (ECF No. 106).

I.      **BACKGROUND**

        This suit originated when Plaintiff filed a Complaint alleging copyright infringement on June 20, 2012. (ECF No. 1.) By commencing the lawsuit, Plaintiff expected to "cease Defendant's infringement of its copyrighted audiovisual works, and to recoup the lost sales of its content suffered through Oron's piracy." (ECF No. 89, 5:16-20.) First, Plaintiff sought and obtained a Temporary Restraining Order ("TRO") against Defendant that also ordered that Defendant's accounts be frozen. (ECF No. 11.) Additionally, Plaintiff filed a Motion for a Preliminary Injunction. (ECF No. 4.) However, both parties later stipulated that the hearing on the Motion for Preliminary Injunction should be delayed and the effect of the TRO should be extended while the parties engaged in settlement discussions. (ECF No. 28.) In granting this stipulation, the Court also set an extended briefing schedule for Plaintiff's Motion for

1    Preliminary Injunction. (ECF No. 29.)

2          Ultimately, the parties appeared to reach an agreement on the terms of a settlement (*see*

3    ECF No. 33-1.)  Notably, Defendant agreed that it would pay $550,000 to the Plaintiff, that

4    Defendant would "take both strong and bold measures to keep Liberty Media content off of its

5    servers," that it would "assist Liberty in identification and civil prosecution of any parties who

6    have been using Oron to distribute Liberty's copyrighted material," and that Plaintiff would

7    have "unfettered access to takedown/delete any of Liberty's material that are being distributed

8    through Oron.com." (ECF No. 33-1.)  However, once Plaintiff began performing the agreement,

9    Defendant began disputing that these terms were actually agreed upon and had resulted in a

10   binding contract (ECF No. 44).  While the parties were disputing the effect of the settlement

11   agreement, Plaintiff necessarily continued to prepare its brief in support of its motion for

12   preliminary injunction in accordance with the extended briefing schedule. (ECF No. 89.)

13         Subsequently, on August 7, 2012, the Court granted Plaintiff's Motion to Enforce the

14   Settlement entered by the parties on July 5, 2012.  (ECF No. 85.)  In that Order, the Court

15   determined that the parties had mutually agreed to the terms once they resolved all disputes

16   surrounding the interpretation of those terms.  (ECF No. 85.)  Specifically, the Court stated that

17   "[t]here can be no dispute that there was a meeting of the minds" when "Plaintiff's counsel

18   orally accepted Defendant's interpretation" of the settlement terms. (ECF No. 85, 6.)   The

19   Order further stated that "Defendant cannot plausibly claim that it no longer intended to be

20   bound by all the other terms of the Settlement Letter when it 'got its way' . . . ." (*Id.* at 6:23-25.)

21         Thereafter, Plaintiff brought this motion seeking an award of attorneys' fees pursuant to,

22   *inter alia*, § 505 of the Copyright Act. (ECF No. 85.)  Since the instant case was filed on June

23   20, 2012, both parties have been very active in advancing the case.  In fact, the docket contains

24   over 100 entries, including Plaintiff's motion seeking a preliminary injunction (ECF No. 4),

25   multiple motions that Defendant filed seeking disbursement of its frozen funds (ECF Nos. 20,

24, 90), Defendant's Motion to Dismiss (ECF No. 21), and Plaintiff's motion requesting

enforcement of the settlement agreement (ECF No. 33).  To pursue this case, Plaintiff enlisted

Randazza Legal Group and incurred charges ranging from $400-$500 per hour for partners,

$350 per hour for of counsel, $325 per hour for associate attorneys, and $125 per hour for law

clerks. (ECF No. 89.)  The resolution of this case required 325.90 labor hours from Randazza

Legal Group, resulting in Plaintiff incurring $134,910.00 in attorney fees and $64,911.50 in

costs. (ECF No. 89.)  Thus, Plaintiff filed this Motion requesting that this Court order Defendant

to pay Plaintiff $199,821.50. (*Id.*)  On August 26, 2012, Plaintiff supplemented its original

request for seeking attorneys' fees incurred in attempting to satisfy the judgment against

Defendant. (*See* ECF No. 101.)  According to the supplement, Plaintiff's counsel spent an

additional 40 hours of labor to obtain satisfaction of that judgment and respond to Defendant's

Motion for Disbursement of Fees, resulting in an additional $15,142.50 in attorneys' fees. (*Id.*)

Thus, the Plaintiff is requesting $150,052.50 in attorneys' fees and $64,911.50 in costs, totaling

$214,964.00. (*See* ECF No. 89, 101.)

     In accordance with Local Rules of Practice, United States District Court, District of

Nevada, LCR 54-16, Plaintiff included a reasonable itemization and description of the work

performed.  For the reasons stated below, the Court finds that an award of **$131,797.50** in

attorneys' fees is appropriate.

## II.   DISCUSSION

### A.  Costs

     Pursuant to Federal Rule of Civil Procedure 54(d)(1), "costs—other than attorney's fees

should be allowed to the prevailing party." However, Local Rules of Practice, United States

District Court, District of Nevada, LCR 54-1, requires that a party claiming such costs "shall

serve and file a bill of costs and disbursements on the form provided by the Clerk no later than

fourteen (14) days after the date of entry of the judgment or decree." LCR 54-1(a).  Local Rule

54-1(b) further requires that "[e]very bill of costs and disbursements shall be verified and distinctly set forth each item so that its nature can be readily understood. . . . An itemization and, where available, documentation of requested costs in all categories must be attached to the bill of costs." LCR 54-1(b).

Although Plaintiff provided an itemization of the work performed by its attorneys, Plaintiff failed to file the required Bill of Costs form (AO 133) and failed to file the required itemization of the *costs*. (*See* ECF No. 89-4.) Therefore, to the extent that Plaintiff seeks an award for the costs incurred, other than attorneys' fees, Plaintiff's motion is denied.

**B. Attorneys' Fees**

Section 505 of the Copyright Act grants district courts discretion to award "a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. In determining whether an award of attorneys' fees is appropriate under § 505, a district court engages in a two-part inquiry. First, a court determines whether the party requesting the attorneys' fees is actually a "prevailing party." 17 U.S.C. § 505. Second, a district court exercises its "equitable discretion" in determining whether an award of attorneys' fees would "further[] the underlying purposes of the Copyright Act . . . ." *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1229-1230 (9th Cir. 1997) (citation and internal quotation marks omitted). Once a district court determines that an award of attorneys' fees is appropriate, then the court calculates the amount of that award. *Cadkin v. Loose*, 569 F.3d 1142, 1147 (9th Cir. 2009).

**C. Liberty Media is a "prevailing party" because the Order Granting Liberty Media's Motion to Enforce Settlement materially altered the legal relationship between the parties.**

In *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, the Supreme Court determined that, in the context of the Fair Housing Amendment Act, "prevailing party" is defined as a party who has been awarded some relief by

1    the court. 532 U.S. 598, 603 (2001).  Subsequently, in *Cadkin v. Loose*, the Ninth Circuit

2    applied this definition of "prevailing party" to the use of that term in the Copyright Act. 569

3    F.3d 1142, 1148 (9th Cir. 2009).  Therefore, the touchstone of this inquiry is "whether some

4    court action has created a 'material alteration of the legal relationship of the parties.'" *Cadkin*,

5    569 F.3d at 1148 (quoting *Buckhannon*, 532 U.S. at 604).  In fact, the Supreme Court has

6    explicitly explained when this alteration of legal relationship can occur: "[n]o material alteration

7    of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce

8    a judgment, consent decree, *or settlement against the defendant*." *Farrar v. Hobby*, 506 U.S.

9    103, 113 (1992) (emphasis added)); *see also Cadkin*, 569 F.3d at 1145 (noting that "dismissal

10   without prejudice does not alter the legal relationship of parties for the purposes of entitlement

11   to attorneys' fees . . .").

12        In this case, Liberty Media is a prevailing party because the Order Granting Liberty

13   Media's Motion to Enforce Settlement materially altered the legal relationship between the

14   parties. (ECF No. 85.)  This Court previously determined that the parties formed an enforceable

15   contract on July 5, 2012, when Plaintiff's counsel orally accepted Defendant's interpretation of

16   the proposed settlement terms. (*Id.* at 6.)  Thus, at this time, Plaintiff was entitled to enforce that

17   settlement.  Moreover, in the Order Granting Liberty Media's Motion to Enforce Settlement, the

18   Court entered judgment against the Defendant in favor of the Plaintiff in the amount of

19   $550,000.00 and the Court dismissed the case *with prejudice*. (ECF No. 85, 7:20-8:7.)  Thus,

20   these actions resulted in the "material alteration of the legal relationship of the parties" that is

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

required to recover attorneys' fees under § 505 in the Ninth Circuit.[1] *Buckhannon*, 532 U.S. at 604.

### D. Granting Liberty Media's Motion for Attorneys' Fees furthers the underlying purposes of the Copyright Act.

Before awarding attorneys' fees under § 505 of the Copyright Act, district courts first determine whether such an award would "further[] the underlying purposes of the Copyright Act . . . ." *Entm't Research Grp.*, 122 F.3d at 1229-1230. When engaging in this analysis, a district court considers a number of factors, including "(1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) the objective unreasonableness of the losing party's factual and legal arguments; and (5) the need, in particular circumstances, to advance considerations of compensation and deterrence." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 614 (9th Cir. 2010) (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994) (noting that the use of "nonexclusive factors . . . may be used to guide courts' discretion, so long as such factors are faithful to the purposes of the Copyright Act . . .")).

In this case, the Court finds three of these factors especially persuasive in determining that an award of attorneys' fees for Plaintiff is appropriate: (i) the objective unreasonableness of the Defendant's factual and legal arguments; (ii) the degree of success obtained; and (iii) the need to advance considerations of compensation and deterrence. First, in its Order Granting Plaintiff's Motion to Enforce the Settlement Agreement, the court stated that "[t]here can be no dispute that there was a meeting of the minds" when "Plaintiff's counsel orally accepted Defendant's interpretation" of the settlement terms. (ECF No. 85, 6.) The order further stated

---

[1] Defendant argues that an award of attorneys' fees under § 505 is appropriate only when a party "secure[s] a judgment on the merits or [is] a party to a settlement agreement that is expressly enforced by the court *through a consent decree*." (ECF No. 104) (citing *NXIVM Corp. v. Ross Institute*, No. 1:03-cv-00976-GLS-DRH, 2005 WL 1843275, at *2 (N.D.N.Y. Aug. 2, 2005). To support this proposition, Defendant relies solely on an unreported case from the Northern District of New York. The Court does not find Defendant's argument persuasive. Instead, this Court relies on controlling authority within the Ninth Circuit. *See Cadkin*, 569 F.3d at 1148. Given that the Ninth Circuit has already provided a definition of "prevailing party" under § 505, Defendant's discussion of consent decrees is wholly irrelevant.

that "Defendant cannot plausibly claim that it no longer intended to be bound by all the other terms of the Settlement Letter when it 'got its way' . . . ." (*Id.* at 6:23-25.)  Therefore, Defendant's arguments in challenging the enforcement of the settlement agreement were objectively unreasonable.

Second, the Plaintiff  negotiated a considerably successful settlement which required Defendant to both make a monetary payment to Plaintiff,  as well as "take both strong and bold measures to keep Liberty Media content off of its servers," and "assist Liberty in identification and civil prosecution of any parties who have been using Oron to distribute Liberty's copyrighted material . . . ." (ECF No. 33-1, 2.)  Plaintiff also received "unfettered access to takedown / delete any of Liberty's material that are being distributed through Oron.com . . . ." (*Id.*)  Given the monetary payment, the measures that Defendant agreed to undertake to protect Plaintiff's intellectual property, and the cessation of future litigation between these parties, Plaintiff obtained marked success through the settlement agreement and the Order enforcing that agreement.

Third, the need to advance considerations of compensation and deterrence favors an award of attorneys' fees in this case for Plaintiff.  Not only does an award of attorneys' fees deter any copyright infringement, it also deters the needless extension of litigation regarding claims of copyright infringement, thus making it more financially feasible for copyright holders to protect their intellectual property.

### E.  The amount of Attorneys' Fees requested by Liberty Media is reasonable.

Calculation of reasonable attorneys' fees requires a two-step inquiry.  First, the court computes the "lodestar" figure, which requires the court to multiply the reasonable hourly rate by the number of hours reasonably expended on the litigation. *Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000).  Next, the court considers the factors articulated by the Ninth Circuit in *Kerr v. Screen Extras Guild, Inc.* and decides whether to increase or reduce the

1    lodestar amount. 526 F.2d 67, 70 (9th Cir. 1975); *see Fischer*, 214 F.3d at 1119.  Specifically,

2    the court considers (1) the time and labor required, (2) the novelty and the difficulty of the

3    questions involved, (3) the skill required to perform the legal service properly, (4) the preclusion

4    of other employment by the attorney due to the acceptance of the case, (5) the customary fee,

5    (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or

6    circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation,

7    and ability of the attorney, (10) the "undesirability" of the case, (11) the nature and length of the

8    professional relationship with the client, and (12) awards in similar cases. *Kerr*, 526 F.2d at 70.

9    These factors are consistent with the Local Rules of Practice, United States District Court,

10    District of Nevada, LCR 54-16, which governs motions for attorneys' fees. *See* LR 54–16(b)(3).

11         With respect to the first step, the hourly rates that Plaintiff's attorneys charged are

12    reasonable rates in the Las Vegas legal market.  Plaintiff enlisted Randazza Legal Group and

13    incurred charges ranging from $400-$500 per hour for partners, $350 per hour for of counsel,

14    $325 per hour for associate attorneys, and $125 per hour for law clerks. (ECF No. 89, 8:2-5.)

15    Plaintiff's attorneys claim that working on Plaintiff's case "consumed 325.90 hours preparing,

16    filing, and responding to the many motions in this case." (ECF No. 89, 7:23-25.) After a review

17    of the itemized bill, the Court denies those fees that are traditionally secretarial-type services,

18    such as docketing.  The Court also denies those fees that are duplicative due to Plaintiff's

19    attorneys' consulting together.  Rather, the Court allows only the fee for the one attorney in the

20    consultation with the highest hourly rate.  Additionally, the Court denies those fees that Plaintiff

21    incurred as a result of litigation activities in Hong Kong.  Thus, the court will exclude the costs

22    incurred in these activities and awards a total fee award of **$131,797.50.**

23         Second, the Court sees no reason to increase or reduce the lodestar amount based on the

24    *Kerr* factors.  This motion was filed in accordance with LRC 54-16 by including the "[a]

25    reasonable itemization and description of the work performed" and "[a] brief summary" of the

relevant factors.  Notably, this case has been active for slightly longer than two months and the number of filings in the docket already exceeds 100.  In fact, the docket includes Plaintiff's motion seeking a preliminary injunction (ECF No. 4), multiple motions that Defendant filed seeking disbursement of its frozen funds (ECF Nos. 20, 24, 90), Defendant's Motion to Dismiss (ECF No. 21), and Plaintiff's Motion Requesting Enforcement of the Settlement Agreement (ECF No. 33).  Plaintiff asserts that its attorneys' "ability to take on other representations and serve other clients was significantly, and necessarily, impaired" during this time. (ECF No. 89, 7:22-23.)  Given the volume of filings in this case and Plaintiff's itemized list of attorneys' fees totaling over 320 labor hours, the Court agrees that by representing Plaintiff, its attorneys were precluded from other employment.  In addition to the reasons stated in Section II.D. above, the Court finds that the volume of labor intensive filings further supports the conclusion that the amount of attorneys' fees need not be reduced based on the *Kerr* factors.

## III.  <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Plaintiff's Emergency Renewed Motion for Attorneys' Fees (ECF No. 89) is **GRANTED.**  Plaintiff is awarded attorneys' fees in the amount of **$131,797.50.**

**IT IS FURTHER ORDERED** that, due to Plaintiff's failure to file the required Bill of Costs form (AO 133) and the required itemization of *costs*, Plaintiff's Motion for Costs is **DENIED**. (*See* ECF No. 89-4.)

**DATED** this 4th day of September, 2012.

_____
Gloria M. Navarro
United States District Judge

Page 9 of 9

# EXHIBIT 2

# EXHIBIT 2

✎ AO450 (Rev. 5/85)  Judgment in a Civil Case

# UNITED STATES DISTRICT COURT

DISTRICT OF                          Nevada

Liberty Media Holdings, LLC,

                        Plaintiff,

V.

FF Magnat Limited, et al.,

                        Defendants.

**JUDGMENT IN A CIVIL CASE**
Attorney's Fees

Case Number:  2:12-cv-01057-GMN-RJJ

☐ **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and  a decision has been rendered.

☐ **Notice of Acceptance with Offer of Judgment.**  A notice of acceptance with offer of judgment has been filed in this case.

  IT IS ORDERED AND ADJUDGED

that attorney's fees are awarded in favor of Plaintiff Liberty Media Holdings, LLC and against Defendant Oron.com in the amount of $131,797.50.

| | |
|---|---|
| September 4, 2012 | /s/ Lance S. Wilson |
| Date | Clerk |
| | /s/ Erin Smith |
| | (By) Deputy Clerk |

Case: 15-14889      Date Filed: 06/05/2017      Page: 234 of 597

# EXHIBIT 3

# EXHIBIT 3

1  Marc J. Randazza, NV Bar # 12265
   Ronald D. Green, NV Bar # 7360
2  J. Malcolm DeVoy, NV Bar #11950
   Randazza Legal Group
3  6525 W. Warm Springs Rd., Ste. 100
   Las Vegas, NV 89118
4  888-667-1113
   305-437-7662 (fax)
5  rlgall@randazza.com
6
7  Attorneys for Plaintiff,
   Liberty Media Holdings, LLC
8
                    **IN THE UNITED STATES DISTRICT COURT**
9                         **DISTRICT OF NEVADA**
10
11  Liberty Media Holdings, LLC, a California    )   Case No.: 2:12-cv-01057
    Corporation                                   )
12                                                )   **PLAINTIFF'S EMERGENCY RENEWED**
                                                  )   **MOTION FOR ATTORNEY'S FEES AND**
13  Plaintiff,                                    )   **COSTS**
                                                  )
14  vs.                                           )
                                                  )
15  FF Magnat Limited d/b/a Oron.com; Maxim       )
16  Bochenko a/k/a Roman Romanov; and John        )
    Does 1-500,                                    )
17                                                )
18  Defendants.                                   )
                                                  )
19                                                )
                                                  )
20  ─────────────────────────────────
21           **PLAINTIFF'S EMERGENCY RENEWED MOTION**
             **FOR ATTORNEY'S FEES AND COSTS**
22
23          Randazza Legal Group (alternatively, the "Firm"), retained by Plaintiff Liberty Media

24  Holdings LLC ("Liberty") in the above-captioned matter, hereby brings this emergency motion for

    attorney's fees and costs against Defendants FF Magnat Limited d/b/a Oron.com ("Oron," or the
25
    "Defendant"), pursuant to Fed. R. Civ. P. 54, 17 U.S.C. § 505, 28 U.S.C. § 1927, this Court's
26
    August 7, 2012 order granting Liberty's Motion to Enforce Settlement, and subsequent entry of
27
    judgment. (ECF 85, 86)  This Motion is based upon the corresponding memorandum of points and
28
    authorities and exhibits thereto, the Affidavit of Ronald D. Green and declaration of John L.

Krieger, the papers and pleadings on file in this action, and any oral argument permitted by this Court.

In light of the Court's August 7, 2012 order freezing FF Magnat Limited's funds for thirty (30) days, **Liberty files this motion on an emergency basis and respectfully requests that the Court set an expedited briefing schedule** so that its entitlement to attorneys' fees is not thwarted by Oron's dissipation of its funds.

1. On June 20, 2012, Liberty filed suit against Defendants Oron and Maxim Bochenko for numerous instances of copyright infringement (ECF 1).

2. Liberty further sought a Temporary Restraining Order against Defendants' disposition of their assets (ECF 2).

3. On June 21, the Court entered a TRO in Liberty's favor, enjoining Defendants' assets for fourteen (14) days and scheduling a motion hearing on July 3, 2012 on Liberty's Motion for Preliminary Injunction (ECF 11).

4. The Court subsequently amended this Order on June 22, requiring Defendants to preserve and/or restore any data relevant to Liberty's case (ECF 13).

5. Oron then moved the Court, twice, seeking withdrawal of a total of $400,000 in fees through emergency motions seeking partial relief from the temporary restraining order (ECF 15, 16, 20).

6. Liberty opposed both of these motions within twenty-four hours of their filing, respectively, and, successfully defeated Oron's requests for additional fees but for $100,000 allegedly needed to pay counsel – an expenditure Liberty did not contest (ECF 17, 22).

7. Shortly thereafter, the parties entered into a stipulation, which the Court approved, extending the briefing and hearing deadlines on Liberty's Motion for Preliminary Injunction by thirty (30) days (ECF 29).

8. On June 28, Bochenko moved to dismiss the litigation under Fed. R. Civ. P 12(b)(2) (ECF 21). Liberty requested an extension of time to respond to this Motion on July 11 (ECF 42), which the Court subsequently granted (ECF 43). Liberty responded to Bochenko's Motion to

Liberty's Emergency Renewed Motion for Attorneys' Fees Against Defendant FF Magnat Limited

1   Dismiss on August 7, 2012 (ECF 83), but the litigation concluded before this motion could be

2   decided (*see* ECF 85, 86).

3       9.      In early July 2012, Liberty entered into settlement discussions with Oron's counsel,

4   Stevan Lieberman.  The discussions culminated in the settlement agreement (ECF 33-1) enforced

5   by this Court on August 7, 2012 (ECF 85).

6       10.     Liberty began performance of the agreement upon its signing (ECF 33).  Oron,

7   however, did not honor its obligations pursuant to the agreement and begin its performance,

8   compelling Liberty to file its Motion to Enforce Settlement (*id*.).  Liberty contemporaneously filed

9   a motion for attorneys' fees with its Motion to Enforce Settlement (ECF 34).  In order to resolve

10  this dispute outside of public view in light of Oron's stated desire to keep the terms of the

11  settlement confidential, Liberty moved to file both of these motions under seal (ECF 32).

12      11.     Opposing the Motion to Seal, Oron's counsel filed an opposition brief –

13  characterized by this Court as "fiery" – on July 9, 2012 (ECF 39).  Liberty filed its reply brief on

14  July 10, noting that it had filed the Motion to File Under Seal for Oron's benefit but would not

15  oppose Oron's subsequent request for the filings to be made public (ECF 41).

16      12.     Additional opposition briefs followed, with Oron filing oppositions to Liberty's

17  Motion to Enforce Settlement (ECF 44) and Motion for Attorneys' Fees (ECF 45) on July 12,

18  2012.  Liberty replied to in support of its motions on July 23, 2012 (ECF 66, 67).

19      13.     During this time, Liberty attempted to keep the case moving in the most efficient

20  manner possible.  On July 26, Liberty requested that the Court extend the hearing schedule on its

21  Motion for Preliminary Injunction until its Motion to Enforce Settlement had been decided, as the

22  latter had the potential to (and ultimately did) conclude the litigation (ECF 68).  Oron opposed this

23  motion, and Liberty filed a reply in support of it (ECF 79, 80).

24      14.     Liberty additionally filed an emergency motion for a case management conference

25  on July 31, prior to Oron's filings that day (ECF 70).

26      15.     Oron filed its own Motion to Dismiss for lack of personal jurisdiction on July 31,

27  2012 (ECF 74).  Liberty responded to this Motion on August 7 (ECF 84), but, like Bochenko's

28

1   Motion to Dismiss, the Court did not render a decision on Oron's motion because of the case's

2   conclusion on the same day (ECF 85).

3       16.     Keeping with the extended briefing schedule approved by the parties and the Court

4   (ECF 29), Oron filed its opposition to Liberty's Motion for Preliminary Injunction (ECF 71) on

5   July 31, 2012.  Bochenko filed a separate opposition, largely joining in Oron's, on August 2, 2012

6   (ECF 78).

7       17.     Liberty worked diligently to prepare its reply brief in support of its Motion for

8   Preliminary Injunction, which was due to chambers at noon on August 7, 2012 (ECF 13) and

9   necessitated by Oron's failure to abide by the terms of the settlement agreement. (ECF 85)

10      18.     In addition to significant briefing and the marshaling of voluminous rebuttal

11  evidence, both factual and expert in nature, Liberty moved the court to designate the August 9

12  hearing as an evidentiary hearing, allowing Liberty to put on witnesses so the Court could assess

13  the necessity of a preliminary injunction (ECF 75).  Oron and Bochenko opposed the motion, and

14  Liberty replied to those oppositions, by August 3, 2012 – almost a full week before the scheduled

15  hearing (ECF 76, 77, 81, 82)

16      19.     Just minutes before the reply in support of the Motion for Preliminary Injunction

17  was to be filed and delivered to the Court's chambers, though, the Court informed Liberty's

18  counsel that it had granted Liberty's Motion to Enforce Judgment, entering judgment in Liberty's

19  favor, and dismissing Oron and Bochenko from the case. (Green Aff. ¶¶ 10-12)

20      20.     Thus, while Liberty had completed its reply briefing, the need for its filing with the

21  Court was mooted only minutes before it was to be submitted. (*Id.*)

22      21.     Liberty now renews its original motion for attorneys' fees (ECF 34), which the

23  Court had taken under consideration (ECF 85 at 8), and seeks an award of attorney's fees and costs,

24  pursuant to Fed. R. Civ. P. 54, 17 U.S.C. § 505, and 28 U.S.C. § 1927.

25      22.     A true and correct invoice of time spent and costs expended Liberty has incurred in

26  this case, totaling 325.90 total labor hours, worth $134,910.00, in addition to $64,911.50 in costs –

27  inclusive of time spent seeking an award of attorney's fees and the preparation of this Motion – is

28  attached hereto as Exhibit A. (Green Aff. ¶¶ 16-28)

Case 9:14-cv-00637-... Document ... Entered on FLSD Docket 03/04/2019 Page 240 of ...

Case: 15-14889     Date Filed: 05/05/2017     Page: 239 of 597

23.     In total, Liberty seeks $199,821.50 in attorneys' fees and costs.

24.     This figure was reached by adding Liberty's $64,911.50 in costs to the $134,910 incurred by by Liberty's attorneys and legal assistants in this matter, at their regular hourly rates of $500, $400, $350, $325 and $125 per hour, respectively. (*Id*. ¶¶ 16-28.)

25.     Liberty's costs, incurred through the use of foreign counsel to obtain and maintain a Mareva injunction over Oron's global financial assets, and numerous investigators who obtained information about Oron's non-compliance with the DMCA, as well as its true ownership and conduct with respect to ownership of Internet forums dedicated to piracy, were integral to the successful conclusion of this case.  As such, these costs are itemized in Exhibit A and submitted to the Court as reasonable expenditures in the course of this spirited and high-speed litigation.

26.     The undersigned have complied with LR 54-16(c) by including the affidavit of Ronald D. Green, who authorized and can authenticate all the billings in this case (*Id*.).

27.     Pursuant to Local Rule 54-16(b), the following considerations are salient to the Court's decision to award fees in this case:

**A.**     Liberty brought this case for two reasons: To cease Defendants' infringement of its copyrighted audiovisual works, and to recoup the lost sales of its content suffered through Oron's piracy.   The settlement agreement enforced by this Court (ECF 33-1) effects both goals, compensating Liberty $550,000 for Oron's infringement of its content, and halting Oron's unfettered infringement of Liberty's works.   To that end, Liberty's litigation was a success. Weighing the certainty of settlement and time value of money against the legal fees and uncertainty of protracted litigation, Liberty's outcome in this matter is of equivalent value to a full victory at trial on the case's merits.

**B.**     As seen by the docket report for this case, with eighty-eight (88) entries accumulated in fewer than fifty (50) days, Liberty's case required an extensive commitment of attorney time, fees, and costs.   Liberty committed a great deal of its resources to obtain judgment against Oron. Similarly, because of the constant attention and immediate responses often required in this case

1   (*compare* ECF 2 and 10; 15 and 17; 20 and 22; 39 and 41), Liberty's counsel was precluded from

2   seeking or obtaining other work during this time. Significant factual investigation and legal

3   research were required throughout the life of this case, from the very beginning (ECF 1, 2, 10)

4   through Liberty's last filings (ECF 83, 84), as new information was constantly being obtained by –

5   and even delivered to – the Plaintiff. As seen in Exhibit A, Liberty incurred a total of 325.90 hours

6   in this representation: an average of 6 hours per day between filing the Complaint and the filing of

7   this Motion.

8

9   **C.**    The questions presented within Liberty's litigation are novel nationally and within this

10  district. Nationally, Liberty's claim was one of the few of its kind against "file-locker" data storage

11  sites, which store one file at a specific URL and sell increased data access to their customers. The

12  most notable analogue case is the United States Department of Justice's prosecution of

13  Megaupload, Limited, and its principals for rampant copyright infringement and money laundering

14  through their administration of a nearly identical service. A central issue in this case was the

15  applicability of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, to Oron's

16  service. Interpretation of the DMCA is an important and hotly contested issue, and one that is

17  constantly evolving. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) (vacating

18  several district court holdings regarding § 512(c) safe harbor protections); *vacating and remanding*

19  *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010). In bringing this case,

20  Liberty endeavored to be the first company anywhere to obtain a judicial decree that Oron's

21  business model – used by dozens of other file-locker sites like it – was unlawful.

22         Additionally, and as seen in Oron's opposition to Liberty's Motion for Preliminary

23  Injunction, the application of the DMCA's safe harbor provisions would have been a primary issue

24  in the district. Although Liberty prepared and finalized a comprehensive reply brief on this issue, it

25  was not filed because it was informed that judgment had been granted in its favor minutes before

26  the filing deadline. This issue would have been one of great importance and first impression within

27  the district: only four District of Nevada decisions even cite the DMCA. One analyzes a portion of

28  the Act that is irrelevant to this case, 17 U.S.C. § 512(b), *Field v. Google, Incorporated*, 412 F.

1   Supp. 2d 1106 (D. Nev. 2006) while two others, simply refer to the law to mention its existence.

2   *Righthaven LLC v. Vote for the Worst LLC*, Case No. 2:10-cv-01045, *2011 U.S. Dist. LEXIS 40797*

3   (D. Nev. Mar. 30, 2011); *Two Plus Two Publ'g LLC v. Jacknames.com*, Case No. 2:09-cv-002318,

4   2010 U.S. Dist. LEXIS 105269 (D. Nev. Sept. 30, 2010).   The final decision referencing the

5   DMCA within this District was filed by Jonathan Lee Riches, a widely renowned frivolous pro se

6   litigant, against Donald Trump. *Riches v. Trump*, Case No. 3:07-cv-00478, *2007 U.S. Dist. LEXIS*

7   *97435* (D. Nev. Oct. 16, 2007).   Thus, the questions presented within the litigation were novel

8   within this district and, even among the various Courts of Appeal, are areas of constantly shifting

9   ground where this District would have gained from new decisional authority – especially with

10  respect to the issue of file-locker sites, where there is a national vacuum of controlling, or even

11  influential, precedent.

12

13  **D.**   This case presented complex questions of international jurisdiction over an Internet company

14  with principals, agents, business entities, and operations spread across the globe – before even

15  reaching the intellectual property claims at the heart of Liberty's case against Oron.   Attorneys of

16  considerable experience and ability were needed to bring the case competently, let alone

17  successfully.   Because of the constantly evolving and sometimes contradictory posture of national

18  precedent on DMCA issues, and the general complexity of litigation where jurisdiction is premised

19  on Fed. R. Civ. P. 4(k)(2), attorneys experienced with both bodies of law were necessary to ensure

20  Liberty's claim could even proceed.

21

22  **E.**   The Firm's ability to take on other representations and serve other clients was significantly,

23  and necessarily (*see* Exhibit A), impaired by representing Liberty in this matter.   In roughly fifty

24  (50) days, Liberty's United States attorneys consumed 325.90 hours preparing, filing, and

25  responding to the many motions made in this case.   As seen in Exhibit A, successful representation

26  of Liberty required long days, many long nights, and the prioritization of this case over other

27  potential engagements.   As such, Liberty's counsel made a significant investment into the case.

28

Liberty's Emergency Renewed Motion for Attorneys' Fees Against Defendant FF Magnat Limited

**F.**     The fees counsel charged Liberty in this matter were customary and, like other enforcement actions of this nature, accrued on an hourly basis (*id*. ¶¶ 16-28).  Liberty incurred Randazza Legal Group's customary fees that are regularly charged to all clients: Marc Randazza, owner, at $500 per hour; Ronald Green, partner, at $400 per hour; Jason A. Fischer, of counsel, at $350 per hour; J. Malcolm DeVoy, associate, at $325 per hour; and Laura Tucker, law clerk, at $125 per hour. (*Id*.)

**G.**     In the above-captioned matter, Randazza Legal Group regularly billed Liberty for their services, calculated based on the attorneys' standard hourly rates. (*Id*.)

**H.**     Marc Randazza is a graduate of Georgetown University Law Center, a nationally recognized specialist on First Amendment issues, focusing on copyright and trademark matters, and regularly appears in the media, including National Public Radio, CNN, and the New York Times. Randazza was recognized by XBiz Magazine as one of the top 50 newsmakers in adult entertainment for 2011, and recently honored as one of Las Vegas' top 100 attorneys by Vegas Inc.  Ronald Green is a graduate of the University of Pittsburgh School of Law and is an experienced intellectual property attorney with more than 10 years of experience and has filed hundreds of intellectual property cases with this Court.  Green worked for 2 years at Quirk & Tratos, Nevada's premier intellectual property firm, for over 2 years and remained with the firm for 6 more years after it merged with Greenberg Traurig, LLP, one of the world's largest law firms.  J. Malcolm DeVoy is a recent *cum laude* graduate of the University of Wisconsin School of Law who has quickly become experienced copyright litigator.  In fact, DeVoy already has two reported federal decisions on matters of copyright enforcement, *Righthaven LLC v. Wolf*, 813 F. Supp. 2d 1265 (D. Colo. 2011), and *Righthaven LLC v. Hoehn*, 792 F. Supp. 2d 1138 (D. Nev. 2011). Laura Tucker is a rising third-year law student at the University of Nevada – Las Vegas Boyd School of Law and, as a law clerk for Randazza Legal Group since November 2011, has been exposed to and researched numerous complex issues in intellectual property litigation.

1    **I.**    Liberty's case was undesirable because of the considerable cost it would impose on any

2    plaintiff to pursue the legal action Liberty did. Oron clearly was a well-heeled adversary, retaining

3    three firms from across the United States to represent it in this action and quickly fill the docket

4    with nearly 100 filings. In addition to Oron's considerable resources – a circumstance that would

5    present a great asymmetry of force to many adult entertainment companies – the case contained

6    complicated jurisdictional and intellectual property questions that counsel with less experience in

7    this area would have been ill-equipped to handle. Because Oron is based overseas, and no

8    Defendants resided within Nevada, significant questions regarding jurisdiction required Liberty's

9    counsel to perform a great deal of analysis before determining that this case was properly before

10    this Court.

11    Similarly, due to the aforementioned confusion in the law over what conduct is (and is not)

12    protected by the DMCA's safe harbor provisions in § 512(c), any action against Oron would

13    necessarily involve extensive briefing on the issue. In this case, the question of Oron's safe harbor

14    protections arose even before its responsive pleading was filed (ECF 2, 71), and would have had to

15    be further litigated in motions for summary judgment, motions for directed verdict, and any pre-

16    trial memoranda this Court would have required. Not only would these questions of safe harbor

17    protection be legally complex, but they would be factually challenging as well, requiring extensive

18    and costly discovery – easily into the six figures – for both parties if the case had moved forward.

19

20    **J.**    Liberty has exclusively used Randazza Legal Group for its legal representation since late

21    2008; Marc Randazza serves as Liberty's general counsel and oversees all dimensions of its anti-

22    piracy activities, ranging from technological innovations to legal pursuits of both individual

23    infringers and institutional infringers, such as Oron and other file-locker and YouTube-style sites

24    that infringe on Liberty's works.

25

26    **K.**    This Court and many others have adjudicated the fees of Liberty's attorneys to be reasonable

27    in numerous copyright cases. In *Righthaven LLC v. Hoehn*, Case No. 2:11-cv-00050 (D. Nev.

28    2011), a colleague of this Court adjudicated attorneys Randazza and DeVoy's hourly rates were

1   reasonable at $425 and $275 per hour, respectively, and that their client was entitled to award of his

2   full attorneys' fees and costs.   Similarly, this Court held that all of attorney DeVoy's time

3   expenditures, and his hourly rate of $275, were reasonable in *Righthaven LLC v. Leon et al.*, Case

4   No. 2:10-cv-01672 (D. Nev. 2011).  The District of Colorado agreed with the District of Nevada in

5   *Righthaven LLC v. Wolf et al.*, Case No. 1:11-cv-00830 (D. Colo. 2011), awarding Leland Wolf his

6   costs and full attorneys' fees for Marc Randazza at both $425 and, later, $500 per hour; attorney

7   Fischer at $300 per hour; and attorney DeVoy at $275 per hour.

8          Other district courts have similarly upheld Marc Randazza's rates for all of his successful

9   representation in copyright matters. In *Liberty Media Holdings LLC v. Vinigay.com*, Case No. 2:11-

10  cv-00280 (D. Ariz. 2011), Magistrate Judge Lawrence Anderson found that Marc Randazza's

11  hourly rate of $450, and the 45.2 hours he had spent on the case, were both reasonable, and

12  approved both as a component of the recommended award of attorneys' fees and costs. When

13  deciding the Plaintiffs' motion for sanctions in *IO Group Inc v. GLBT Ltd.*, Case No. C-10-1282

14  (N.D. Cal. 2011), the Northern District of California did not object to or reduce Marc Randazza's

15  hourly rate of $450, nor did it indicate any objection to the hours expended in seeking sanctions

16  against the Defendants. The Southern District of California reached a similar conclusion in *Liberty

17  Media Holdings LLC v. Pornilove.net*, Case No. 10-cv-1810 (S.D. Cal. 2011), after specifically

18  seeking evidence from Marc Randazza that his hourly rate of $450 per hour was reasonable as a

19  matter of law. The Court found that Marc Randazza's hourly rate of $450 was reasonable, as were

20  the full 61.9 hours Randazza billed to the case, and consequently approved an award of attorneys'

21  fees based on that hourly rate and amount of time. *Id.*

22         This Court has found Ronald Green's rate to be reasonable in copious cases that he has filed,

23  argued, and obtained judgment in before this Court as an attorney for the plaintiff.

24

25         For the foregoing reasons, as well as the attached affidavit and memorandum of law, Liberty

26  requests award of reasonable attorney's fees and costs of $199,821.50 against Oron, pursuant to

27  Fed. R. Civ. P. 54, 17 U.S.C. § 505, and 28 U.S.C. § 1927.   Should the Court request any

28

Liberty's Emergency Renewed Motion for Attorneys' Fees Against Defendant FF Magnat Limited

1  clarification as to the amounts sought, Liberty respectfully requests the opportunity to answer such

2  questions at oral argument or through supplemental briefing as directed by the Court.

3

4  Dated: August 10, 2012

5                                                    Respectfully Submitted,

6

7                                                    *s/J. Malcolm DeVoy IV*

8                                                    Marc J. Randazza, Esq., NV Bar # 12265
                                                     Ronald D. Green, NV Bar # 7360
9                                                    J. Malcolm DeVoy, NV Bar #11950
                                                     Randazza Legal Group
10                                                   6525 W. Warm Springs Rd., Ste. 100
                                                     Las Vegas, NV 89118
11                                                   888-667-1113
                                                     305-437-7662 (fax)
12                                                   rlgall@randazza.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Liberty's Emergency Renewed Motion for Attorneys' Fees Against Defendant FF Magnat Limited

**CERTIFICATE OF SERVICE**

I am an authorized representative of Randazza Legal Group and hereby certify that the foregoing document was filed using this Court's CM/ECF system on August 10, 2012.

Dated: August 10, 2012

Respectfully Submitted,

*s/J. Malcolm DeVoy IV*

Marc J. Randazza, Esq., NV Bar # 12265
Ronald D. Green, NV Bar # 7360
J. Malcolm DeVoy, NV Bar #11950
Randazza Legal Group
6525 W. Warm Springs Rd., Ste. 100
Las Vegas, NV 89118
888-667-1113
305-437-7662 (fax)
rlgall@randazza.com

# Exhibit A

**Randazza Legal Group - Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON LITIGATION | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| Date | Matter | Description | Rate/ Unit Price | Labor Time/ Quantity | Billable Time/ Cost Price | Bill Amt/ Sell Price | Non-Billable Time |
|------|--------|-------------|------------------|----------------------|---------------------------|----------------------|-------------------|
| **ORON Litigation** | | | | | | | |
| **Jason Fischer** | | | | | | | |
| 06/25/2012 | Common to All Plaintiffs | Setup new Jungle Disk partition for Oron litigation files; migrate copy of litigation files; create user account for use by outside attorneys to access Oron litigation files. | $0 hr | 0.90 | 0 | $0.00 | 0.90 |
| 08/06/2012 | Corbin Fisher Only | Receipt and review of draft declarations concerning change in revenues for ▇▇▇▇ over past five days (i.e., after shutdown of Oron.com); office conference concerning identity of appropriate declarant for ▇▇ | $350.00 hr | 0.30 | 0.30 | $105.00 | 0.00 |
| 08/07/2012 | Corbin Fisher Only | Telephone conference concerning required declaration for submission of ▇▇▇▇ DMCA notices sent to Oron; review and revise proposed declaration; exchange emails with declarant concerning substance of declaration. | $350.00 hr | 0.30 | 0.30 | $105.00 | 0.00 |
| 08/07/2012 | Corbin Fisher Only | Finalize declaration of Kone concerning DMCA notices sent to Oron; office conference concerning signing of declaration; scan signed declaration. | $125.00 hr | 0.40 | 0.40 | $50.00 | 0.00 |
| | | *Total Labor For Jason Fischer* | | 1.90 | 1.00 | $260.00 | 0.90 |
| | | *Total Expense For Jason Fischer* | | | $0.00 | $0.00 | |
| | | *Total For Jason Fischer* | | | | $260.00 | |
| **Jay DeVoy** | | | | | | | |
| 06/20/2012 | Common to All Plaintiffs | Receive numerous updates on litigation status, orders from RDG. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |

**Randazza Legal Group – Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON Litigation | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| 06/20/2012 | Common to All Plaintiffs | Correspond with RDG and MJR regarding status and plans for Oron filing and TRO. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
|---|---|---|---|---|---|---|---|
| 06/20/2012 | Common to All Plaintiffs | Review of Oron Complaint, supporting Exhibits. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/20/2012 | Common to All Plaintiffs | Review of TRO motion and outline of potential issues for potential hearing ████████ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/20/2012 | Common to All Plaintiffs | Review of TRO motion and outline of potential issues for potential hearing ████████ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/20/2012 | Common to All Plaintiffs | Review of TRO motion and outline of potential issues for potential hearing ████████ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | IM exchange with JAF regarding Complaint. | $0 hr | 0.10 | 0 | $0.00 | 0.10 |
| 06/21/2012 | Common to All Plaintiffs | Review of numerous D. Nev. ecf notifications; confer with RDG regarding ████████ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Review and distribution of D. Nev. Rule 4(k)(2) decision issued by case judge w/ MJR and RDG. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Meet with RDG regarding ████████ | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Review of materials submitted by Erika Dillon; discuss and prepare for hearing with LMT and RDG. | $325.00 hr | 0.50 | 0.50 | $162.50 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Phone call with Nate Glass; apprise RDG of ████████ Research cost-effectiveness of b████████ ████████ report on same to litigation team. | $325.00 hr | 0.40 | 0.40 | $130.00 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Review of numerous e-mail exchanges regarding injunction and US litigation. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |

**Randazza Legal Group - Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON LITIGATION | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/21/2012 | Common to All Plaintiffs | Confer with RDG regarding ▓▓▓▓▓▓ | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Meet with RDG to discuss, review and edit supplemental brief to TRO motion.  Review e-mails from Erika Dillon and MJR regarding ▓▓▓▓▓ | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Convert MJR skype comments into briefing on ▓▓▓▓▓▓ | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Review proposed notice to preserve evidence and accompanying cover letter for Erika Dillon; submit to RDG for final approval. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Review of RDG proposed language for supplemental brief. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Debrief on letters, notice to preserve and supplemental brief with RDG. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Follow-up phone call with Nate Glass per RDG comments; review of e-mail exchanges ▓▓▓▓▓ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Exchange messages with Erika Dillon regarding Supplemental brief; review filing after receiving ecf notice. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/21/2012 | Common to All Plaintiffs | Phone calls with RDG and Erika Dillon; e-mail exch. with Nate Glass. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Review e-mail from Erika re ▓▓▓▓▓▓, HK court documents re Mareva injunction and IM conference with RDG regarding same. | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Receive update on litigation from RDG. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |

**Randazza Legal Group - Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON Litigation | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/22/2012 | Common to All Plaintiffs | Correspond with Erika Dillon and RDG regarding deposit to court. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Transmit injunctions to HSBC HK contact; underlying coordination with MJR and RDG. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Coordinate with Erika Dillon and execute deposit form for $100 TRO security. | $325.00 hr | 0.50 | 0.50 | $162.50 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Receipt, review and forward of e-mail from Nate Glass re ▬▬▬▬ | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Review of proposed motion for ▬▬▬▬ reply to litigation team re same. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Review Erika Dillon e-mail regarding deposit of TRO security; response to RDG questions re ▬▬▬▬ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Review ecf filing for certificate of cash deposit. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Research fax numbers for HSBC locations and transmit mareva injunction notices accordingly. | $325.00 hr | 0.50 | 0.50 | $162.50 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Skype conference with MJR; research and fax/e-mail injunction information to four websites providing payment processing to Oron.com | $325.00 hr | 0.40 | 0.40 | $130.00 | 0.00 |
| 06/22/2012 | Common to All Plaintiffs | Review of media coverage and analysis (gfy, xbiz) of Oron developments. | $0 hr | 0.30 | 0 | $0.00 | 0.30 |
| 06/23/2012 | Common to All Plaintiffs | Review ▬▬▬▬ and discuss with RDG. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/24/2012 | Common to All Plaintiffs | Review of ▬▬▬▬ | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/24/2012 | Common to All Plaintiffs | Receipt and review of text messages from MJR, e-mail concerning ▬▬▬▬ | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |

**Randazza Legal Group - Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON Litigation | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/25/2012 | Common to All Plaintiffs | Review of amended order entered by Judge Navarro re deletion of discoverable data; review of e-mails with ▮ | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | Review and archival of returned certificate of service as e-filed w/ D. Nev. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | Coordinate with Erika Dillon re faxes/transmissions of injunction orders and compare contact information records. | $0 hr | 0.00 | 0.00 | $0.00 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | Phone call with Nate Glass seeking declaration re ▮ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | IM exchange, skype call with MJR regarding recent Oron motions and use of ▮ ▮ n proving Oron's ownership of pornbb and forumophilia. | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | Meet with MJR, RDG and LMT to chart out MPI, set fact chart and assess necessary evidence. | $325.00 hr | 0.60 | 0.60 | $195.00 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | exchange messages with nate glass; review of evidence submitted by same. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | Draft v1 of opposition to emergency motion for stay of TRO. | $325.00 hr | 3.00 | 3.00 | $975.00 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | meet with MJR, RDG regarding ▮ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | Review of emergency motions. | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/25/2012 | Common to All Plaintiffs | Contact potential experts/witnesses ▮ | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | Apprise RDG of opposition brief status and arguments therein. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |

**Randazza Legal Group - Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON Litigation | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| Date | Matter | Description | Rate | | | Amount | |
|---|---|---|---|---|---|---|---|
| 06/26/2012 | Common to All Plaintiffs | Review and further revise Opp brief after RDG edits; delegate declaration to LMT with instructions re same. Coordiante workflow via e-mail with MJR and RDG; correspond with Erika Dillon regarding ▓▓▓ | $325.00 hr | 0.90 | 0.90 | $292.50 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | Research regarding scope of appearances in D. Nev. courts; coordinate with LMT and Erika Dillon regarding exhibits and ▓▓▓ | $325.00 hr | 0.60 | 0.60 | $195.00 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | Phone call with Nate Glass; f/u with MJR. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | Status update to RDG on condition of opp, supporting documents. | $0 hr | 0.10 | 0 | $0.00 | 0.10 |
| 06/26/2012 | Common to All Plaintiffs | final review and finalization of opp brief, review of evidence and coordinate with MJR, RDG and Erika Dillon | $325.00 hr | 0.40 | 0.40 | $130.00 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | status conference regarding pending motions and preparation with RDG | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | Phone call with Eric Green regarding ▓▓▓ | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | Review e-mails ▓▓▓ from Eric Green. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | Research sources for substantiating CP issues with Oron. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/26/2012 | Common to All Plaintiffs | Draft, format, receive approval for and file notice of correction w/r/t opposition to emergency motion (correcting pornbb.com as pornbb.org) | $325.00 hr | 0.40 | 0.40 | $130.00 | 0.00 |
| 06/26/2012 | Corbin Fisher Only | draft proposed ▓▓▓ | $325.00 hr | 0.50 | 0.50 | $162.50 | 0.00 |
| 06/26/2012 | Corbin Fisher Only | Revise proposed press release regarding backup of "legitimate" Oron data. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |

**Randazza Legal Group - Client Summary**

Case 15-14889   Date Filed: 06/05/2017   Page: 254 of 597

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON Litigation | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/26/2012 | Corbin Fisher Only | Respond to message concerning alegedly improper transfer demands from RLG. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Phone call with Amazon.com counsel regarding | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Follow-up phone call with US Atty's Office regarding | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Receipt and review of order on emergency motion; distribute to team and discuss with RDG. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Follow up with witnesses regarding rescheduled hearing on MPI. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Solicit and seek additional information regarding infringement | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Follow-up e-mails with content removal services w/r/t additional evidence of harm caused by Oron. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Contact acquaintances with Adobe, Amazon and confer with Eric Green of RYC regarding | $325.00 hr | 0.50 | 0.50 | $162.50 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Receipt and review of numerous e-mails with information about Oron and linked infringing acts. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/27/2012 | Corbin Fisher Only | Revise press release re Oron data loss. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/27/2012 | Common to All Plaintiffs | Receive update regarding from MJR. | $0 hr | 0.10 | 0 | $0.00 | 0.10 |
| 06/27/2012 | Common to All Plaintiffs | Receive update regarding from MJR. | $0 hr | 0.10 | 0 | $0.00 | 0.10 |
| 06/28/2012 | Common to All Plaintiffs | Review of e-mail from Jason Vorhees; correspond with MJR regarding same and additional evidence | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |

**Randazza Legal Group - Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON Litigation | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/28/2012 | Common to All Plaintiffs | Receive and review correspondence from Leaseweb in response to preservation notice; transmit to MJR and Erika Dillon for file records. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Organize, sort and format materials submitted by prospective witnesses for declarations; follow-up with ▮▮▮▮▮▮▮ Begin preparing declarations and other materials needed for volunteer witnesses. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Receipt and review of latest filing seeking disbursement of funds; analyze and submit commentary to litigation team. | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Discuss strategy for Opp to Emerg. Mtn. for Disbursement with MJR, LMT, RDG | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Phone call with Nate Glass, draft declaration and revise/finalize with Nate. | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Receive information from Zak Thompson re YFN and hosting; prepare declaration and finalize/revise with ZT. | $325.00 hr | 1.00 | 1.00 | $325.00 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Review and receipt of 12(b)(2) MTD of Maxim Bochenko. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | prepare draft declarations for ▮▮▮▮▮▮▮ Peter Phinney; exchange messages with MJR. | $325.00 hr | 0.60 | 0.60 | $195.00 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Coordinate and finalize declarations for Glass and Thompson, exchange emails with Phinney, Randazza and Jason Tucker regarding additional declarations. Consider other evidence for use. | $325.00 hr | 0.80 | 0.80 | $260.00 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Review, revise, format and edit Jason Tucker declaration; circulate to litigation team. | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |

**Randazza Legal Group - Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON Litigation | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| Date | Matter | Description | Rate | Hours | | Amount | |
|------|--------|-------------|------|-------|---|--------|---|
| 06/28/2012 | Common to All Plaintiffs | Finalize Glass and Tucker affidavits; review opp brief with RDG.  Exchange e-mails coordinating declarations and exhibits. ▆▆▆▆▆ and transmit to witness with commentary. | $325.00 hr | 1.50 | 1.50 | $487.50 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | confer with Silverman regarding Leaseweb business and revisions to declaration; format and revise Phinney declaration, and coordinate logistics with hotel fax. Confer with RDG regarding declaration status and filing timeline. | $325.00 hr | 1.20 | 1.20 | $390.00 | 0.00 |
| 06/28/2012 | Common to All Plaintiffs | Contact RYC and TDP regarding draft declarations for their clients; subsequent e-mails with both | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 06/28/2012 | eMAP Only | Revise draft declaration template; e-mail exchange with client regarding ▆▆▆▆ | $0 hr | 0.20 | 0 | $0.00 | 0.20 |
| 06/28/2012 | eMAP Only | Draft template declaration for use by participating companies.  Transmit to PG with explanation. | $0 hr | 0.70 | 0 | $0.00 | 0.70 |
| 06/29/2012 | Common to All Plaintiffs | Review and documentation of supplemental motion; document for co-counsel and provide analysis of same. | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/29/2012 | Common to All Plaintiffs | Receipt and review of order on emergency motion for funds. Analyze court holdings and rationales; discuss strategy for ▆▆▆▆▆ | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/29/2012 | Common to All Plaintiffs | confer with MJR, revise and distribute documents ▆▆▆▆ | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 06/29/2012 | Common to All Plaintiffs | Complete Thompson Decl., complete Phinney Decl., update team regarding status of exhibits/declarations. | $325.00 hr | 0.50 | 0.50 | $162.50 | 0.00 |
| 06/29/2012 | Common to All Plaintiffs | Strategy / logistics calls and e-mails with MJR, RDG and others. | $125.00 hr | 0.50 | 0.50 | $62.50 | 0.00 |

**Randazza Legal Group - Client Summary**

Starting : 06/19/2012 | Ending : 08/09/2012 | Client : ORON Litigation | Matter : All | User : All Users | Account Manager : All | Client Type : All | Matter Type : All Matter Types | Activity Type : All Activity Types | Expense Type : All | Billable : All | Billing Status : All

| Date | Client | Description | Rate | | | | |
|------|--------|-------------|------|------|------|------|------|
| 06/29/2012 | Common to All Plaintiffs | Review filed and corrected opposition; review and analyze supplemented motion filed by Oron. | $325.00 hr | 0.50 | 0.50 | $162.50 | 0.00 |
| 06/29/2012 | eMAP Only | Phone call with Jack Aaronson regarding status and inclusion fo eMAP litigants. | $0 hr | 0.10 | 0 | $0.00 | 0.10 |
| 06/30/2012 | Common to All Plaintiffs | Review and exchange e-mails regarding ▓▓▓▓▓▓ with MJR, RDG, Erika Dillon | $325.00 hr | 0.40 | 0.40 | $130.00 | 0.00 |
| 07/01/2012 | Common to All Plaintiffs | Exchange e-mails with MJR and DMCA take-down witnesses; organize ▓▓▓▓ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 07/01/2012 | Common to All Plaintiffs | Supply ▓▓▓▓ to MJR in response to ▓▓▓. Exchange further messages with MJR and RDG via email and text. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 07/02/2012 | Common to All Plaintiffs | Document website's continued service on 7/2; review distribution of CF press release on backed up data. | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 07/02/2012 | Common to All Plaintiffs | Meet with RDG to strategize ▓▓▓▓▓▓▓▓ | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |
| 07/02/2012 | Common to All Plaintiffs | Phone call with MJR, Nate Glass regarding ▓▓▓▓ | $325.00 hr | 0.10 | 0.10 | $32.50 | 0.00 |
| 07/03/2012 | Common to All Plaintiffs | Review of emails between ▓▓▓; discuss same and ▓▓▓ with RDG; review of materials regarding ▓▓▓ and other matters ▓▓▓. Review and file executed stipulation filed in D. Nev. | $325.00 hr | 0.30 | 0.30 | $97.50 | 0.00 |
| 07/04/2012 | Common to All Plaintiffs | | $0 hr | 0.00 | 0.00 | $0.00 | 0.00 |
| 07/04/2012 | Common to All Plaintiffs | Discuss status of ▓▓▓ and ▓▓▓ with RDG and MJR. | $0 hr | 0.40 | 0 | $0.00 | 0.40 |
| 07/05/2012 | Corbin Fisher Only | Review of e-mails and receive update from RDG. | $325.00 hr | 0.20 | 0.20 | $65.00 | 0.00 |